Slip Op. 21-4

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| MID CONTINENT STEEL & WIRE, INC. ET AL., | |
|     Plaintiff and Consolidated Plaintiffs, | |
| v. | Before: Claire R. Kelly, Judge |
| UNITED STATES, | Consol. Court No. 15-00213 |
|     Defendant, | |
| and | |
| PT ENTERPRISE INC. ET AL., | |
|     Defendant-Intervenors and Consolidated Defendant-Intervenors. | |

## OPINION AND ORDER

[Sustaining Commerce's decision to use a simple average to calculate a pooled standard deviation as part of its differential pricing analysis in its antidumping duty investigation of certain steel nails from Taiwan.]

Dated: January 8, 2021

Adam H. Gordon and Ping Gong, The Bristol Group PLLC of Washington, DC, for plaintiff and consolidated defendant-intervenor Mid Continent Steel & Wire, Inc.

Bruce M. Mitchell, Ned H. Marshak, Andrew T. Schutz, and Dharmendra Choudhary, Grunfeld Desiderio Lebowitz Silverman & Klestadt LLP of Washington, DC, and New York, NY, for consolidated plaintiffs and defendant-intervenors PT Enterprise Inc., Pro-Team Coil Nail Enterprise Inc., Unicatch Industrial Co., Ltd., WTA International Co., Ltd., Zon Mon Co., Ltd., Hor Liang Industrial Corp., President Industrial Inc., and Liang Chyuan Industrial Co., Ltd.

Mikki Cottet, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant.  Also on the brief were

Jeffrey Bossert Clark, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director.  Of counsel on the brief was Vania Wang, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce of Washington, DC.

Kelly, Judge:   Before the court is the U.S. Department of Commerce's ("Commerce") second remand redetermination in the antidumping duty ("ADD") investigation of certain steel nails from Taiwan, pursuant to the court's order implementing the Court of Appeals for the Federal Circuit's ("Court of Appeals") mandate in Mid Continent Steel & Wire, Inc. v. United States, 940 F.3d 662 (Fed. Cir. 2019) ("Mid Continent III") rev'g in part 41 CIT __, 219 F. Supp. 3d 1326 (2017) ("Mid Continent I").  See also Mid Continent Steel & Wire, Inc. v. United States, 41 CIT __, 273 F. Supp. 3d 1161 (2017) ("Mid Continent II"); Final Results of Redetermination Pursuant to Court Order, June 16, 2020, ECF No. 144-1 ("Second Remand Results"); Order, Dec. 3, 2019, ECF No. 132 ("Order").

The court remanded to Commerce for further proceedings in conformity with Mid Continent III, see Order, where the Court of Appeals found wanting, for several reasons, Commerce's explanation of its use of a simple average when determining the pooled standard deviation in its Cohen's d test.  See Mid Continent III, 940 F.3d at 673–75.  The Court of Appeals observed that: Commerce failed to address that the relevant part of the literature Commerce itself cites, calls for the use of weighted averages; Commerce's statement that simple averaging will not "skew" the outcome of its analysis, was conclusory; Commerce neither supported its dismissal of PT's charge that simple averages would distort the outcome of its Cohen's d test, nor

Case 1:15-cv-00213-CRK   Document 170   Filed 01/08/21   Page 3 of 20


Consol. Court No. 15-00213                                           Page 3

explained why simple averaging was preferable; and, Commerce appeared to assume

that weighted averaging must be done by counting the number of transactions, as

opposed to quantities, sold within every transaction. <u>See id.</u>

On remand, Commerce reconsiders whether its "calculation of the pooled

standard deviation based on a simple average of the variances determined for the test

and comparison groups was appropriate," and finds that it is. <u>Second Remand</u>

<u>Results</u> at 4–17. Commerce explains that a simple average of the variances for each

group accurately represents pricing behaviors within each group because it is the

group pricing that matters, and not the individual pricing amongst all sales, for the

purposes of its analysis. <u>See id.</u> at 15–17, 35–36. Thus, using a simple average of the

variances within each group in the pooled standard deviation, as the denominator in

the Cohen's d analysis, will not mask possible targeted dumping that only exists

within one group. <u>See id.</u> Conversely, a weighted average, based either on the

number of transactions, sales volume or value, would skew the results towards the

group with greater transactions or sales volume or value (and thus dilute the results

from the other group). <u>See id.</u> at 2, 15–17. Commerce, therefore explains that a

simple average is preferable because the purpose of the analysis is to identify masked

dumping within the test group. <u>See id.</u> at 8, 14–17. For the following reasons, the

court sustains Commerce's decision to use a simple average to calculate the pooled

standard deviation.

**BACKGROUND**

On June 25, 2014, in response to a petition filed by Mid Continent, Commerce initiated an ADD investigation of certain steel nails from six countries, including Taiwan.  See Certain Steel Nails from India, the Republic of Korea, Malaysia, the Sultanate of Oman, Taiwan, the Republic of Turkey, and the Socialist Republic of Vietnam, 79 Fed. Reg. 36,019 (Dep't Commerce June 25, 2014) (initiation of less-than-fair-value investigations).  Commerce selected Taiwanese exporters PT Enterprise Inc. et al.'s ("PT")[1] and its affiliated producer, Pro-Team, and Quick Advance, Inc. and its affiliated producer, Ko's Nails Inc., as mandatory respondents for the investigation.  See Certain Steel Nails from Taiwan, 79 Fed. Reg. 78,053, 78,054 (Dep't Commerce Dec. 29, 2014) (preliminary determination of sales at less than fair value, postponement of final determination) ("Prelim. Results"); Decision Memorandum for the Preliminary Determination in the Antidumping Duty Investigation of Certain Steel Nails from Taiwan at 2, PD 225, bar code 3247845-01

---

[1] PT Enterprise Inc., Pro-Team Coil Nail Enterprise Inc., Unicatch Industrial Co., Ltd., WTO International Co., Ltd., Zon Mon Co., Ltd., Hor Liang Industrial Corp., President Industrial Inc. and Liang Chyuan Industrial Co., Ltd.

Consol. Court No. 15-00213                                               Page 5

(Dec. 17, 2014) ("Prelim. Decision Memo");[2] see also Section 777A of the of the Tariff

Act of 1930, as amended 19 U.S.C. § 1677f-1(c)(2)(B) (2012).[3]

On December 29, 2014, Commerce issued its negative preliminary

determination.  See Prelim. Results, 79 Fed. Reg. at 78,053; see also Prelim. Decision

Memo at 1.  Commerce applied its differential pricing analysis and determined that,

although 41.73 percent of PT's U.S. sales passed the Cohen's d test, a meaningful

difference did not exist in the dumping margins that would result from using the

standard average-to-average ("A-to-A") methodology and the alternate mixed

methodology.  See Prelim. Decision Memo at 12.  Commerce accordingly applied the

standard A-to-A methodology to all of PT's sales, and preliminarily determined that

respondents' steel nails from Taiwan "are not being, or are not likely to be, sold in the

United States at less than fair value."  Id. at 1.[4]  Commerce preliminarily assigned

---

[2] On October 16, 2015, Defendant submitted indices to the public and confidential administrative records underlying Commerce's Final Results. These indices are located on the docket at ECF No. 17. All further references in this opinion to administrative record documents are identified by the numbers assigned by Commerce in those indices and preceded by "PD" and "CD" to denote public or confidential documents.

[3] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

[4] Commerce uses what it refers to as a differential pricing analysis to determine whether there is a pattern of prices for comparable merchandise which differed significantly and then considers whether those differences can be taken into account using an A-to-A, a transaction-to-transaction or an average-to-transaction methodology.  See 19 U.S.C. § 1677f-1.  Specifically, the statute provides:

(footnote continued)

Consol. Court No. 15-00213                                                  Page 6

PT a weighted-average dumping margin of 0.00 percent.  See Prelim. Results, 79 Fed.

Reg. at 78,054.

On May 20, 2015, Commerce issued its final determination.  See Certain Steel

Nails from Taiwan, 80 Fed. Reg. 28,959 (Dep't Commerce May 20, 2015) (final

determination of sales at less than fair value) ("Final Results") and accompanying

Issues and Decision Memorandum for the Affirmative Final Determination in the

Less than Fair Value Investigation of Certain Steel Nails from Taiwan, May 13, 2015,

ECF No. 17 ("Final Decision Memo").  As an initial matter, Commerce determined

that it made ministerial errors which impacted the dumping margins it calculated in

the Prelim. Results.  See Final Results, 80 Fed. Reg. at 28,960.  Additionally,

Commerce made other adjustments, including changes to the margin calculation.  See

Final Decision Memo at 1; Final Results, 80 Fed. Reg. at 28,960; Mid Continent I, 41

---

The administering authority may determine whether the subject
merchandise is being sold in the United States at less than fair value by
comparing the weighted average of the normal values to the export
prices (or constructed export prices) of individual transactions for
comparable merchandise, if--

(i)     there is a pattern of export prices (or constructed export prices)
        for comparable merchandise that differ significantly among
        purchasers, regions, or periods of time, and

(ii)    the administering authority explains why such differences cannot
        be taken into account using a method described in paragraph [19
        U.S.C. § 1677f-1(1)(A)(i) or (ii)].

19 U.S.C. § 1677f-1(d)(1)(B).  In its analysis, Commerce creates a ratio where the
numerator is the difference between the mean of the test group's prices and the mean
of the comparison group's prices and the denominator is the "pooled" variance of the
test and comparison groups.  See Mid Continent III, 940 F.3d at 671.  Mid Continent
III found wanting Commerce's explanation for its decision to use simple averaging to
calculate the pooled variance as opposed to weighted averaging.  See id. at 673–675.

Consol. Court No. 15-00213                                                    Page 7

CIT at __, 219 F. Supp. 3d at 1331.  Commerce determined that 42.27 percent of PT's

U.S. sales had passed the Cohen's d test, and accordingly applied the mixed

methodology, by which Commerce applies the average-to-transaction ("A-to-T")

method to PT's sales that passed the Cohen's d test and the A-to-A method to PT's

sales that did not pass the Cohen's d test, to calculate a respondent's weighted-

average dumping margin.  See Final Decision Memo at 19.  Commerce determined

that a meaningful difference existed between the resultant A-to-A margin and mixed

methodology margin, so it applied the mixed methodology (A-to-T) to calculate PT's

weighted-average dumping margin.  See Final Decision Memo at 15–17.  Commerce

subsequently assigned PT a weighted-average dumping margin of 2.24 percent.  See

Final Results, 80 Fed. Reg. at 28,961.  The final determination resulted in an ADD

order on subject nails from Taiwan.  See Certain Steel Nails from the Republic of

Korea, Malaysia, the Sultanate of Oman, Taiwan, and the Socialist Republic of

Vietnam, 80 Fed. Reg. 39,994, 39,994–97 (Dep't Commerce July 13, 2015) ([ADD]

orders).[5]

_____

[5] On September 4, 2015, Mid Continent Steel & Wire, Inc. ("Mid Continent")
challenged Commerce's final determination.  See Compl., Sept. 4, 2015, ECF No. 9.
On September 18, 2015, PT moved to intervene as a defendant-intervenor, see Con.
Mot. to Intervene as of Right, Sept. 18, 2015, ECF No. 11, which the court granted.
See Order, Sept. 21, 2015, ECF No. 15.  Later, Mid Continent's challenge was
consolidated with a challenge by PT in Ct. No. 15-00220, a parallel proceeding
involving the same parties, facts and record.  See Joint Status Report & Proposed
Briefing Schedule at 2, Nov. 16, 2015, ECF No. 18; Order, Nov. 16, 2015, ECF No. 19.
All of the issues raised in either Mid Continent's or PT's original complaints have

(footnote continued)

Consol. Court No. 15-00213                                          Page 8

On March 23, 2017, the U.S. Court of International Trade ("CIT") sustained

Commerce's determination including its decision to use a simple average to calculate

the pooled standard deviation. See Mid Continent I, 41 CIT at __, 219 F. Supp. 3d at

1340–43.  On October 3, 2019, the Court of Appeals vacated and remanded in part

the CIT's judgment sustaining Commerce's decision. See Mid Continent III, 940 F.3d

at 675.  The Court of Appeals disagreed with PT's challenge to Commerce's use of

zeroing and Commerce's requirement to have a Cohen's d coefficient of at least 0.8,

and thus sustained this court's ruling upholding Commerce on those issues. See Mid

Continent III, 940 F.3d at 672.  However, the Court of Appeals instructed the CIT to

remand to Commerce to provide additional reasoning in support of its decision to use

a simple average to calculate the pooled standard deviation. See id. at 673–75.  On

December 3, 2019, the CIT remanded to Commerce to provide further explanation in

accordance with the Court of Appeals' directive. See Order, Dec. 3, 2019, ECF No.

132.

On March 3, 2020, Commerce released its draft remand redetermination and

invited the parties to comment. See Draft Results of Redetermination Pursuant to

---

been resolved before this court, and the Court of Appeals, but for the issue of whether
Commerce's decision to use a simple average (as opposed to weighted average) to
calculate the pooled standard deviation was reasonable. See generally Mid Continent
I, 41 CIT __, 219 F. Supp. 3d 1326; Mid Continent II, 41 CIT __, 273 F. Supp. 3d 1161;
Mid Continent III, 940 F.3d 662.

Consol. Court No. 15-00213                                                      Page 9

Court Order [Mid Continent III], PRRs 3–5, bar codes 3949998-01–03 (Mar. 3, 2020).[6]

On March 19, 2020, PT and Mid Continent submitted comments to Commerce.  See

Second Remand Results at 3.  On April 9, 2020, Commerce gave the parties an

opportunity to submit factual information to rebut, clarify or correct the information

contained in the comments submitted on March 19, 2020.  See id.  On May 4, 2020,

Mid Continent submitted new factual information in response to PT's comments.  See

id.  On June 16, 2020, Commerce published its Second Remand Results.  See

generally id.  It continues to find that it was justified in using a simple average of the

variances to calculate the pooled standard deviation.  See generally id.[7]

---

[6] On June 23, 2020, Defendant submitted indices to the public and confidential
administrative records underlying Commerce's Second Remand Results. These
indices are located on the docket at ECF Nos. 147-2 and 147-3, respectively. All
further references in this opinion to administrative record documents are identified
by the numbers assigned by Commerce in those indices and preceded by "PRR" and
"CRR" to denote public or confidential documents.

[7] PT filed comments on the Second Remand Results on July 28, 2020, see Pl. [PT]'s
Cmts. on Remand Results, July 28, 2020, ECF No. 150, and Mid Continent and
Commerce each filed a reply to PT's comments on the remand results.  See Pl. &
Consol. Def.-Intervenor [Mid Continent]'s Rely to Cmts. on Remand Results, Sept.
10, 2020, ECF No. 154; Def.'s Resp. to Cmts. on Remand Results, Sept. 10, 2020, ECF
No. 155.  Later, PT made a motion to file additional comments, see Mot. for Leave to
File Add. Cmts., Sept. 16, 2020, ECF No. 156, which the court granted.  See Order,
Oct. 8, 2020, ECF No. 164.  PT filed additional comments on October 15, 2020, see Pl.
[PT]'s Add. Cmts. on Remand Results, Oct. 15, 2020, ECF No. 165 ("PT.'s Add.
Cmts."), and Mid Continent and Commerce each filed a reply to the additional
comments.  See Def. [U.S.]'s Reply to Cmts. on Remand Results, Oct. 22, 2020, ECF
No. 166; Pl. & Def.-Intervenor [Mid Continent]'s Reply to Cmts. on Remand Results,
Oct. 22, 2020, ECF No. 167.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(i), and 28 U.S.C. § 1581(c) (2012),[8] which grant the court authority to review actions contesting the final determination in an investigation of an ADD order.  The court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]"  19 U.S.C. § 1516a(b)(1)(B)(i).  "The results of a redetermination pursuant to court remand are also reviewed 'for compliance with the court's remand order.'"  Xinjiamei Furniture (Zhangzhou) Co. v. United States, 38 CIT __, __, 968 F. Supp. 2d 1255, 1259 (2014) (quoting Nakornthai Strip Mill Public Co. v. United States, 32 CIT 1272, 1274, 587 F. Supp. 2d 1303, 1306 (2008)).

## DISCUSSION

In the results of its second remand redetermination, Commerce again decides to calculate a simple average of the variances in its Cohen's d analysis, because in the present context it is more accurate to assign the test and comparison groups equal weight.  See Second Remand Results.  PT contends that a simple average is inconsistent with the statute and unreasonable as applied to this case, while the use of a weighted average is consistent with the statute, reasonable and produces a more accurate result.  See Pl. [PT]'s Cmts. on Remand Results, July 28, 2020, ECF No. 150 ("PT's Br.").  For the following reasons, Commerce's decision is sustained.

---

[8] Further citations to Title 28 of the U.S. Code are to the 2012 edition.

In its second remand redetermination, Commerce again examines whether PT's sales reflect a "pattern of export prices" for "comparable merchandise that differ[ed] significantly among purchasers, regions, or periods of time" and whether the differences can be "taken into account" using an A-to-A or A-to-T methodology. See Second Remand Results at 5. Commerce determines whether there is a pattern of export prices using a test known as Cohen's d, which tests differences among subsets within a complete set of data. See id.; Mid Continent III, 940 F.3d at 671. The subsets here are called the test group and the comparison group. See Mid Continent III, 940 F.3d at 671. The Cohen's d test requires Commerce to create a ratio in which the numerator is the difference between the mean of the test group's prices and the mean of the comparison group's prices. See Mid Continent III, 940 F.3d at 671. The denominator is the "pooled" variance of the test and comparison groups. See Mid Continent III, 940 F.3d at 671. Although the pooled variance could either be a weighted average or a simple average, Commerce chooses in its analysis to use a simple average. See Second Remand Results at 15–16; see also Final Decision Memo at 28–29. Ultimately, Commerce divides the difference in the mean by the pooled variance to determine the Cohen's d coefficient. See Mid Continent III, 940 F.3d at 671. If the Cohen's d coefficient is 0.8 or greater, Commerce will deem the test group's pricing significantly different from the comparison group's pricing for purposes of meeting the "pattern" condition. See Mid Continent III, 940 F.3d at 671.

Consol. Court No. 15-00213                                                    Page 12

In the Second Remand Results, Commerce further explains that it uses a

simple average, rather than a weighted average, for the pooled standard deviation to

calculate an average of the comparison and test group's pricing behaviors that equally

reflects both groups:

> [T]he purpose of Commerce's Cohen's d test is to determine whether U.S.
> prices differ significantly among purchasers, regions, or time periods –
> i.e., do prices to each purchaser, region, or time period differ
> significantly from all other prices of the comparable merchandise.
> Although these are all prices in the U.S. market made by the
> respondent, this analysis requires that these prices be subdivided into
> separate distinct groups to consider separately whether the
> respondent's pricing behavior for sales to one specific group differs from
> its pricing behavior for all other sales. In other words, these prices, all
> of which are used to evaluate: 1) a respondent's pricing behavior in the
> U.S. market; and 2) whether the respondent is dumping, are now
> considered to represent two distinct pricing behaviors which may differ
> significantly. For the purpose of this particular analysis, Commerce
> finds that these two distinct pricing behaviors are separate and equally
> rational, and each is manifested in the individual prices within each
> group.

Second Remand Results at 8–9, 32.  Commerce reasons that the appropriate yardstick

by which to gauge the difference in the means between the groups is a simple average

of each group's standard deviation, rather than one that weights the deviation based

on the individual sales.  See id. at 9–10.  Commerce explains, given the objective of

comparing pricing behavior of two distinct groups of sales, weight-averaging by sales

volume or value (or number of transactions), would inappropriately move the pooled

standard deviation toward the pricing behavior of either the test or comparison group.

See Second Remand Results at 7–9, 14–16, 32.  Thus, in its Second Remand Results,

Commerce continues to find that using a simple average is preferable to a weighted

average, and Commerce further addresses the specific points for which the Court of

Appeals ordered further explanation. See generally id.

In using a simple average, Commerce acknowledges that the Cohen's d

literature supports the use of a weighted average, but further explains that the

literature varies depending on the given context. See Second Remand Results at 32–

33 (invoking the literature produced by Cohen, Ellis and Coe); Mid Continent III, 940

F.3d at 673–74 (the Court of Appeals found Commerce's argument to be deficient

because "Commerce said that it was simply using a widely accepted statistical test;

yet it did not acknowledge that the only cited literature source for the relevant aspect

of the test itself calls for the use of weighted averages."). In this context, Commerce

examines a company's pricing behavior within a group of sales, and therefore, the

effect of the standard deviation within that group should not be diluted by the effect

of the standard deviation within another group.[9] See Second Remand Results at 33–

36. Commerce explains that the pricing behaviors categorized by purchaser, region

or time period are "equally genuine," and thus deserve equal weight. See id. at 32.

Commerce's analysis of the literature and the varying alternatives to calculate a

pooled standard deviation implicates the Court of Appeals' second and third concerns

regarding whether the simple average or the weighted average will skew the results

---

[9] Further, Commerce states that the relevant literature deals with sampled data, thus PT's emphasis on "statistical significance and inferences, including sample size" as taken from the literature is misplaced in this context because Commerce is not conducting any sampling, but rather is "calculate[ing] means and variances of the U.S. prices [which] are the actual values of the entire population of U.S. sales." See Second Remand Results at 37–38.

Consol. Court No. 15-00213                                    Page 14

and why a simple average is more accurate than a weighted average.[10]   See Mid

Continent III, 940 F.3d at 674.

Commerce also confronts the examples PT provided to the Court of Appeals,

and the Court of Appeals referenced in its holding, which PT argues prove that simple

averaging to get the pooled variance distorts the results of the Cohen's d test.  See

Second Remand Results at 10–14; Mid Continent III, 940 F.3d at 674.  As a

preliminary matter, Commerce claims, as it did in the Final Decision Memo, that PT

relies upon a flawed assumption in the use of its examples.  Namely, Commerce

claims that PT's examples rest on the assumption that the standard deviation will

increase with the group size.[11]   The Court of Appeals noted that Commerce's

determination that the assumption PT was purportedly making—that standard

deviation will increase with the group size—is not always true was unsupported and,

in any event, did not substitute for an explanation of why using the weighted-average

methodology would distort the results.  See Mid Continent III, 940 F.3d at 674.  PT

refutes Commerce's characterization of its argument and states unequivocally "that

---

[10] Further, Commerce explains that contrary to PT's contentions, the term "skew" as used in statistical analysis is not relevant here because Commerce is not sampling data, it is using all available data.  See Second Remand Results at 38.  Commerce simply uses "skew" in a generic sense to discuss the appropriate weight to be given to each subset of data relevant to calculating the variances.  See id.

[11] Commerce states that "[t]he Department disagrees with Respondents' argument that using a simple average rather than a weighted average, by number of observations, undervalues the pooled standard deviation, which thereby distorts the results of the Cohen's d test. Respondents' conclusion is based on its assumptions that the number of observations and the variance of the U.S. prices to the test groups will both be smaller than the number of observations and the variance of the U.S. prices to the comparison groups."  See Final Decision Memo at 29.

PT's proposed methodology has nothing to do with 'the assumption that the standard deviation increases as the size of the group increases.'" PT's Br. at 34.  Indeed, PT provides other examples to illustrate its point that Commerce's characterization of its argument is incorrect and that its approach is reasonable while Commerce's is not. See PT's Br. at Ex. 1.  Thus, PT and Commerce agree that the standard deviation does not necessarily increase as the sample size increases.  See Second Remand Results at 11–12; PT's Br. at 34.

Nonetheless, PT's examples do not demonstrate that Commerce's approach is unreasonable.  PT claims its examples show that using a simple average is objectively unreasonable, but it offers no explanation in support of its assertion, other than pointing out that the use of a simple average results in a dumping margin for PT, while the use of a weighted average produces a de minimis rate.  See PT's Br. at 3, 8–12.  In response to the Court of Appeals concerns, Commerce explains how its approach effectuates its statutory objective.  Commerce further states that PT's argument that Commerce's choice of methodology may produce different results does not on its own demonstrate that Commerce's chosen methodology is unreasonable. See Fujitsu Gen. v. United States, 88 F.3d 1034, 1043 (Fed. Cir. 1996) ("To survive judicial scrutiny, an agency's construction need not be the only reasonable interpretation or even the most reasonable interpretation.").

Finally, although the Court of Appeals found that Commerce's view—that simple averaging was more predictable, while weighted averaging can conceal manipulation—appeared to be based on the assumption that weight averaging must

Consol. Court No. 15-00213                                                    Page 16

be done by counting the number of transactions, as opposed to quantities, see Mid

Continent III, 940 F.3d at 674, Commerce now explains that that distinction is

immaterial.  See Second Remand Results at 15–16.  Commerce states that no matter

how it weights the smaller group, either by volume, value or number of transactions,

using a weighted average "would improperly give preference to one pricing behavior

over another."[12]  See id. at 16.

Before the court, PT supplies various examples as to why, in its view, weighted-

averaging leads to reasonable results and a simple average does not.  See PT's Br. at

8–16.    Defendant argues that PT's examples and arguments relying on these

examples are barred by the doctrine of exhaustion.  See Second Remand Results at

18–25.  "[T]he Court of International Trade shall, where appropriate, require the

exhaustion of administrative remedies."  28 U.S.C. § 2637(d).  Where the doctrine of

exhaustion applies, and a party fails to exhaust its remedies by not raising a

particular issue(s) in the case brief to the agency, those issues cannot be considered

by the court.  See id.; Consol. Bearings Co. v. United States, 348 F.3d 997, 1003 (Fed.

Cir. 2003) (citations omitted).  The purpose of exhaustion is to afford the agency an

opportunity to consider an interested party's concerns before the courts review the

agency determination for reasonableness.  See Jacobi Carbons AB v. United States,

41 CIT __, __, 222 F. Supp. 3d 1159, 1170 (2017).

---

[12] Commerce further states that this preference would "vary wildly for the same
purchaser, region or time period for different products."  See Second Remand Results
at 16.

Consol. Court No. 15-00213                                              Page 17

Much of the information to which Defendant objects further illustrates arguments that PT already made.[13]   To the extent that these examples provide further illustrations of PT's examples provided to the Court of Appeals and considered by Commerce, they are not barred by the doctrine of exhaustion.   See Apex Frozen Foods Private Ltd. v. United States, 41 CIT __, __, 208 F. Supp. 1398, 1404 (2017) ("Apex") (finding that plaintiffs "fully developed and squarely addressed" the relevant issue in prior litigation with the government). To the extent that PT seeks to illustrate insights beyond those illustrated in the examples previously supplied, those arguments are barred by the doctrine of exhaustion.

Nonetheless, as further examples they do no more than reveal that the results of a simple average and weighted average pooled standard deviation are different. See PT's Br. at 17–18 (presenting and explaining Table 1, which shows the number of times that the simple average and weighted average produced different results). Although PT repeatedly concludes that the weighted average results are reasonable, while the simple average results are not, it offers no analysis of why its

---

[13] PT justifies its submission as a response to Commerce's argument that PT's examples are "cherry-picked" and as further evidence that Commerce's use of the simple average is unreasonable.   See Consol. Pl. [PT's] Add. Cmts. on Redetermination at 1–2, Oct. 15, 2020, ECF No. 165.  Commerce first raised the point that the examples were cherry-picked in its draft results for the second remand redetermination, see Draft Results of Redetermination Pursuant to Ct. Order at 12, PRRs 3–5, bar codes 3949998-01–03 (Mar. 30, 2020), and therefore Defendant argues PT could have raised its additional information in response to the draft results. See Zehejiang Mach. Imp. & Exp. Corp. v. United States, 44 CIT __, __, Slip Op. 20-122 at 26–30 (Aug. 21, 2020) (finding that plaintiff failed to exhaust its remedies on a particular issue where Commerce raised the issue in its preliminary results and plaintiff failed to respond).

Consol. Court No. 15-00213                                                        Page 18

pronouncements are accurate.  See, e.g., PT's Br. at 19 ("examples of [simple average]

results being more reasonable than [weighted average] results, if they exist at all, are

much harder to find"); see also, e.g., id. at 23 ("for certain scenarios Commerce's

[simple average] methodology does not work").  The one point that PT appears to

make with these visuals is that the test group may have a similar price spread as the

comparison group in cases where the test group nonetheless passes the Cohen's d test

using a simple average.  See PT's Br. at Exs. 2, 3 & 4.  Implicit in this point is a view

that the test group should have a different spread from the comparison group in order

to have a passing score for Cohen's d.  It is unclear to the court why PT's implicit

assumption should be true.  The very point that Commerce makes to support its use

of a simple average is that the test group and the comparison group are two distinct

groups and the price variances within them need to be considered independently.  The

statute tasks Commerce with determining whether there are U.S. prices that differ

significantly among purchasers, regions or periods of time; and therefore, Commerce

examines the pricing behaviors for those distinct groups.  See Second Remand Results

at 8–9, 32; Def.'s Resp. to Cmts. on Remand Redetermination at 15–16, Sept. 10, 2020,

ECF No. 155 ("Def.'s Resp.").  The court fails to see how the existence of similar price

spreads among sales within the two groups necessarily means that the overall pricing

behaviors of the two groups are the same.

   For similar reasons PT's arguments regarding analysis of variance or

"ANOVA" fail to persuade the court that Commerce's approach is unreasonable.

Again, in its comments before this court PT includes arguments that Defendant

Consol. Court No. 15-00213                                                Page 19

claims PT failed to exhaust before the agency. See PT's Br. at 34–39. PT argues that

the statistical principles upon which the Cohen literature relied support the use of a

weighted average for the pooled standard deviation. See id. at 34–36. More

specifically PT argues that the statistical concept ANOVA "establishes universal

relationships between the spread of a batch of data. . . and the spreads within

subgroups of that batch." See id. at 35. Thus PT contends ANOVA supports the use

of weighted average. See id. at 34–36. Defendant argues that PT failed to exhaust

its argument regarding ANOVA before Commerce and therefore should not be

allowed to raise the issue before the court. See Def.'s Resp. at 23–25. Although, PT

did not use the phrase analysis of variance or ANOVA in its comments on the draft

remand redetermination, it did argue Commerce's approach did not comport with the

statistical principles underlying the Cohen's d analysis. See Pl. [PT]'s Cmts. on Draft

Redetermination at 16–19 & Ex. 2, PRR 9, bar code 3955836-01 (Mar. 19, 2020).

But again, even allowing PT to make the more detailed argument in this court

does not convince the court that Commerce's approach is unreasonable. Commerce

considered the arguments for using a weighted average, including the literature cited

by PT explaining that statistical principles supported the use of a weighted average.

See generally Second Remand Results; see also Fujitsu, 88 F.3d at 1039 (noting the

deference due to Commerce's expertise for determinations involving "complex

economic and accounting decisions of a technical nature"). Commerce concluded that,

given the task before it as provided in the statute, it would rely on the simple average

because

in the context of the Cohen's d test, the U.S. prices to each purchaser, region or time period separately and equally represent the respondent's pricing behavior, which itself is determined by the respondent's rational economic goal of maximizing the benefits accruing to the respondent.

Second Remand Results at 36.   Therefore, PTs arguments concerning ANOVA as support for the use of a weighted average have been addressed by Commerce.  For the foregoing reasons, Commerce's choice to use a simple average for the pooled standard deviation is reasonable.

## CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Commerce's Second Remand Results is sustained.  Judgment will enter accordingly.

 /s/ Claire R. Kelly
Claire R. Kelly, Judge

Dated:        January 8, 2021
              New York, New York