## UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE**

| | | |
|---|---|---|
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯x | | |
| MID CONTINENT STEEL AND WIRE, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | Consol. Court No. 15-00213 |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant, | : | |
| | : | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯x | | |

## <u>CONSOLIDATED PLAINTIFFS TAIWAN RESPONDENTS'S COMMENTS ON RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND</u>

Ned H. Marshak
Andrew T. Schutz*

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

599 Lexington Ave, 39th Floor
New York, New York 10022
(212) 557-4000
-and-
*1201 New York Ave., NW, Suite 650
Washington, DC 20005
(202) 786-6881

*Counsel for PT Enterprise, Inc., Pro-Team Coil Nail Enterprise Inc., Unicatch Industrial Co., Ltd., WTA International Co., Ltd., Zon Mon Co., Ltd., Hor Liang Industrial Corp., President Industrial Inc.* and *Liang Chyuan Industrial Co., Ltd.*

Dated:  December 13, 2022

## TABLE OF CONTENTS

INTRODUCTION & SUMMARY OF ARGUMENT ................................................................. 1

HISTORY OF THIS COHEN'S D LITIGATION ................................................................. 2

ARGUMENT ................................................................................................................. 5

  I.   COHEN, ELLIS, AND COE SUPPORT RELIANCE ON A WEIGHTED AVERAGE
METHODOLOGY .................................................................................................... 5

  II.  THE ACADEMIC LITERATURE DOES NOT SUPPORT SIMPLE AVERAGING ....... 8

  III.   AN ANALYSIS OF FULL POPULATIONS IS BASED ON THE SAME
PRINCIPLES AS AN ANALYSIS OF SAMPLES ................................................... 13

  IV.   COMMERCE HAS NOT EXPLAINED WHY SIMPLE AVERAGING IS A
REASONABLE METHODOLOGY ......................................................................... 16

  V.  WA LEADS TO REASONABLE RESULTS BASED ON THE RECORD IN THIS
CASE; SA DOES NOT .......................................................................................... 18

  VI.   COMMERCE'S REJECTION OF PORTIONS OF TAIWAN RESPONDENTS' CASE
BRIEF WAS CONTRARY TO LAW ...................................................................... 31

    A.  HUBER DECLARATION ................................................................................. 31

    B.  TEXTBOOK REFERENCES ............................................................................. 32

    C.  EXHIBIT FOUR: COHEN, PAGES 359 – 361 ................................................... 33

  VII.  CONCLUDING COMMENTS .............................................................................. 34

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Allied Tube & Conduit Corp. v. United States*, 132 F. Supp. 2d 1087 (Ct. Int'l Trade 2001)...... 15

*Alloy Piping Prod., Inc. v. United States,* 32 C.I.T. 249 (2008) .................................................... 5

*Diamond Sawblades Manufacturers' Coal. v. United States*, 37 ITRD 2191 (CIT 2015), *aff'd* 866 F.3d 1304 (Fed. Cir. 2017)..................................................................................................... 15

*Good Samaritan Hosp. v. Shalala*, 508 U.S. 402 (1993)................................................................. 5

*INS v. Cardoza–Fonseca,* 480 U.S. 421 (1987).............................................................................. 4

*MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349 (CIT 2015) .................................... 15

*Mid Continent III,* 940 F. 3d 662 (Fed. Cir. 2019) ............................................................. 2, 4, 35

*Mid Continent IV,* 495 F. Supp. 3d 1298 (CIT 2021) .................................................................... 3

*Mid Continent Steel & Wire, Inc. v United States,* 31 F.4ᵗʰ 1367 (Fed. Cir. 2022) .............. passim

*Pitsker v. Off. of Pers. Mgmt.,* 234 F.3d 1378 (Fed. Cir. 2000)................................................... 29

*RZBC Group Shareholding Co. v. United States*, 100 F. Supp. 3d 1288 (Ct. Int'l Trade 2015) . 15

*Sorrells v. United States*, 287 U.S. 435 (1932) ............................................................................ 29

*Timex V.I. v. United States*, 157 F.3d 879 (Fed. Cir. 1998) ........................................................ 30

*Tung Mung Dev. Co. v. United States*, 25 C.I.T. 752 (2001)......................................................... 5

*United States v. Eurodif S.A.*, 555 U.S. 305 (2009)..................................................................... 31

*Yangzhou Bestpak Gifts & Crafts Co. v. United States,* 716 F.3d 1370 (Fed. Cir. 2013) ...... 17, 30

**Administrative Decisions**

*Certain Steel Concrete Reinforcing Bars From Turkey*, 68 ITADOC 53127 (September 9, 2003) ....................................................................................................................................... 32

*Polyethylene Terephthalate Film, Sheet, and Strip From China: Final Results of Antidumping Duty Administrative Review*, 77 Fed. Reg. 14,493 (March 12, 2012) ...................................... 15

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE**

| | |
|---|---|
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯x | |
| MID CONTINENT STEEL AND WIRE, INC.,      : | |
|                                                               : | |
|              Plaintiff,                               : | |
|                                                               :    Consol. Court No. 15-00213 |
|              v.                                         : | |
|                                                               : | |
| UNITED STATES,                               : | |
|                                                               : | |
|              Defendant,                             : | |
|                                                               : | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯x | |

## CONSOLIDATED PLAINTIFFS TAIWAN RESPONDENTS'S COMMENTS ON RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND

### INTRODUCTION & SUMMARY OF ARGUMENT

These comments are filed on behalf of our clients, Taiwan Respondents,[1] in response to the Department of Commerce's ("Commerce" or "Department") Final Results of Redetermination Pursuant to Court Remand, dated November 11, 2022. Public Document ("PD") 27 ("Final Results"). In its Final Results, Commerce held that its "use of a simple average when calculating the denominator of the effect size, as part of the Cohen's *d* test in Commerce's differential pricing analysis, is consistent with the statute, has support in the academic literature, and is reasonable in its examination of whether prices differ significantly pursuant to section 777A(*d*)(1)(B)(i) of the Act." Final Results at 60.

Commerce is wrong. Use of a simple average: (1) is inconsistent with the statutory directive that Commerce must determine whether "there is a pattern of  export prices (or

---

[1] PT Enterprise Inc., Pro-Team Coil Nail Enterprise Inc., Unicatch Industrial Co., Ltd., WTA International Co., Ltd., Zon Mon Co., Ltd., Hor Liang Industrial Corp., President Industrial Inc., and Liang Chyuan Industrial Co., Ltd. ("Taiwan Respondents" or "PT," the mandatory respondent in the investigation whose database was subjected to the Cohen's *d* methodology).

constructed export prices) for comparable merchandise that differ significantly among

purchasers, regions or periods of time," Section 77A(*d*)(1)(B)(i); (2) is not supported in the

academic literature; and (3) leads to unreasonable, and at times, absurd results, in this case.

Moreover, Commerce's Final Results ignore the Federal Circuit's directive in *Mid Continent*

*Steel & Wire, Inc. v United States*, 31 F.4th 1367 (Fed. Cir. 2022) ("*Mid Continent V")* to "either

provide an adequate explanation for its choice of simple averaging or make a different choice,

such as use of weighted averaging or use of the standard deviation for the entire population." As

discussed below, this Court should reject Commerce's analysis and remand this case to

Commerce with instructions to calculate the Cohen's *d* denominator in a reasonable manner,

consistent with the academic literature, either by use of weighted averaging or the standard

deviation for the entire population.[2]

## HISTORY OF THIS COHEN'S D LITIGATION

*Mid Continent V* is the second Federal Circuit decision in this proceeding to reject

Commerce's reliance on simple averaging ("SA") to calculate the Cohen's *d* denominator. In the

first decision, *Mid Continent III,* 940 F. 3d 662 (Fed. Cir. 2019), PD 25 at Appx647-657,[3]  the

---

[2] Taiwan Respondents believe that weighted averaging is more consistent with statistical and mathematical principles than relying on the standard deviation for the entire population. This issue was discussed in the Huber Declaration, attached as Exhibit One to Taiwan Respondents Comments on Commerce's Draft Redetermination, which Commerce rejected in the underlying proceeding as unsolicited new factual information ("NFI"). PD 9 at ¶65-67. This issue is not further discussed in these Comments to the Court; rather, we focus solely on the reasons why simple averaging is contrary to law. Taiwan Respondents are asking this Court to include the Huber Declaration in the Administrative Record. See Section VI, below.

[3] Documents in the *Mid Continent V* Joint Appendix were attached to Taiwan Respondents Comments on Draft Redetermination. PD 25 – 26. These documents had Federal Circuit Appendix page numbers ("Appx") in the bottom center of each page. The Appx page numbers often have gaps between the numbers - e.g., Appx1, 3, 7. This is because the Joint Appendix filed with the Federal Circuit is limited to precise pages referenced in the parties' briefs. In these Comments we refer to the Appx page numbers as the pinpoint citation to the documents in PD 25 – 26.

Federal Circuit discussed the flaw in Commerce's initial determination as follows:

> First, Commerce said that it was simply using a widely accepted statistical test; yet it did not acknowledge that the only cited literature source for the relevant aspect of the test itself calls for the use of weighted averages.

> Second, Commerce's language of "skew{ing}" is a mere conclusion where, as here, it is unaccompanied by an explanation of why the right result, consistent with the relevant statutory purpose, should be different. Third, although Commerce determined that PT's charge that simple averaging "distorts" the outcome rests on an assumption that is not always true, that determination is both unsupported and, in any event, not itself an explanation of why weighted averaging is actually distortive in a relevant sense or, more affirmatively, why simple averaging is preferable. Fourth, Commerce asserted that simple averaging was more "predictab{le}" than weighted averaging, but the only expressed reason seems to be a concern about manipulation in how sales are reported, and that concern seems to assume that weighted averaging must be done by counting numbers of transactions, rather than quantity sold within transactions.

On remand, Commerce reaffirmed its initial decision, continuing to rely on simple averaging. Appx1071-1121. Taiwan Respondents challenged this decision in the CIT. Appx1122-1373. In *Mid Continent IV*, 495 F. Supp. 3d 1298 (CIT 2021), Appx1-20, the CIT affirmed Commerce's remand determination, reasoning that it was "not convince{ed} . . . that Commerce's approach is unreasonable," in light of the "deference due to Commerce's expertise for determinations involving 'complex economic and accounting decisions of a technical nature.'"

Taiwan Respondents appealed to the Federal Circuit. In *Mid Continent V*, the Federal Circuit expressly rejected all of the reasons why Commerce had decided to rely on simple averaging. First, the Court reasoned that "the fact that the seller is acting rationally and genuinely in its pricing choices in both the test and comparison groups provides no apparent reason for assigning equal weight to each group's standard deviation when computing the pooled standard deviation." 31 F. 4 at 1379. Second, the Court reasoned that "Commerce has not provided a reasonable explanation for this predictability assertion." *Id.* Finally, the Court rejected

Commerce's "abstract effect" rationale, reasoning that *"that section does not call for simple averaging for unequal size groups in the denominator of Cohen's* $d$ *or in the formula for the related* $f$ *figure." Id.* at 1380. The Federal Circuit continued:

> More broadly and fundamentally, Commerce has not explained why the fact that the focus is being placed on the difference between the groups distinguishes the teaching of the cited literature—which, as discussed, uses the Cohen's $d$ coefficient precisely to provide a yardstick for determining the significance of the difference in group means. Thus, Commerce has not explained why that focus calls for a simple-averaging yardstick figure for determining the significance of the difference when calculating Cohen's $d$ (or, even, the $f$ statistical measure) for different-size groups.

*Id.*

In its Final Results, Commerce acknowledged that *Mid Continent V* precluded Commerce from relying on its previously articulated rationale. Final Results at 7. Commerce then admitted that its Final Results were based on a new approach:

> The CAFC has already opined in *Mid Continent V* that these prior arguments are unpersuasive to support that the use of a simple average is reasonable, and now Commerce has taken a new approach which focuses on the academic literature consistent with the CAFC's opinion in *Mid Continent V*.

*Id.* at 36.

In sum, in its Final Results, faced with a Federal Circuit decision which expressly rejected its Cohen's $d$ analysis, Commerce adopted a new rationale, eight years after its initial Cohen's $d$ decision, and seven years and five judicial decisions after this litigation commenced. In light of this history, this Court should accord limited, if any, deference to Commerce's analysis, and instead should analyze the competing methodologies based on the teachings of *Mid Continent III* and *Mid Continent V*.[4]

---

[4] *INS v. Cardoza–Fonseca,* 480 U.S. 421, 446 n. 30 (1987) ("An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is entitled to considerably less deference than a consistently held agency view.") (quotation marks omitted);

## ARGUMENT

**I.**   **COHEN, ELLIS, AND COE SUPPORT RELIANCE ON A WEIGHTED AVERAGE METHODOLOGY**

The record in this proceeding contains chapters of three statistical references – *Cohen*, *Coe* and *Ellis*[5] – upon which Commerce relied in applying its differential pricing analysis. As the *Mid Continent V* court reasoned, 31 F. 4th at 1380, these references support Taiwan Respondents' position that "the cited literature nowhere suggests simple averaging for unequal-size groups."[6]

In its Final Results, Commerce claims that the Federal Circuit was wrong. According to Commerce, *Cohen*, *Ellis* and *Coe* did not approve relying on weighted averages for analyses of the entire universe of the available data. Commerce states:

> Commerce's calculation of the Cohen's *d* coefficient is not based on sampled data, and there is no estimation of the actual mean and standard deviation of the test group and of the comparison group.  The academic literature provides for the use of a weighted average as a possible approach when estimating the denominator of the effect size when the actual standard deviations are not known, which is not the situation with Commerce's application of the Cohen's *d* test.

Final Results at 14.

While Commerce is correct that *Cohen/Coe/Ellis* focus on samples as distinguished from actual populations, what Commerce has not done, because it cannot do, is to explain why an analysis of all available data should be treated differently than an analysis of sample data. In both

---

*Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 417 (1993) ("{T}he consistency of an agency's position is a factor in assessing the weight that position is due."); *Alloy Piping Prod., Inc. v. United States,* 32 C.I.T. 249, 253 (2008) ("{W}hen granting *Chevron* deference, the court looks to "the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position."); *Tung Mung Dev. Co. v. United States*, 25 C.I.T. 752 (2001) ("The case for judicial deference is less compelling with respect to agency positions that are inconsistent with previously held views.").

[5] Jacob Cohen ("Cohen") (Appx723-761), Robert Coe ("Coe") (Appx763-773); and Paul D. Ellis ("Ellis") (Appx678- 721).

[6] See also Appx878-932 (citations to additional literature).

cases, the sizes, standard deviations ("SD"), and total transaction quantities of each subgroup are essential elements of the group's pricing patterns. Group size matters, whether the group is a sample or the entire population. By relying on Cohen's effect size methodology as the basis for its differential pricing analysis, but then failing to account for transaction quantities in calculating the effect size "*d*," and in rejecting Cohen's own definition of pooled standard deviations,[7] Commerce has selectively adopted those parts of Cohen's principles that lead to its desired result and rejected those that do not.

Moreover, contrary to Commerce's claim, *Cohen* has stated that when all data (rather than merely a sample) are available, weighting is required where the size of the groups differ.[8]

> {E}qual-sampling … is not objectionable if the investigator wishes to consider membership in a given … group as an abstract effect quite apart from the relative frequency with which that effect … occurs in the population, **but it clearly cannot be referred to the natural population with its varying group frequencies**.", (emphasis added).[9]

---

[7] Commerce states: "Commerce recognizes that in our prior remand proceedings, we used the term "pooled standard deviation" to denote the denominator of the "Cohen's *d* coefficient" used in the Cohen's *d* test. We clarify that our reference to a "pooled standard deviation" is not consistent with the use of that term in the academic literature and may have caused confusion with the courts. . . . Rather, Commerce has used the simple average of the actual standard deviations of the populations of the test and comparison groups as set forth in Dr. Cohen's equation 2.3.2." Final Results at 12-13.

[8] This conclusion was followed by Coe, Ellis, and multiple other commentators. See Appx878-932 (excerpts attached to PT Comments of March 19, 2020 (Appx780) at Exhibit Four).

[9] The relevant pages of Cohen's paper, referenced in the *Mid Continent V* opinion and oral argument were attached to PT's *Mid Continent V* Reply Brief as an Exhibit, but were rejected by Commerce. See PD 10 at Exhibit Four. See also Appx735-736, wherein Cohen states: "When … the populations {A and B} are concrete and unequal collections of cases, the inequality [in population sizes] should figure in the assessment of the degree of relationship…" Cohen's formula (2.2.7) explicitly includes terms *p* and *q* reflecting relative weights of the two populations. Appx736. Cohen's statement relates to the statistic "r" (the ratio of between spread and overall spread) which is commonly used in ANOVA calculations and which is mathematically equivalent to Cohen's *d*.

6

"Equal-sampling effect size" is mathematically equivalent to the straight average ("SA") pooling method Commerce uses to compute Cohen's *d*. Because Cohen's qualifying "but" clause emphasizes that the (equal-sampling) effect size does not describe the population ("**cannot be referred to the natural population with its varying group frequencies**"), the application of the SA methodology is explicitly limited and rendered inapplicable to the targeted dumping analyses.

Cohen's equal sampling statement was discussed extensively in the *Mid Continent V* Oral Argument. PD 26 at Exhibit 3, pages 6- 7 (Mr. Gordon), 9 -10 (Mr. Mrshach (sic). In *Mid Continent V*, the Federal Circuit resolved the dispute as to the meaning of Cohen's analysis as follows.

> The section of *Cohen* (at 359–61) cited by Mid Continent and Commerce for its "abstract effect" language is no exception. It nowhere recites use of a simple average for calculating a pooled standard deviation from groups of unequal size. The discussion in that section involves *f*, an effect size index that is related to, but not the same as, the Cohen's *d* coefficient, applicable when there are arbitrarily many groups to compare, rather than just two. *See Cohen* at 274–80. It expressly sets forth a simple average formula for when the groups are equal in size but a weighted average formula for when the groups are of different size. *Id.* at 359–60. The language of "abstract effect" is used in a discussion of forming certain equal-size groups for the comparative analysis: in the example given, if the object was to identify differences in viewpoint on a topic (attitudes toward the United Nations) among three groups (Jews, Protestants, Catholics), the researcher could form equal groups even though random sampling from a population would produce different-size groups. *Id.* at 360–61. Nothing in the section applies simple averaging to pooled standard deviation estimates for different-size groups.

*Mid Continent V*, 31 F 4th at 1378-79.

In sum, Cohen concludes that SA does not apply to a natural population, and, even if it did, SA would yield "artificial" results that do not reflect the population.

II.     **THE ACADEMIC LITERATURE DOES NOT SUPPORT SIMPLE
        AVERAGING**

The linchpin of Commerce's Final Results is its claim that "the academic literature allows for Commerce's use of the simple average, i.e., Cohen equation 2.3.2, as the denominator of the effect size, *i.e.*, the Cohen's *d* coefficient, when the actual standard deviation of each population is known and they are unequal." Final Results at 13-14. Commerce states:

> In Commerce's use of the Cohen's *d* test, the standard deviations of population A (test group) and population B (comparison group) are known, but the standard deviations of population A and population B are not equal. Consequently, we formulate the denominator of the effect size using equation 2.3.2, where the standard deviations of population A and population B are known and not equal.

Final Results at 14; see also *id.* at 22.

According to Commerce, SA not only is sanctioned by equation 2.3.2, but also is "explicit" in Dr. Cohen's discussion of that equation. See Final Results at 35 ("Dr. Cohen explicitly presents equations to calculate the effect size based on a population."); *Id.* at 42 ("Dr. Cohen explicitly prescribes the simple average when there is no longer a common within-population {standard deviation}."); *Id.* at 51 ("{T}the academic literature draws a distinct line between a population and sampled data."); *Id.* at 57 ("Commerce's use of a simple average is explicitly supported in the academic literature when the results of the analysis are based on the full populations of data that is being compared. . . ."); *Id.* ("{T}he academic literature also makes an explicit delineation between these two situations . . .").

Attached to these Comments is Section 2.3.3 of Dr. Cohen's treatise, in which example 2.3.2 is discussed. See also Appx745-746. The express terms of Section 2.3.3 specify that equation 2.3.2 refers to **"normal populations"** (i.e., a population whose distribution is at least approximately distributed like a standard "bell curve" or "Normal Distribution" as given by a specific mathematical formula), in which $\sigma A \neq \sigma B$ (i.e., the standard deviation of one group

differs from the standard deviation of the second group) and **nA = nB** (i.e., the sample size of one group is equal to the sample size of the second group).  After specifying the formula 2.3.2, Cohen concludes this Section by noting that if σA ⊬σB  **and nA ⊬ nB** "the values in Table 2 may be greatly in error."

Section 2.3 concerns the use of "power tables" for planning an "experiment," which in Cohen always refers to *sampling* from a population.[10] Nowhere in Section 2.3.3 does Cohen **expressly or implicitly state** that formula 2.3.2 applies solely to "full populations," let alone that simple averaging should be used to calculate the denominator in an analysis of the difference between groups of different sizes and variances. And nowhere in this Section does Cohen **explain why** simple averaging should be used in these situations. To the contrary, Section 2.3.3 assumes that the sample sizes of each group are the same.

In its Final Results, Commerce attempts to establish that Cohen's equation 2.3.2 supports its decision through a lengthy, technical, and ultimately erroneous discussion of statistical principles. In reviewing Commerce's claim, we ask this Court to consider the following factors. First, Commerce did not assert that Cohen's handbook expressly supported its conclusion until after *Mid Continent V* had expressly rejected its prior rationale. Second, the plain meaning of Section 2.3.3 does not establish that Cohen expressly stated that simple averaging should be used when dealing with full populations. Third, Section 2.3.3 does not imply that Dr. Cohen believed there was a distinct difference between "an analysis based on a population and one based on

---

[10] Because the chapters in *Cohen* are organized around statistical tests that apply only to random samples, some form of *random* sampling is implied in every case, including throughout Section 2.3. Necessarily *Cohen* must refer to the populations of interest and to their statistical properties, such as their means and standard deviations, in order to discuss the degree to which experimental results compare to those population properties. However, this does not imply that *Cohen* is ever discussing observations of entire population or calculations of their statistical properties.

sampled data." If such a difference existed, Commerce would have included authority for that principle in its decision. Some statistician, in some journal, some place, at some time would have discussed why SA was required when analyzing a census (i.e., full population). Yet Commerce did not reference any third-party authority for the new theory which Commerce discussed for the first time in its Final Results.

Fourth, Formula 2.3.2 appears in a discussion of how Cohen's "power tables" should be used to aid the pre-computer experimenter (who existed in the 1960's when Cohen wrote the first edition of his Treatise and into the 1980's when the edition upon which Commerce relies was published) in performing Student t tests.  Underlying all of Cohen's considerations in this section are various unstated formulas for the Student t statistic: Except in cases of equal group sizes and equal group standard deviations, *all* such formulas for Student's *t* are weighted in various ways.  *Even* 2.3.2 is a weighted formula, but because each member of each group receives an equal weight *and the group sizes are equal*, the weights appear in the particularly simple form of "1/2" multiplying each group variance.

*The population effect size is intimately connected with the t statistic.*  The logic goes like this:  The experimenter plans to use a suitable Student t statistic to compare two group means.  A power analysis analyzes the relationship between any proposed, hypothetical sample sizes and the population effect which the analyst hopes to detect with a desired level of confidence (a role played by "*a*" in Cohen).  The only way to do this is to produce a formula for the population effect *d* that can be directly related to the t statistic.  Thus, the relevant formula for Student *t* partly determines how to define Cohen's *d*.

Without (1) a sampling plan and (2) a statistical test in mind, it is not possible to identify what version of Cohen's *d* or its equivalent would be appropriate to use in the power

analysis.  The test, the sampling method, and the effect size are inextricably linked with the power.  *Cohen* lays this all out in Chapter 1, pp 14 - 16, where the subsections enumerate the ways in which these relationships are used: "1.5.1 Power as a function of *a* [which determines the confidence], ES, and *n* [sample size]."  "1.5.2 *n* as a function of ES, *a*, and power."  "1.5.3 ES as a function of *a*, *n* and power."  "1.5.4 *a* as a function of *n*, power, and ES." *These are all predicated on the statistical hypothesis test.*  It is the test that differentiates each of the subsequent chapters 2 - 10: "Chapter 2. The t Test for Means."  "Chapter 3.  The significance of a Product Moment" [that is, of a correlation coefficient].  "Chapter 4. Differences between Correlation Coefficients." *Etc., etc.*  Finally, the choice of test is determined by (a) what the purpose of the experiment is and (b) how subjects are selected into the sample: the sampling plan.  (To be very clear: the word "test" here is used in the sense of a "statistical null hypothesis test" established in *Cohen* chapter 1; it is *not* employed in Commerce's sense of its "Cohen's *d* test"!).

Just before 2.3.2, at the bottom of page 43, Cohen states that when there is a "moderate failure of this assumption [of equal standard deviations]" and "provided the sample sizes are about equal," then we don't have to worry about the weighting and can use "the tables in the ordinary way."  This approximation permits Cohen to abbreviate the tables considerably, because he only needs to consider a *single* subgroup sample size rather than needing to tabulate all combinations of *two* subgroup sample sizes, which takes far more space and effort.

Commerce's conclusion is on shaky ground because it is appealing to an *approximation* that holds only when the two group standard deviations are close and sample sizes are close.[11]  There are many examples in PT's data where Commerce calculates its Cohen's

---

[11] "Close" is a matter of judgment, but there are objective standards. The problematic cases occur when the smaller sample size is less than 20 or so and the ratio of standard deviations exceeds

*d* when one or both of these conditions are violated.

Because Commerce errs in considering its data to be the entire population, it does not have sufficient information to identify a suitable form of effect size, because it claims it is not sampling and not testing in Cohen's sense.  When Commerce refers to a Cohen's *d* "test" and to a "significant" effect, it is not using either of those words in the sense *Cohen* intends  (Cohen situates his book squarely within the tradition of null hypothesis testing, which is based on *random samples;* where a "test" requires formulating a probabilistic hypothesis (the "null"); and "significance" indicates only that the sample has a small chance of occurring in any hypothetical world where the null is true.  This part of statistics has almost nothing to say about examining whole populations.).

What Commerce is doing, therefore, is (1) manufacturing a formula for an effect size out of nothing more than a formal similarity to an inapplicable formula it found in *Cohen* (i.e., formula 2.3.2) and (2) deciding that any population of transactions where this effect (for comparing any subgroup to all the others) exceeds 0.8 is one in which masked dumping has occurred.  This procedure cannot be justified in *Cohen* or his commentators (*Coe*, *Ellis*).  *Cohen* and the other "academic literature" are window dressing that support Commerce only insofar as Commerce can arbitrarily re-interpret familiar words like "test," "population," "effect," *etc*.

Fifth, a medical handbook analogy illuminates the illogical nature of Commerce's interpretation of *Cohen*, *Coe*, and *Ellis*.  To justify various recommendations concerning when to administer aspirin (and when not to) and how much to a patient, a medical handbook aimed at the physician will merely allude to the mechanism whereby aspirin can affect the human body, without further explanation, just as Cohen alludes to Student *t* tests for an audience of scientific

---

2:1 or so. These are not hard and fast thresholds, but most textbooks and practitioners will adhere to something like them.

experimenters.  The mere appearance of a recommendation to administer (say) 2000 mg of aspirin per day to certain kinds of patients should not be taken as justification to administer that dose to any patient. Indeed, for many patients such a dose would be actively harmful. Commerce's argument is tantamount to asserting "high doses of a substance we choose to call aspirin (but isn't really aspirin) are academically supported for our patient because the medical literature allows high doses of aspirin."  In medicine that prescription could kill the patient and would be considered malpractice.  Commerce's Cohen's *d* test is statistical malpractice.

Finally, Exhibit One of Taiwan Respondents Comments to Commerce consists of a declaration by Dr. William A. Huber ("Huber Declaration"), explaining why Commerce's new rationale misconstrued *Cohen*. PD10. This analysis was submitted as a stand-alone statistical declaration "{b}ecause the Department's analysis is written in technical jargon with multiple formulas." PD 9. For these reasons, Taiwan Respondents "request{ed} that the Department's statisticians review Dr. Huber's critique." *Id.* Rather than agree to this suggestion, Commerce rejected the entire Huber Declaration, reasoning that it constituted NFI. PD 15. As discussed below, this rejection should be reversed. However, regardless of this Court's decision on the NFI issue, Commerce does not deserve another chance. Thus, this Court's remand order should direct Commerce to abandon simple averaging while at the same time directing Commerce to include the Huber Declaration on the record.

### III.   AN ANALYSIS OF FULL POPULATIONS IS BASED ON THE SAME PRINCIPLES AS AN ANALYSIS OF SAMPLES

A second linchpin of Commerce's rationale is its claim that reliance on simple averaging when comparing "two distinct groups of prices" in its Cohen's *d* analysis is "distinct from relying on weighted averaging "to calculate a value within a given group of data." Final Results at 59. Commerce reasons:

> In general, Commerce agrees that the use of a weighted average is appropriate in many situations, such as in the calculation of a weighted-average U.S. or comparison market price, a period-wide weighted-average cost of production, and a weighted-average dumping margin. Each of these calculations provides a single measure which aggregates a given value, *e.g.*, price, for a group of observations. . . . However, here in the Cohen's *d* test, Commerce is comparing the prices to a given purchaser, region or time period with the prices of comparable merchandise.  . . .As such, Commerce is directed to *compare* the prices to each given purchaser, region and time period to all other prices and *not combine*, *i.e.*, commingle, these prices into a single group.

*Id.* at 41- 42 see also *id.* at 49 ("As such, Commerce is comparing the prices to each purchaser, region and time period to all other prices and not combining, *i.e.*, commingling, these prices into a single group.").

This argument is without merit. First, Commerce conducts the identical "comparison" between "two distinct groups of data" whether each group encompasses a full population or a sample. Commerce's argument, therefore, is equally applicable to samples as to complete groups. If the meaningful comparison in a sample uses weighed average pooling (WA), then the meaningful comparison in the population will use WA as well. The need for such consistency is made clear by comparing the analysis of a census (i.e., full population) to that of a large sample. Relying on SA with respect to a full population containing, say, 20 sales in a Test group and 200 sales in a Comparison group, while turning around and relying on WA for 18 Test Group and 180 Comparison Group sales (thereby comprising 90 percent of the full population) would not make sense. No statistical principle or guideline exists to say at what point the effect size in a sample should be formulated in a different manner than in the full population. This example reveals that it is inconsistent and illogical to distinguish examinations of samples and full populations in the manner proposed by Commerce.

Second, Commerce's comparison of prices in two distinct groups of sales in two distinct markets (i.e., home market and U.S. market) to determine a respondent's dumping margin is

similar to Commerce's comparison of prices in two distinct markets (i.e., test group and comparison group) to determine whether that respondent is engaged in targeted dumping. In its margin analysis, Commerce commingles two groups by calculating a single overall margin of dumping, by weight averaging the margins for each group based on the quantity of U.S. sales. In its targeted dumping analysis, Commerce also comingles two groups by calculating a single Cohen's $d$ factor, by weight averaging the standard deviation of each group based on the quantity of U.S. sales. Commerce fails in its attempt to distinguish its margin calculation methodology from its Cohen's $d$ methodology. Consequently, the judicial and administrative precedent which favors WA over SA applies to Commerce's calculation of the Cohen's $d$ denominator. See *Diamond Sawblades Manufacturers' Coal. v. United States*, 37 ITRD 2191 (CIT 2015), *aff'd* 866 F.3d 1304 (Fed. Cir. 2017) (holding that simple averaging was permissible only because "the record contained no information about what portion of the PRC wide entity ATM comprised."); *MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1359–64 (CIT 2015) (holding that relying on an SA, rather than a WA, was "unreasonable in light of the statute's clear preference for the accuracy enhancing value of weight-averaging and the particular facts of this case."); *Allied Tube & Conduit Corp. v. United States*, 132 F. Supp. 2d 1087, 1096 (Ct. Int'l Trade 2001) (rejecting Commerce's unreasoned reliance on simple average data in lieu of more accurate weighted average data); *RZBC Group Shareholding Co. v. United Stat*es, 100 F. Supp. 3d 1288, 1309 (Ct. Int'l Trade 2015) (rejecting Commerce's use of an SA because "{a} simple average, unlike a weighted average, gives equal weight to all prices regardless of the quantities sold"); *Polyethylene Terephthalate Film, Sheet, and Strip From China: Final Results of Antidumping Duty Administrative Review*, 77 Fed. Reg. 14,493 (March 12, 2012), IDM at 8 (explaining that "using a simple average to increase the impact of lower volume exporters necessarily distorts the

margin by inflating the effect of a smaller amount of data").

Finally, Test Groups and Comparison Groups are not distinct groups. These groups do not have an independent existence. Each sale is a member of multiple Test Groups and Comparison Groups. For example, in its Period test, Commerce subdivides each group (CONNUM) into four calendar quarters. For each quarter it compares that quarter's sales (Test Group) to the sales in the other three quarters (Comparison Group). Thus, any first quarter sale is in the Test Group for one test and in the Comparison Group for the other three tests. The compositions of the Comparison Groups change from test to test: for quarter two, the Comparison Group consists of sales in quarters 1, 3, and 4; for quarter three, the Comparison Group consists of sales in quarters 1, 2, and 4; and for quarter four, the Comparison Group consists of sales in quarters 1, 2, and 3. The numbers of sales and the total sales volumes in the Comparison Group change as sales in quarters 2, 3, and 4 are variously grouped with sales in quarter 1. Thus, the SA methodology results in each quarter 1 sale sometimes receiving a high weight which may strongly influence the outcome and sometimes receiving a low weight which may have little influence on the outcome.

In contrast, in the WA methodology, each kilogram is treated equally relative to all other kilograms sold for every one of the Period, Regional, and Purchaser tests. Because each kilogram of sales is correctly treated on an equal basis, regardless of whether it falls within a Test Group or a Comparison Group, relying on a weighted pooled SD makes sense.

## IV.   COMMERCE HAS NOT EXPLAINED WHY SIMPLE AVERAGING IS A REASONABLE METHODOLOGY

In its Final Results, Commerce concludes that "the literature does have support for Commerce's reliance on a simple average when sampling is not used, the standard deviations of the full populations are known, and the standard deviations of both populations are not equal."

Final Results at 8; see also *id.* at 13 ("{T}he academic literature allows for Commerce's use of the simple average, *i.e.*, *Cohen* equation 2.3.2, as the denominator of the effect size, . . .").

However, the mere fact that academic literature potentially "allows for the use" of a particular theoretical methodology does not allow Commerce to conclude without further analysis that the "allowed" methodology is reasonable when applied to a unique set of facts. (Recall the aspirin analogy, supra.) *Yangzhou Bestpak Gifts & Crafts Co. v. United States,* 716 F.3d 1370, 1378 (Fed. Cir. 2013) discusses this principle as follows.

> Nevertheless, "{w}hile various methodologies are permitted by the statute, it is possible for the application of a particular methodology to be unreasonable in a given case." . .
> This court finds that this case presents that situation. Although Commerce may be permitted to use a simple average methodology to calculate the separate rate, the circumstances of this case renders a simple average of a *de minimis* and AFA China-wide rate unreasonable as applied. Similarly, a review of the administrative record reveals a lack of substantial evidence showing that such a determination reflects economic reality.

Taiwan Respondents submit that Commerce's analysis of the academic literature is wrong. However, even if the literature did "allow for use" of simple averaging, Commerce's decision cannot be sustained unless this Court also concludes that Commerce also established that simple averaging leads to a reasonable result and is supported by substantial evidence. For this Court to affirm Commerce's decision, Commerce was required to establish how and why, based on the administrative record, simple averaging constitutes a reasonable method of determining whether PT's prices in its Test Groups are, or are not, substantially different from PT's prices in its Comparison Groups.

In its initial determination and first redetermination, Commerce attempted to support its conclusion with an explanation as to the how and the why. In *Mid Continent V,* the Federal Circuit disagreed with Commerce's rationale and remanded Commerce's decision to the agency

with instructions that Commerce should try again to justify its conclusion, or should rely on an alternative methodology. Commerce, however, did not follow the Court's directive. Rather, it merely concluded, in our opinion improperly, that academic literature allows simple averaging. It did not take the next essential step; that is, to explain how and why simple averaging constitutes a reasonable methodology based on the record in this case. In the absence of such explanation, Commerce has not followed the Federal Circuit's directive and its Final Results cannot be affirmed.

### V.   WA LEADS TO REASONABLE RESULTS BASED ON THE RECORD IN THIS CASE: SA DOES NOT

In its Comments to Commerce, Taiwan Respondents submitted graphic illustrations of five price comparisons: One hypothetical which was the focus of the oral argument in *Mid Continent III*, Appx647-657, and four actual comparisons found in PT's database. Appx1136-11150. Taiwan Respondents argued that these examples illustrate how and why WA is reasonable, while SA is not.

Commerce rejected these arguments. Final Results at 37 – 41. At the same time, however, Commerce acknowledged that relying on the WA methodology led to results which differed from relying on SA.

> When the weights are based on the sales quantities of each group, the smaller group will have less weight than the larger group, and the value being averaged (*i.e.*, the standard deviation) will have a smaller impact on the calculated average, and conversely the value of the larger group will have a larger impact. If the standard deviation of the smaller group is small, then the calculated average will be larger and the Cohen's *d* coefficient will be smaller. If the standard deviation for the smaller group is larger, then the calculated average will be smaller and the Cohen's *d* coefficient will be larger.

*Id.* at 38.

Commerce is correct. Results differ when WA, rather than SA, is used to calculate the

denominator in the Cohen's $d$ equation. The existence of this difference, which Taiwan Respondents have identified throughout this litigation, is not in dispute. The disagreement between the parties is whether SA leads to a reasonable result.

As Commerce recognizes, when the Test Group and Comparison Group have different quantities, the group with the larger quantity will have a greater impact on the ultimate result. What Commerce fails to recognize is that this result makes sense; in this manner, each kilogram (or each nail) has an equal impact on the result, whether in the Test Group or the Comparison Group. In contrast, if each group is given equal weight, a kilogram in the smaller group will have a disproportionately larger impact on the results than a kilogram in the larger group. And the same kilogram, in the same sale, will have a different impact depending on whether the sale falls within the Test Group or the Comparison Group.

The error is compounded by the fact that Cohen's $d$ also is affected by how its numerator is computed. The numerator—whose calculation is not disputed—is the difference of two *quantity weighted* means. Thus, in Commerce's SA methodology each kilogram affects the numerator of Cohen's $d$ in one way but affects the denominator in a different way, undermining the validity of the resulting ratio. In contrast, the WA methodology uses consistent weights for each kilogram sold in both the numerator and the denominator, yielding a meaningful ratio.

Commerce also correctly recognizes that when the small group has a small standard deviation, the denominator of the Cohn's $d$ calculation will be smaller than it would be when the small group has a large standard deviation. The smaller the denominator, the greater the "$d$" and the more likely that the ultimate result will be a pass (signifying targeted dumping) than a no-pass (signifying no targeted dumping).

According to Commerce, these results are "simply an arithmetic tautology" and "reliance

on such arithmetic logic to invent support for the reasonableness of the weighted average is without merit." Final Results at 38. Commerce also claims that "there is no visual distinction between any of the graphical representations of the test and comparison group prices which would lead a reasonable observer to recognize that one difference in prices pass the Cohen's *d* test and another difference in prices does not pass the Cohen's *d* test, irrespective of whether a simple average or a weighted average is used." *Id.* at 37-38. According to Commerce, Taiwan Respondents' assertion that simple averaging leads to results that are "facially odd" is "simply ineffective and unsupported." *Id.* at 58.[12]

As the five examples set forth below reveal, Commerce is wrong. The first example shows hypothetical data. The other four show sales in PT's database.

---

[12] At the *Mid Continent III* Oral Argument, 25:54 – 26:08, Judge Taranto of the CAFC stated that Commerce's decision that the hypothetical data resulted in a "pass" was "facially odd." PD 25, Taiwan Respondents Comments on Draft Redetermination, at 17.

*Figure 1  Hypothetical Data Illustrating Visual Comparison of Pricing Patterns and SDs*
**Hypothetical Example Discussed in *Mid Continent III***



## DATA AND METHODOLOGY[13]

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|
| Q Test | Q Comp | WA Price Test | WA Price Comp | Price Difference | Price Range Test | Price Range Comp | SD Test | SD Comp |
| 10 | 1000 | $1.50 | $1.75 | $0.25 | $1.46 - $1.54 | $1.00 - $2.46 | $0.04 | $0.40 |

---

[13] The columns in this table and the four other tables set forth below contain the following information: **(1-2)** "Q Test and Q Comp": quantity, in kilograms (kg), in the Test Group and the Comparison Group. **(3 – 4)** "WA Price Test" and "WA Price Comp": weighted average price, in $/kg, in the Test Group and the weighted average price, in $/kg, in the Comparison Group. **(5)** "Price Difference": Difference in price, in $/kg, between the WA Price Comp and WA Price Test $(5 = 4 - 3)$. **(6 – 7)** "Price Range Test" and "Price Range Comp": high and low prices, in $/kg, in the Test Group and the Comparison Group. **(8-9):** "SD Test" and "SD Comp": standard deviation, in $/kg, in the Test Group and the Comparison Group. **(10)** "PSD": pooled standard deviation, in $/kg, computed by simple averaging and weighted averaging (this is the only place where SA and WA differ). The PSD for SA is obtained by summing the squares of the $0.04 and $0.40 SDs, dividing by two, and taking the square root. The PSD for WA is obtained by (a) multiplying the square of $0.04 by 10kg; (b) multiplying the square of $0.40 by 1000 kg; (c)

|  | 10 | 11 | 12 | 13 |
|---|---|---|---|---|
|  | PSD | $d$ calculation |  | Pass |
| Simple average | $0.284 | 0.25/0.284 | 0.88 | yes |
| Weighted average | $0.398 | 0.25/0.398 | 0.63 | no |

**Source: Appx1132-1134; Appx656, Appx782-786;** *Mid Continent III*, Oral Argument at 11:07 – 17:55 (PT) and 25:27 – 35:52 (Government).

---

dividing the sum of these results by 1000 + 10 kg; and (d) taking the square root. **(11)** "*d* Calculation": to calculate Cohen's *d*, the numerator is the Price Difference (5) and the denominator is the PSD (10). **(12)** "*d*": the value of "*d*" used to determine whether there is a "pass" or "no pass". **(13)** "Pass" is "yes" when *d* is greater than 0.80, taken as an indication of targeted dumping in this CONNUM; "Pass" is "no" when *d* is less than 0.80, which means that there is no indication of targeted dumping.

CONNUM 121012572121, REGION SOUTH
**Data Presented to CIT in _Mid Continent IV_**



*Figure 2  Actual Data*

| Q Test | Q Comp | WA Price Test | WA Price Comp | Price Difference | Price Range Test | Price Range Comp | SD Test | SD Comp |
|--------|--------|---------------|---------------|------------------|------------------|------------------|---------|---------|
| 884.40 | 5673.60 | 5.392 | 5.483 | 0.091 | 5.305 – 5.441 | 5.308 – 5.806 | 0.07 | 0.14 |

|    | PSD | _d_ calculation | _d_ | Pass |
|----|-----|-----------------|-----|------|
| SA | 0.110 | 0.091/0.110 | 0.83 | yes |
| WA | 0.133 | 0.091/0.133 | 0.68 | no |

**Source: Appx843-853, Appx1136-1142, Appx1184-1191.**

CONNUM 127014570111, West Region



*Figure 3: Actual Data*

| Q Test | Q Comp | WA Price Test | WA Price Comp | Price Difference | Price Range Test | Price Range Comp | SD Test | SD Comp |
|---|---|---|---|---|---|---|---|---|
| 11,252 | 125,623 | 1.13220 | 1.16903 | 0.03683 | 1.12508 – 1.19807 | 1.11335 – 1.72100 | 0.01831 | 0.05910 |

| | PSD | *d* calculation | *d* | Pass |
|---|---|---|---|---|
| SA | 0.043751 | 0.03683/0.043751 | 0.84 | yes |
| WA | 0.056863 | 0.03683/0.056863 | 0.65 | no |

**Source: Appx1143, Appx1192-1202.**

24



CONNUM 121012572121, Purchaser
*Figure 4  Actual Data*
Cohen's WA d: 1.01 Pass
Cohen's SA d: 0.69 No pass

| Q Test | Q Comp | WA Price Test | WA Price Comp | Price Difference | Price Range Test | Price Range Comp | SD Test | SD Comp |
|---|---|---|---|---|---|---|---|---|
| 5822 | 736 | 5.45563 | 5.58696 | 0.13133 | 5.30769 - 5.71693 | 5.3049 - 5.80605 | 0.10686 | 0.24859 |

|  | PSD | D calculation | *d* | Pass |
|---|---|---|---|---|
| SA | 0.19133 | 0.13133/0.19133 | 0.69 | no |
| WA | 0.13165 | 0.13133/0.13065 | 1.01 | yes |

**Source: Appx1145-1146, Appx1214-1221.**

CONNUM 127033572121 MIDWEST Region



*Figure 5 Actual Data*
Cohen's WA d: 1.10 Pass
Cohen's SA d: 0.47 No pass

**Appx1148.**

| Q Test | Q Comp | WA Price Test | WA Price Comp | Price Diff. | Price Range Test | Price Range Comp | SD Test | SD Comp |
|--------|--------|---------------|---------------|-------------|------------------|------------------|---------|---------|
| 5757.50 | 78448.70 | 1.87084 | 1.83523 | 0.03561 | 1.82569-2.15165 | 1.82177 – 1.94873 | 0.10599 | 0.01742 |

|    | PSD | D calculation | *d* | Pass |
|----|-----|---------------|-----|------|
| SA | 0.075955 | 0.03561/0.075955 | 0.4747 | no |
| WA | 0.032416 | 0.03561/0.032416 | 1.1010 | yes |

**Source: Appx1147-1150, Appx1222-1231.**

These five examples show the weighted mean prices in each group and plot the data in a way that reveals how the prices are spread within each group and what the transaction quantities are. The accurate visual display of spreads and weights reveals how SA over-weights the smaller group (the one with lower total quantity; i.e., kilograms sold). When the smaller

26

group has a small spread, the SA methodology *decreases* the pooled standard deviation ("PSD"). Because that PSD is the denominator of the Cohen's *d* formula, the result is an incorrect *increase* in Cohen's *d*. This can cause a low "no-pass" value of *d* to exceed Commerce's threshold of 0.80, incorrectly resulting in a "pass." Visually, this phenomenon is assessed by comparing price differences to the degree of horizontal spreading in the price points: that is the meaning of Cohen's "relative effect size," of which Cohen's *d* is the prime example.

In the first three examples (Figures 1, 2, and 3), the differences in weighted average prices are $0.25/kg, $0.09/kg and $0.37/kg, respectively. These absolute differences do not (alone) establish whether the difference is significant. Nor is the significance of the difference determined by the percentage difference between these prices and a potentially normal price. Rather, by relying on a methodology based on Cohen's *d*, Commerce compares this absolute difference in prices to a calculated spread between sales prices in the CONNUM, and if so, whether the difference is large compared to the spread. This comparison can be made visually by assessing the differences in average group prices relative to the large horizontal dispersions of the points within each group. In the first three examples, Test Group sales prices do not differ appreciably from Comparison Group sales prices. In fact, any of the Test Group red dots plausibly could have arisen by sampling the Comparison Group gray or blue dots—all red dots fit comfortably in the middle of the range of the Comparison Group prices—indicating the economic pricing patterns of the groups are similar. This visualization corresponds to the intended meaning and correct mathematical calculation of Cohen's *d*.  There clearly is no significant difference between prices.  Commerce's blind claim to the contrary is wrong.

This visual evidence supports reliance on WA because it agrees with the WA conclusions

and disagrees with the SA conclusions. Importantly, it also makes the reason for preferring WA apparent, because in all the figures the total amount of a color (red, blue, or gray) indicates the total size of each group. WA respects these amounts but SA ignores them, allowing the spread within any small group to have an outsized effect on the DP determination. SA steers the PSD towards the value of the smaller group, *whether that is the higher or lower of the two group standard deviations*. The problem is not that SA always yields a value of Cohen's *d* that is too high or too low; the problem is that SA is *wrong*. The difference between WA and SA will nevertheless only matter in the cases where the resulting Cohen's *d* is near the 0.8 threshold. These examples were chosen to illustrate such conditions. They were not "cherry picked," as Commerce claims, to present a biased perspective on the two methods; rather, they were chosen to illustrate this *predictable* and *visually evident* difference between the methods.

In contrast, Figures 4 and 5 display patterns of visually apparent price differences that WA detects but SA fails to find. In Figure 4 the smaller Comparison Group comprises two transactions (gray dots). These are the lowest price and highest price for all sales in the CONNUM, a pattern characteristic of "masked dumping:" a sale at an unusually low unit price of $5.31 is counterbalanced by another sale at an unusually high unit price of $5.81. *Any effective procedure to identify masked dumping should flag this pattern*.

Similarly, in Figure 5, the extreme price in the small Test Group led to a no-pass determination using SA because *that price alone* caused the SD of its group to be large. This is another predictable failure of SA: whenever the total quantity in one group is small, a single small-quantity transaction at an unusual price will inflate[14] the group's standard deviation,

---

[14] The SD is computed from the variance which, in turn, is an average *squared* price deviation. The squaring gives extra weight to the most extreme prices: those appearing at the very left hand and right hand sides of each figure. In this fashion any single extremely high or low price in a

decreasing Cohen's *d*. The same no-pass SA result also will occur when, hypothetically, the extremely high Test Group transaction price is replaced by an extremely *low* Test Group price. Such an extremely low-priced sale should be treated as evidence of targeted dumping, but under Commerce's SA methodology, the failure to correctly account for the difference in spreads of Comparison Group and Test Group transactions in pooling the SD leads to an unwarranted no pass. *SA pooling allows small transactions at extremely unusual prices to hide within an incorrectly computed value of Cohen's d.*

In short, these examples illustrate a predictable tendency for WA to make sense and produce a reliable determination, whereas SA does not. SA also fails to achieve the objective of Commerce's DP analysis; that is, of identifying evidence of targeted dumping. The reason for these differences is found in the linchpin of Taiwan Respondents' argument; that is, reliance on a SA methodology in this case leads to unreasonable results when the SD of a small sized group is relatively large (unnaturally increasing the Cohen's *d* denominator, potentially turning a pass into a no- pass) or relatively small (unnaturally decreasing the Cohens *d* denominator, potentially turning a no-pass into a pass).

These visually evident results support the WA methodology and show why reliance on the SA methodology led to unreasonable results in this case. Examining the accuracy of results is the best method of confirming that a methodology is reasonable in the real world, in light of its purpose. In contrast, a methodology which leads to absurd results cannot be sustained. *See Sorrells v. United States*, 287 U.S. 435, 446 (1932) (explaining a statutory interpretation cannot be upheld "at the expense of the reason of the law and producing absurd consequences."); *Pitsker v. Off. of Pers. Mgmt.,* 234 F.3d 1378, 1383 (Fed. Cir. 2000) ("OPM's requirement also violates

---

group will have a greater effect on the group's variance than suggested by the size of the transaction alone.

the canon of statutory construction that an interpretation that causes absurd results is to be

avoided if at all possible."); *Timex V.I. v. United States*, 157 F.3d 879, 886 (Fed. Cir. 1998) ("a

statutory construction that causes absurd results is to be avoided if at all possible"); *Bestpak Gifts*

*& Crafts Co., supra,* 716 F.3d at 1378.

  Finally, a sales price without a quantity is meaningless. Factoring quantity into the

analysis is necessary to evaluate whether a price difference is significant. For example, assume

that one kilogram of a good is sold at varying prices with a standard deviation of $10/kg and one

thousand kilograms are sold at varying prices with an SD of $1/kg. The variance of the first

group of sales is $10 \times 10 = 100$ while the variance of the second group is only $1 \times 1 = 1$. Thus,

the first group of sales, which is economically inconsequential, accounts for more than 99% of

the Cohen's *d* denominator using Commerce's method, and could be used to establish a pattern

of significant price differences. In contrast, with weighted pooling, the first group of sales

accounts for only 9% of the pooled SD[15], and the high-priced $10 sales will have a minimal

impact in determining whether the price difference is really significant. It is unreasonable that

miniscule sales quantities could create an affirmative determination of significant price

differences unrelated to the significance of the quantities.

  In contrast, because the weighted PSD removes distortions created by low quantities,

relying on the WA methodology allows Commerce to evaluate the actual economic impact of the

price differentials by time period, region, and purchaser. This Court should require that

---

[15] Although the variance of the first group is 100 times the variance of the other group, it is
associated with only 1/1001 of the total quantity in both groups, $1 + 1000 = 1001$ Kg. Its
contribution to the weighted pooled variance is $100 \times 1/1001 = 100/1001$. The other
group's contribution is $1 \times 1000/1001 = 1000/1001$. The pooled variance is the sum,
$100/1001 + 1000/1001 = 1100/1001$. The proportion of this contributed by the first group
therefore is 100/1001 divided by 1100/1001, equal to 100/1100 or approximately 9%.

Commerce calculate the PSD in this manner, in order to properly place "the emphasis . . . on economic reality." *United States v. Eurodif S.A.*, 555 U.S. 305, 317-18 (2009).

## VI.   COMMERCE'S REJECTION OF PORTIONS OF TAIWAN RESPONDENTS' CASE BRIEF WAS CONTRARY TO LAW

By decision dated October 25, 2022, affirmed on November 1, 2022, Commerce rejected portions of Taiwan Respondents' Case Brief. Final Results at 2. As discussed below, the rejected material was not new factual information ("NFI"), and Commerce's rejection decision was contrary to law.

### A.   HUBER DECLARATION

In submitting Comments to Commerce, Taiwan Respondents' statistical consultant, Dr. William Huber, analyzed Commerce's rationale in the same manner as he had responded to Commerce's Draft Results after the *Mid Continent III* remand. PD 9 at Exhibit 1 (Huber Declaration 2022); Appx843-865 (Huber Declaration 2020). Dr. Huber's declaration constitutes his opinion. Expert analysis is not new factual information. The Huber Declaration is no more NFI than the analysis submitted by Mid Continent, the sole difference being that Taiwan Respondents chose to submit Dr. Huber's analysis as a stand-alone document. Taiwan Respondents could have simply incorporated Dr. Huber's analysis in the "lawyer comments" and the NFI issue would have been limited to one or two citations to scholarly sources.

Moreover, *Mid Continent V* focused on academic literature. It reasoned that "Commerce has departed from the methodology described in all the cited statistical literature governing Cohen's *d*, but it has not justified that departure as reasonable." *Mid Continent V*, 31 F 4th at 1377. The Federal Circuit did not limit Commerce's analysis to Cohen, Coe, and Ellis. In fact, in *Stupp,* the Federal Circuit relied on published literature which had not previously been included

in the administrative record.[16] Clearly, the Federal Circuit did not intend that Commerce limit its inquiry to three papers, and refuse to consider any other academic analyses (e.g., Huber Declaration) which parties placed on the record.

**B.** **TEXTBOOK REFERENCES**

Page 35, footnote 18 of Taiwan Respondents' Comments, refers to a statistical textbook, "George W. Snedecor and William G. Cochran, *Statistical Methods,* Eighth Ed. (Iowa State University Press 1989) at p. 7" as a source for a statement in the text that "*stratified sampling* is appropriate in certain situations." PR 8. At page 52, Taiwan Respondents reference Samuelson and Nordhaus' textbook on Economics. *Id*.

These references do not constitute NFI. The *Statistical Methods* text "is a reference to information in the public realm rather than as the submission of new factual information." *Certain Steel Concrete Reinforcing Bars From Turkey*, 68 ITADOC 53127 (September 9, 2003) at IDM, Comment 12. Moreover, the text in Taiwan Respondents' Comments – "*stratified sampling* is appropriate in certain situations" – is a statistical/ legal argument that Taiwan Respondents are allowed to make. Deleting the academic source for a statistical principle makes absolutely no sense, and is directly contrary to the Federal Circuit's mandate that Commerce's ultimate conclusion conform to academic literature.

Moreover, Taiwan Respondents' citation to Samuelson and Nordhaus is no different than Mid Continent's reliance on these experts in its comments on Commerce's first draft results. See Appx1102 ("Citing Paul Samuelson and William Nordhaus, Mid Continent asserts that 'rational consumer behavior is that which maximizes the consumer's benefit or well- being.'"). In many

---

[16] *Stupp Corp. v. United States*, 5 F.4th 1341, 1358 (Fed. Cir. 2021) ("There is extensive literature describing the problems associated with applying the Cohen's *d* test to data that are not normally distributed or that are lacking equal variances.")

respects, Samuelson is the "Bible" of economics for high school and college students. Query, would Commerce reject a reference to the Bible as NFI, or Commerce's own antidumping manual for that matter?

### C.      EXHIBIT FOUR: COHEN, PAGES 359 – 361.

Taiwan Respondents attached this textual material to their Comments because in *Mid Continent V*, the Federal Circuit expressly held that "the section of Cohen (at 359 – 361) cited by Mid Continent and Commerce for its 'abstract effect' language" did not apply "simple averaging to pooled standard deviation estimates for different-size groups." *Mid Continent V*, 31 F. 4th at 1378-79. Pages 359 – 361 also were discussed at length in the Federal Circuit oral argument. PD 26 at Exhibit 3, pages 6- 7 (Mr. Gordon), 9 -10 (Mr. Mershach (sic). Clearly, a document that Mid Continent originally brought to Commerce's attention and which was a focus of the *Mid Continent V* oral argument and *Mid Continent V* decision should not be stricken from Commerce's record as NFI.

In sum, the rejected material was directly responsive to the Federal Circuit's remand order, which required that Commerce carefully review academic literature. The purpose of Commerce's analysis is to obtain a legally correct, factually accurate, reasonable result, supported by substantial evidence, and in this case by academic literature.  Taiwan Respondents' comments were designed to allow Commerce to meet these goals. Commerce's rejection of the Huber declaration and other documents resulted in a decision based on an incomplete record.

Notwithstanding the foregoing, we ask this Court not to remand this matter to Commerce merely to allow Commerce to analyze these documents. Rather, this matter should be remanded with instructions that: (1) Commerce should rely on weighted averaging or use the standard deviation for the entire population; and (2) Commerce should include the rejected documents in the remand record.

## VII.   __CONCLUDING COMMENTS__

These Comments have focused on the principal errors in Commerce's Final Results:

- departing from the academic literature upon which Commerce claims to have relied, and which the Federal Circuit expressly determined supported reliance on weighted averaging;

- misinterpreting *Cohen/Coe/Ellis* by ignoring the context and scope of their formulas and recommendations;

- confusing statistical treatment of samples and populations;

- ignoring clear (and real) examples of how and why WA yields reasonable determinations supported by substantial evidence, and SA does not;

- ignoring judicial precedent requiring that Commerce rely on procedures less crude than SA (e.g., weighted averaging) rather than SA where sufficient information is available; and

- basing its decision on its belief that the academic literature supports reliance on SA, without also discussing how and why SA is a reasonable methodology in light of the facts in this case and the statutory mandate to determine whether there is a significant difference between the prices in a Test Group and a Comparison Group.

Moreover, while not discussed in detail in these Comments, Commerce's analysis often ignores or misinterprets basic statistical principles, by: (1) confusing counts of random samples with total transaction quantities; (2) failing to see that *any* pooling formula is weighted, making the question *which weights to use*; (3) misinterpreting formulas involving hypothetical population properties in *Cohen/Coe/Ellis*; and (4) misrepresenting statistical formulations in *Cohen/Coe/Ellis*.

Finally, reliance on WA, rather than SA, results in PT's margin being reduced from 2.16% percent to *de minimis*. Thus, Commerce's choice of methodology has "a material impact on the results of the less-than-fair-value investigation," *Stupp, supra*, and results in a "meaningful difference" in PT's margin. Appx468.

Accordingly, Taiwan Respondents ask this Court to remand this matter to Commerce with instructions to calculate the Cohen's *d* denominator in a reasonable manner, consistent with the academic literature, and the teachings of *Mid Continent III* and *Mid Continent V*, either by using weighted averaging or the standard deviation for the entire population.

<div style="margin-left:50%">

Respectfully Submitted,

GRUNFELD, DESIDERIO, LEBOWITZ, SILVERMAN & KLESTADT LLP

*/s/Ned H. Marshak*
Ned H. Marshak
Andrew T. Schutz

*Counsel for PT Enterprise, Inc., Pro-Team Coil Nail Enterprise Inc., Unicatch Industrial Co., Ltd., WTA International Co., Ltd., Zon Mon Co., Ltd., Hor Liang Industrial Corp., President Industrial Inc.* and *Liang Chyuan Industrial Co., Ltd.*

</div>

Dated:  December 13, 2022

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Consolidated Plaintiff's Remand Comments as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word, is 9,930 words, less than the 10,000 word limit.


*/s/ Ned H. Marshak*
Ned H. Marshak


Dated: December 13, 2022

Attachment

2.3.3.  CASE 2: $\sigma_A \neq \sigma_B$, $n_A = n_B$. For normal populations of unequal variance, the formula for $t$ does not follow the tabled values for $t$, that is, this condition constitutes a "failure of the assumptions" (or more properly conditions) under which $t$ is generated. However, there is ample evidence for the robustness of the $t$ test despite moderate failure of this assumption provided that sample sizes are about equal (Scheffé, 1959; Cohen, 1965). Approximations to the true power values which are adequate for most purposes are available by using the tables in the ordinary way.

It should be kept in mind that when $\sigma_A \neq \sigma_B$, the definition of $d$ will be slightly modified. Since there is no longer a common within-population $\sigma$, $d$ is defined as above (formulas (2.2.1) and (2.2.2)), but instead of $\sigma$ in the denominator, the formula requires the root mean square of $\sigma_A$ and $\sigma_B$, that is, the square root of the mean of the two variances:

$$(2.3.2) \qquad \sigma' = \sqrt{\frac{\sigma_A^2 + \sigma_B^2}{2}}.$$

The unequal variability need not affect the conception of $d$ developed in Section 2.2. Given that there is a difference between $\sigma_A$ and $\sigma_B$, we merely are using a kind of average within-population standard deviation to standardize the difference between means. It is not the arithmetic mean of $\sigma_A$ and $\sigma_B$, but, as noted, the root mean square. (However, unless $\sigma_A$ and $\sigma_B$ differ markedly, $\sigma'$ will not differ greatly from the arithmetic mean of $\sigma_A$ and $\sigma_B$.)

In interpreting $d$ for this case, the $U$ (percent nonoverlap) measures can no longer be generally defined and the Table 2.2.1 $U$ columns will not obtain. However, interpreting $d$ in terms of $r$ and $r^2$ proceeds completely unaffected by $\sigma_A \neq \sigma_B$, and the conventional definitions of small, medium, and large $d$ can also continue to be used.

Note that if $\sigma_A \neq \sigma_B$ and it is also the case that $n_A \neq n_B$, the nominal values for $t$ and power at a given significance criterion, $a$, may differ greatly from the true values (Scheffé, 1959; Cohen, 1965, p. 115). Under these conditions ($\sigma_A \neq \sigma_B$ and $n_A \neq n_B$, simultaneously), the values in Tables 2.3 may be greatly in error.