UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE CLAIRE R. KELLY

|  |  |
|---|---|
| MID CONTINENT STEEL & WIRE, INC., et al.,  ) ) Plaintiff and Consolidated Plaintiffs, ) ) v. ) ) UNITED STATES, ) ) Defendant, ) ) and ) ) PT ENTERPRISE INC., et al., ) ) Defendant-Intervenors and Consolidated ) Defendant Intervenor. ) | Consol. Court No. 15-00213 |

MID CONTINENT STEEL & WIRE, INC.'S COMMENTS
IN SUPPORT OF FINAL REMAND RESULTS

Adam H. Gordon
Jennifer M. Smith
Lauren Fraid
**THE BRISTOL GROUP PLLC**
1707 L Street NW
Suite 570
Washington, DC 20036
(202) 991-2700
*Counsel to Mid Continent Steel & Wire, Inc.,*

Dated: February 13, 2023

## I. INTRODUCTION

On behalf of Mid Continent Steel & Wire, Inc. ("Mid Continent"), we submit these comments in support of the Final Remand Results issued by the Department of Commerce ("Commerce") (PD 26), and in response to comments in opposition to Final Remand Results filed by Defendant-Intervenors PT Enterprise Inc., Pro-Team Coil Nail Enterprise Inc., Unicatch Industrial Co., Ltd., WTA International Co., Ltd., Zon Mon Co., Ltd., Hor Liang Industrial Corp., President Industrial Inc., and Liang Chyuan Industrial Co., Ltd. (collectively, "Taiwan Respondents" or "PT"). *See* Final Results of Redetermination Pursuant to Court Remand, Certain Steel Nails from Taiwan, *Mid Continent Steel & Wire, Inc. v. United States*, CAFC Case 21-1747 (CAFC April 21, 2022) (Nov. 10, 2022) ("*Final Remand Results*"); Taiwan Respondents' Comments on Results of Redetermination Pursuant to Court Remand (CM/ECF Doc. No. 188) (Dec. 13, 2022) ("*Taiwan Respondents' Comments*"). These comments are timely submitted pursuant to the Court's Amended Scheduling Order, dated January 3, 2023 (CM/ECF Doc. No. 190).

## II. DISCUSSION

Mid Continent supports Commerce's *Final Remand Results*. In reconsidering the use of a simple average in the calculation of the denominator of the Cohen's *d* coefficient as part of the differential pricing analysis, and in reevaluating the academic literature on the record, Commerce properly followed and responded to the Federal Circuit's opinion in *Mid Continent Steel & Wire, Inc. v United States*, 31 F.4th 1367 (Fed. Cir. 2022) (*Mid Continent V*). In doing so, Commerce demonstrated that use of a simple average for the purpose described above is consistent with the statute, supported in the academic literature, and reasonable in its examination of whether prices

1

differ significantly pursuant to section 777A(d)(1)(B)(i) of the Tariff Act of 1930, as amended (the "Act").

### A. Taiwan Respondents' Comments Begin with a Flawed Premise

At the outset, *Taiwan Respondents' Comments* attempt to frame the *Final Remand Results* in a highly prejudicial manner, claiming that

> faced with a Federal Circuit decision which expressly rejected its Cohen's *d* analysis, Commerce adopted a new rationale, eight years after its initial Cohen's *d* decision, and seven years and five judicial decisions after this litigation commenced. In light of this history, this Court should accord limited, if any, deference to Commerce's analysis, and instead should analyze the competing methodologies based on the teachings of *Mid Continent III* and *Mid Continent V*.

*Taiwan Respondents' Comments* at 4. This characterization is misleading, at best. First, while it is true that there have been several rounds of litigation, most of these have not dealt expressly with the sole aspect of Commerce's differential pricing methodology that remains at issue, *i.e.*, its use of the simple average of the actual standard deviations of the populations of the test and comparison groups in the denominator. For nearly all other aspects under consideration during the various cycles of the present litigation, the courts have ruled in Commerce's favor, or Commerce has made minor modifications in response to judicial decisions.

Second, this characterization relies upon judicial precedent that is of limited relevance to the present set of circumstances. *Id.*[1] What is clear from the summary of the cited cases is that

---

[1] *Citing INS v. Cardoza–Fonseca,* 480 U.S. 421, 446 n. 30 (1987) ("An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is entitled to considerably less deference than a consistently held agency view.") (quotation marks omitted);*Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 417 (1993) ("{T}he consistency of an agency's position is a factor in assessing the weight that position is due."); *Alloy Piping Prod., Inc. v. United States,* 32 C.I.T. 249, 253 (2008) ("{W}hen granting *Chevron* deference, the court looks to "the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position."); *Tung Mung Dev. Co. v. United States*, 25 C.I.T.

they all dealt with instances where an agency's position had been inconsistent or had deviated from its original stance. In contrast to the cited cases, Commerce has been entirely consistent in defending the application of the Cohen's *d* measure in its differential pricing methodology and has maintained a consistent rationale for doing so. Indeed, the Federal Circuit requested in *Mid Continent V* that Commerce reexamine the academic literature to find support for the idea of using a simple average of the standard deviations of the test and comparison groups in the denominator. In implementing the Federal Circuit's directive, and given that court's skepticism towards prior explanations proffered by the agency, it is thus unsurprising that Commerce relied upon additional evidence in the record in order to defend its <u>consistent</u> position that the use of a simple average, as described above, is an appropriate implementation of its authority under the governing statute.

PT's portrayal of this litigation should be taken with a huge grain of salt. More to the point, Taiwan Respondents have not pointed to any manner in which the *Final Remand Results* are inconsistent with Commerce's prior explanations. If anything, they build upon and buttress the agency's consistent support of the use of a simple average in the denominator of the Cohen's *d* measure. Commerce thus faithfully, and in Mid Continent's view, successfully, followed the Federal Circuit's instructions in *Mid Continent V*. Its *Final Remand Results* should thus be fully entitled to *Chevron* deference as the administering authority of the antidumping statute.

**B.    Commerce Appropriately Used an Academically Supported Version of the Cohen's *d* Measure That Relies on a Simple Average in the Denominator**

Contrary to what the Taiwan Respondents argue (*Taiwan Respondents' Comments* at 8-18), Commerce correctly implemented the Cohen's *d* measure given the circumstances it faces

---

752 (2001) ("The case for judicial deference is less compelling with respect to agency positions that are inconsistent with previously held views.").

3

in its antidumping cases. The Cohen's *d* measure is a difference of means divided by a measure of variance to calculate a ratio that describes the dispersion in a group of data, whether a sample or an entire population. Cohen's general formula and the version used by Commerce in its differential pricing analysis are shown in the following:

$$d = \frac{m_A - m_B}{\sigma}$$

$$= \frac{m_A - m_B}{\sqrt{\frac{\sigma^2_A + \sigma^2_B}{2}}}$$

$$= \frac{m_A - m_B}{\sqrt{\frac{1}{2}}\sqrt{\frac{1}{n_A-1}\sum_{t=1}^{n_A}(x_{At} - \bar{x}_A)^2 + \frac{1}{n_B - 1}\sum_{t=1}^{n_B}(x_{Bt} - \bar{x}_B)^2}}$$

Here, *m* denotes a weighted within-group mean (weighting by quantity), *x* denotes price, $\bar{x}$ denotes the mean of the indexed group, and *n* denotes a group size, all for both the test group *A* and the comparison group *B*. Also, $\sum$ is the conventional notation for summing the indexed by *i* values from the lower index value (*i* = 1) to the higher index value ($n_a$ or $n_b$). The form in the first expression of the equation above is directly from Cohen's book, the second expression defines σ as Commerce calculates it, and the third expression shows the structure of the shared variability in the denominator.[2] This measure is used if there are at least two cases ($x_i$) in each group and the comparison group has at least five percent of the total observations.

---

[2] *See* Cohen, Jacob, *Statistical Power Analysis for the Behavioral Sciences*, Lawrence Erlbaum Associates, Publishers (1988) ("*Cohen*"), at 20. The first two chapters of *Cohen* are included in Appendix II to Commerce's Second Draft Redetermination. *See* Draft Results of Remand Redetermination, *Mid Continent Steel & Wire, Inc. et al. v. United States*, Court No. 15-00213 (Dec. 3, 2019) (Second Draft Redetermination).

Commerce's purpose in using the Cohen's *d* measure is to calculate a standardized expression of mean differences to measure the effect by which two populations' average prices differ. This also is the main purpose for the development of Cohen's *d* as described by Cohen himself: measuring the effect to which two populations' average values differ. For Commerce's purposes, the two groups to be compared are determined for each discrete category of products subject to the antidumping proceeding (each "control number", or CONNUM) by selecting the sales to an individual purchaser that are then compared to the sales to all other purchasers, the sales in a specific region compared to those in all other regions, or the sales in a specific time period compared to the sales in all other time periods. The analysis is repeated for all purchasers, regions, and time periods to produce different versions of the *d* measure that are used to evaluate whether patterns of "significantly"[3] differing prices exist in a complete population of U.S. sales made by the foreign producer or exporter. All sales of each CONNUM are used in each of these analyses.[4] Therefore, this is a population-to-population comparison, and no statistical sampling, or estimation, is performed or needed.

The Taiwan Respondents argue that "{w}hile Commerce is correct that *Cohen/Coe/Ellis* focus on samples as distinguished from actual populations, what Commerce has not done, because it cannot do, is to explain why an analysis of all available data should be treated differently than an analysis of sample data." *Taiwan Respondents' Comments* at 5. Commerce correctly refuted this claim when it observed that:

> Dr. Cohen explicitly presents equations to calculate the effect size based on a population. In direct contrast, Dr. Cohen and other authors in the

---

[3] This is significance in the plain language sense, not in the statistical sense, as no distributional test is performed.

[4] Commerce then sums the volume of the sales whose Cohen's *d* measure exceeds 0.8 and uses that to determine whether the volume of sales whose prices differ significantly requires changes to the methodology used to calculate the margin of dumping.

5

> academic literature present equations to calculate the effect size based on sampled data to estimate the effect size in the actual population. These approaches to estimate the actual value of the effect size in the populations may include weighting. However, because Commerce's application of the Cohen's *d* test is based on the actual full populations of U.S. sale prices in each of the test group and comparison group, such estimation of the Cohen's *d* coefficient is not necessary and reliance on weighting to calculate the denominator of the Cohen's *d* coefficient is not warranted.

*Final Remand Results* at 35 (citations omitted).

Expanding upon this point, the form of *d* expressed on page four is exactly the correct method for the application performed by Commerce for two main reasons. First, because the groups of data examined are populations, not samples, there are no sampling criteria chosen and applied by researchers that would need to be weighted to account for discretionary decisions made in such a process, such as determining a sampling frame, accounting for sampling bias, randomization/selection strategies, purposive decisions, unit availability, imputing missing data, etc. If the data constitute the entire population, and therefore are the complete and "true" universe of information, then weighting to account for human decisions involved in picking and choosing a sample of those data is unnecessary. Indeed, doing so would only serve to distort the truth described by the entire population of data.

This point can be illustrated by considering the most frequent form of weighting, which takes place in survey research. It is common to take a sample with hundreds or even thousands of respondents and then up- or down-weight cases based on demographics using Census information. A hypothetical example illustrates this point. Assume, for instance, that there are 5,484 (0.5 percent) African-American residents of Montana out of 1,104,271 total residents according to the 2020 Census. Obviously, it is unlikely in a national sample of mere thousands that more than a few African-American Montana residents will be in the dataset. Knowing that this group is undercounted by reliable population summary data means that it is appropriate to

weight these responses higher in proportion to such population data for subsequent analysis. However, in a different setting. where the full population is being analyzed, *e.g.*, the complete set of Census data, there is no reason to up-weight 5,484 cases even though this is a small number, because it is the full "truth" of the population. Hence, no estimation of the population values based on samples is needed.

Second, group sizes are already considered when calculating the means of the test and comparison groups (*i.e.*, the numerator of the calculation) in order to account for differently-sized sales quantities within each group.

Moreover, in terms of nomenclature, the label "Cohen's *d*" is used to refer to a number of related techniques, rather than a single, strictly defined formula. As the parties and the Federal Circuit have observed, even what is narrowly defined as the Cohen's *d* measure itself has variations depending on the circumstances of the available data. Thus, inasmuch as the Federal Circuit has taken issue with the way Commerce has applied the Cohen's *d* measure, this may be remedied by a straightforward distinction of nomenclature by stating that the differential pricing methodology in fact uses an academically supported variation of the Cohen's *d* measure given the circumstances of the data and the specific purpose of the analysis.

Indeed, Commerce emphasizes this very point when it cites Cohen's discussion of how to approach a situation when the standard deviations of populations A and B are not equal:

> In other words, when the standard deviations of the two populations are not equal, then the denominator of the effect size should be the simple average of the two, unequal standard deviations of population A and population B. In this scenario, there is no common within-population standard deviation. Moreover, unlike a common within-population standard deviation where one of the population standard deviations is used as the denominator, the denominator in this scenario is defined as the root mean square, *i.e.*, the simple average, of the standard deviations of population A and population B. *Throughout Cohen, when the standard deviations of the two populations are known, the denominator of the effect*

7

> size is either the common population standard deviation when the
> standard deviations of the two populations are equal, or the root square
> mean of the two standard deviations when the standard deviations of the
> two populations are unequal.

*Final Remand Results* at 9-10, *citing Cohen* at 43-44 and equation 2.3.2 (citations omitted and emphasis added). Thus, there can be no reasonable dispute that different statistical methods are warranted when dealing with populations versus samples.

It is important to note that the formula offered by Cohen in equation 2.3.2 reflects the variances of the two populations without reference to the relative size (*i.e.*, the "*n*") of either one.[5]

As a separate matter, we note that the final paragraph of Section 2.3.3 does not undermine the validity of using a simple average of the variances to establish the denominator of the Cohen's *d* calculation. The final paragraph reads as follows:

> Note that if $\sigma_A \neq \sigma_B$ and it is also the case that $n_A \neq n_B$, the nominal values
> for t and power at a given significance criterion, **a**, may differ greatly from
> the true values (Scheffé, 1959; Cohen, 1965, p. 115). Under these
> conditions ($\sigma_A \neq \sigma_B$ and $n_A \neq n_B$, simultaneously), the values in Tables 2.3
> may be greatly in error.[6]

This passage comments on the impact these circumstances ($\sigma_A \neq \sigma_B$ and $n_A \neq n_B$, simultaneously) have on the ability to rely with confidence on the power tables provided in Tables 2.3. It does not comment on or challenge the need to use the simple average of the variances to calculate the denominator of the Cohen's *d* measure when $\sigma_A \neq \sigma_B$.

It should also be noted that the second paragraph of section 2.3.3, which discussed the need to use the root mean square to calculate the denominator and sets forth equation 2.3.2, is a

---

[5] Moreover, we believe that it is important to recognize that while Formula 2.3.2 is identified in the context of examples related to power analysis, as demonstrated above, Cohen did not limit its application.

[6] *See Cohen* at 44.

stand-alone paragraph, indicating that it was viewed by Cohen as an independent concept not tied to or reliant upon the Case 2 assumption that $n_A = n_B$. This is supported by Cohen's own language, which simply states:

> It should be kept in mind that when $\sigma_A \neq \sigma_B$, the definition of $d$ will be slightly modified. Since there no longer is a common within-population $\sigma$, $d$ is defined as above (formulas (2.2.1) and (2.2.2)), but instead of $\sigma$ in the denominator, the formula requires the root mean square of $\sigma$, and that is, the square root of the mean of the two variances ….[7]

As this shows, Cohen's comment and the modified calculation of $\sigma$ in the denominator are offered without reference to or the condition that $n_A = n_B$. Structurally, then, Cohen himself described the approach to calculating $d$ when the standard deviations of the two populations are unequal as a discrete concept.

      In sum, Commerce has demonstrated that there is clear support in the academic literature for the approach it took in its differential pricing analysis. More generally, the idea of comparing means and somehow standardizing them to find the difference between mean price values should be the goal rather than simply following certain pre-defined instructions that are applicable to *sample*-based studies, but not to the situation facing Commerce, where it has complete population data at its disposal and seeks to fulfill a statutorily defined objective. Because using a simple average is well-supported by the academic literature for precisely the kind of scenario that Commerce deals with in antidumping cases, it is thus essentially axiomatic that the results obtained therefrom will be intrinsically reasonable.

---

[7] *See id*. at 43-44.

### C. Weighted Averaging Is Not Appropriate for the Manner in Which Commerce Applies the Cohen's *d* Measure, Nor Do the Illustrative Examples Provided by Taiwan Respondents Demonstrate the Weighted Averaging Is Reasonable

Respondents suggested using volume weighting in the calculation of the denominator of *d* in the following way:

$$d_W = \frac{m_A - m_B}{\sigma_v} = \frac{m_A - m_B}{\sqrt{\frac{W_A}{W_A - W_B}\sigma^2_A + \frac{W_B}{W_A - W_B}\sigma^2_B}}$$

where $W_A$ is the total kilogram weights in the test group and $W_B$ is the total kilogram weights in the comparison group. The denominator is therefore a weighted average based on the physical weights (in kilograms) of sales within each group. This approach, however, produces exactly the opposite of what Commerce is trying measure. Suppose that a foreign supplier sells a product to purchaser, region, or in time period *B* and does so with a large contrasting volume $W_A$ relative to $W_B$. Since $W_A$ is in the numerator of the denominator, this has the effect of lowering Cohen's *d* compared to using the simple average. So even if $m_A - m_B$ is relatively large, this supplier has the ability to manipulate the measure of *d* by changing the relative volume since this method gives more weight to standard deviations from smaller groups when those smaller groups are from larger sales.

Commerce effectively countered the five illustrative examples from the case data that PT offered as evidence to show the weighted averaging leads to reasonable results but that using a simple average does not. *Final Remand Results* at 36-38. Mid Continent agrees with and supports Commerce's analysis with respect to this matter. Additionally, a straightforward counterexample underscores the flawed nature of Taiwan Respondents' proposal. Consider the following two hypothetical scenarios where the mean price difference ($m_A$ and $m_B$) and the

10

within-group standard deviations ($\sigma^2_A$ and $\sigma^2_B$) remain the same but the volume ($W_A$ and $W_B$) for the higher priced group sales is increased:

(1) $m_A = 4.3, m_B = 3, \sigma^2_A = 3, \sigma^2_B = 2, W_A = 10, W_B = 10$

$$d_W = \frac{4.3 - 3}{\sqrt{\frac{10}{10+10} \times 3 + \frac{10}{10+10} \times 2}} = 0.8221922$$

(2) $m_A = 4.3, m_B = 3, \sigma^2_A = 3, \sigma^2_B = 2, W_A = 30, W_B = 10$

$$d_W = \frac{4.3 - 3}{\sqrt{\frac{30}{30+10} \times 3 + \frac{10}{30+10} \times 2}} = 0.7839295$$

As this shows, in the first case the value of Cohen's $d$ exceeds the "large" effect size 0.8 threshold, but with the same pricing difference the manipulated volume value in the calculation of $d$ does not. Obviously, this is a simplified example, but it illustrates that a supplier can manipulate sales volume to alter the value of $d$ when this approach is used. Given the prevalence and sophistication of many respondents' "dump-proofing" activities, this scenario is not far-fetched. It is certainly mathematically possible as a strategy to hide price manipulation as a seller. Mid Continent respectfully submits that any approach that would enable such manipulation would be inherently *unreasonable*. In contrast, the simple average used by Commerce would obviate the concern about the potential manipulation of sales quantities that is an inherent characteristic of PT's preferred method.

  **D.**  **Commerce Correctly Determined That Using the Standard Deviation of the Entire Population in the Denominator Was Also Inappropriate**

In its opinion, the Federal Circuit held that:

> Commerce has not explained why the basic choice of weighted averaging of unequal-size groups fails to apply to the present context. The cited literature nowhere suggests simple averaging for unequal-size groups. Indeed, when the entire population is known, the cited literature points

> toward using the standard deviation of the entire population as the denominator in Cohen's d – which Commerce has not done.[8]

In other words, the Federal Circuit observed that when two populations are used, instead of two samples, which is the case here, Cohen's *d* may be defined as

$$d = \frac{\mu_1 - \mu_2}{\sigma}$$

where $\mu_1$ is the mean of the first population and $\mu_2$ is the mean of the second population. Sigma, $\sigma$, is the population standard deviation *that is assumed to be "common" (equal) in both populations*. In other words, it is assumed that $\sigma_1 = \sigma_2 = \sigma$ in this context.

We agree with Commerce's analysis that the Federal Circuit's suggested approach is not viable. *Final Remand Results* at 17-23. Indeed, the proposed approach is based on the rather large assumption that the population standard deviation is the same in both populations. Whether the population standard deviation is indeed the "common" measure of variation across all populations needs to be questioned. If two populations are different in terms of their observation values, the population standard deviation will be skewed in favor of the group with a larger amount of variation among its observations. The pooled variance will be affected by the larger population size, which is contrary to Commerce's goal of simply comparing prices regardless of the number or quantity of sales. Commerce uses the average of both variances to make it representative of both populations.

For example, if $N_1 = 50, \sigma_1^2 = 10, N_2 = 200, and\ \sigma_2^2 = 15$, the pooled variance is $\sigma_p^2 = \frac{49*10+199*15}{248} = 14.01$, which is very close to the variance of the population with a larger size.

---

[8] *See Mid Continent Steel & Wire, Inc. v. United States*, 31 F.4th 1367, 1380 (Fed. Cir. Apr. 21, 2022) ("*Mid Continent V*").

The larger one of the population sizes is, the more weight is given to the variance of the larger group, and it will directly affect the values of the pooled standard deviation.

If the averaged variance was calculated, this value would be equal to $\frac{10+15}{2}$ = 12.5, which is in the middle of the variances of two populations and as a result representative of both variances rather than being dominated by the variance of the larger population. Moreover, it bears reiterating that Commerce's calculation already incorporates different group sizes in the calculation of the means values used in the numerator of the effect size calculation. Additionally, group sizes were considered in the calculation of standard deviation values used to calculate the denominator of the effect size.

As this shows, the proposal by the Federal Circuit to use the standard deviation of the entire population is not appropriate given the context of Commerce's analysis; due to the nature of the data being analyzed, one group will almost always have a much larger number of sales, and thus have an outsized influence on the calculation of the overall standard deviation. This would undermine the ultimate goal of Commerce's evaluation of the data, which is to determine whether the means of the two groups individually are different enough such that they cross a preselected effect size threshold (currently 0.8) and are therefore differentially priced.

Finally, it was implied in *Mid Continent V* that the quantity/population size is ignored if the square root of the average of variances is used instead of the pooled standard deviation. That is not correct, because the population size is used in the calculation of each mean and standard deviation and hence in the calculation of Cohen's *d*:

$$\sigma_1^2 = \frac{\sum_{i=1}^{N_1}(x_i - \mu_1)^2}{N_1},$$

and

$$\sigma_2^2 = \frac{\sum_{i=1}^{N_2}(x_i - \mu_2)^2}{N_2},$$

Both have their respective population size ($N_1$ is the population mean of the first group and $N_2$ is the population mean of the second group) in the denominator. The equations below show algebraically how they are reflected in the calculation of the Cohen's $d$ measure used by Commerce:

$$Cohen's\ d = \frac{\mu_1 - \mu_2}{\sqrt{\frac{\sigma_1^2 + \sigma_2^2}{2}}} = \frac{\frac{\sum_{i=1}^{N_1} x_i}{N_1} - \frac{\sum_{i=1}^{N_2} x_i}{N_2}}{\sqrt{\frac{\frac{\sum_{i=1}^{N_1}(x_i - \mu_1)^2}{N_1} + \frac{\sum_{i=1}^{N_2}(x_i - \mu_2)^2}{N_2}}{2}}}$$

$$= \frac{\frac{N_2 \sum_{i=1}^{N_1} x_i - N_1 \sum_{i=1}^{N_2} x_i}{N_1 N_2}}{\sqrt{\frac{N_2 \sum_{i=1}^{N_1}(x_i - \mu_1)^2 + N_1 \sum_{i=1}^{N_2}(x_i - \mu_2)^2}{2 N_1 N_2}}}$$

$$= \frac{\sqrt{\frac{N_2 \sum_{i=1}^{N_1} x_i - N_1 \sum_{i=1}^{N_2} x_i}{N_1 N_2}} * \sqrt{\frac{N_2 \sum_{i=1}^{N_1} x_i - N_1 \sum_{i=1}^{N_2} x_i}{N_1 N_2}}}{\sqrt{\frac{N_2 \sum_{i=1}^{N_1}(x_i - \mu_1)^2 + N_1 \sum_{i=1}^{N_2}(x_i - \mu_2)^2}{2 N_1 N_2}}}$$

$$= \frac{\frac{\sqrt{N_2 \sum_{i=1}^{N_1} x_i - N_1 \sum_{i=1}^{N_2} x_i}}{\sqrt{N_1 N_2}} * \frac{\sqrt{N_2 \sum_{i=1}^{N_1} x_i - N_1 \sum_{i=1}^{N_2} x_i}}{\sqrt{N_1 N_2}}}{\frac{\sqrt{N_2 \sum_{i=1}^{N_1}(x_i - \mu_1)^2 + N_1 \sum_{i=1}^{N_2}(x_i - \mu_2)^2}}{\sqrt{2} * \sqrt{N_1 N_2}}}$$

$$= \frac{\frac{N_2 \sum_{i=1}^{N_1} x_i - N_1 \sum_{i=1}^{N_2} x_i}{\sqrt{N_1 N_2}}}{\frac{\sqrt{N_2 \sum_{i=1}^{N_1}(x_i - \mu_1)^2 + N_1 \sum_{i=1}^{N_2}(x_i - \mu_2)^2}}{\sqrt{2}}}$$

$$= \frac{\sqrt{2} * (N_2 \sum_{i=1}^{N_1} x_i - N_1 \sum_{i=1}^{N_2} x_i)}{\sqrt{N_1 N_2} * \sqrt{N_2 \sum_{i=1}^{N_1}(x_i - \mu_1)^2 + N_1 \sum_{i=1}^{N_2}(x_i - \mu_2)^2}}$$

As it can be seen from the final equation, the population sizes are considered and used in the calculation of the Cohen's *d* measure used by Commerce, and by using this version, instead of the pooled version, the population size information is not lost.

E. **Consideration of an Alternative Effect Size Threshold**

Mid Continent suggested that if this court or the Federal Circuit were to mandate changes to discretionary choices made, as a matter of policy, in Commerce's carefully balanced differential pricing methodology – such as the use a simple average when calculating the denominator of the Cohen's *d* analysis – Commerce should consider adopting the 0.5 ("medium") effect size threshold in its differential pricing methodology rather than the "large" effect size threshold of 0.8 that it currently uses.  Indeed, in another recent remand redetermination Commerce itself observed that it reasonably could choose the 0.5 threshold: "Commerce could have also used the medium 0.5 threshold as it 'is conceived as one large enough to be visible to the naked eye.'"[9]  While the effect size threshold values are somewhat arbitrary and should not be interpreted rigidly, benchmarks are nonetheless necessary because each finding is novel given the circumstances underlying it.  Given that a respondent company is in control of its pricing behavior, the impact of any potential manipulation could be further curtailed by using a lower effect size threshold.

---

[9] *See Marmen Inc., et al., v. United States*, Court No. 20-00169 Slip Op. 21-148 (CIT Oct. 22, 2021), Final Results of Redetermination Pursuant to Court Remand (May 26, 2022), *citing Cohen* at 26.

      **F.**     **Commerce Correctly Rejected the Untimely New Factual Information that Taiwan Respondents Attempted to Place on the Record**

In a clear abuse of the administrative process that would have prejudiced not only Mid Continent, but also Commerce itself, during the remand proceeding below the Taiwan Respondents attempted to make a last-minute dump of extensive and untimely new factual information ("NFI") included with their comments on Commerce's *Draft Remand Results*. Commerce correctly rejected the NFI pursuant to 19 C.F.R. § 351.302(d)(1)(i). During the remand proceeding Commerce did not reopen the record. As such, there was no opportunity to submit any new factual information.[10] As Mid Continent argued, and Commerce agreed, none of the materials comprising the NFI had previously been present before Commerce on the record of the proceeding. Commerce did not place new information on the record at all, but rather, in accordance with the Federal Circuit's decision, relied on existing record evidence (including academic literature *already on the record*) to demonstrate that its use of a simple average in the denominator of the calculation of the Cohen's *d* measure is both supported by academic literature and reasonable given the statutory goal the agency is charged with achieving. The current situation stands in contrast to the prior round of litigation where Commerce reopened the record and allowed parties to submit NFI to further develop the record. All in all, Commerce's rejection of the untimely NFI was wholly consistent its practice and past judicial precedent.

### III.   CONCLUSION

    For the reasons discussed above, Mid Continent fully supports Commerce's determination that its use of a simple average (*i.e.*, the root mean square) in the denominator of the Cohen's *d* calculation is supported by the academic literature and is reasonable. Commerce

---

[10] *PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 760-61 (Fed. Cir. 2012); *Apex Frozen Foods Private Ltd. v. United States*, 144 F. Supp. 3d 1308 (Ct. Int'l Trade 2016)

also properly found that the use of the standard deviation of the entire population would not be appropriate, and correctly rejected untimely NFI that Taiwan Respondents tried to place on the record. With respect to considering an alternative effect size threshold, Commerce did not take a position because doing so was unnecessary at this time. Nonetheless, it should preserve the administrative flexibility to do so as a discretionary policy choice it is entitled to make as the administering authority. Commerce has provided adequate explanations for why its determination is in accordance with law and supported by substantial evidence, and its *Final Remand Results* should be affirmed.

                                                          Respectfully submitted,

                                                          */s/ Adam H. Gordon*
                                                          Adam H. Gordon
                                                          Jennifer M. Smith
                                                          Lauren Fraid
                                                          **THE BRISTOL GROUP PLLC**
                                                          1707 L Street, NW
                                                          Suite 570
                                                          Washington, DC 20036

                                                          *Counsel to Mid Continent Steel & Wire, Inc.*

Dated: February 13, 2023

**CERTIFICATE OF COMPLIANCE**

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that these comments comply with the word limitation requirement. The word count for Plaintiff Mid Continent Steel & Wire, Inc.'s Comments in Support of Final Remand Results, as computed by The Bristol Group PLLC's word processing system Microsoft Word for Microsoft 365, is 4,721 words, below the 10,000-word limit pursuant to Standard Chambers Procedures 2(B)(1)(b).

/s/ Adam H. Gordon
Adam H. Gordon
**THE BRISTOL GROUP PLLC**
*Counsel to Mid Continent Steel & Wire, Inc.*

Dated: February 13, 2023

## **CERTIFICATE OF SERVICE**

     I hereby certify that on the 13th day of February, 2023, I electronically filed a copy of the forgoing using the CM/ECF system, which sent a notification of such filing to counsel of record for all parties.

                                            */s/ Adam H. Gordon*
                                            Adam H. Gordon