## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

|  |  |  |
|---|---|---|
| MID CONTINENT STEEL & WIRE, INC., | ) | |
| | ) | |
| Plaintiff/Consolidated Defendant-Intervenor, | ) ) | |
| | ) | |
| v. | ) | Consol. Court No. 15-00213 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| PT ENTERPRISE INC., et al., | ) | |
| | ) | |
| Defendant-Intervenors/ Consolidated Plaintiffs. | ) ) | |

## DEFENDANT'S RESPONSE TO COMMENTS ON REMAND REDETERMINATION

<div style="margin-left:40%">

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

</div>

OF COUNSEL:

VANIA WANG
Attorney
U.S. Department of Commerce
Office of the Chief Counsel for
Trade Enforcement & Compliance
Washington, DC 20230

February 13, 2023

<div style="margin-left:40%">

MIKKI COTTET
Senior Trial Counsel
U.S. Department of Justice
Civil Division, Commercial Litigation Branch
Classification Unit, 8th Floor
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 307-0962
Facsimile: (202) 514-7965

Attorneys for Defendant, United States

</div>

## <u>TABLE OF CONTENTS</u>

BACKGROUND ......................................................................................................2

SUMMARY OF THE ARGUMENT ........................................................................6

ARGUMENT ...........................................................................................................8

I.      Standard Of Review ....................................................................................8

II.     Commerce's Remand Redetermination Is Reasonable And Supported By Substantial Evidence ..................................................................................................9

        A.      The Cohen's d Test Is Used In The First Stage Of Commerce's Differential Pricing Analysis .................................................................................11

        B.      Commerce Explained How The Academic Literature Supports The Use Of A Simple Average In The Context Of Using The Full Populations Of The Groups ...........................................................................................13

        C.      Taiwan Respondents' Arguments Should Be Rejected .........................15

                1.      Taiwan Respondents' New Arguments Should Be Rejected Because They Failed To Exhaust Their Administrative Remedies.........................15

                2.      Taiwan Respondents' Argument That There Is No Difference Between Populations And Samples Is Unsupported And Lacks Merit ...................23

                3.      Taiwan Respondents' Argument That Commerce Has Not Explained Why Simple Averaging Is A Reasonable Methodology Based On The Academic Literature Lacks Merit ............................................................26

                4.      Taiwan Respondents' Visual Examples Do Not Demonstrate That Simple Averaging Leads To Unreasonable Results And Weight Averaging Leads To Reasonable Results ..................................................27

                5.      Commerce's Rejection Of New Factual Information Contained In Taiwan Respondents' Draft Remand Comments Was In Accordance With Law ...................................................................................................29

CONCLUSION.......................................................................................................31

## **TABLE OF AUTHORITIES**

**Cases**                                                                                         **Page(s)**

*Alloy Piping Prod., Inc. v. United States,*
    32 CIT 249 (2008) ................................................................................................. 9

*Apex Frozen Foods Private Ltd. v. United States,*
    144 F. Supp. 3d 1308 (Ct. Int'l Trade 2016) ................................................... 30

*Apex Frozen Foods Private Ltd. v. United States,*
    862 F.3d 1337 (Fed. Cir. 2017) ......................................................................... 9

*Bethlehem Steel Corp. v. United States,*
    223 F. Supp. 2d 1372 (Ct. Int'l Trade 2002) .................................................... 8

*Boomerang Tube LLC v. United States,*
    856 F.3d 908 (Fed. Cir. 2017) ......................................................................... 16

*Corus Staal BV v. United States,*
    502 F.3d 1370 (Fed. Cir. 2007) ................................................................. 16, 17

*Essar Steel Ltd. v. United States,*
    678 F.3d 1268 (Fed. Cir. 2012) ....................................................................... 29

*Fujitsu General Ltd. v. United States,*
    88 F.3d 1034 (Fed. Cir. 1996) ........................................................................... 8

*Good Samaritan Hosp. v. Shalala,*
    508 U.S. 402 (1993) ........................................................................................... 9

*INS v. Cardoza–Fonseca,*
    480 U.S. 421 (1987) ........................................................................................... 9

*Itochu Bldg. Prods. v. United States,*
    733 F.3d 1140 (Fed. Cir. 2013) ....................................................................... 17

*JBF RAK LLC v. United States,*
    790 F.3d 1358 (Fed. Cir. 2015) ..................................................................... 8, 9

*Luoyang Bearing Factory v. United States,*
    240 F. Supp. 2d 1268 (Ct. Int'l Trade 2002) .................................................. 17

*McCarthy v. Madigan,*
    503 U.S. 140 (1992) ......................................................................................... 16

*Mid Continent Steel & Wire, Inc. v. United States*,
219 F. Supp. 3d 1326 (Ct. Int'l Trade 2017)...................................................... 3

*Mid Continent Steel & Wire, Inc. v. United States*,
273 F. Supp. 3d 1161 (Ct. Int'l Trade 2017)...................................................... 3

*Mid Continent Steel & Wire, Inc. v. United States*,
940 F.3d 662 (Fed. Cir 2019).......................................................................... 4, 8

*Mid Continent Steel & Wire, Inc. v. United States*,
495 F. Supp. 3d 1298 (Ct. Int'l Trade 2021) ................................................... 1, 4

*Mid Continent Steel & Wire, Inc. v. United States*,
31 F.4th 1367 (Fed. Cir. 2022)................................................................... passim

*Mittal Steel Point Lisas Ltd. v. United States*,
548 F.3d 1375 (Fed. Cir. 2008)......................................................................... 16

*Navigator Co., S.A. v. United States*,
463 F. Supp. 3d 1302 (Ct. Int'l Trade 2020)..................................................... 16

*Ningbo Dafa Chem. Fiber Co. v. United States*,
580 F.3d 1247 (Fed. Cir. 2009).......................................................................... 9

*NLRB v. Iron Workers*,
434 U.S. 335 (1978).......................................................................................... 9

*PSC VSMPO-Avisma Corp. v. United States*,
688 F.3d 751 (Fed. Cir. 2012).......................................................................... 30

*Stupp Corp. v. United States*,
5 F.4th 1341 (Fed. Cir. 2021).......................................................................... 8, 9

*Tri Union Frozen Prod., Inc. v. United States*,
163 F. Supp. 3d 1255 (Ct. Int'l Trade 2016)..................................................... 31

*Tung Mung Dev. Co. v. United States*,
25 CIT 752 (2001)............................................................................................ 9

*U.S. Steel Grp. v. United States*,
96 F.3d 1352 (Fed. Cir. 1996)........................................................................... 8

*United States v. L.A. Tucker Truck Lines, Inc.*,
344 U.S. 33 (1952)......................................................................................... 16

**Statutes**

19 U.S.C. § 1516 .................................................................................................. 8, 29

19 U.S.C. § 1677 ............................................................................................. 9, 11, 25

28 U.S.C. § 2637 ................................................................................................... 15

**Regulations**

19 C.F.R. § 351.302 .............................................................................................. 30

19 C.F.R. § 351.309 .............................................................................................. 16

**Executive Determinations**

*Certain Steel Nails from Taiwan*,
   79 Fed. Reg. 78,053 (Dep't of Commerce Dec.  29, 2014) ....................................... 2

*Certain Steel Nails From Taiwan*,
   80 Fed. Reg. 28,959 (Dep't of Commerce May 20, 2015) ....................................... 2

*Certain Steel Nails From the Republic of Korea, Malaysia, the Sultanate of Oman, Taiwan,
and the Socialist Republic of Vietnam*,
   80 Fed. Reg. 39,994 (Dep't of Commerce July 13, 2015) ....................................... 3

*Definition of Factual Information and Time Limits for Submission of Factual Information*,
   78 Fed. Reg. 21,246 (Dep't of Commerce Apr. 10, 2013) ....................................... 30

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

_____

|  |  |  |
|---|---|---|
| MID CONTINENT STEEL & WIRE, INC., | ) | |
| | ) | |
| Plaintiff/Consolidated | ) | |
| Defendant-Intervenor, | ) | |
| | ) | |
| | ) | |
| v. | ) | Consol. Court No. 15-00213 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| PT ENTERPRISE INC., et al., | ) | |
| | ) | |
| Defendant-Intervenors/ | ) | |
| Consolidated Plaintiffs. | ) | |

_____

## DEFENDANT'S RESPONSE TO COMMENTS ON REMAND REDETERMINATION

Defendant, the United States, respectfully submits this response to the comments filed by consolidated plaintiffs, PT Enterprise Inc., Pro-Team Coil Nail Enterprise Inc. (collectively, PT), Unicatch Industrial Co., Ltd., WTA International Co., Ltd., Zon Mon Co., Ltd., Hor Liang Industrial Corp., President Industrial Inc., and Liang Chyuan Industrial Co., Ltd. (collectively Taiwan Respondents) (TR Cmts., ECF No. 188), on the final remand redetermination issued by the Department of Commerce (Commerce) pursuant to *Mid Continent v. United States*, 31 F.4th 1367 (Fed. Cir. 2022) (*Mid Continent V*), remanding the Court's judgment in 495 F. Supp. 3d 1298 (Ct. Int'l Trade 2021) (*Mid Continent IV*), and the Court's Order entered on June 14, 2022 (ECF No. 178) (Remand Order).  *See* Final Results of Redetermination Pursuant to Court Remand, ECF No. 186-1 (Remand Redetermination).

As we demonstrate below, the remand redetermination fully complies with the Court's remand order and the opinion of the Court of Appeals for the Federal Circuit in *Mid Continent V*, and it is reasonable, supported by substantial evidence, and otherwise in accordance with law. Accordingly, the Court should sustain Commerce's remand redetermination.

## BACKGROUND

In 2015, Commerce issued a final determination in the less-than-fair-value investigation covering certain steel nails from Taiwan, finding that certain steel nails from Taiwan were being sold at less than fair value in the United States. *See Certain Steel Nails From Taiwan*, 80 Fed. Reg. 28,959 (Dep't of Commerce May 20, 2015) (final determination of sales at less than fair value) (Final Determination), P.R. 296[1], and the accompanying Issues and Decision Memorandum (IDM), P.R. 300. As it had done in the preliminary determination, and in the accompanying preliminary decision memorandum, Commerce employed a differential pricing analysis in its final determination. *Id; Certain Steel Nails from Taiwan*, 79 Fed. Reg. 78,053 (Dep't of Commerce Dec. 29, 2014) (negative prelim. determination of sales at less than fair value) (Preliminary Determination), P.R. 224, and accompanying Preliminary Decision Memorandum (PDM), P.R. 225. However, while Commerce's determination that there existed a pattern of prices for comparable merchandise that differed significantly among purchasers, regions, or time periods remained unchanged in the final determination, unlike in the preliminary determination, Commerce determined that such differences could not be accounted for under the

---

[1] Public documents on the administrative record are designated as "P.R." and confidential documents are designated as "C.R." All P.R. and C.R. references in this brief cite to the antidumping duty record. References to the public documents on the administrative record for the second remand redetermination are designated as "P.R.R." and for the third remand redetermination are designated as "P.R.R.R."

average-to-average (A-to-A) comparison method.  IDM at 18-20; P.R. 267, PT Final Sales

Analysis Memorandum at 2.  Accordingly, based on the finding that 42.27 percent of PT's U.S.

sales were at prices that differed significantly in the United States market, *i.e.*, a pattern of prices

that differ significantly, Commerce applied the average-to-transaction (A-to-T) comparison

method to those of PT's U.S. sales that passed the Cohen's *d* test, and the A-to-A comparison

method to those of PT's U.S. sales that did not pass the Cohen's *d* test.  IDM at 18-20.  PT's

estimated weighted-average dumping margin in the final determination was 2.24 percent.[2]  Final

Determination at 5.

　　Following the affirmative injury determination by the U.S. International Trade

Commission (ITC), Commerce's and the ITC's final determinations resulted in an antidumping

duty order covering certain steel nails from Taiwan.  *Certain Steel Nails From the Republic of*

*Korea, Malaysia, the Sultanate of Oman, Taiwan, and the Socialist Republic of Vietnam*, 80 Fed.

Reg. 39,994 (Dep't of Commerce July 13, 2015) (antidumping duty order), P.R. 307.  Taiwan

Respondents appealed Commerce's determination, challenging three aspects of Commerce's

differential pricing analysis as contrary to law, including Commerce's use of a simple average to

calculate the denominator for the Cohen's *d* coefficient.  The Court sustained Commerce's final

determination in all respects.  *Mid Continent Steel & Wire, Inc. v. United States*, 219 F. Supp. 3d

1326, 1344 (Ct. Int'l Trade 2017) (*Mid Continent I*); *Mid Continent II*, 273 F. Supp. 3d 1161.

Taiwan Respondents appealed.  Then, although it had rejected most of Taiwan Respondents'

challenges on appeal, the Federal Circuit vacated the Court's judgment upholding Commerce's

---

[2]  In its first remand redetermination, Commerce revised PT's general and administrative (G&A) expense ratio, which reduced PT's rate to 2.16 percent; however, the results of the differential pricing analysis remained unchanged.  *See Mid Continent Steel & Wire, Inc. v. United States*, 273 F. Supp. 3d 1161 (Ct. Int'l Trade 2017) (*Mid Continent II*).

determination to use a simple average in calculating the denominator of the Cohen's *d* coefficient and remanded to secure further explanation from Commerce about that one issue.  *Mid Continent Steel & Wire, Inc. v. United States*, 940 F.3d 662 (Fed. Cir 2019) (*Mid Continent III*).  The Court remanded the action to Commerce for further proceedings in conformity with the Federal Circuit's opinion in *Mid Continent III*.

On March 3, 2020, Commerce issued a draft remand redetermination wherein it further explained the use of a simple average.  *See* Draft Remand Redetermination, C.R.R. 1-2, P.R.R. 3-5.  Commerce also reopened the record for new factual information, and it included sections of academic literature from Cohen, Coe, and Ellis on the record.  *See* Draft Second Remand Redetermination at Appx I, Paul D. Ellis, *The Essential Guide to Effect Sizes* (2010) (Ellis), P.R.R. 1, C.R.R. 1; Draft Second Remand Redetermination at Appx II, Jacob Cohen, *Statistical Power Analysis for the Behavioral Sciences* (2d ed. 1988) (Cohen), P.R.R. 2, C.R.R. 2; Draft Second Remand Redetermination at Appx III, Robert Coe, *It's The Effect Size, Stupid: What Effect Size Is And Why It Is Important*, Paper presented at the Annual Conf. of British Educational Research Ass'n (Sept. 2002) (Coe), P.R.R. 2, C.R.R. 2.  Taiwan Respondents and Mid Continent Steel & Wire, Inc. (Mid Continent) submitted factual information.  *See* Taiwan Respondents Second Draft Remand Comments, P.R.R. 9, C.R.R. 3; Mid Continent Rebuttal Factual Information, P.R.R. 16.  After consideration of the comments, arguments and evidence on the draft remand redetermination presented to it by the parties, on June 16, 2020, Commerce released the second remand redetermination, wherein it explained the bases for its continued use of a simple average to calculate the denominator of the Cohen's *d* coefficient.

On January 8, 2021, the Court sustained Commerce's second remand redetermination. *Mid Continent IV*, 495 F. Supp. 3d 1298.  However, on April 21, 2022, the Federal Circuit

vacated the Court's decision and ordered a remand to Commerce, holding that "Commerce has not adequately justified its adoption of simple averaging for calculating the Cohen's *d* denominator." *Mid Continent V*, 31 F.4th at 1370, 1377.

The Federal Circuit's opinion was based on several holdings. The Federal Circuit stated that the academic literature governing the Cohen's *d* test uniformly taught use of the "pooled standard deviation" estimate involved weighted averaging, and the academic literature did not apply simple averaging to pooled standard deviation estimates for different-size groups. *Id*. at 1370, 1377-78. In the Federal Circuit's view, by adopting simple averaging for the Cohen's *d* denominator of the Cohen's d coefficient, Commerce had departed from the methodology described in the academic literature. *Id*. at 1378. The Federal Circuit held that Commerce's reasons for the departure, that the pricing behavior of each group was equally genuine and equally rational, had no connection to the purpose of the denominator to provide a dispersion figure for the more general pool that served as yardstick for deciding on the significance of difference in mean prices of two groups. *Id*. Further, according to the Federal Circuit, the formula that Commerce uses, *i.e.*, Cohen equation 2.3.2, applies to groups that are the same size, but which have different standard deviations. *Id*. at 1372. However, Commerce used the formula without group-size weighting even when, unlike the situation described in the Cohen section from which Commerce's formula is borrowed, the groups are of different sizes. *Id*. at 1372, 1378. Finally, the Federal Circuit asserted that nothing in the Cohen's section from which Commerce's formula is borrowed applies simple averaging to pool standard deviation estimates for different-size groups. *Id*. Based on these conclusions, the Federal Circuit ordered Commerce to "either provide an adequate explanation for its choice of simple averaging or make a different choice, such as use of weighted averaging or use of the standard deviation for the entire

population." *Id.* at 1381.  The Court remanded the action to Commerce for further proceedings in conformity with the Federal Circuit's opinion.

On September 13, 2022, Commerce issued a draft third remand redetermination in which it reevaluated the academic literature and explained how the academic literature supports the use of a simple average in its Cohen's *d* test.  *See* Draft Remand Redetermination, P.R.R.R. 1. Commerce invited comments from interested parties, but it did not reopen the record for new factual information.  On September 30, 2022, Taiwan Respondents and Mid Continent submitted comments.  *See* Taiwan Respondents Second Revised Draft Remand Comments, P.R.R.R. 25-26; Mid Continent Draft Remand Comments, P.R.R.R. 11.  However, because Taiwan Respondents' draft remand comments contained new factual information, Commerce rejected their comments and requested that they resubmit their draft remand comments without the new factual information.  *See* Taiwan Respondents Second Revised Draft Remand Comments, P.R.R.R. 25-26; Rejection Letter, P.R.R.R. 15; Reconsideration Letter, P.R.R.R. 24.

After consideration of the comments on the draft remand redetermination, on November 10, 2022, Commerce issued the third remand redetermination, wherein it explained how the academic literature on the record of this proceeding supports the use of a simple average to calculate the denominator of the Cohen's *d* test, Remand Redetermination at 8-16, clarified misconceptions regarding the academic literature and terminology used therein, *id.* at 16-22, and addressed the parties' comments to the draft remand redetermination.  *Id.* at 34-60.

<u>SUMMARY OF THE ARGUMENT</u>

The Court should sustain the third remand redetermination because Commerce complied with the remand order in all respects, and its determination is reasonable, supported by substantial evidence, and otherwise in accordance with law.

6

In accordance with the Federal Circuit's opinion in *Mid Continent V*, Commerce further explained its determination to use a simple average to calculate the denominator of the Cohen's *d* coefficient. Upon reevaluation of the academic literature, Commerce determined that the literature supports the use of a simple average to calculate the denominator of the Cohen's *d* coefficient when the full populations of the groups are used, that is - where the actual values of the standard deviations of the test and comparison groups are known and used to calculate the denominator of the Cohen's *d* coefficient. Commerce further explained how use of a weighted average as pressed by the Taiwan Respondents and the use of a single standard deviation of all sale prices in both the test and comparison groups as the denominator of the Cohen's *d* coefficient as suggested by Federal Circuit were not supported by the academic literature.

Taiwan Respondents' arguments challenging Commerce's remand redetermination lack merit. First, Taiwan Respondents' argument that Commerce's use of a simple average is not reasonable because the academic literature does not support use of a simple average is unavailing. Commerce's remand redetermination demonstrates that its use of a simple average is reasonable and that it is supported by academic literature. Second, Taiwan Respondents' argument that the academic literature supports reliance on a weighted average methodology is unavailing. As explained in the remand redetermination, according to the academic literature, the use of a weighted average is one approach that may be used with samples to estimate the denominator of the Cohen's *d* coefficient when the actual values of the standard deviations are not known. Third, Commerce's rejection of portions of Taiwan Respondents' comments on the draft remand redetermination for constituting new factual information was consistent with Commerce's regulations and consistent with law.

Finally, once again, Taiwan Respondents make arguments to the Court that were not raised during the remand proceeding. The arguments that were not presented to Commerce during the remand proceeding should be rejected for failure to exhaust administrative remedies.

Accordingly, Commerce's remand redetermination should be sustained.

<div align="center">ARGUMENT</div>

I.    Standard Of Review

"The same standard of review applies to the review of a remand determination as to the review of the original determination." *Bethlehem Steel Corp. v. United States*, 223 F. Supp. 2d 1372, 1375 (Ct. Int'l Trade 2002). Accordingly, the "court will sustain {Commerce's} determination upon remand if it complies with the court's remand order, is supported by substantial evidence on the record, and is otherwise in accordance with law." *Id.* (citing 19 U.S.C. § 1516a(b)(1)(B)(i)).

The Court affords Commerce a great deal of deference when "a statute fails to make clear 'any Congressionally mandated procedure or methodology for assessment of the statutory tests.'" *JBF RAK LLC v. United States*, 790 F.3d 1358, 1363 (Fed. Cir. 2015) (quoting *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1362 (Fed. Cir. 1996)). In the absence of any Congressionally mandated procedure or methodology, "Commerce 'may perform its duties in the way it believes most suitable.'" *Id.*; *see also Fujitsu General Ltd. v. United States,* 88 F.3d 1034, 1039 (Fed. Cir. 1996) (requiring "tremendous deference" that is "both greater than and distinct from that accorded the agency in interpreting the statutes it administers" when Commerce exercises its technical expertise to select and apply methodologies to implement dictates of the trade statute).

Finally, "Commerce has discretion to make reasonable choices within statutory constraints." *Mid Continent III*, 940 F.3d at 667; *Stupp Corp. v. United States*, 5 F.4th 1341,

<div align="center">8</div>

1353, 1354 (Fed. Cir. 2021). "Commerce's 'special expertise in administering antidumping duty law' is one recognized basis for the 'significant deference' embodied in the reasonableness standard." *Mid Continent V*, 31 F. 4th at 1376 (quoting *Ningbo Dafa Chem. Fiber Co. v. United States*, 580 F.3d 1247, 1256 (Fed. Cir. 2009)) (citation omitted). The reasonableness standard applies to Commerce's selection of statistical tests and numerical cutoffs. *See Stupp*, 5 F.4th at 1353 (Fed. Cir. 2021) ("Our precedents make clear that the relevant standard for reviewing Commerce's selection of statistical tests and numerical cutoffs is reasonableness, not substantial evidence") (citations omitted); *Apex Frozen Foods Private Ltd. v. United States*, 862 F.3d 1337, 1346 (Fed. Cir. 2017) (holding Commerce's "meaningful difference" test to be "reasonable"); *JBF*, 790 F.3d at 1363, 1367 (holding that Commerce's interpretation of 19 U.S.C. § 1677f-1(d)(1)(B)(i) was reasonable, and "{b}ecause Congress did not provide for a direct methodology, Commerce properly 'fill{ed} th{at} gap'").[3]

II.   **Commerce's Remand Redetermination Is Reasonable And Supported By Substantial Evidence**

In its third remand redetermination, Commerce complied with *Mid Continent V* by providing further explanation for its adoption of simple averaging for the denominator of the

---

[3] Taiwan Respondents argue that the Court should accord limited, if any, deference to Commerce's analysis because "Commerce adopted a new rationale" in support of the use of a simple average. TR Cmts. at 4. Taiwan Respondents refer to several cases to support their limited deference argument. *Id.* at 4-5 n.4 (citing *INS v. Cardoza–Fonseca,* 480 U.S. 421, 446 n.30 (1987); *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 417 (1993); *Alloy Piping Prod., Inc. v. United States*, 32 CIT 249, 253 (2008); *Tung Mung Dev. Co. v. United States*, 25 CIT 752 (2001)). Even assuming Commerce's position had changed, which it has not, an "administrative agency is not disqualified from changing its mind; and when it does, the courts still sit in review of the administrative decision[.]" *Good Samaritan Hosp.*, 508 U.S. at 417 (quoting *NLRB v. Iron Workers*, 434 U.S. 335, 351 (1978)). Here, Commerce provided an explanation for its remand redetermination that properly focusses on the academic literature in a manner consistent with *Mid Continent V. See* Remand Redetermination at 6-7, 36. Moreover, as stated above, the relevant standard for reviewing Commerce's calculation methodologies is reasonableness, and this standard of review is the same as that applicable to the Commerce's original determination. Commerce is entitled to significant deference under this standard of review.

Cohen's *d* coefficient.  First, Commerce addressed the Federal Circuit's holding that Commerce had departed from academic literature in relying on a simple average.  Upon reevaluation of the academic literature on the record of this remand proceeding, Commerce determined that the literature supports using a simple average to calculate the denominator of the Cohen's *d* coefficient when sampling is not used, the standard deviations of the full populations are known, and the standards deviations of both populations are not equal.  Remand Redetermination at 8-14.  Second, Commerce explains that it calculates the denominator of the effect size using Dr. Cohen's equation 2.3.2, where the standard deviations of the test group and comparison group are known and not equal.  *Id*. at 14.  The Federal Circuit described equation 2.3.2 as being "designed to be applied when the two groups, though of the same size, have different standard deviations."  *Mid Continent V*, 31 F.4th at 1372 (referring to Cohen at 44).  After reevaluating the academic literature, however, Commerce determined that the sizes of the groups do not limit the use of a simple average when the full population is known and not equal.  Remand Redetermination at 14-16.  Third, Commerce addressed the use of Taiwan Respondents' proposed weighted average calculation and determined that Taiwan Respondents' citations to the academic literature do not support the use of their alternative calculation using a weighted average.  *Id*. at 16-17.  Fourth, in *Mid Continent V*, 31 F.4th at 1372, the Federal Circuit suggested that Commerce may opt on remand to use "the standard deviation for the entire population" in the denominator of the Cohen's *d* coefficient in lieu of a simple average and, after reevaluating the academic literature, Commerce determined that use of a single standard deviation is not contemplated by the academic literature.  Remand Redetermination at 17-23.

Finally, in response to the draft remand comments, Commerce explained why (1) Taiwan Respondents' examples lacked persuasiveness, (2) a weighted average is not more accurate than

a simple average for the calculation of the denominator of the Cohen's *d* coefficient, and (3) the academic literature does not describe all possible applications of the concepts espoused in them, and they do not prohibit the adaptation or application of the concepts in situations not originally contemplated by the authors. *Id*. at 36-46. Commerce further explained that samples and full populations are treated differently in the academic literature and that group size does not prohibit Commerce's use of a simple average for the denominator of the Cohen's *d* test because practical significance and statistical significance are not the same. *Id*. at 47-51.

Thus, as discussed more fully below, Commerce's use of a simple average to calculate the denominator of the Cohen's *d* coefficient is reasonable.

A.     The Cohen's *d* Test Is Used In The First Stage Of Commerce's Differential Pricing Analysis

In the final determination, Commerce applied a differential pricing analysis to determine whether it could use an alternative comparison method to calculate each respondent's estimated weighted-average dumping margin pursuant to 19 U.S.C. § 1677f-1(d)(1)(B). Section 1677f-1(d)(1)(B) provides that Commerce may resort to a comparison method based on average-to-transaction comparisons (wherein Commerce compares weighted-average normal values with the export prices or constructed export prices of individual sales) when two requirements have been met: (1) there exists a pattern of prices that differ significantly for comparable merchandise among purchasers, regions, or time periods; and (2) one of the standard comparison methods under section 1677f-1(d)(1)(A) cannot account for such differences. The first of these requirements is referred to as the "pattern" requirement, and the second is referred to as the "meaningful difference" requirement. To examine these two requirements, Commerce utilizes the differential pricing analysis. *See* Remand Redetermination at 5.

In its examination of the pattern requirement, Commerce first performs a "Cohen's *d* test" and then uses the ratio test.[4]  Together, these steps allow Commerce to determine whether U.S. sales prices differ *significantly* among purchasers, regions, or periods of time (*i.e.*, by measuring the extent of the difference between the mean net prices of the test group and the comparison group relative to the standard deviation of the prices in each of these two groups).

The Cohen's *d* test examines whether the U.S. sales prices to a given purchaser, region, or time period differ *significantly* from the sales prices of comparable merchandise to other purchasers, regions, or time periods.  *Id*.  Commerce's Cohen's *d* test is based on a measure of effect size, the concept of which was expounded by Dr. Jacob Cohen in his textbook on statistical power analysis, and which is the measure of the practical significance of the difference in two means.  *Id*. at 6; *see also* Coe at 5 ("Effect size quantifies the size of the difference between two groups, and may therefore be said to be a true measure of the significance of the difference.").  The effect size, the "Cohen's *d* coefficient," is the ratio of the difference in the means of two groups, divided by the "standard deviation," *i.e.*, the variance in the underlying data.  *Id*.  The Cohen's *d* coefficient is used to evaluate the extent to which the weighted-average net prices (*i.e.*, the mean of the net prices) to a particular purchaser, region, or time period (*i.e.*, the test group) differ from the weighted-average net prices of all other sales of comparable merchandise (*i.e.*, the comparison group).  PDM at 11.  The Cohen's *d* coefficient is calculated as a ratio, where the numerator is the difference in the means of the net prices and the denominator is the "standard deviation."  *Id*.; *see also* Cohen at 20.  Commerce calculates the

---

[4]  The ratio test, which is not at issue in this litigation, is used to assess the extent of the significant price differences for all sales as measured by the Cohen's *d* test and whether there exists a pattern of prices that differ significantly.  *Id*.

denominator of the effect size as a "simple average"[5] of the standard deviations of the test group

and comparison group.  Remand Redetermination at 6; *see also* Cohen at 43-44.

      B.      Commerce Explained How The Academic Literature Supports The Use Of A
              <u>Simple Average In The Context Of Using The Full Populations Of The Groups</u>

As discussed above, the Federal Circuit's opinion is predicated on a conclusion that

Commerce had departed from academic literature when using a simple average in the Cohen's *d*

denominator.  After reexamining the academic literature on the record of the remand proceeding,

Commerce explained how that literature supports the use of a simple average when sampling is

not used, the standard deviations of full populations of both the test and comparison groups are

known, and the standard deviations of both populations are not equal.  Remand Redetermination

at 8.  Commerce identified the portions of the academic literature that state that when the

standard deviations of the populations are known and not equal, the denominator of the Cohen's

*d* test may be a simple average, or a root square mean of the standard deviations (Cohen at 44,

equation 2.3.2).  *Id*. at 8-14.  Commerce also addressed the Federal Circuit's description of Dr.

Cohen's formula set forth in equation 2.3.2 as "designed to be applied when the two groups,

though of the same size, have different standard deviations."  *Mid Continent V*, 31 F. 4th at 1372

(referencing Cohen at 44 (equation 2.3.2).  Commerce found that the unequal sample size

limitation does not prevent the use of equation 2.3.2 to formulate the denominator of the effect

size when the standard deviations of the test group and the comparison group are known and not

equal.  *Id*. at 14-16.  In this regard, Commerce explained that "Dr. Cohen's first equations for

quantifying the *d* coefficient have as the denominator 'the standard deviation of either population

(since they are assumed equal).' {}"  *Id*. at 49 (footnote omitted) (quoting Cohen at 20, equations

---

    [5]  This "simple average" is really the square root of the simple average of the variances of
the test group and the comparison group.  *Id*. at n.22.

2.2.1 and 2.2.2).  Commerce concluded that "Dr. Cohen defines the denominator of the *d* coefficient as the standard deviation of either population, not of both populations, assuming that the standard deviation of one population is the same as the standard deviation of the other population."  *Id.*  Furthermore, "{t}he 'group size' of either of the populations is not a factor when using the standard deviation of either of these populations; Dr. Cohen's only stipulation for equations 2.2.1 and 2.2.2 is that 'they are assumed equal.'"  *Id.*  Finally, Commerce explained that "{i}f the standard deviations of the two populations are not equal, then Dr. Cohen prescribes the 'root mean square of $\sigma_A$ and $\sigma_B$,'{} also with no reference to the 'group size' of either of the populations."  *Id.* (footnote omitted) (citing Cohen at 44, equation 2.3.2, and Cohen at 27).

Commerce also clarified that it does not use the "pooled standard deviation" to calculate the denominator of the Cohen's *d* test, rather it uses the root square mean equation or simple average set forth in Cohen's equation 2.3.2.  *Id*. at 12.  Commerce explained that "pooled standard deviation" is used to estimate the denominator of effect size based on ***sampled*** data, *i.e.*, when the complete populations of data are unknown.  *Id.* at 13-14.  Commerce concluded that the academic literatures' discussions of "pooled standard deviation" are not applicable to Commerce's use of the Cohen's *d* test, which is based on the full populations for the test and comparison groups.  *Id.*

Finally, Commerce found no evidence in the academic literature that would support the use of the standard deviation for the entire population, which the Federal Circuit proposed as an alternative available to Commerce for use as the denominator in the Cohen's *d* coefficient.  *Id*. at 17-22.  Upon reexamining the academic literature, Commerce found that Dr. Cohen did not refer to a single standard deviation for a combined group of data from the test and comparison groups, but rather always distinguished between the two populations whose differences were being

14

examined.  *Id.* at 19.  Further, Commerce found that Professor Coe warned that a single standard deviation of the combined data would introduce distortions because the "yardstick" by which the difference in the means is measured would include not only the variances in the data within the two groups, but also would include the difference between the two groups.  *Id.* at 20-22.  Thus, the academic literature on the record of the remand proceeding does not support this alternative approach.

Commerce has explained why using a simple average for the standard deviation is reasonable based on the academic literature, and Commerce's determination should be sustained.

C.  <u>Taiwan Respondents' Arguments Should Be Rejected</u>

Taiwan Respondents press several arguments in an effort to demonstrate that Commerce should not use a simple average and should use a weighted average.  However, each of their arguments should be rejected.

1.  Taiwan Respondents' New Arguments Should Be Rejected Because They Failed To Exhaust Their Administrative Remedies

Taiwan Respondents contend that the academic literature does not support simple averaging when the standard deviation of each population is known and are unequal.  TR Cmts. at 8.  In support of that contention, they argue that because Section 2.3.3 of Dr. Cohen's text refers to normal populations and equal sample sizes, equation 2.3.2 must also require the same conditions.  *Id*. at 8-9.  Similarly, they argue that equation 2.3.2 implicitly assumes sampling because of the power tables in Section 2.3.  *Id*. at 9.  However, Taiwan Respondents failed to make these arguments during the remand proceeding.  Therefore, these new arguments should be rejected because Taiwan Respondents failed to exhaust their administrative remedies.

Congress has directed that "the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies."  28 U.S.C. § 2637(d).  Section 2637(d)

"indicates a congressional intent that, absent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies." *Boomerang Tube LLC v. United States*, 856 F.3d 908, 912 (Fed. Cir. 2017) (citing *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007)). Commerce's regulations also expressly require that a party raise all arguments in a timely manner before the agency. *See* 19 C.F.R. § 351.309(c)(2) ("The case brief must present all arguments that continue in the submitter's view to be relevant to the Secretary's final determination or final results, including any arguments presented before the date of publication of the preliminary determination or preliminary results."). "The exhaustion requirement in this context is therefore not simply a creature of court decision, as is sometimes the case, but is a requirement explicitly imposed by the agency as a prerequisite to judicial review." *Corus Staal*, 502 F.3d at 1379 (citing 19 C.F.R. § 351.309(c)(2)). Also, "general policies underlying the exhaustion requirement – 'protecting administrative agency authority and promoting judicial efficiency'" – would be vitiated if the Court were to consider arguments raised for the first time in judicial proceedings. *See id.* (quoting *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992)). "Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against *objection made at the time appropriate under its practice*." *Id.* at 1383–84 (emphasis added) (quoting *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952)). The exhaustion doctrine applies to remand proceedings. *See Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1383–84 (Fed. Cir. 2008); *Navigator Co., S.A. v. United States*, 463 F. Supp. 3d 1302 (Ct. Int'l Trade 2020). And, the Court should "generally take{} a 'strict view' of the requirement that parties exhaust their administrative remedies before {Commerce} in trade

16

cases." *Corus Staal*, 502 F.3d at 1379.  There are exceptions to the exhaustion requirement; however, none of the recognized exceptions apply here.  *See Itochu Bldg. Prods. v. United States*, 733 F.3d 1140, 1145–48 (Fed. Cir. 2013); *Luoyang Bearing Factory v. United States*, 240 F. Supp. 2d 1268, 1297 n.26 (Ct. Int'l Trade 2002).

In any event, Taiwan Respondents' new arguments lack merit.  Taiwan Respondents claim that Cohen equation 2.3.2, as part of section 2.3.3, specifically requires equal sample sizes and normal populations; and that after specifying the formula in equation 2.3.2, Dr. Cohen concludes the section by noting that if the standard deviations and the sample sizes are not equal, then "the values in Table 2 {sic} may be greatly in error."  TR Cmts. at 8-9 (quoting Cohen at 44).  However, these claims relate specifically to the *t* test and the power tables, neither of which are applicable to the calculation of effect size in Cohen section 2.3.3.  *See* Remand Redetermination at 15.

Indeed, Dr. Cohen states:

> For normal populations of unequal variance, the formula for *t* does not follow the tabled values for *t*, that is, this condition constitutes a "failure. of the assumptions" (or more properly conditions) under which *t* is generated.  However, there is ample evidence for the robustness of the *t* test despite moderate failure of this assumption provided that sample sizes are about equal.

Cohen at 43 (citations omitted).  The *t* test evaluates the statistical significance of an analysis based on ***sampled*** data (*i.e.*, the difference in the means and the acceptance or rejection of the null hypothesis), and not on an assessment of the practical significance of the difference in the means as measured by the effect size.  The *t* distribution, by which the statistical significance, *i.e.*, reliability of the results, is measured, is dependent on sample size, normality of the data and equal variances, but where moderate departures from these assumptions are negligible.  Remand Redetermination at 15 (citing Cohen at 6, 19 and 43).

Dr. Cohen further states the following regarding unequal standard deviations and different sample sizes:

> Note that if $\sigma_A \neq \sigma_B$ and it is also the case that $n_A \neq n_B$, the nominal values for $t$ and power at a given significance criterion, $a$, may differ greatly from the true values. Under these conditions ($\sigma_A \neq \sigma_B$ and $n_A \neq n_B$, simultaneously), the values in Tables 2.3 may be greatly in error.

Cohen at 44 (citations omitted).  Here, as Commerce noted, Dr. Cohen reiterates that the results of the $t$ test may "differ greatly" and adds that the power of the analysis, *i.e.*, as found in Table 2.3, "may be greatly in error." *Id.* (referencing Cohen at 27-39 ("2.3 Power Tables")).

Commerce found that this limitation on Dr. Cohen's analysis does not impact the calculation of effect size or the calculation of the denominator in equation 2.3.2.  *Id*. at 16.  This is so because, in the paragraph introducing equation 2.3.2, Dr. Cohen only states "It should be kept in mind that when $\sigma_A \neq \sigma_B$, the definition of d will be slightly modified," as provided in equation 2.3.2.  Cohen at 43-44.  Further,

> The unequal variability need not affect the conception of d developed in Section 2.2. Given that there is a difference between $\sigma_A$ and $\sigma_B$, we merely are using a kind of average within-population standard deviation to standardize the difference between means.

Cohen at 44.  Dr. Cohen does not include a requirement of normality or sample size because they are not relevant when the *d* coefficient is based on the full populations of data in the two groups. Remand Redetermination at 16.  Accordingly, Commerce determined that Cohen does not support the Taiwan Respondents' arguments that normality or equal sample size restrict the calculation of the Cohen's *d* coefficient based on equation 2.3.2.

Taiwan Respondents' arguments (1) that Cohen section 2.3.3 does not expressly or implicitly state that equation 2.3.2 applies solely to full populations or that simple averaging

should be used to calculate the denominator in an analysis of the difference between groups of different sizes and variances and (2) that Cohen section 2.3.3 assumes that the sample sizes of each group are the same, TR Cmts. at 9, are unavailing. Dr. Cohen's assumption that the sample size of each group be equal only applies to the *t* test and the power of the analysis. *See* Remand Redetermination at 15, 50. Further, sample size, by definition, is only relevant to sampled data as a factor in the reliability of the analysis results to estimate the actual parameters of the underlying populations. Cohen at 6; Remand Redetermination at 15. Again, Dr. Cohen only references normality and sample size when considering analysis based on sampled data and not when the analysis is based on the full populations of data.

Taiwan Respondents insist that

> {T}he plain meaning of Section 2.3.3 does not establish that Cohen expressly stated that simple averaging should be used when dealing with full populations. {} Section 2.3.3 does not imply that Dr. Cohen believed there was a distinct difference between "an analysis based on a population and one based on sampled data." If such a difference existed, Commerce would have included authority for that principle in its decision.

TR Cmts. at 9-10. Taiwan Respondents ignore Commerce's citations to the academic literature, specifically to Dr. Cohen himself, and what Dr. Cohen teaches on the subject of effect size. Remand Redetermination at 45-47. Dr. Cohen introduces effect size as "the *degree* to which the phenomenon is present in the population." Cohen at 9 (emphasis in original). Dr. Cohen then addresses separately effect size based on sampled data:

> {W}e can define the effect size *in the sample* ($ES_S$) using sample statistics in the same way as we define it for the population, and a statistically significant $ES_S$ is one which exceeds an appropriate criterion value. For most of the power tables, these criterion values for significance of the sample ES (for the given *a* significance criterion and *n* {sample size}) . . . .

Cohen at 17 (emphasis in original).  Thus, the significance criterion and the sample size are associated with the sample-based effect size (*i.e.*, the reliability of the estimate of effect size) and not with the population-based effect size which is the actual value for the population.  Remand Redetermination at 45, 48-49.

Furthermore, when discussing the effect size based on the difference in the means, Dr. Cohen continues to distinguish between calculations based on populations and calculations based on samples.  This is evidenced in how Dr. Cohen formulated the equation for effect size differently for full populations versus sampling, with different symbols for each.  Remand Redetermination at 15.  *See also* Cohen at 20, 27 and 44 (populations); Cohen at 66-67, Ellis at 10 and Coe at 6 (samples).  In equation 2.3.2 for calculating the denominator of the Cohen's *d* coefficient when the standard deviations of the populations are known but unequal, Dr. Cohen used the σ symbol for the denominator of effect size based upon full populations, whereas equation 2.5.2 uses the *s* symbol to denote the standard deviation based on sampled data.  Remand Redetermination at 15 n.53.  Commerce determined that "If the effect size were based on sampled data, then it would be determined by equations 2.5.1 and 2.5.2 where the sample sizes are an input into the estimation of the effect size of the full populations of data."  *Id.* at 15.  Importantly, Commerce determined that "{w}hen the effect size is based on sampled data, the sample size also may be an input into the calculated effect size as can be seen in the equations presented above from Cohen, Ellis, and Coe for calculating a pooled standard deviation."  *Id.*  In contrast, "Dr. Cohen does not apply the limitation of equal sample sizes, *i.e.*, $n_A = n_B$, in his description of equation 2.3.2 to calculate the denominator of the effect size."  *Id.*  Rather, Commerce reasonably concluded, "the sample size, n, is an important factor in the determination of the statistical significance, *i.e.*, the reliability, of an analysis result based on a sample."  *Id.*

*See also* Cohen at 6 ("Depending upon the statistic in question, and the specific statistical model on which the test is based, reliability may or may not be directly dependent upon the unit of measurement, the population value, and the shape of the population distribution.  However, it is always dependent upon the size of the sample."); Cohen at 17 ("For most of the power tables, these criterion values for significance of the sample ES (for the given *a* significance criterion and *n* {sample size})").

Taiwan Respondents insist that the "*population effect size is intimately connected with the t statistic*."  TR Cmts. at 10 (emphasis in original).  They claim that the "{statistical} test, the sampling method, and the effect size are inextricably linked with the power" by Dr. Cohen where he "enumerate{s} the ways in which these relationships are used."  TR Cmts. at 11 (referencing Cohen at 14-16).  Commerce agrees that Dr. Cohen identifies elements that are constituent components of a power analysis: the significance criteria, the reliability of the results and sample size, and the effect size.  *See* Remand Redetermination at 48 (citing Cohen at 4-14).  Dr. Cohen uses these four parameters to present the "Types of Power Analysis" as noted by the Taiwan Respondents.  Cohen at 14-16 ("Four parameters of statistical inference have been described: power, significance criterion (*a*), sample size (*n*), and effect size (ES).").  For each of these approaches, there are three independent parameters, which in turn determine the fourth, dependent, parameter.  For three of these approaches, effect size, is an independent parameter, and is used in conjunction with two other independent parameters to determine the fourth dependent parameter.  Where effect size is the fourth dependent parameter, it is determined by the other three independent variables.  This, however, does not mean that effect size is "intimately" connected with the *t* statistic as claimed by the Taiwan Respondents.  Where effect size is an independent parameter, it is calculated based on the available data, whether these data

21

are full populations or sampled.  Where effect size is the dependent parameter, it is simply a function of the independent parameters.  Commerce's Cohen's *d* test, however, is not based on Dr. Cohen's power analysis.  If three of the parameters are known, the fourth parameter is able to be known, but otherwise, these four parameters are independent of each other.  Dr. Ellis states "Practical significance is inferred from the size of the effect while statistical significance is inferred from the precision of the estimate."  Ellis at 5 (Also, "the results are practically meaningful yet statistically nonsignificant.").  Professor Coe admonishes that "{e}ffect size emphasizes the size of the difference rather than confounding this with sample size."  Coe at 1. *See also* Remand Redetermination at 49.

Taiwan Respondents state that "{t}hese are all predicated on the statistical hypothesis test."  TR Cmts. at 11.  Taiwan Respondents misunderstand the Cohen's *d* test.  Commerce is not performing a "statistical hypothesis test" to determine the statistical significance of the difference in the means.  Ellis at 5 ("we can draw no conclusions about the practical significance of a result from tests of statistical significance.").  Rather, the practical significance, as measured by the effect size, is "the degree to which the phenomenon is present in the population."  Cohen at 9.

> By the above route, it can now readily be made clear that when the null hypothesis is false, it is false to some specific degree, *i.e., the effect size* (ES) *is some specific nonzero value in the population.* The larger this value, the greater the *degree* to which the phenomenon under study is manifested.

Cohen at 10 (emphasis in the original).  Effect size is a parameter of a population that exists independent of statistical considerations.  Commerce's Cohen's *d* test is based on the full population of price data in both the test and comparison groups and includes no sampling or statistical hypothesis testing as might be present in a research project as proposed by the Taiwan Respondents.  Taiwan Respondents conflate practical significance (*i.e.*, effect size) and statistical

significance (*i.e.*, the reliability of the results), and their argument to improperly project statistical analysis into Commerce's Cohen's *d* test is baseless.  Remand Redetermination at 49.

Taiwan Respondents state that "Commerce's conclusion is on shaky ground because it is appealing to an approximation that holds only when the two group standard deviations are close and sample sizes are close."  TR Cmts. at 11 (referencing Cohen at 43).  Again, Taiwan Respondents' reference here is to the *t* test and the assumptions underlying the *t* distribution. They do not relate to equation 2.3.2 and the calculation of the Cohen's *d* coefficient when based on the full populations.

Taiwan Respondents argue that Commerce's Cohen's *d* test is statistical malpractice.  TR Cmts. at 13.  They analogize Commerce's interpretation of Cohen, Coe, and Ellis with a hypothetical medical handbook providing recommendations on when and how much aspirin to administer to a patient.  *Id*. at 12.  Taiwan Respondents then claim that Cohen alludes to the *t* test for a scientific audience in the same manner as the medical handbook aimed at a physician alludes to how the aspirin can affect the human body.  *Id*. at 12-13.  This analogy represents pure conjecture and, therefore, is misplaced.  Taiwan Respondents have provided no ***evidence*** to support this wild, nonsensical comparison.

> 2.     Taiwan Respondents' Argument That There Is No Difference Between Populations And Samples Is Unsupported And Lacks Merit

Taiwan Respondents argue that if an analysis based on sampled data uses weight averaging, then an analysis based on the full population will use weight averaging as well.  TR Cmts. at 14.  Taiwan Respondents cite to no principle, statistical or otherwise, to support their argument that there is no difference between populations and samples.  However, "Dr. Cohen explicitly presents equations to calculate the effect size based on a population."  Remand Redetermination at 35 (citing Cohen at 20, equations 2.2.1 and 2.2.2, and at 43-44, equation

2.3.2).  Commerce also determined that, contrary to Taiwan Respondents' argument, "Dr. Cohen and other authors in the academic literature present equations to calculate the effect size based on sampled data to estimate the effect size in the actual population." *Id.* (citing Cohen at 66-67, equations 2.5.1 and 2.5.2; Ellis at 10, 26-27; Coe at 2, 6).  Moreover, unlike Taiwan Respondent's example, TR Cmts. at 14, Commerce compares the full population of the test group with the full population of the comparison group.  *Id*. at 35.  Therefore, Commerce concluded that "such estimation of the Cohen's *d* coefficient is not necessary and reliance on weighting to calculate the denominator of the Cohen's *d* coefficient is not warranted."  *Id.*

Taiwan Respondents argue that "Commerce's comparison of prices in two distinct groups of sales in two distinct markets (i.e., home market and U.S. market) to determine a respondent's dumping margin is similar to Commerce's comparison of prices in two distinct markets (i.e., test group and comparison group) to determine whether that respondent is engaged in targeted dumping."  TR Cmts. at 14-15.  In the margin analysis, they claim that Commerce commingles two groups by calculating a single overall margin of dumping, by weight averaging the margins for each group based on the quantity of U.S. sales.  In the Cohen's *d* test, they claim that Commerce also commingles two groups by calculating a single Cohen's *d* factor by weight averaging the standard deviation of each group based on the quantity of U.S. sales.  *Id*. at 15.

Commerce agrees that the test and comparison groups are separate and distinct from one another.  Remand Redetermination at 18, 22.  However, weight averaging based on the academic literature for calculating the "pooled standard deviation" based on sampled data involves a different equation from weight averaging based upon one commingled population.  *Compare* Remand Redetermination at 16 (showing Taiwan Respondents' proposed equation to calculate the denominator) *with* Remand Redetermination at 22 (showing the equation for a single

standard deviation).  Commerce explains that the academic literature does not support weight averaging based on one combined population and highlighted the mathematical issues with the equation.  Remand Redetermination at 17-22.  Furthermore, in their draft remand comments, Taiwan Respondents conceded that a single standard deviation as proposed by the Federal Circuit does not conform to the academic literature.  Taiwan Respondents Second Revised Draft Comments at 51.

Furthermore, Taiwan Respondents erroneously equate the comparison of two distinct groups of U.S. prices in the Cohen's $d$ test "to determine whether that respondent is engaged in targeted dumping" with the calculation of a respondent's weighted-average dumping margin which "commingles" two distinct groups of sales used to calculate individual dumping margins and weighted by the U.S. sales quantities.  TR Cmts. 14-15.  Taiwan Respondents disregard the purpose of the Cohen's $d$ test, which is to examine whether the differences between U.S. prices are significant.  The Cohen's $d$ test does not examine "targeted dumping," includes no comparison with normal values, and only involves an analysis of U.S. prices.  PDM at 11; Remand Redetermination at 41-42.  Neither the calculation of individual dumping margins, nor the aggregation of these dumping margins to calculate the weighted-average dumping margin involves standard deviations or an examination of the significance of the difference between the two groups.  The statute defines the dumping margin as the "amount by which normal value exceeds the export price or constructed export price" and the weighted average dumping margin as the "percentage determined by dividing the aggregate dumping margins determined by the aggregate export prices and constructed export prices . . . ."  19 U.S.C. §§ 1677(35)(A), (B).  In contrast, Commerce does not use the Cohen's $d$ test to calculate either individual dumping margins or the weighted average dumping margin.  Commerce uses the result of the Cohen's $d$

test as the first step in its differential pricing analysis, the purpose of which is to determine whether differences in U.S. prices are significant.  The Cohen's *d* test examines the difference in the mean prices between the test group and the comparison group and determines whether that difference is significant based on the variances of the prices within the two groups.  Remand Redetermination at 41-42.  Taiwan Respondents cite several judicial and administrative decisions as supporting the use of weight averaging over simple averaging, TR Cmts. at 15; however, these decisions are inapposite because they do not involve the advanced statistical concepts at issue in this litigation.  Remand Redetermination at 41.

        3.       **Taiwan Respondents' Argument That Commerce Has Not Explained Why Simple Averaging Is A Reasonable Methodology Based On The Academic Literature Lacks Merit**

Taiwan Respondents argue that, even if the academic literature permits the use of a simple average, Commerce did not follow the Federal Circuit's "directive."  TR Cmts. at 16-18.  They claim that Commerce improperly concluded that the academic literature allows simple averaging, without explaining how and why simple averaging constitutes a reasonable methodology based on the record in this case.  *Id*. at 18.  This argument lacks merit because Taiwan Respondents ignore Commerce's ***analysis*** of the academic literature.

The academic literature demonstrates that the alternative formulas, which may involve the use of a weighted average to calculate of the standard deviations of the data in the compared groups as proposed by Taiwan Respondents, are limited to calculations based upon ***sampled*** data when the actual population data are unknown.  Remand Redetermination at 16-17, 42 (citing Ellis at 10).  When the full populations of the groups are known and the standard deviations of each group are unequal, the academic literature provides for use of the root square mean (*i.e.*, the simple average) of the standard deviations as the denominator of the Cohen's *d* coefficient.  *Id.* at

42 (citing Cohen at 43-44 and equation 2.3.2.).  Moreover, in *Mid Continent V*, the Federal

Circuit held that Commerce must provide a reasonable justification for departing from the

academic literature that the agency embraced.  *Mid Continent V*, 31 F.4th at 1381.  However, as

explained in the remand redetermination, Commerce's use of a simple average is not a

divergence from the academic literature.  Remand Redetermination at 8-16.  Indeed, Dr. Cohen

specifically provides for use of a simple average when the actual values of the standard

deviations of the full populations of data within the test and comparison groups are known.

Remand Redetermination at 9-10.

> 4.   Taiwan Respondents' Visual Examples Do Not Demonstrate That Simple
>      Averaging Leads To Unreasonable Results And Weight Averaging Leads
>      To Reasonable Results

Taiwan Respondents argue that simple averaging leads to unreasonable results but weight

averaging leads to reasonable results, and they offer five examples that purportedly show that

simple averaging leads to incorrect and unreasonable results.  *Id*. at 18-30.  The Taiwan

Respondents' conclusions are neither visually obvious nor logically supported.  In fact, their only

corroboration that a weighted average yields reasonable results is that in the end results "PT's

margin {is} reduced from 2.16% percent {sic} to *de minimis*."  *Id*. at 35.

As Commerce stated in the remand redetermination, the difference in the results of the

Cohen's *d* test is merely a reflection of applying different weights to differing standard deviation

values.

> The Taiwan Respondents' "unreasonable finding" is simply an
> arithmetic tautology. When the weights for averaging two values
> change from being identical (*e.g.*, one) to being non-equal values,
> the results will change. When the weights are based on the sales
> quantities of each group, the smaller group will have less weight
> than the larger group, and the value being average (*i.e.*, the
> standard deviation) will have a smaller impact on the calculated
> average, and conversely the value of the larger group will have a

> larger impact. If the standard deviation of the smaller group is
> small, then the calculated average will be larger and the Cohen's *d*
> coefficient will be smaller. If the standard deviation for the smaller
> group is larger, then the calculated average will be smaller and the
> Cohen's *d* coefficient will be larger.  Reliance on such arithmetic
> logic to invent support for the reasonableness of a weighted
> average is without merit.

Remand Redetermination at 38.

Although Taiwan Respondents and Commerce agree that the use of a simple average or a weighted average result in different Cohen's *d* coefficients because of the differences in the arithmetic, TR Cmts. at 18-19, the changes in the results of the Cohen's *d* test go both ways, from pass to no-pass, and from no-pass to pass.  Remand Redetermination at 29, n. 124 (citations omitted).  Both types of changes are also part of the Taiwan Respondents' examples which they claim demonstrate that the results of the Cohen's *d* test using a simple average is unreasonable.

Moreover, Taiwan Respondents' examples demonstrate the flaw in their logic.  "{T}he graphical representations of the test and comparison groups of prices {provided by the Taiwan Respondents} do not demonstrate a 'visually obvious' conclusion that a given set of compared prices represents a Cohen's *d* coefficient that is larger or smaller than 0.8, *i.e.*, that the differences in prices are significant or not."  Remand Redetermination at 37.  "In other words, there is no visual distinction between any of the graphical representations of the test and comparison group prices which would lead a reasonable observer to recognize that one difference in prices pass the Cohen's *d* test and another difference in prices does not pass the Cohen's *d* test, irrespective of whether a simple average or a weighted average is used."  *Id*. at 37-38.  As Commerce noted, "the only differences are the results themselves, and the arithmetic logic that different outcomes result when different weights are used to combine the standard deviations in the denominator of the Cohen's *d* coefficient."  *Id*. at 37.  Moreover, the "only

visually recognizable pattern in the Taiwan Respondents' graphical representations is whether the small group, *i.e.*, the group with few observations, has a larger or smaller variance in the prices." *Id*. at 38. Thus, the differences in the results of the Cohen's *d* test between the use of a simple average or a weighted average are simply a consequence of "an arithmetic tautology." *Id*.

Finally, "Taiwan Respondents' claim that the use of a weighted average is reasonable is based, in part, on the results which it generates. The fact that the results of the proposed methodology benefit the proposer of the methodology does not provide support for the reasonableness of the methodology." *Id*. at 40. Simply put, beyond the results-oriented outcome which benefits them, Taiwan Respondents have provided no reason that the use of the weighted average is reasonable, or that the use of the simple average is not reasonable. *Id*.

     5.    Commerce's Rejection Of New Factual Information Contained In Taiwan Respondents' Draft Remand Comments Was In Accordance With Law

By statute, Commerce bases its determinations upon the record developed during the administrative proceeding. 19 U.S.C. §§ 1516a(b)(1) & (2). Unlike the second remand redetermination in which Commerce reopened the record and allowed parties to submit new factual information, in the third remand redetermination, Commerce did not reopen the record. Commerce only allowed parties an opportunity to submit argument but not new factual information. Neither *Stupp* nor *Mid Continent V* limited Commerce's discretion to keep the record closed. *See e.g., Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1276-77 (Fed. Cir. 2012).

Commerce rejected new factual information in Taiwan Respondents' draft remand comments, and this rejection was in accordance with law. Specifically, Commerce rejected the second Huber declaration, textbook references within the narrative, and textbook pages because Commerce had not reopened the record for new factual information as part of the remand

redetermination, and the second Huber declaration, textbook references within the narrative, and textbook pages were new factual information. *See* 19 C.F.R. § 351.302(d) (providing that Commerce will reject untimely filed factual information).

The second Huber declaration submitted with the Taiwan Respondents' draft remand comments was untimely new factual information. An expert opinion that analyzes information clearly assumes the weight of evidence, and consequently amounts to factual information. *See, e.g., PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 760-61 (Fed. Cir. 2012) ("The weight accorded the Foster Affidavit arose not from the underlying data submitted therein, but rather from Dr. Foster's analysis of that data. Thus, although the underlying data might in fact have been cumulative, the importance of the affidavit rests in Dr. Foster's status as a third-party expert. Accordingly, as the Court stated, 'expert opinion analyzing reported information "clearly assumes the weight of evidence" and, as such, amounts to "[d]ata or statements of fact in support of allegations," *i.e.*, factual information.'") (citations omitted); *Apex Frozen Foods Private Ltd. v. United States*, 144 F. Supp. 3d 1308 (Ct. Int'l Trade 2016).[6] Because the Huber declaration is also given weight as an expert's analysis of existing record evidence, his analysis in the declaration that was included in and with Taiwan Respondents' draft remand comments amounts to new factual information. Thus, Commerce's rejection of the second Huber declaration was in accordance with law.

---

[6] Although these cases use the prior version of the regulations, the preamble revising the regulations states that the "{revised} definition does not change the types of information that can be submitted in a segment of a proceeding; rather, it allows for more accurate classification of factual information." *Definition of Factual Information and Time Limits for Submission of Factual Information*, 78 Fed. Reg. 21,246, 21,247 (Dep't of Commerce Apr. 10, 2013). Consequently, the finding regarding whether expert opinion is factual information is still relevant.

Papers, articles, and academic literature constitute factual information that must be submitted to the record of the administrative proceeding for Commerce to consider. *Tri Union Frozen Prod., Inc. v. United States*, 163 F. Supp. 3d 1255, 1290 (Ct. Int'l Trade 2016). In their draft remand comments, Taiwan Respondents cited a text from Snedecor and Cochran and a text from Samuelson and Nordhaus. Taiwan Respondents also quoted text not already on the record and cited to portions of the text not already submitted to the record. As explained above, Commerce did not reopen the record for the submission of new factual information during the third remand and, therefore, the record remained closed. Therefore, Commerce's rejection of these textbook references as untimely submitted new factual information was in accordance with law.

Finally, although certain quotations from pages 360 and 361 of the Cohen textbook were on the record and were not rejected, portions of Taiwan Respondent's Exhibit 4 (pages 359 to 361 of Cohen's textbook) were not previously on the record and constituted new factual information. As explained above, academic literature is factual information that must be submitted to the record of the administrative proceeding for Commerce to consider. Thus, Commerce's rejection of Exhibit 4 was in accordance with law.

## **CONCLUSION**

For these reasons, we respectfully request that the Court sustain Commerce's remand redetermination and enter judgment in favor of the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

/s/ Patricia M. McCarthy
PATRICIA M. MCCARTHY
Director

31

OF COUNSEL:                              /s/ Mikki Cottet
                                        MIKKI COTTET
VANIA WANG                              Senior Trial Counsel
Attorney                                U.S. Department of Justice
U.S. Department of Commerce             Civil Division, Commercial Litigation Branch
Office of the Chief Counsel for         Classification Unit, 8th Floor
Trade Enforcement & Compliance          P.O. Box 480, Ben Franklin Station
Washington, DC 20230                    Washington, DC 20044
                                        Telephone: (202) 307-0962
                                        Facsimile: (202) 514-7965

February 13, 2023                       Attorneys for Defendant, United States

## **CERTIFICATE OF SERVICE**

I, Mikki Cottet, hereby certify that on this day, February 13, 2023, I electronically filed a copy of the foregoing using the CM/ECF system, which sent a notification of such filing to all counsel of record.

/s/ Mikki Cottet

## **CERTIFICATE OF COMPLIANCE**

I, MIKKI COTTET, a Senior Trial Counsel in the Office of the Assistant Attorney General, Civil Division, Commercial Litigation Branch, am responsible for filing the foregoing brief, relying upon the Microsoft Word Word-Count feature of the word processing system used to prepare the brief, including text, footnotes, and headings, certify that this brief complies with the word count limitation of the U.S. Court of International Trade Standard Chambers Procedures and contains 9,846 words.

/s/ Mikki Cottet