## UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE**

_____x

MID CONTINENT STEEL AND WIRE, INC.,    :

    :

        Plaintiff,    :

    :    Consol. Court No. 15-00213

       v.    :

    :

UNITED STATES,    :

    :

        Defendant,    :

    :

_____x

### CONSOLIDATED PLAINTIFFS TAIWAN RESPONDENTS COMMENTS ON RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND

Ned H. Marshak
Andrew T. Schutz*

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

599 Lexington Ave, 39th Floor
New York, New York 10022
(212) 557-4000
-and-
*1201 New York Ave., NW, Suite 650
Washington, DC 20005
(202) 786-6881

*Counsel for PT Enterprise, Inc., Pro-Team
Coil Nail Enterprise Inc., Unicatch
Industrial Co., Ltd., WTA International Co.,
Ltd., Zon Mon Co., Ltd., Hor Liang
Industrial Corp., President Industrial Inc.
and Liang Chyuan Industrial Co., Ltd.*

Dated:  October 2, 2023

## TABLE OF CONTENTS

**INTRODUCTION & SUMMARY OF ARGUMENT** .............................................................1

**HISTORY OF THIS COHEN'S *D* LITIGATION** ....................................................3

**ARGUMENT** ............................................................................................................7

    **I.**    **SIMPLE AVERAGING IS CONTARY TO THE ACADEMIC LITERATURE UPON WHICH COMMERCE'S DIFFERENTIAL PRICING ANALYSIS IS BASED** ....................................................7

    **II.**    **COMERCE'S "EQUALLY RELIABLE" RATIONALE DOES NOT ADEQUATELY EXPLAIN ITS DECISION TO RELY ON SIMPLE AVERAGING** ............................................................................9

    **III.**    **ADMINISTRATIVE PRACTICE AND JUDICIAL PRECEDENT SUPPORT RELYING ON WEIGHTED AVERAGING** ............................13

    **IV.**    **WA LEADS TO REASONABLE RESULTS BASED ON THE RECORD IN THIS CASE; SA DOES NOT** ....................................................17

    **V.**    **COMMERCE HAS NOT EXPLAINED WHY BASED ON THE FACTS OF THIS CASE SIMPLE AVERAGING IS A REASONABLE METHODOLOGY SUPPORTED BY SUBSTANTIAL EVIDENCE** .....29

    **VI.**    **RELYING ON A SINGLE STANDARD DEVIATION IS A REASONABLE METHODOLOGY** ............................................................30

**CONCLUSION** ........................................................................................................32

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE**

```
_____x
MID CONTINENT STEEL AND WIRE, INC.,         :
                                            :
            Plaintiff,                      :
                                            :        Consol. Court No. 15-00213
      v.                                    :
                                            :
UNITED STATES,                              :
                                            :
            Defendant,                      :
                                            :
_____x
```

**CONSOLIDATED PLAINTIFFS TAIWAN RESPONDENTS COMMENTS ON
RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND**

**INTRODUCTION & SUMMARY OF ARGUMENT**

These comments are filed on behalf of our clients, Taiwan Respondents,[1] in response to the Department of Commerce's ("Commerce" or "Department") Final Results of Redetermination Pursuant to Court Remand, dated August 31, 2023. Public Document ("PD") 13 ("Remand"). In its Remand, Commerce concluded that its "use of a simple average is consistent with the statute and is reasonable in its examination of whether prices differ significantly pursuant to section 777A(d)(1)(B)(i)," Tariff Act of 1930, as amended ("the Act"). *Id*. at 67-68. Commerce is wrong.

In its Remand, Commerce failed to provide an "adequate explanation for its choice of simple averaging" ("SA") as required by the Federal Circuit in *Mid Continent Steel & Wire, Inc. v United States*, 31 F.4th 1367 (Fed. Cir. 2022) ("*Mid Continent V")* and this Court in *Mid Continent VI,* 628 F. Supp. 3d 1316 (CIT 2023). Commerce's rationale fails for the same

---

[1] PT Enterprise Inc., Pro-Team Coil Nail Enterprise Inc., Unicatch Industrial Co., Ltd., WTA International Co., Ltd., Zon Mon Co., Ltd., Hor Liang Industrial Corp., President Industrial Inc., and Liang Chyuan Industrial Co., Ltd. ("Taiwan Respondents" or "PT," the mandatory respondent whose database was subjected to the Cohen's *d* methodology).

reasons as did its first three attempts. Use of a simple average is inconsistent with the statutory directive, in Section 777A(d)(1)(B)(i), requiring that Commerce determine whether "there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions or periods of time." Commerce's rationale: (1) is contrary to the academic literature; (2) does not support its decision to rely on SA; (3) is inconsistent with the manner in which Commerce relies on weighted averaging ("WA") rather than SA in comparable analyses; (4) leads to unreasonable and, at times, absurd results; and (5) does not explain why SA is a reasonable methodology supported by substantial evidence.

As discussed below, this Court should remand this case to Commerce with express instructions to calculate the denominator yardstick of the Cohen's $d$ equation in its differential pricing ("DP") analysis either by weighted averaging[2] the standard deviations ("SD") of the Test Group and the Comparison Group or by relying on the (transaction-weighted) SD of the entire population. Commerce, having already failed three times to justify reliance on SA, is not entitled to the same deference accorded Commerce when this Court analyzed its initial decision.[3]  And if this Court decides that Commerce's fourth justification similarly falls short, Commerce should not be accorded another chance.[4]

---

[2] "Weighted averaging" refers to weighting the group variances (which themselves are the squared standard deviations) in direct proportion to the total transaction quantity in each group to obtain a "pooled variance" and using its square root, the "pooled standard deviation," as the denominator in Cohen's $d$.  These group variances themselves are computed using transaction quantities as weights.  For convenience, this whole procedure is referred to as "weighted averaging" of the standard deviations, or "WA."  The "simple averaging" or "SA" method pools the standard deviations by weighting their variances equally, regardless of the number or total quantity of transactions in each group.

[3] See INS v. Cardoza–Fonseca, 480 U.S. 421, 446 n. 30 (1987) ("An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is entitled to considerably less deference than a consistently held agency view.") (quotation marks omitted); Good Samaritan Hosp. v. Shalala, 508 U.S. 402, 417 (1993) ("{T}he consistency of an agency's position is a factor in assessing the weight that position is due."); Tung Mung Dev. Co. v. United States, 25 C.I.T. 752 (2001) ("The case for judicial deference is less compelling with respect to agency positions that are inconsistent with previously held views.").

[4] See Olympic Adhesives, Inc. v. United States, 899 F.2d 1565, 1574–75 (Fed. Cir. 1990) ("Due to the passage of time, Extraco's 1981 exit from the production of bone glues, the lack of any evidence supporting the fictitious home

## HISTORY OF THIS COHEN'S *D* LITIGATION

*Mid Continent V* and *VI* were the second and third judicial decisions to reject

Commerce's reliance on SA to calculate the Cohen's *d* denominator. In *Mid Continent III, Mid*

*Continent Steel & Wire, Inc. v. United States*, 940 F.3d 662, 674 (Fed. Cir. 2019), (Appx647-

657),[5] the first judicial decision reversing Commerce, the Federal Circuit reasoned:

> First, Commerce said that it was simply using a widely accepted statistical test;
> yet it did not acknowledge that the only cited literature source for the relevant
> aspect of the test itself calls for the use of weighted averages.
>
> Second, Commerce's language of "skew{ing}" is a mere conclusion where, as
> here, it is unaccompanied by an explanation of why the right result, consistent
> with the relevant statutory purpose, should be different. Third, although
> Commerce determined that PT's charge that simple averaging "distorts" the
> outcome rests on an assumption that is not always true, that determination is both
> unsupported and, in any event, not itself an explanation of why weighted
> averaging is actually distortive in a relevant sense or, more affirmatively, why
> simple averaging is preferable. Fourth, Commerce asserted that simple averaging
> was more "predictab{le}" than weighted averaging, but the only expressed
> reason seems to be a concern about manipulation in how sales are reported, and that
> concern seems to assume that weighted averaging must be done by counting
> numbers of transactions, rather than quantity sold within transactions.

On remand, Commerce reaffirmed its initial decision to rely on SA, advancing additional

arguments in support of its position.  Appx1071-1121. Taiwan Respondents appealed that decision

to the CIT. Appx1122-1373. In *Mid Continent IV*, 495 F. Supp. 3d 1298 (CIT 2021), Appx1-20,

the CIT affirmed Commerce's remand determination.  In *Mid Continent V,* the Federal Circuit

---

market sales allegation, and in the interests of judicial economy, we remand this cause to the Court of International
Trade with instructions to direct the ITA to assess antidumping duties in accord with the margins determined in the
preliminary investigation for the years in question."); *CS Wind Vietnam Co. v. United States,* 832 F.3d 1367, 1374
(Fed. Cir. 2016) ("Because the reason Commerce offers for using the packed weights is without record support, we
find Commerce's choice to be unsupported by substantial evidence. We therefore reverse the Court of International
Trade's affirmance of that choice and direct Commerce to use the manufacturer-reported weights in its
calculation.").

[5] Documents in the *Mid Continent V* Joint Appendix were attached to Taiwan Respondents Comments on Draft
Redetermination. PD 6 - 12. These documents had Federal Circuit Appendix page numbers ("Appx") in the bottom
center of each page. The Appx page numbers often have gaps between the numbers - e.g., Appx1, 3, 7. This is
because the Joint Appendix filed with the Federal Circuit is limited to precise pages referenced in the parties' briefs.
In these Comments we refer to the Appx page numbers as the pinpoint citation to the documents in PD 6 - 12.

disagreed, rejecting all of the reasons why Commerce had continued to rely on SA. First, the

Court concluded that "the fact that the seller is acting rationally and genuinely in its pricing

choices in both the test and comparison groups provides no apparent reason for assigning equal

weight to each group's standard deviation when computing the pooled standard deviation." 31

F.4th at 1379.  Second, the Court reasoned that "Commerce has not provided a reasonable

explanation for this predictability assertion." *Id.*  Finally, the Court rejected Commerce's

"abstract effect" rationale, reasoning that *"*that section does not call for simple averaging for

unequal size groups in the denominator of Cohen's *d* or in the formula for the related *f* figure."

*Id.* at 1380. The Federal Circuit continued:

> More broadly and fundamentally, Commerce has not explained why the fact that
> the focus is being placed on the difference between the groups distinguishes the
> teaching of the cited literature—which, as discussed, uses the Cohen's *d*
> coefficient precisely to provide a yardstick for determining the significance of the
> difference in group means. Thus, Commerce has not explained why that focus
> calls for a simple-averaging yardstick figure for determining the significance of
> the difference when calculating Cohen's *d* (or, even, the *f* statistical measure) for
> different-size groups.

*Id.*

On remand, Commerce acknowledged that *Mid Continent V* precluded Commerce from

relying on its previously articulated rationale. Final Results of Redetermination of *Mid Continent

V*, Docket 186-1, at 7 (November 10, 2022). Commerce then admitted that its Remand was based

on a new approach:

> The CAFC has already opined in *Mid Continent V* that these prior arguments are
> unpersuasive to support that the use of a simple average is reasonable, and now
> Commerce has taken a new approach which focuses on the academic literature
> consistent with the CAFC's opinion in *Mid Continent V*.

*Id.* at 36.

In *Mid Continent VI,* this Court rejected Commerce's "new approach." The Court initially

4

noted that Commerce "fail{ed} to offer any further explanation for its assertions of predictability, abstract effect, and rationality, observing that '{t}he CAFC has already opined in Mid Continent V that these prior arguments are unpersuasive to support that the simple average is reasonable." Slip Op. 23-45 at 14. It then summarized Commerce's new, reliance on academic literature, rationale:

> Commerce argues that the simple average is supported because it uses the full population of sales, and does not estimate means or standard deviations for the test and comparison groups. Remand Results at 14. Therefore, because the literature only contemplates using the weighted average approach when the standard deviations are estimates, Commerce argues that the simple average is supported, and the weighted average is not.

*Id*. at 16-17. The Court disagreed with Commerce's analysis:

> {I}t is unclear what supports Commerce's premise that Cohen contemplated using equation (2.3.2), the simple average, with full populations. . . . Commerce does not explain, and it is not discernable why Commerce believes that equations (2.2.1) and (2.2.2)—still less equation (2.3.2), which expressly implicates sample size—are intended for testing full populations. Moreover, the Court of Appeals has already held that the literature does not suggest simple averaging for unequal-sized groups.
>
> . . . .
>
> Commerce also asserts that the differential pricing analysis does not involve sampling, but uses full populations, and thus concludes that weighted averaging is inappropriate in light of this distinction. Remand Results at 14. **However, Commerce's premise does not lead to its conclusion.** That weighted averaging is supported when sampling is present does not mean that it is unsupported when sampling is absent.

*Id*. at 15-17 (emphasis added). The Court continued.

> Additionally, Commerce's assertion that the literature provides no support for the weighted average appears to contradict Cohen, Ellis, and Coe at a number of points, as the Court of Appeals has already observed. . . . None of Cohen's many illustrative examples show using simple averaging with unequal samples. . . . .Therefore, as the Court of Appeals found in Mid Continent V, Commerce's claim that academia supports the simple average appears to be contradicted by the literature itself.

*Id*. 18-20.

In its Remand, "Commerce respectfully disagree{d}" with the *Mid Continent V* and *Mid Continent VI* holdings, but nevertheless concluded that "Commerce's use of the simple average in the Cohen's *d* test is reasonable when the data under analysis are the full populations of sale prices in the test group and of sale prices in the comparison group." Remand at 9. Commerce's justified its decision as follows:

> Because the sample sizes are equal in size and reliability, the estimated standard deviation for each of the sampled groups also has the same "reliability" (or precision) of a sample value {which} is the closeness with which it can be expected to approximate the relevant population value." Consequently, a simple average of the standard deviations of the two groups is appropriate because the reliability of each value of the standard deviation is equal. In other words, when the sample sizes of the two groups are equal, then the reliability of the estimates of the standard deviations are the same, and it is appropriate to give equal weights, *i.e.*, a simple average, when averaging the two standard deviations to calculate the denominator of the Cohen's *d* coefficient.

Remand at 11.[6] Commerce claimed that its "equally reliable" rationale was consistent with the academic literature.

> To follow the logic to its conclusion, the academic literature teaches that weight averaging is appropriate when the reliability of the samples is different; the literature also teaches that the reliability increases as the sample size increases. Therefore, when using a full population, *i.e.,* a "sample size" of 100%, and regardless of the number of observations in the sample, the reliability reaches 100%, and it is appropriate to weight the values equally, *i.e.*, to calculate a simple average.

*Id*. at 27.[7]

---

[6] *See also id*. at 12 ("Because the reliability of the standard deviations based on full populations is equal, to calculate the denominator of the Cohen's *d* coefficient, Commerce finds that it is reasonable to weight these standard deviations equally, *i.e.*, a simple average, as presented in Dr. Cohen's equation 2.3.2, just as when the reliability is equal for standard deviations based on sampled data with equal sample sizes."); *id.* at 13, 24.

[7] *Id*. at 56 ("Because the groups are equally reliable when the sample sizes are equal and because when full populations are used, they too are equally reliable, Commerce finds it appropriate to use Dr. Cohen's equation 2.3.2 when full populations are used.").

In sum, in its Remand, Commerce claimed that it had now, after eight years and three failed attempts, found a rationale which adequately explained why SA was reasonable and WA was not. As discussed below, Commerce once again – for the fourth time – is wrong.

## ARGUMENT

**I.    SIMPLE AVERAGING IS CONTARY TO THE ACADEMIC LITERATURE UPON WHICH COMMERCE'S  DIFFERENTIAL PRICING ANALYSIS IS BASED**

Commerce relied on three statistical references – *Cohen*, *Coe* and *Ellis*[8] –in creating its differential pricing analysis. In *Mid Continent VI,* this Court concluded that "the Court of Appeals has already held that literature does not suggest simple averaging for unequal-sizes groups." Slip Op. 23-45 at 16.[9]

And in *Mid Continent V*, the Federal Circuit concluded that  "{t}he cited literature makes clear that one way to form the more general data-pool dispersion figure for the denominator— seemingly the preferred way if the full set of population data is available—is to use the standard deviation for the entire population." *Mid Continent V*, 31 F.4th at 1377.  In support of this conclusion, the Federal Circuit quoted *Ellis*:

> To calculate the difference between two groups we subtract the mean of one group from the other $(M_1 − M_2)$ and divide the result by the standard deviation (SD) *of the population from which the groups were sampled.* The only tricky part in this calculation is figuring out the population standard deviation. If this number is unknown, some approximate value must be used instead.

*Id*.  And Coe:

> The "standard deviation" is a measure of the spread of a set of values. Here it refers to the standard deviation *of the population from which the different treatment groups were taken.* In practice, however, this is almost never known, so it must be estimated either from the standard deviation of the control group, or from a "pooled" value from both groups .... (*Coe* at 2 (emphasis added).

---

[8] Jacob Cohen ("Cohen") (Appx723-761), Robert Coe ("Coe") (Appx763-773); and Paul D. Ellis ("Ellis") (Appx678- 721).

[9] *See also* Appx878-932 (citations to additional literature).

7

*Id*. at 1378.  And *Cohen:*

> .*Cohen* similarly indicates that the ideal denominator is the full
> population's standard deviation, which may be approximated by a pooled
> estimate. *See Cohen* at 27 (dividing by "the common within-population
> standard deviation"); *Cohen* at 67 (noting that the denominator is "the
> usual pooled within sample estimate of the population standard
> deviation"—indicating that the pooling method, based on the standard
> deviations of each of the two groups, aims to estimate the standard
> deviation of the overall population). When the full population data set is
> unavailable, all of the cited literature points to use of a "pooled standard
> deviation" of the two particular groups at issue to form the
> denominator. *Cohen* at 67; *Ellis* at 10, 26–27; *Coe* at 6.

*Id*.

Cohen's views regarding equal sampling were discussed extensively in the *Mid Continent V* Oral Argument.[10] In its decision, the *Mid Continent V* court reasoned:

> The section of *Cohen* (at 359–61) cited by Mid Continent and Commerce for its
> "abstract effect" language is no exception. It nowhere recites use of a simple
> average for calculating a pooled standard deviation from groups of unequal size. .
> . . It expressly sets forth a simple average formula for when the groups are equal
> in size but a weighted average formula for when the groups are of different size. .
> . .Nothing in the section applies simple averaging to pooled standard deviation
> estimates for different-size groups.

*Id.* at 1378-79.

The fact that the literature upon which Commerce relied in implementing its differential pricing analysis – Cohen, Coe and Ellis – expressly conclude that the DP denominator should be based on the full population's standard deviation, and should never be based on simple averaging of unequal sized groups, creates an extraordinarily high bar for Commerce to overcome in this fourth bite at the apple.  To succeed, Commerce has to establish why and how its rationale is

---

[10] See **Attachment 1** containing the transcript of the Oral Argument discussing Cohen's statement that "equal-sampling … is not objectionable if the  investigator wishes to consider membership in a given … group as an abstract  effect quite apart from the relative frequency with which that effect … occurs in the population, but it clearly cannot be referred to the natural population with its varying group frequencies."  The text of Cohen's paper in which this statement appears is found in **Attachment 2**. We note that Commerce did not allow Taiwan Respondents to include this text in the administrative record. See CAFC 21-1747, Certain Steel Nails from Taiwan: Rejection of Comments of Taiwan Plaintiffs on Draft Results of Redetermination (October 25, 2022), barcode 4304452-01.

reasonable notwithstanding that this Court and the Federal Circuit have expressly held that

academic literature does not support reliance on simple averaging.

## II.     COMERCE'S "EQUALLY RELIABLE" RATIONALE DOES NOT ADEQUATELY EXPLAIN ITS DECISION TO RELY ON SIMPLE AVERAGING

In its Remand, Commerce relies on a new theory to support its reliance on SA; that is,

that "a simple average of the standard deviations of the two groups is appropriate because the

reliability of each value of the standard deviation is equal." Remand at 11. This rationale fails.

First, the reliability of data does not control Commerce's decision as to how to calculate

the Cohen's *d* denominator.  This Court's conclusion in *Mid Continent VI* is equally applicable to

Commerce's "equally reliable" rationale; that is, "Commerce's premise does not lead to its

conclusion. That weighted averaging is supported when sampling is present does not mean that it

is unsupported when sampling is absent." Slip Op. 23-45 at 17.  Similarly, Commerce's premise

that the Test Group and Comparison Group of a full population are equally reliable does not

mean that the Cohen's *d* denominator can be calculated using SA when there is a full population.

Equality in size does not necessarily result in equality in reliability. And equality in reliability is

not dispositive in determining whether the Cohen's *d* denominator should be based on WA or

SA. Indeed, in this case there is no equality in size. The Cohen's *d* Test Group and Comparison

Group do not have the same numbers of sales (i.e., counts) and do not have the same weight (i.e.,

number of kilograms). That the Cohen's *d* denominator in a sampled population can be

calculated using SA when the Test Group and Comparison Group have the same number of

counts does not mean that a denominator in a full population can be calculated based on SA

when the Test Group and Comparison Group have a different number of counts and are not equal

in weight. As this Court succinctly stated, "Commerce's premise does not lead to its conclusion."

Second, in its sampling analyses, Cohen and its progeny examine the number of counts in

9

each group. Counts (for Cohen's intended audience) normally consist of persons. In Cohen's examples the size of a count (e.g., weight of a person) is not a relevant factor, whether the person falls within a Test Group or a Comparison Group. In contrast, in Commerce's differential pricing analyses the analog of a count is the weight of the group (total quantity transacted), and not the number of transactions.  Commerce recognizes this by always computing group means and group standard deviations using transaction weights rather than count weights.  Commerce's comparison of group means (the numerator of Cohen's $d$) is based on dollars per kilogram ("$/kg"), reflecting the weighted average of the different sized transactions in each group.  The fact that each group may have the same number of sales (i.e., count of transactions) or a different number of sales does not control the comparison.  Thus, Commerce's premise that equality in counts in a sampling analysis in which each count is equal in weight justifies relying on an SA methodology in a full population analysis – where each count has a different weight  - does not support its conclusion.

Third, Commerce claims that the reliability of a sample is directly dependent on the sample count, and when those numbers are the same, each group is equally reliable. Commerce then claims that because SA can be used when each group in a sample is equally reliable, SA can be used in full populations because in that case, both groups are perfectly reliable.  Commerce's analysis proves nothing. First, Cohen defines reliability as precision (Appx727, Cohen at 6 – 7). A sample's precision reflects its standard error; that is, the amount by which the sample mean is likely to deviate from the population mean. Precision depends on multiple factors, including sample size, the amount of variation in the population, the method by which the sample was obtained, the method used to estimate the population property from the sample property, and other factors. Thus, the reliability of samples cannot be readily compared to the reliability of a

10

full population, let alone be a reason why the standard deviation yardstick of a full population

can be based on simple averaging of the SDs of two unequal groups.

A related error in Commerce's analysis is its claim that a perfectly reliable full population

is 100% reliable; rather, perfect reliability should be expressed as having zero errors. Commerce

claims that because each group has zero errors, each group should be accorded equal weight.

However, the fact that a group has zero errors is not related to the size of each group. In short,

the fact that two groups in a sample are equal in size does not support the proposition that

significant differences in two groups of a full population, with zero errors in each, can be

identified by taking a simple average of the SD of each group.

Fourth, Commerce's equal reliability rationale suffers from the same defects as its

"equally rationale" and "equally genuine" rationales.  The *Mid Continent III* court reasoned that

"the fact that the seller is acting rationally and genuinely in its pricing choices in both the test

and comparison groups provides no apparent reason for assigning equal weight to each group's

standard deviation when computing the pooled standard deviation." 31 F.4 at 1379.  Similarly,

the fact that the Test Group and Comparison Group of a full population may be equally reliable

"provides no apparent reason for assigning equal weight to each group's standard deviation when

computing the pooled standard deviation." *Id*.

Commerce argues that *Mid Continent III* is inapposite because equal reliability is "based

on the characteristic of the data rather than the pricing behavior of the respondent" and "is not a

function of the type of data under examination." Remand at 8.  Once again, Commerce is wrong.

A respondent's pricing behavior cannot be separated from the data which resulted from the

behavior, or the data which led to the behavior. Commerce fails in its attempt to create a

distinction between reliability, rationality and genuineness, since such distinction does not

exist.[11] And even if it did, equal reliability "provides no apparent reason for assigning equal weight to each group's standard deviation when computing the pooled standard deviation." 31 F.4th at 1379.

Finally, Commerce's equal reliability rationale fails because its Cohen's *d* Test Groups and Comparison Groups do not have independent existences. Each sale (i.e., count) is a member of multiple groups, both test and comparison. For example, in its Period test, Commerce subdivides each CONNUM into four calendar quarters. For each quarter it compares that quarter's sales (Test Group) to the sales in the other three quarters (Comparison Group). Thus, any first quarter sale falls within the Test Group for one test and in the Comparison Group for the other three tests. The composition of the Test Group and Comparison Group change from test to test: for quarter two, the Test Group consists of sales in Quarter 2 and Comparison Group consists of sales in quarters 1, 3, and 4; for quarter three, the Test Group consists of sales in Quarter 3 and the Comparison Group consists of sales in quarters 1, 2, and 4; and for quarter four, the Test Group consists of sales in Quarter 4 and the Comparison Group consists of sales in quarters 1, 2, and 3. The numbers of sales and the total sales volumes in the Comparison Group change as sales in quarters 1, 2, 3, and 4 are variously grouped with sales in quarters 1, 2, 3 and 4. Thus, the impact of each sale in Commerce's SA analysis changes depending upon whether the sale falls with the Test Group or the Comparison Group, and upon which particular group is designated as the Test Group and the Comparison Group in the analysis.  In the SA methodology, a particular sale will receive more weight than other sales for certain comparisons, thereby strongly influencing the outcome, while in other comparisons the same sale will receive a low weight, thereby having little influence on the outcome. Query, how can the SA methodology lead to

---

[11] "Rationality" and "genuineness" are neither statistical concepts nor do they have sufficiently clear definitions to be applicable in determining significance.  As such, these terms do not appear in Cohen, Coe, or Ellis.

reliable results when each sale has a different effect on the result depending on the group in which it falls?

In contrast, in the WA methodology, each kilogram is treated equally relative to all other kilograms sold for all of the Period, Regional, and Purchaser tests. Because each kilogram is correctly treated on an equal basis throughout the analysis, regardless of whether it falls within a Test Group or a Comparison Group, relying on a weighted pooled SD leads to a reliable, consistent, and predictable comparison.

**III.    ADMINISTRATIVE PRACTICE AND JUDICIAL PRECEDENT SUPPORT RELYING ON WEIGHTED AVERAGING**

Commerce's comparison of prices in two markets (i.e., test group and comparison group) in its differential analysis is substantially similar to Commerce's comparison of prices in two markets (i.e., home market and U.S. market) to determine a respondent's dumping margin. In its margin analysis in initial investigations,[12] Commerce calculates the weighted average U.S. price (e.g., $986.36 for Product 1) and the weighted average home market (or third country) price (e.g., $905.56 for Product 1) (known as Normal Value ("NV")) of multiple distinct, equally reliable, total populations of U.S. sales and NV sales on a CONNUM-specific basis.  Next, Commerce calculates the dumping margin for each CONNUM, by comparing the WA of NV prices and the WA of U.S. prices ($905.56 - $986.36  = -$80.80). Commerce then calculates the absolute dumping margin for each CONNUM (i.e., WA margin (-$80.80) multiplied by quantity of U.S. sales (1,100)) and adds these absolute CONNUM specific dumping margins (-$88,889) together to calculate the potential uncollected dumping duty due (commonly known as "PUDD") (-$88,889 + $75,000 + $24,375 = $10,486). Finally, Commerce divides this numerator ($10,486)

---

[12] *See Union Steel v. United States*, 36 C.I.T. 288, 305 (2012), *aff'd*, 713 F.3d 1101 (Fed. Cir. 2013), at Appendix, page 1. The quantity and values in the text of this Brief track the data in Appendix, page 1, "Average-to-Average Comparisons (without Zeroing)."

by the total value of U.S. sales (the denominator) ($2,407,500) to calculate a WA dumping margin (0.44%).

Commerce's Cohen's *d* analysis is similar. Commerce calculates weighted average mean prices of a Test Group and a Comparison Group on a CONNUM specific basis. It then determines the difference in these WA prices. This is the Cohen's *d* numerator. Commerce also calculates weighted average standard deviations of the sales in each group.  The issue in this case is whether the Cohen's *d* denominator can be based on the simple average pooling of the SDs of each group.

Relying on a WA rather than an SA of the SDs is consistent with the manner in which Commerce calculates ADD margins; relying on a SA of the SDs is not. In calculating ADD margins and Cohen's *d* percentages, sales quantity (i.e., kilograms sold) is a critical factor throughout the analysis. In Commerce's ADD margin calculations, the requirement that the result be reasonable requires that quantity is considered in all phases of the analysis. In its Cohen's *d* DP pricing calculations, Commerce relies on WA for all phases of the analysis – until the very end, at which point it inexplicably relies on simple averaging two groups of data which have been obtained by weighted average prices and weighted standard deviations of prices. As discussed in these Comments, this abrupt change in methodology skews the results by according more weight to certain sales (and less weight to others) than they previously had been accorded throughout the analysis. It also leads to Commerce's Cohen's *d* analysis being inconsistent with its margin calculation methodology, and therefore unreasonable.

In its Remand, Commerce attempts to distinguish its margin calculation methodology from its Cohen's *d* methodology. It claims that "none of the" cases cited by Taiwan Respondents in support of relying on WA "involved the advanced statistical concepts at issue

in this case."  Remand at 54 – 55.

Commerce is wrong. Commerce's Cohen's *d* rationale is equally applicable to the manner in which Commerce calculates WA margins. In both cases, Commerce compares prices of comparable merchandise in two groups. The purpose of the comparison is to determine the significance of the difference in prices of the two groups. In both comparisons "two distinct groups of data are compared" to determine whether the differences in prices are significant. As such, calculating the Cohen's *d* numerical result is substantially similar to calculating weighted average dumping margins.

Moreover, in *Polyethylene Terephthalate Film, Sheet, and Strip From China: Final Results of Antidumping Duty Administrative Review*, 77 Fed. Reg. 14,493 (March 12, 2012), IDM at 8, Commerce discussed why weighted averaging is preferable to simple averaging as follows:

> Even if the Department were to accept the premise of Wanhua et. al.'s argument that Dongfang's U.S. sales volume is small in relation to Wanhua's sales volume, its conclusion does not logically follow that calculating a simple average using Dongfang's quantity is less distortive than calculating a weighted average. The Department prefers a weighted-average because it more accurately reflects overall trade by accounting for relative import volumes; using a simple average to increase the impact of lower volume exporters necessarily distorts the margin by inflating the effect of a smaller amount of data.

The courts have consistently agreed. *See, e.g.*, *MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1359–64 (CIT 2015) (holding that relying on an SA, rather than a WA, was "unreasonable in light of the statute's clear preference for the accuracy enhancing value of weight-averaging and the particular facts of this case."); *Allied Tube & Conduit Corp. v. United States*, 132 F. Supp. 2d 1087, 1096 (CIT 2001) (rejecting Commerce's unreasoned reliance on simple average data in lieu of more accurate weighted average data); *Diamond Sawblades Manufacturers' Coal. v. United States*, 2015 WL 5603898 at *4 (CIT 2015), *aff'd* 866 F.3d

1304 (Fed. Cir. 2017 (holding that simple averaging was permissible only because "the record

contained no information about what portion of the PRC wide entity ATM comprised.")

In *RZBC Grp. Shareholding Co. v. United States*, 100 F. Supp. 3d 1288, 1308–09 (CIT

2015), the court reasoned:

> Like simple averaging, the weight-averaging method blends country-level prices
> into world benchmarks. But unlike simple averages, weighted averages assign
> each price a weight proportional to the quantity shipped at that price. What results
> are benchmarks that favor prices from large-quantity shipments. The method
> ensures that high prices from countries with low-volume exports do not skew the
> benchmarks upward. . . . The choice to take simple averages was not just arbitrary
> in the abstract, however. The method also caused real distortions in the
> benchmarks Commerce created. A simple average, unlike a weighted average,
> gives equal weight to all prices regardless of the quantities sold. High prices from
> small transactions can balloon the average to absurd proportions, and that seems
> to be what happened here.

*See also Circular Welded Carbon Steel Pipes and Tubes From Turkey: Final Results of*

*Countervailing Duty Administrative Review; Calendar Year 2015*, 82 Fed. Reg. 47,479 (October

12, 2017), IDM at Cmt. 4 ("We find the use of a weighted -average price ensures that outlier

prices do not skew the benchmark. The Court has affirmed the Department's use of weighted-

average LTAR benchmarks in this regard, opining that unlike simple averages, weighted

averages assign each price a weight proportional to the quantity shipped at that price.").

Finally, Commerce's "advanced statistical concepts" argument can be easily dismissed.

The decision to rely on SA or WA is no more complex or advanced in this case than it is any of

the other analyses, discussed above, in which the courts and Commerce have held that WA

should be used instead of SA.   Thus, Commerce's decision to abandon its normal, accuracy

enhancing choice of WA in the instant case constitutes additional support for Taiwan

Respondents position that the Remand should be reversed.

## IV.    WA LEADS TO REASONABLE RESULTS BASED ON THE RECORD IN THIS CASE; SA DOES NOT

In its Comments to Commerce, Taiwan Respondents submitted graphical illustrations of five price comparisons: One hypothetical which was the focus of the oral argument in *Mid Continent III* and four actual comparisons found in PT's database. PD 6, Comments at 40-45. Taiwan Respondents argued that these examples illustrate how and why WA is reasonable, while SA is not.

Commerce concluded that Taiwan Respondents' argument was an "arithmetic tautology." Remand at 52. At the same time, however, Commerce acknowledged that relying on WA led to results which differed from relying on SA.

> When the weights for averaging two values change from being identical (*e.g.*, one) to being non-equal values, the results will change.  When the weights are based on the sales quantities of each group, the smaller group will have less weight than the larger group, and the value being averaged (*i.e.*, the standard deviation) will have a smaller impact on the calculated average, and conversely the value of the larger group will have a larger impact.  If the standard deviation of the smaller group is small, then the calculated average will be larger and the Cohen's *d* coefficient will be smaller. If the standard deviation for the smaller group is larger, then the calculated average will be smaller and the Cohen's *d* coefficient will be larger.

*Id*. at 52-53.

Commerce is correct. Results differ when WA, rather than SA, is used to calculate the denominator in the Cohen's *d* equation. The existence of this difference, which Taiwan Respondents have identified throughout this litigation, is not in dispute. The disagreement between the parties is whether SA leads to a reasonable result.

As Commerce recognizes, when the Test Group and Comparison Group have different quantities, the group with the larger quantity will have a greater impact on the ultimate result. This result makes sense; in this manner, each kilogram (or each nail) has an equal impact on the result, whether in the Test Group or the Comparison Group. In contrast, if each group is given

17

equal weight, regardless of its size, a kilogram in the smaller group will have a disproportionately larger impact on the results than a kilogram in the larger group. And, as discussed above, the same kilogram, in the same sale, will have a different impact on the result, depending on whether the sale falls within the Test Group or the Comparison Group.

The error Commerce makes is compounded by the fact that Cohen's $d$ also is affected by how its numerator is computed. The numerator—whose calculation is not disputed—is the difference of two *quantity weighted* means. Thus, in Commerce's SA methodology each kilogram affects the numerator of Cohen's $d$ in one way but affects the denominator in a different way, undermining the validity of the resulting ratio. In contrast, the WA methodology uses consistent weights for each kilogram sold in both the numerator and the denominator, yielding a meaningful ratio.

Commerce also correctly recognizes that when the small group has a small standard deviation, the denominator of the Cohn's $d$ calculation will be smaller than it would be when the small group has a large standard deviation. The smaller the denominator, the greater the "$d$" and the more likely that the ultimate result will be a pass (signifying targeted dumping) than a no-pass (signifying no targeted dumping).

According to Commerce, "reliance on such arithmetic logic to invent support for the reasonableness of the weighted average is without merit." Remand at 53. Commerce also claims that "there is no visual distinction between any of the graphical representations of the test and comparison group prices which would lead a reasonable observer to recognize that one difference in prices pass the Cohen's $d$ test and another difference in prices does not pass the Cohen's $d$ test, irrespective of whether a simple average or a weighted average is used." *Id*. at 52. While the Federal Circuit has yet to formally opine on these five examples, Commerce's "no

18

visual distinction comment" is belied by the graphs themselves, and Judge Taranto's colloquy with counsel at the *Mid Continent III* oral argument, including his comment that Commerce's decision that the hypothetical data resulted in a "pass" was "facially odd." [13]

The five examples set forth below show how SA skews the results. The first example shows hypothetical data. The other four show sales in PT's database.

*Figure 1  Hypothetical Data Illustrating Visual Comparison of Pricing Patterns and SDs*
**Hypothetical Example Discussed in *Mid Continent III***



---

[13] See *Mid Continent III* Oral Argument, 25:54 – 26:08. Judge Taranto of the CAFC stated that Commerce's decision that the hypothetical data resulted in a "pass" was "facially odd."  PD 6, Comments at 41.

**DATA AND METHODOLOGY**[14]

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|
| Q Test | Q Comp | WA Price Test | WA Price Comp | Price Difference | Price Range Test | Price Range Comp | SD Test | SD Comp |
| 10 | 1000 | $1.50 | $1.75 | $0.25 | $1.46 - $1.54 | $1.00 - $2.46 | $0.04 | $0.40 |

| | 10 | 11 | 12 | 13 |
|---|---|---|---|---|
| | PSD | $d$ calculation | $d$ | Pass |
| Simple average | $0.284 | 0.25/0.284 | 0.88 | yes |
| Weighted average | $0.398 | 0.25/0.398 | 0.63 | no |

**Source: Appx1132-1134; Appx656, Appx782-786;** *Mid Continent III*, Oral Argument at 11:07 – 17:55 (PT) and 25:27 – 35:52 (Government).

---

[14] The columns in this table and the four other tables set forth below contain the following information: **(1-2)** "Q Test and Q Comp": quantity, in kilograms (kg), in the Test Group and the Comparison Group. **(3 – 4)** "WA Price Test" and "WA Price Comp": weighted average price, in $/kg, in the Test Group and the weighted average price, in $/kg, in the Comparison Group. **(5)** "Price Difference": Difference in price, in $/kg, between the WA Price Comp and WA Price Test (5 = 4 – 3). **(6 – 7)** "Price Range Test" and "Price Range Comp": high and low prices, in $/kg, in the Test Group and the Comparison Group. **(8-9):** "SD Test" and "SD Comp": standard deviation, in $/kg, in the Test Group and the Comparison Group. **(10)** "PSD": pooled standard deviation, in $/kg, computed by simple averaging and weighted averaging (this is the only step in computing Cohen's $d$ where SA and WA differ). The PSD for SA is obtained by summing the squares of the $0.04 and $0.40 SDs, dividing by two, and taking the square root. The PSD for WA is obtained by (a) multiplying the square of $0.04 by 10kg; (b) multiplying the square of $0.40 by 1000 kg; (c) dividing the sum of these results by 1000 + 10 kg; and (d) taking the square root. **(11)** "$d$ Calculation": to calculate Cohen's $d$, the numerator is the Price Difference (5) and the denominator is the PSD (10). **(12)** "$d$": the value of "$d$" used to determine whether there is a "pass" or "no pass". **(13)** "Pass" is "yes" when $d$ is greater than 0.80, taken as an indication of targeted dumping in this CONNUM; "Pass" is "no" when $d$ is less than 0.80, which means that there is no indication of targeted dumping.

CONNUM 121012572121, REGION SOUTH
**Data Presented to CIT in *Mid Continent IV***

*Figure 2  Actual Data*



| Q Test | Q Comp | WA Price Test | WA Price Comp | Price Difference | Price Range Test | Price Range Comp | SD Test | SD Comp |
|---|---|---|---|---|---|---|---|---|
| 884.40 | 5673.60 | 5.392 | 5.483 | 0.091 | 5.305 – 5.441 | 5.308 – 5.806 | 0.07 | 0.14 |

|  | PSD | *d* calculation | *d* | Pass |
|---|---|---|---|---|
| SA | 0.110 | 0.091/0.110 | 0.83 | yes |
| WA | 0.133 | 0.091/0.133 | 0.68 | no |

**Source: Appx843-853, Appx1136-1142, Appx1184-1191.**

CONNUM 127014570111, West Region



*Figure 3: Actual Data*
Cohen's WA d: 0.65 No pass
Cohen's SA d: 0.84 Pass

| Q Test | Q Comp | WA Price Test | WA Price Comp | Price Difference | Price Range Test | Price Range Comp | SD Test | SD Comp |
|--------|--------|---------------|---------------|------------------|------------------|------------------|---------|---------|
| 11,252 | 125,623 | 1.13220 | 1.16903 | 0.03683 | 1.12508 – 1.19807 | 1.11335 – 1.72100 | 0.01831 | 0.05910 |

| | PSD | *d* calculation | *d* | Pass |
|----|------|------------------|------|------|
| SA | 0.043751 | 0.03683/0.043751 | 0.84 | yes |
| WA | 0.056863 | 0.03683/0.056863 | 0.65 | no |

**Source: Appx1143, Appx1192-1202.**

CONNUM 121012572121, Purchaser



*Figure 4  Actual Data*

| Q Test | Q Comp | WA Price Test | WA Price Comp | Price Difference | Price Range Test | Price Range Comp | SD Test | SD Comp |
|--------|--------|---------------|---------------|------------------|------------------|------------------|---------|---------|
| 5822 | 736 | 5.45563 | 5.58696 | 0.13133 | 5.30769 - 5.71693 | 5.3049 - 5.80605 | 0.10686 | 0.24859 |

| | PSD | D calculation | | *d* | Pass |
|----|-------|------------------|----|------|------|
| SA | 0.19133 | 0.13133/0.19133 | | 0.69 | no |
| WA | 0.13165 | 0.13133/0.13065 | | 1.01 | yes |

**Source: Appx1145-1146, Appx1214-1221.**

23

CONNUM 127033572121 MIDWEST Region



*Figure 5 Actual Data*

**Appx1148.**

| Q Test | Q Comp | WA Price Test | WA Price Comp | Price Diff. | Price Range Test | Price Range Comp | SD Test | SD Comp |
|--------|--------|---------------|---------------|-------------|------------------|------------------|---------|---------|
| 5757.50 | 78448.70 | 1.87084 | 1.83523 | 0.03561 | 1.82569-2.15165 | 1.82177 – 1.94873 | 0.10599 | 0.01742 |

|     | PSD | D calculation | *d* | Pass |
|-----|-----|---------------|-----|------|
| SA | 0.075955 | 0.03561/0.075955 | 0.4747 | no |
| WA | 0.032416 | 0.03561/0.032416 | 1.1010 | yes |

**Source: Appx1147-1150, Appx1222-1231.**

These five examples show the weighted mean prices in each group and plot the data in a way that reveals how the prices are spread within each group and what the transaction quantities are. The unit prices are accurately indicated by the horizontal locations of the circular symbols. The transaction quantities are proportional to the areas of the same symbols. Two vertical

colored lines depict the weighted group means.

The accurate visual display of spreads and weights reveals how SA over-weights the smaller group (the one with lower total quantity; i.e., kilograms sold). When the smaller group has a small spread, the SA methodology *decreases* the pooled standard deviation ("PSD"). Because that PSD is the denominator of the Cohen's *d* formula, the result is an incorrect *increase* in Cohen's *d*. This can cause a low "no-pass" value of *d* to exceed Commerce's threshold of 0.80, incorrectly resulting in a "pass." Visually, this phenomenon is assessed by comparing price differences to the degree of horizontal spreading in the price points: that is the meaning of Cohen's "relative effect size," of which Cohen's *d* is the prime example.

In the first three examples (Figures 1, 2, and 3), the differences in weighted average prices are \$0.25/kg, \$0.09/kg and \$0.37/kg, respectively. These absolute differences do not (alone) establish whether the difference is significant. Nor is the significance of the difference determined by the percentage difference between these prices and a potentially normal price. Rather, by relying on a methodology based on Cohen's *d*, Commerce compares this absolute difference in prices to a calculated spread between sales prices in the CONNUM, and if so, whether the difference is large compared to the spread. This comparison can be made visually by assessing the differences in average group prices relative to the large horizontal dispersions of the points within each group. In the first three examples, Test Group sales prices do not differ appreciably from Comparison Group sales prices. In fact, any of the Test Group red dots plausibly could have arisen by sampling the Comparison Group gray or blue dots—all red dots fit comfortably in the middle of the range of the Comparison Group prices—indicating the economic pricing patterns of the groups are similar. This visualization corresponds to the intended meaning and correct mathematical calculation of Cohen's *d*.  There clearly is no

significant difference between prices.  Commerce's blind claim to the contrary is wrong.

This visual evidence supports reliance on WA because it agrees with the WA conclusions and disagrees with the SA conclusions. Importantly, it also makes the reason for preferring WA apparent, because in all the figures the total amount of a color (red, blue, or gray) indicates the total size of each group. WA respects these amounts but SA ignores them, allowing the spread within any small group to have an outsized effect on the DP determination. SA steers the PSD towards the value of the smaller group, *whether that is the higher or lower of the two group standard deviations*. The problem is not that SA always yields a value of Cohen's *d* that is too high or too low; the problem is that SA is *wrong*. The difference between WA and SA will nevertheless only matter in the cases where the resulting Cohen's *d* is near the 0.8 threshold. These examples were chosen to illustrate such conditions. They were not "cherry picked," as Commerce claims, to present a biased perspective on the two methods; rather, they were chosen to illustrate this *predictable* and *visually evident* difference between the methods.

In contrast to Figures 1,2, and 3, Figures 4 and 5 display patterns of visually apparent price differences that WA detects but SA fails to find. In Figure 4 the smaller Comparison Group comprises two transactions (gray dots). These are the lowest price and highest price for all sales in the CONNUM, a pattern characteristic of "masked dumping:" a sale at an unusually low unit price of $5.31 is counterbalanced by another sale at an unusually high unit price of $5.81. *Any effective procedure to identify masked dumping should flag this pattern*.

Similarly, in Figure 5, the extreme price in the small Test Group led to a no-pass determination using SA because *that price alone* caused the SD of its group to be large. This is another predictable failure of SA: whenever the total quantity in one group is small, a single

small-quantity transaction at an unusual price will inflate[15] the group's standard deviation,

decreasing Cohen's *d*. The same no-pass SA result also will occur when, hypothetically, the

extremely high Test Group transaction price is replaced by an extremely *low* Test Group price.

Such an extremely low-priced sale should be treated as evidence of targeted dumping, but under

Commerce's SA methodology, the failure to correctly account for the difference in spreads of

Comparison Group and Test Group transactions in pooling the SD leads to an unwarranted no

pass. *SA pooling allows small transactions at extremely unusual prices to hide within an*

*incorrectly computed value of Cohen's d.*

   In short, these examples reveal why WA makes sense and produces a reliable

determination, whereas SA does not. SA also fails to achieve the objective of Commerce's DP

analysis; that is, identifying evidence of targeted dumping. The reason why SA fails is found in

the linchpin of Taiwan Respondents' argument; that is, reliance on SA leads to unreasonable

results when the SD of a small sized group is relatively large (unnaturally increasing the Cohen's

*d* denominator, potentially turning a pass into a no- pass) or relatively small (unnaturally

decreasing the Cohens *d* denominator, potentially turning a no-pass into a pass).

   This Court should not ignore these results. They confirm that the WA is reasonable to

apply to the facts in this case to achieve the statutory goal of determining whether prices in two

groups are substantially different.  In contrast, these examples show that the SA methodology

leads to absurd results, and accordingly cannot be sustained. *See Sorrells v. United States*, 287

U.S. 435, 446 (1932) (explaining a statutory interpretation cannot be upheld "at the expense of

the reason of the law and producing absurd consequences."); *Pitsker v. Off. of Pers. Mgmt.,* 234

---

[15] The SD is computed from the variance which, in turn, is an average *squared* price deviation. The squaring gives
extra weight to the most extreme prices: those appearing at the very left hand and right hand sides of each figure. In
this fashion any single extremely high or low price in a group will have a greater effect on the group's variance than
suggested by the size of the transaction alone.

F.3d 1378, 1383 (Fed. Cir. 2000) ("OPM's requirement also violates the canon of statutory construction that an interpretation that causes absurd results is to be avoided if at all possible."); *Timex V.I. v. United States*, 157 F.3d 879, 886 (Fed. Cir. 1998) ("a statutory construction that causes absurd results is to be avoided if at all possible"); *Yangzhou Bestpak Gifts & Crafts Co. v. United States,* 716 F.3d 1370, 1378 (Fed. Cir. 2013).

Finally, a sales price without a quantity is meaningless. Factoring quantity into the analysis is necessary to evaluate whether a price difference is significant. For example, assume that one kilogram of a good is sold at varying prices with a standard deviation of $10/kg and one thousand kilograms are sold at varying prices with an SD of $1/kg. The variance of the first group of sales is $10 \times 10 = 100$ while the variance of the second group is only $1 \times 1 = 1$. Thus, the first group of sales, which is economically inconsequential, accounts for more than 99% of the Cohen's *d* denominator using Commerce's method, and could be used to establish a pattern of significant price differences. In contrast, with weighted pooling (or reliance on a single weighted SD for all sales in a CONNUM) the first group of sales accounts for only 9% of the pooled SD[16], and the high-priced $10 sales will have a minimal impact in determining whether the price difference is really significant. It is unreasonable that minuscule sales quantities could create an affirmative determination of significant price differences unrelated to the significance of the quantities.

In contrast, because the weighted PSD removes distortions created by low quantities, relying on the WA methodology allows Commerce to evaluate the actual economic impact of the price differentials by time period, region, and purchaser. This Court should require that

---

[16] Although the variance of the first group is 100 times the variance of the other group, it is associated with only 1/1001 of the total quantity in both groups, $1 + 1000 = 1001$ Kg. Its contribution to the weighted pooled variance is $100 \times 1/1001 = 100/1001$. The other group's contribution is $1 \times 1000/1001 = 1000/1001$. The pooled variance is the sum, $100/1001 + 1000/1001 = 1100/1001$. The proportion of this contributed by the first group therefore is 100/1001 divided by 1100/1001, equal to 100/1100 or approximately 9%.

Commerce calculate the PSD in this manner, in order to properly place "the emphasis . . . on economic reality." *United States v. Eurodif S.A.*, 555 U.S. 305, 317-18 (2009).

## V.   COMMERCE HAS NOT EXPLAINED WHY BASED ON THE FACTS OF THIS CASE SIMPLE AVERAGING IS A REASONABLE METHODOLOGY SUPPORTED BY SUBSTANTIAL EVIDENCE

In *Yangzhou Bestpak Gifts & Crafts Co.*, 716 F.3d at 1378, the Federal Circuit discussed what Commerce needed to do to support a methodology that is challenged as contrary to both the law and the evidence:

> Nevertheless, '{w}hile various methodologies are permitted by the statute, it is possible for the application of a particular methodology to be unreasonable in a given case.' . . Although Commerce may be permitted to use a simple average methodology to calculate the separate rate, the circumstances of this case renders a simple average of a *de minimis* and AFA China-wide rate unreasonable as applied. Similarly, a review of the administrative record reveals a lack of substantial evidence showing that such a determination reflects economic reality.

As discussed in detail in these comments, Taiwan Respondents submit that Commerce's rationale is unreasonable as a matter of law. However, even if this court concludes that simple averaging may be appropriate in certain circumstances, Commerce's decision cannot be sustained unless this Court also concludes that Commerce has established that based on the facts in this case, simple averaging of the Cohen's *d* denominator leads to a reasonable result and is supported by substantial evidence. In other words, Commerce needs to establish how and why, based on this administrative record, simple averaging constitutes a reasonable method of determining whether PT's Test Group prices are, or are not, substantially different from PT's Comparison Group prices.[17] Commerce has not met this burden. Commerce has not analyzed the

---

[17] In its Remand, Commerce discounted the impact of the Federal Circuit decision in *Stupp Corp. v. United States*, 5 F.4th 1341 (Fed. Cir. 2021), on this case, noting that "the issue in Stupp involves whether the test and comparison groups must satisfy certain statistical criteria . . . and not whether a simple average is reasonable to use when calculating the denominator of the Cohen's d coefficient." Remand at 60 – 61. Taiwan Respondents agree that the issues in *Stupp* are different from those raised in this case. We note that in *Stupp Corp. v. United States*, 619 F. Supp. 3d 1314, 1328 n.13 (Ct. Int'l Trade 2023), this Court upheld Commerce's reliance on Cohen's *d* on remand,

record evidence and has not rebutted the detailed data summarized in Section IV above. For this reason alone, Commerce's decision cannot be affirmed.

## VI.    RELYING ON A SINGLE STANDARD DEVIATION IS A REASONABLE METHODOLOGY

In its Remand, Commerce concluded that relying on the standard deviation for the entire population" in the denominator of the Cohen's *d* coefficient in lieu of a simple average" was not "reasonable in the context of Commerce's differential pricing analysis." Remand at 14. This conclusion rested in large measure on the fact that such reliance "causes the denominator of the Cohen's *d* coefficient to reflect not just the dispersion of the data within each group, but also the dispersion of the data between the two groups." *Id*. at 17. As a result, the single standard deviation increases "despite their being no change in the variances, i.e., the dispersion, in the date within each of the two groups." *Id*. Commerce reasons that because the denominator is extended by this between group dispersion, a single SD cannot be used in the Cohen's *d* analysis.

Commerce's analysis ignores the fact that in *Mid Continent V*, the Federal Circuit noted that Cohen, Coe and Ellis all opined that "the ideal denominator is the full population's standard deviation," and that "{w}hen the full population data set is unavailable, all of the cited literature points to use of a 'pooled standard deviation' of the two particular groups at issue to form the denominator." 31 F.4th at 1378. Commerce also fails to recognize that the Cohen's *d* Test Group and Comparison Group are not distinctly different datasets. As discussed above, each sale (i.e., count) is a member of multiple groups, both test and

---

noting that "SeAH does not argue that it received an alternative method because its own combined sales inappropriately passed the Cohen's *d* test. Rather it offers a hypothetical to challenge the reasonableness of Commerce's methodology more generally."  Most recently, in *HiSteel Co. v. United States*, No. 22-00142, 2023 WL 5944119, at *10 (CIT Sept. 12, 2023), the Court stayed its decision "pending the final resolution of all appellate review proceedings in Stupp Corp. v. United States, No. 23-1663 (Fed. Cir. docketed Mar. 27, 2023), including any further appeal therefrom."

comparison. Thus, the dispersion of the data between each group changes depending on the composition of the group. These differences are *arbitrary* (and unpredictable) factors in Commerce's DP analysis. They have little or no economic meaning but are merely artifacts of the economically arbitrary splitting and re-splitting of one population of transaction data into various test and comparison groups.

Moreover, relying on the standard deviation for the entire population is consistent with weighted averaging insofar as both methodologies accord equal weight to each kilogram of nails being analyzed regardless of the group in which the sale falls.  Because both methodologies accord equal weight to each kilogram sold, and because both methodologies are otherwise consistent with Cohen's *d* methodology for determining whether there are significant differences between two groups of data, both methodologies are reasonable.

In contrast, in the SA methodology, a particular sale will receive more weight than other sales for certain comparisons, thereby strongly influencing the outcome, while in other comparisons the same sale will receive a low weight, thereby having little influence on the outcome. As a result, SA is an unreasonable and economically meaningless methodology for determining whether there are significant differences between prices, leading to unreasonable results.

Finally, Commerce's rationale for rejecting reliance on the standard deviation for the entire population – that the "between group" data are not factored into the Cohen's *d* denominator – is another reason why the SA methodology fails. As discuss in detail in Taiwan Respondents' Comments to Commerce, weighted averaging conforms to the basic ANOVA equation; relying on simple averaging or on the weighted standard deviation for the entire population does not. PD6 at 53 – 59. Thus, while the single standard deviation solution does not

strictly conform to academic literature and ANOVA, its result is reasonable.  In contrast, Commerce's SA methodology is not supported by any academic literature, does not conform to ANOVA, leads to facially odd results, and is contrary to administrative practice and judicial precedent.

## CONCLUSION

Relying on WA, rather than SA, results in PT's margin being reduced from 2.16% percent to *de minimis*. Relying on the standard deviation of the entire population leads to a similar *de minimis* margin, since including the "between spread" in the denominator increases the Cohen's *d* denominator, thereby reducing the "*d*" percentage.  Thus, Commerce's choice of methodology has "a material impact on the results of the less-than-fair-value investigation," *Stupp, supra*, and results in a "meaningful difference" in PT's margin. Appx468.

Accordingly, Taiwan Respondents ask this Court to remand this matter to Commerce with instructions to calculate the Cohen's *d* denominator in a reasonable manner, consistent with the academic literature, and the teachings of *Mid Continent III, V* and *VI,* either by using weighted averaging or the weighted standard deviation for the entire population.

<div style="margin-left:40%">

Respectfully Submitted,

GRUNFELD, DESIDERIO, LEBOWITZ, SILVERMAN & KLESTADT LLP

*/s/Ned H. Marshak*
Ned H. Marshak
Andrew T. Schutz

*Counsel for PT Enterprise, Inc., Pro-Team Coil Nail Enterprise Inc., Unicatch Industrial Co., Ltd., WTA International Co., Ltd., Zon Mon Co., Ltd., Hor Liang Industrial Corp., President Industrial Inc.* and *Liang Chyuan Industrial Co., Ltd.*

</div>

Dated:  October 2, 2023

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Consolidated Plaintiff's Remand Comments as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word, is 9,850 words, less than the 10,000 word limit.


*/s/ Ned H. Marshak*
Ned H. Marshak


Dated: October 2, 2023