## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| MID CONTINENT STEEL & WIRE, INC., ) | |
| ) | |
| Plaintiff/Consolidated ) | |
| Defendant-Intervenor, ) | |
| ) | |
| ) | |
| v.                        ) | Consol. Court No. 15-00213 |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| and                       ) | |
| ) | |
| PT ENTERPRISE INC., et al., ) | |
| ) | |
| Defendant-Intervenors/ ) | |
| Consolidated Plaintiffs. ) | |

## DEFENDANT'S RESPONSE TO COMMENTS ON REMAND REDETERMINATION

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

OF COUNSEL:

VANIA WANG
Attorney
U.S. Department of Commerce
Office of the Chief Counsel for
Trade Enforcement & Compliance
Washington, DC 20230

MIKKI COTTET
Senior Trial Counsel
U.S. Department of Justice
Civil Division, Commercial Litigation Branch
Classification Unit, 8th Floor
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 307-0962
Facsimile: (202) 514-7965

November 15, 2023          Attorneys for Defendant, United States

## <u>TABLE OF CONTENTS</u>

BACKGROUND ..................................................................................................................2

ARGUMENT ......................................................................................................................8

I.     Standard Of Review ................................................................................................8

II.    Commerce's Remand Redetermination Is Reasonable And Supported By Substantial Evidence ................................................................................................................10

      A.    Commerce's Cohen's *d* Test Is Used In The First Stage Of Its Differential Pricing Analysis ..................................................................................10

      B.    Commerce's Use Of A Simple Average To Calculate The Denominator Of Its Cohen's *d* Coefficient Is Reasonable And Supported By Substantial Evidence ...12

      C.    Taiwan Respondents' Arguments Regarding Use Of A Weighted Average Do Not Undermine The Reasonableness Of Commerce's Use Of A Simple Average ..................................................................................................24

      D.    Commerce Reasonably Found That A Single Standard Deviation Is Not Appropriate For Commerce's Cohen's d Test ......................................28

CONCLUSION ................................................................................................................31

## **TABLE OF AUTHORITIES**

**Cases**                                                **Page(s)**

*Apex Frozen Foods Private Ltd. v. United States,*
   862 F.3d 1337 (Fed. Cir. 2017) ................................................................ 9

*Bethlehem Steel Corp. v. United States,*
   223 F. Supp. 2d 1372 (Ct. Int'l Trade 2002) ........................................... 8

*Boomerang Tube LLC v. United States,*
   856 F.3d 908 (Fed. Cir. 2017) ................................................................ 17

*Corus Staal BV v. United States,*
   502 F.3d 1370 (Fed. Cir. 2007) ........................................................ 17, 18

*Fujitsu General Ltd. v. United States,*
   88 F.3d 1034 (Fed. Cir. 1996) ................................................................. 9

*Good Samaritan Hosp. v. Shalala,*
   508 U.S. 402 (1993) ................................................................................. 9

*INS v. Cardoza–Fonseca,*
   480 U.S. 421 (1987) ................................................................................. 9

*Itochu Bldg. Prods. v. United States,*
   733 F.3d 1140 (Fed. Cir. 2013) .............................................................. 18

*JBF RAK LLC v. United States,*
   790 F.3d 1358 (Fed. Cir. 2015) ............................................................ 8, 9

*Luoyang Bearing Factory v. United States,*
   240 F. Supp. 2d 1268 (Ct. Int'l Trade 2002) ......................................... 18

*Mid Continent Steel & Wire, Inc. v. United States,*
   219 F. Supp. 3d 1326 (Ct. Int'l Trade 2017) ........................................... 4

*Mid Continent Steel & Wire, Inc. v. United States,*
   273 F. Supp. 3d 1161 (Ct. Int'l Trade 2017) ........................................ 3, 4

*Mid Continent Steel & Wire, Inc. v. United States,*
   495 F. Supp. 3d 1298 (Ct. Int'l Trade 2021) ........................................... 5

*Mid Continent Steel & Wire, Inc. v. United States,*
   628 F. Supp. 3d 1316 (Ct. Int'l Trade 2023) .................................. passim

*Mid Continent Steel & Wire, Inc. v. United States*,
    940 F.3d 662 (Fed. Cir. 2019) ................................................................ 4, 9

*Mid Continent v. United States*,
    31 F. 4th 1367 (Fed. Cir. 2022) ................................................................ passim

*Mittal Steel Point Lisas Ltd. v. United States*,
    548 F.3d 1375 (Fed. Cir. 2008) ................................................................ 18

*Navigator Co., S.A. v. United States*,
    463 F. Supp. 3d 1302 (Ct. Int'l Trade 2020) ........................................ 18

*NLRB v. Iron Workers*,
    434 U.S. 335 (1978) ................................................................................ 9

*Stupp Corp. v. United States*,
    5 F.4th 1341 (Fed. Cir. 2021) ................................................................ 9

*Tung Mung Dev. Co. v. United States*,
    25 CIT 752 (2001) ................................................................................ 9

*U.S. Steel Grp. v. United States*,
    96 F.3d 1352 (Fed. Cir. 1996) ................................................................ 8

*United States v. L.A. Tucker Truck Lines, Inc.*,
    344 U.S. 33 (1952) ................................................................................ 18

## Statutes

19 U.S.C. § 1516a(b)(1)(B)(i) .................................................................... 8

19 U.S.C. § 1677f-1(d)(1)(A) ................................................................... 10

19 U.S.C. § 1677f-1(d)(1)(B) ................................................................... 10

19 U.S.C. § 1677f-1(d)(1)(B)(i) ................................................................ 9, 23

28 U.S.C. § 2637(d) ................................................................................. 17

## Regulations

19 C.F.R. § 351.309(c)(2) ......................................................................... 17, 18

**Executive Determinations**

*Certain Steel Nails from Taiwan*,
   79 Fed. Reg. 78,053 (Dep't of Commerce Dec. 29, 2014) ........................................................ 2

*Certain Steel Nails From Taiwan*,
   80 Fed. Reg. 28,959 (Dep't of Commerce May 20, 2015) ..................................................... 2, 3

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE**

| | |
|---|---|
| MID CONTINENT STEEL & WIRE, INC., ) | |
| ) | |
| Plaintiff/Consolidated ) | |
| Defendant-Intervenor, ) | |
| ) | |
| v.                                                   ) | Consol. Court No. 15-00213 |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| PT ENTERPRISE INC., et al., ) | |
| ) | |
| Defendant-Intervenors/ ) | |
| Consolidated Plaintiffs. ) | |

## DEFENDANT'S RESPONSE TO COMMENTS ON REMAND REDETERMINATION

Defendant, the United States, respectfully submits this response to the comments filed by

consolidated plaintiffs, PT Enterprise Inc., Pro-Team Coil Nail Enterprise Inc. (collectively, PT),

Unicatch Industrial Co., Ltd., WTA International Co., Ltd., Zon Mon Co., Ltd., Hor Liang

Industrial Corp., President Industrial Inc., and Liang Chyuan Industrial Co., Ltd. (collectively,

Taiwan Respondents) (TR Cmts., ECF No. 209), on the final remand redetermination issued by

the Department of Commerce (Commerce) pursuant to *Mid Continent v. United States*, 31 F. 4th

1367 (Fed. Cir. 2022) (*Mid Continent V*), and the Court's remand order in *Mid Continent Steel &*

*Wire, Inc. v. United States*, 628 F. Supp. 3d 1316 (Ct. Int'l Trade 2023) (*Mid Continent VI*)

(Remand Order). *See* Final Results of Redetermination Pursuant to Court Remand, ECF No. 207-1 (Remand Redetermination).

As we demonstrate below, Commerce's remand redetermination complies with the Court's remand order and the mandate of the Court of Appeals for the Federal Circuit in *Mid Continent V*, and it is reasonable, supported by substantial evidence, and otherwise in accordance with law. Accordingly, the Court should sustain Commerce's remand redetermination.

## BACKGROUND

In 2015, Commerce issued its final determination in the less-than-fair-value investigation covering certain steel nails from Taiwan, finding that certain steel nails from Taiwan were being sold at less than fair value in the United States. *See Certain Steel Nails From Taiwan*, 80 Fed. Reg. 28,959 (Dep't of Commerce May 20, 2015) (final determination of sales at less than fair value) (Final Determination), P.R. 296[1], and the accompanying Issues and Decision Memorandum (IDM), P.R. 300. As it had done in the preliminary determination, Commerce continued to employ a differential pricing analysis in its final determination. *Id.*; *Certain Steel Nails from Taiwan*, 79 Fed. Reg. 78,053 (Dep't of Commerce Dec. 29, 2014) (negative prelim. determination of sales at less than fair value) (Preliminary Determination), P.R. 224, and accompanying Preliminary Decision Memorandum (PDM), P.R. 225. While Commerce's determination that there existed a pattern of prices for comparable merchandise that differed

---

[1] Public documents on the administrative record are designated as "P.R." and confidential documents are designated as "C.R." All P.R. and C.R. references in this brief cite to the administrative investigation record. References to the public documents on the administrative record for the second remand redetermination are designated as "2P.R.," for the third remand redetermination as "3P.R.," and for the fourth remand redetermination as "4P.R." Similarly, references to the confidential documents on the administrative record for the second remand redetermination are designated as "2C.R.," for the third remand redetermination as "3C.R.," and for the fourth remand redetermination as "4C.R."

significantly among purchasers, regions, or time periods remained unchanged in the final

determination, unlike in the preliminary determination, Commerce determined that such

differences could not be accounted for under the average-to-average (A-to-A) comparison

method.  IDM at 18-20; PT Final Sales Analysis Memorandum at 2, P.R. 297, C.R. 267.

Accordingly, based on its finding that 42.27 percent of PT's U.S. sales passed the Cohen's *d* test,

Commerce applied the average-to-transaction (A-to-T) method to PT's U.S. sales that passed the

Cohen's *d* test, and it applied the A-to-A method to PT's U.S. sales that did not pass the Cohen's

*d* test.  IDM at 18-20.  In the final determination, PT's estimated weighted-average dumping

margin was 2.24 percent.[2]  Final Determination at 28,959.

Following the affirmative injury determination by the U.S. International Trade

Commission (ITC), Commerce issued an antidumping duty order covering certain steel nails

from Taiwan.  *Certain Steel Nails From the Republic of Korea, Malaysia, the Sultanate of*

*Oman, Taiwan, and the Socialist Republic of Vietnam*, 80 Fed. Reg. 39,994 (Dep't of Commerce

July 13, 2015) (antidumping duty order), P.R. 307.  Taiwan Respondents appealed Commerce's

determination, challenging three aspects of Commerce's differential pricing analysis as contrary

to law:  (1) Commerce's application of the mixed comparison method, including what Taiwan

Respondents referred to as "double zeroing," to calculate PT's estimated weighted-average

dumping margin; (2) Commerce's use of the Cohen's *d* test thresholds to determine whether

prices differed significantly; and (3) Commerce's use of a simple average to calculate the

denominator for the Cohen's *d* coefficient.  The Court sustained Commerce's final determination

---

[2]  Although PT's weighted-average dumping margin decreased to 2.16 percent following recalculation of its general and administrative expenses on remand, the results of Commerce's differential pricing analysis did not change.  *Mid Continent Steel & Wire, Inc. v. United States*, 273 F. Supp. 3d 1161 (Ct. Int'l Trade 2017) (*Mid Continent II*).

with respect to the challenged differential pricing issues.  *Mid Continent Steel & Wire, Inc. v. United States*, 219 F. Supp. 3d 1326, 1344 (Ct. Int'l Trade 2017) (*Mid Continent I*); *Mid Continent II*, 273 F. Supp. 3d at 1161.  Then, although it rejected most of Taiwan Respondents' challenges on appeal, the Federal Circuit remanded Commerce's determination to use a simple average to calculate the denominator of the Cohen's *d* coefficient and remanded to secure further explanation from Commerce about that issue.  *Mid Continent Steel & Wire, Inc. v. United States*, 940 F.3d 662, 665 (Fed. Cir. 2019) (*Mid Continent III*).

Commerce issued a draft remand redetermination on March 3, 2020, and in it further explained its use of a simple average.  *See* Draft Remand Redetermination, 2C.R. 1-2, 2P.R. 3-5. Commerce also reopened the record for the submission of new factual information, and it included sections of relevant academic literature on the record.  *See* Draft Second Remand Redetermination at Appx I, Paul D. Ellis, *The Essential Guide to Effect Sizes* (2010) (*Ellis*), 2P.R. 1, 2C.R. 1; Draft Second Remand Redetermination at Appx II, Jacob Cohen, *Statistical Power Analysis for the Behavioral Sciences* (2d ed. 1988) (*Cohen*), 2P.R. 2, 2C.R. 2; Draft Second Remand Redetermination at Appx III, Robert Coe, *It's The Effect Size, Stupid: What Effect Size Is And Why It Is Important*, Paper presented at the Annual Conf. of British Educational Research Ass'n (Sept. 2002) (*Coe*), 2P.R. 2, 2C.R. 2.  Taiwan Respondents submitted two expert declarations, various academic articles, and webpages.  Taiwan Respondents Second Draft Remand Comments, 2P.R. 9, 2C.R. 3.  Mid Continent Steel & Wire, Inc. (Mid Continent) submitted an expert statement.  Mid Continent Rebuttal Factual Information, 2P.R. 16.  After consideration of the comments, arguments, and factual information presented by the parties, on June 16, 2020, Commerce released the second remand

redetermination, wherein it explained the bases for its continued use of a simple average to calculate the denominator of the Cohen's *d* coefficient.

On January 8, 2021, the Court sustained Commerce's second remand redetermination. *Mid Continent Steel & Wire, Inc. v. United States*, 495 F. Supp. 3d 1298 (Ct. Int'l Trade 2021) (*Mid Continent IV*). However, on April 21, 2022, the Federal Circuit vacated *Mid Continent IV*, holding that Commerce had not provided a "reasonable justification for departing from what the acknowledge literature teaches about Cohen's *d*." *Mid Continent V*, 31 F.4th at 1381. The Federal Circuit's opinion was based on several conclusions.

First, the Federal Circuit stated that the literature "indicates that the ideal denominator is the full population's standard deviation," but Commerce "did not use the standard deviation of all the data for its denominator" and instead used a simple average of the standard deviations for the two groups. *Id.* at 1378. The Federal Circuit determined that the academic literature on the Cohen's *d* test uniformly teaches that use of the "pooled standard deviation" estimate involves weight averaging, and the academic literature does not apply simple averaging to a pooled standard deviation estimate for different-sized groups. *Id.* at 1370, 1377-78. The Federal Circuit concluded that, by adopting simple averaging for the denominator of the Cohen's *d* coefficient, Commerce had departed from the methodology described in the academic literature. *Id.* at 1378.

Second, the Federal Circuit concluded that Commerce's reasons for the departure, that the pricing behavior of each group was equally genuine and equally rational, had no connection to the purpose of the denominator (which is to provide a dispersion figure for the more general pool that served as yardstick for deciding on the significance of difference in mean prices of two groups). *Id.* The Federal Circuit determined that the Cohen equation 2.3.2 that Commerce uses applies to groups that have the same sample size ($n_A = n_B$) and different standard deviations

($\sigma_A \neq \sigma_B$).  *Id*. at 1372.  However, the Federal Circuit opined that Commerce had used the Cohen

equation 2.3.2 without group-size weighting even when, unlike the situation described in the

section in *Cohen* from which Commerce's formula is borrowed, the groups are of different sizes.

*Id*. at 1372, 1378.  Finally, the Federal Circuit concluded that nothing in the section of the

academic literature from which Commerce's formula is borrowed applies simple averaging to

pool standard deviation estimates for different-sized groups.  *Id*.

Based on these conclusions, the Federal Circuit remanded, instructing that "Commerce

needs a reasonable justification for departing from what the acknowledged literature teaches

about Cohen's *d*" and ordering Commerce to "either provide an adequate explanation for its

choice of simple averaging or make a different choice, such as use of weighted averaging or use

of the standard deviation for the entire population."  *Id.* at 1381.

On remand, Commerce re-examined the academic literature.  Draft Remand

Redetermination, 3P.R. 1.  In the third remand redetermination, which was issued on November

10, 2022, Commerce explained how the academic literature supports the use of a simple average

to calculate the denominator of the Cohen's *d* test.  Final Results of Redetermination Pursuant to

Court Remand, ECF No. 186-1 (Third Remand Redetermination), at 8-16.  On April 3, 2023, the

Court remanded the action to Commerce.  *Mid Continent VI*, 628 F. Supp. 3d at 1318.  The Court

found that Commerce had misunderstood the Federal Circuit's mandate and that Commerce's

practical justifications were unsupported but not unsupportable.  *Id.* at 1323.  The Court also

found that Commerce's further explanation that the academic literature supports the use of a

simple average to calculate the denominator of the Cohen's *d* coefficient was unsupported.  *Id.*

The Court stated that the equations expressly implicate sample size and reasoned that, even if

weight averaging is supported when sampling is present, it does not mean that weight averaging

is unsupported when sampling is absent. *Id.* at 1324. The Court further explained that although it is true that sample size is necessary to determine statistical significance, it does not follow that sample size is irrelevant where statistical significance is absent. *Id.* at 1324-25. The Court observed that even though Commerce was not conducting a power analysis, it does not "mean that it {Commerce} may disregard Cohen's limitations on equations (2.3.2) for calculating *d*." *Id.* at 1325. Consequently, the Court found that "Commerce's claim that academia supports the simple average appears to be contradicted by the literature itself" and instructed that, "{i}f Commerce continues to rely on the academic literature to support its methodology, it must further explain why its choice of the simple average is reasonable in light of this inconsistency." *Id.* at 1326.

On July 7, 2023, Commerce issued the draft results of its fourth redetermination. Therein, Commerce explained that a simple average is reasonable because the reliability of the standard deviations based on the full populations of the two groups is equal, just as the reliability of the standard deviations based on samples of equal sample size is equal, which the Federal Circuit expressed limits the use of Dr. Cohen's equation 2.3.2. *See* Draft Remand Redetermination, 4P.R. 1. Commerce also explained that a simple average is appropriate because the numerator is independent of the group sizes, and, accordingly, the denominator should also be independent of the group sizes. *Id.* Commerce further explained its determination that a full population single standard deviation, an option identified by the Federal Circuit in *Mid Continent V*, is not appropriate as the denominator of the Cohen's *d* coefficient. *Id.* Commerce invited comments from interested parties, and Taiwan Respondents and Mid Continent submitted comments. *See* Taiwan Respondents Draft Remand Comments, 4P.R. 6-12; Mid Continent Draft Remand Comments, 4P.R. 5.

On August 31, 2023, Commerce issued the final fourth redetermination.  Based upon the general statistical principle of reliability, Commerce explained that its use of a simple average of the standard deviation of full populations to calculate the denominator of the Cohen's *d* coefficient is reasonable, even though the academic literature calls for the simple average of the standard deviations where groups have equal sample sizes.  Remand Redetermination at 10-13. Commerce further explained that the single standard deviation of all prices in the test group and the comparison group is not appropriate to use as the denominator of Commerce's Cohen's *d* coefficient.  *Id.* at 13-17.  Finally, Commerce addressed the parties' comments on the draft redetermination and continued to find that the use of a simple average is appropriate.  *Id.* at 21-63.

## **ARGUMENT**

### I.    Standard Of Review

"The same standard of review applies to the review of a remand determination as to the review of the original determination."  *Bethlehem Steel Corp. v. United States*, 223 F. Supp. 2d 1372, 1375 (Ct. Int'l Trade 2002).  Accordingly, the Court will uphold Commerce's remand determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  The Court also reviews Commerce's remand determination for compliance with the remand order.  *See Mid Continent VI*, 495 F. Supp. 3d at 1319.

The Court affords Commerce a great deal of deference when "a statute fails to make clear 'any Congressionally mandated procedure or methodology for assessment of the statutory tests.'" *JBF RAK LLC v. United States*, 790 F.3d 1358, 1363 (Fed. Cir. 2015) (quoting *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1362 (Fed. Cir. 1996)).  In the absence of any Congressionally

mandated procedure or methodology, the Federal Circuit has held that "Commerce 'may perform its duties in the way it believes most suitable.'" *Id.*; *see also Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996) (requiring "tremendous deference" that is "both greater than and distinct from that accorded the agency in interpreting the statutes it administers" when Commerce exercises its technical expertise to select and apply methodologies to implement dictates of the trade statute). Commerce's approach must reasonably interpret and implement the statute. *Stupp Corp. v. United States*, 5 F.4th 1341, 1353 (Fed. Cir. 2021) ("Our precedents make clear that the relevant standard for reviewing Commerce's selection of statistical tests and numerical cutoffs is reasonableness, not substantial evidence") (citations omitted); *Mid Continent III*, 940 F.3d at 667 ("In carrying out its statutorily assigned tasks, Commerce has discretion to make reasonable choices within statutory constraints"); *Apex Frozen Foods Private Ltd. v. United States*, 862 F.3d 1337, 1346 (Fed. Cir. 2017) (holding Commerce's "meaningful difference" test to be "reasonable"); *JBF RAK*, 790 F.3d at 1364, 1367 (holding that Commerce's interpretation of 19 U.S.C. § 1677f—1(d)(1)(B)(i) was reasonable and that "{b}ecause Congress did not provide for a direct methodology, Commerce properly 'fill{ed} th{at} gap").[3]

---

[3]   Taiwan Respondents argue that "Commerce, having failed three times to justify reliance on {simple averaging}, is not entitled to the same deference accorded Commerce when this Court analyzed its initial decision." TR Cmts. at 2. In support of this argument, Taiwan Respondents rely upon and refer to several cases. *Id.* at n.3 (citing *INS v. Cardoza–Fonseca*, 480 U.S. 421, 446 n.30 (1987); *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 417 (1993); *Tung Mung Dev. Co. v. United States*, 25 CIT 752 (2001)). Even assuming Commerce's position had changed, an "administrative agency is not disqualified from changing its mind; and when it does, the courts still sit in review of the administrative decision[.]" *Good Samaritan Hosp.*, 508 U.S. at 417 (quoting *NLRB v. Iron Workers*, 434 U.S. 335, 351 (1978)). Moreover, the Federal Circuit has reiterated that the standard by which Commerce's determination will be judged is reasonableness, and this standard is a deferential one in recognition of Commerce's expertise. *Mid Continent V*, 31 F.4th at 1381 (stating that "Commerce needs a reasonable justification for departing from what the acknowledged literature teaches about Cohen's *d*" and that Commerce's explanation in the second remand failed to meet "the reasonableness threshold (a deferential one,

II.     Commerce's Remand Redetermination Is Reasonable And Supported By Substantial
        Evidence

        Commerce complied with the Court's remand order, and its determination is reasonable,

supported by substantial evidence, and in accordance with law.

        A.      Commerce's Cohen's *d* Test Is Used In The First Stage Of Its Differential Pricing
                Analysis

        In the final determination, Commerce applied a differential pricing analysis to determine

whether it could use an alternative comparison method to calculate each respondent's estimated

weighted-average dumping margin pursuant to 19 U.S.C. § 1677f-1(d)(1)(B).  Section 1677f-

1(d)(1)(B) provides that Commerce may resort to a comparison method based on average-to-

transaction comparisons (wherein Commerce compares weighted-average normal values with the

export prices or constructed export prices of individual sales) when two requirements have been

met:  (1) there exists a pattern of prices that differ significantly for comparable merchandise

among purchasers, regions, or time periods; and (2) one of the standard comparison methods

under section 1677f-1(d)(1)(A) cannot account for such differences.  The first of these

requirements is referred to as the "pattern" requirement, and the second is referred to as the

"meaningful difference" requirement.  To examine these two requirements, Commerce utilizes

the differential pricing analysis.  Remand Redetermination at 5.

        In its examination of the pattern requirement, Commerce first performs a "Cohen's *d*

test" and then uses the ratio test.[4]  *Id*.  Together, these steps allow Commerce to determine

_____

in recognition of expertise)").  The fact that this is the fourth remand does not change the
reasonableness standard by which Commerce's explanation is reviewed, and Taiwan
Respondents have not demonstrated how Commerce's remand redetermination, which accepts
the findings of the courts and provides further explanation, warrants less deference.

     [4]  The ratio test, which is not at issue in this litigation, is used to assess the extent of the
significant price differences for all sales as measured by the Cohen's *d* test and whether there
exists a pattern of prices that differ significantly.  *Id*.

                                          10

whether U.S. sales prices differ *significantly* among purchasers, regions, or periods of time (*i.e.*, by measuring the extent of the difference between the mean net prices of the test group and the comparison group relative to the standard deviation of the prices in each of these two groups).

The Cohen's *d* test examines whether the U.S. sales prices to a given purchaser, region, or time period differ *significantly* from the sales prices of comparable merchandise to other purchasers, regions, or time periods.  *Id*.  Commerce's Cohen's *d* test is based on a measure of effect size, the concept of which was expounded by Dr. Jacob Cohen in his textbook on statistical power analysis, and which is the measure of the practical significance of the difference in two means.  *Id*. at 5-6; *see also Coe* at 5 ("Effect size quantifies the size of the difference between two groups, and may therefore be said to be a true measure of the significance of the difference.").  The effect size, the "Cohen's *d* coefficient," is the ratio of the difference in the means of two groups, divided by the "standard deviation," *i.e.*, the variance in the underlying data.  *Id*. at 6.  The Cohen's *d* coefficient is used to evaluate the extent to which the weighted-average net prices (*i.e.*, the mean of the net prices) to a particular purchaser, region, or time period (*i.e.*, the test group) differ from the weighted-average net prices of all other sales of comparable merchandise (*i.e.*, the comparison group).  PDM at 11.  The Cohen's *d* coefficient is calculated as a ratio, where the numerator is the difference in the means of the net prices and the denominator is the "standard deviation."  *Id*.; *see also Cohen* at 20.  Commerce calculates the denominator of the effect size as a "simple average"[5] of the standard deviations of the test group and comparison group.  Remand Redetermination at 6; *see also Cohen* at 43-44.

The significance of the difference in the means is determined by one of three fixed

---

[5] This "simple average" is really the square root of the simple average of the variances of the test group and the comparison group.  *Id*. at n.25.

thresholds proposed by Dr. Cohen:  small, medium, or large.  *Cohen* at 12-13 ("For each statistical test's {effect size} index, the author proposes, *as a convention*, {effect size} values to serve as operational definitions of the qualitative adjectives 'small,' 'medium,' and 'large.'". . . "Although arbitrary, the proposed conventions will be found to be reasonable by reasonable people.").  Of these thresholds, the large threshold (*i.e.*, 0.8) provides the strongest indication that there is a significant, practical difference between the means of the net prices of the test and comparison groups.  PDM at 11.  Together, these steps allow Commerce to determine whether United States sale prices differ *significantly* among purchasers, regions, or periods of time (*i.e.*, by measuring the extent of the difference between the mean net prices of the test group and the comparison group relative to the dispersion of the prices within each of these two groups).

B.    Commerce's Use Of A Simple Average To Calculate The Denominator Of Its Cohen's *d* Coefficient Is Reasonable And Supported By Substantial Evidence

Acknowledging that the Federal Circuit opined that the academic literature provides for the use of a simple average to calculate the denominator of the Cohen's *d* coefficient only when sample sizes are equal, Commerce determined that the use of a simple average to calculate the denominator of the Cohen's *d* coefficient within the context of Commerce's Cohen's *d* test is reasonable because the calculated standard deviation of the test group and the comparison group are equally reliable, just as the standard deviations calculated based on groups with equal sample sizes are equally reliable.  Remand Redetermination at 10-13.  This determination is reasonable and supported by substantial evidence.

Commerce first explained that sample size is an indicator of "reliability."  *Id*. at 10 (citing and quoting portions of *Cohen*).  Based upon Dr. Cohen's presentation of the parameters of the statistical power analysis and description of the "reliability of sample results and sample size," among other things, Commerce concluded that "{t}he larger the sample size vis-à-vis the

population, the more reliable the sample results." *Id.* Against this backdrop, Commerce discussed its determination within the context of the Federal Circuit's holding that a simple average, or the "root square mean," formula in *Cohen* is limited to where the sample sizes are equal. *Id*. at 11.

Commerce began with "the Federal Circuit's understanding that the use of the simple average of differing standard deviations {(*i.e.*, $\sigma_A \neq \sigma_B$)}, Dr. Cohen's equation 2.3.2, applies to an analysis involving sampled data because it is part of a power analysis which involves sampled data, including use of a *t*-test to evaluate the statistical significance of the results." *Id*. (citing *Cohen* at 43-33). Commerce acknowledged the Federal Circuit's conclusion that *Cohen*'s equation requires equal sample sizes (*i.e.*, $n_A = n_B$) in scenarios where the simple average is applied in the literature. *Id*. (citing *Mid Continent V*, 31 F. 4th at 1378 ("{Equation 2.3.2, the simple average,} comes from a section of Cohen that addresses a situation in which the two groups at issue are of the same size. ('CASE 2: $\sigma_A \neq \sigma_B$, $n_A = n_B$').") (internal citations omitted, emphasis added)).

Commerce explained that, because the sample sizes are equal, the "reliability" of the estimated standard deviations for each of the sampled groups is equal. *Id*. at 10-11. As a result, the simple average is appropriate when there is equality in sample size and reliability. *Id*. at 11. "In other words, when the sample sizes of the two groups are equal, then the reliability of the estimates of the standard deviations are the same, and it is appropriate to give equal weights, *i.e.*, a simple average, when averaging the two standard deviations to calculate the denominator of the Cohen's *d* coefficient." *Id*.

On the other hand, with the weighted average, Commerce explained that "the standard deviation of the group with the larger sample size (*i.e.*, sales volume) is given more weight than

the group with the smaller sample size." *Id*.  If the sample size of one group is larger than the other group, the "reliability" of the standard deviation for that group will also be greater.  *Id*. Because the standard deviation of the group with the larger sample size has greater reliability, more weight is given to that standard deviation (and less weight is given the standard deviation for the group with the smaller sample size), and the weights reflect the relative reliability of the standard deviations from the two groups.  *Id*. at 12.

Commerce explained that, because it uses the full populations of U.S. sale prices for both the test and the comparison groups in its Cohen's *d* test, the standard deviations calculated for the test and comparison groups have a reliability of 100 percent, *i.e.*, "the closeness with which {the calculated value} can be expected to approximate the relevant population value."  *Id*. (quoting Cohen at 6) (cleaned up).  The calculated parameters are equally reliable, and because the "use of the simple average when the sample sizes are equal reflects that the calculated parameters used to calculate the Cohen's *d* coefficient are equally reliable," for Commerce's Cohen's *d* test, it is reasonable to combine the standard deviations using a simple average.  *Id.* at 13.  Thus, Commerce has supported its determination that use of the simple average is reasonable in this context, *i.e.*, to calculate the denominator of the Cohen's *d* coefficient.

Taiwan Respondents, however, contend that Commerce's "equally reliable" rationale does not adequately explain Commerce's decision to rely on simple averaging.  TR Cmts. at 9. In support of this contention, Taiwan Respondents press several unavailing arguments.  First, Taiwan Respondents argue that "the reliability of data does not control Commerce's decision as to how to calculate the Cohen's *d* denominator."  *Id*.  Quoting the Court's conclusion regarding weighted averaging in *Mid Continent VI*, 628 F. Supp. 3d at 1324, they argue that "Commerce's premise that the Test Group and Comparison Group of a full population are equally reliable does

not mean that the Cohen's *d* denominator can be calculated using SA when there is a full

population." *Id*. They further contend:

> Equality in size does not necessarily result in equality in reliability.
> And equality in reliability is not dispositive in determining whether
> the Cohen's *d* denominator should be based on WA or SA. Indeed,
> in this case there is no equality in size. The Cohen's *d* Test Group
> and Comparison Group do not have the same numbers of sales
> (i.e., counts) and do not have the same weight (i.e., number of
> kilograms). That the Cohen's *d* denominator in a sampled
> population can be calculated using SA when the Test Group and
> Comparison Group have the same number of counts does not mean
> that a denominator in a full population can be calculated based on
> SA when the Test Group and Comparison Group have a different
> number of counts and are not equal in weight. As this Court
> succinctly stated, "Commerce's premise does not lead to its
> conclusion."

*Id*. These contentions lack merit.

Commerce thoroughly explained how the general statistical concept of reliability

supports its use of a simple average to calculate the denominator of Commerce's Cohen's *d*

coefficient. Remand Redetermination 10-13. Indeed, Commerce also succinctly summarized its

rationale as follows:

> 1)      The academic literature applies to analyses of sampled
> data, including Dr. Cohen's equation 2.3.2 which provides for the
> simple average of the standard deviations of two groups of data
> where the standard deviations differ but the sample sizes are equal.
>
> 2)      The reliability of an estimated parameter based on sampled
> data may be dependent on many factors, but it is always dependent
> on the number of observations in the sampled data, *i.e.*, the sample
> size (*n*).
>
> 3)      As Dr. Cohen's equation 2.3.2 requires that sample sizes be
> equal, this results in the reliability of the estimated standard
> deviations in equation 2.3.2 to be equal. Accordingly, the
> estimated standard deviations are combined using a simple
> average, *i.e.*, an average with equal weights.
>
> 4)      When the sample sizes differ, then the reliability of the
> estimated standard deviations differs, and it is appropriate to

weight average the estimated standard deviations to calculate the pooled standard deviation. The standard deviation for the group with the greater sample size will be accorded the larger weight.

5)      When the analysis is based on data where each group is the full universe of data for that group (*i.e.*, the full population), then the reliability of the standard deviations for each group is 100 percent. The calculated standard deviations are the actual values of the standard deviation of each group.

6)      Therefore, the average of the standard deviations to calculate the denominator of the *d* coefficient is reasonably unweighted, *i.e.*, a simple average, because, as with the situation where the sample sizes are equal and the reliability of the estimated standard deviations are equal, the reliability of the standard deviations calculated for the full populations of data are equal.

*Id*. at 21-22.  Commerce's explanation may not mean that Commerce *must* use a simple average; however, Commerce's explanation demonstrates that a simple average is reasonable when the reliability of the standard deviations for the two groups is equal, as it is here.

Taiwan Respondents argue that equality in size does not necessarily result in equality in reliability.  TR Cmts. at 9.  However, Taiwan Respondents offer no explanation or record evidence to support this argument.  Therefore, this argument should be flatly rejected.

Likewise, Taiwan Respondents provide no evidentiary support that the reliability of a parameter's value (*e.g.*, standard deviation) based on a full population is not 100 percent, no matter how many observations are included in that population.  Therefore, this argument should be rejected too.  Furthermore, generally, in Commerce Cohen's *d* test, each test group does not have the same number of observations as the corresponding comparison group.  The value of the standard deviation based on the full population is not an estimate; rather, it is the actual value of the standard deviation for that population and will be the same value no matter how many times the standard deviation is calculated based on the full population, independent of whether there are two observations or two thousand observations in that full population.  *See* Remand

Redetermination at 23, 30 (explaining that the reliability of the population is not dependent upon the number of observations). Taiwan Respondents' conclusion that a simple average cannot be used when the test group and comparison group are each composed of the full population of prices to each group is not supported by the record.

Second, Taiwan Respondents state that Dr. Cohen, and the academic literature in general, examined phenomena that were based on "the number of counts in each group," usually based on persons, each of which constituted a single unit or observation. TR Cmts. at 9-10. Therefore, they argue that "weight" was not a relevant factor in the academic literature, whereas in Commerce's differential pricing analysis the "analog of a count is the weight of the group (total quantity transacted), and not the number of transactions. *Id*. at 10. This argument was ***not*** presented to Commerce on remand and, therefore, it should be rejected because Taiwan Respondents failed to exhaust their administrative remedies.

Congress has directed that "the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies." 28 U.S.C. § 2637(d). Section 2637(d) "indicates a congressional intent that, absent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies." *Boomerang Tube LLC v. United States*, 856 F.3d 908, 912 (Fed. Cir. 2017) (citing *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007)). Commerce's regulations also expressly require that a party raise all arguments in a timely manner before the agency. *See* 19 C.F.R. § 351.309(c)(2) ("The case brief must present all arguments that continue in the submitter's view to be relevant to the Secretary's final determination or final results, including any arguments presented before the date of publication of the preliminary determination or preliminary results."). "The exhaustion requirement in this context is therefore not simply a creature of court decision, as is

sometimes the case, but is a requirement explicitly imposed by the agency as a prerequisite to judicial review." *Corus Staal*, 502 F.3d at 1379 (citing 19 C.F.R. § 351.309(c)(2)).  Also, the general policies underlying the exhaustion requirement – protecting administrative agency authority and promoting judicial efficiency – would be vitiated if the Court were to consider arguments raised for the first time in judicial proceedings.  "Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against *objection made at the time appropriate under its practice*."  *Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1383–84 (Fed. Cir. 2008) (quoting *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952) (emphasis added)).  The exhaustion doctrine applies to remand proceedings.  *Id.*; *see also Navigator Co., S.A. v. United States*, 463 F. Supp. 3d 1302 (Ct. Int'l Trade 2020).  And, the Court should "generally take{} a 'strict view' of the requirement that parties exhaust their administrative remedies before {Commerce} in trade cases."  *Corus Staal*, 502 F.3d at 1379.  Although there are exceptions to the exhaustion requirement, none of the recognized exceptions such as futility, intervening judicial act, or pure legal question applies here.  *See Itochu Bldg. Prods. v. United States*, 733 F.3d 1140, 1145–48 (Fed. Cir. 2013); *Luoyang Bearing Factory v. United States*, 240 F. Supp. 2d 1268, 1297 n.26 (Ct. Int'l Trade 2002).

In any event, Taiwan Respondents' new argument is unavailing.  Their argument does not undermine the reasonableness of Commerce's analysis; rather, it highlights the undisputed fact that the scenarios in *Cohen* may differ from the situation faced by Commerce in its differential pricing analysis.  Remand Redetermination at 57.  Dr. Cohen uses "counts" in his examples whether using a simple average or weighted average to calculate the denominator of

the Cohen's *d* coefficient.  *See Cohen* at 40-41, 44-45, 66-70, and equation 2.5.2.  The distinction

that Taiwan Respondents point out is a distinction without a difference.  The stated distinction

does not affect whether a simple average or weighted average is used when combining the

standard deviation of the test and comparison groups.  While Commerce agrees that within each

group, the mean and the standard deviation are weighted by the sale quantity of each transaction,

Remand Redetermination at 37-38, 54-55, this within-group weighting is not the same as

weighting when averaging the standard deviations of the two groups to calculate the denominator

of the Cohen's *d* coefficient.  *Id*. at 38, 44.

Finally on this point, Taiwan Respondents' argument assumes that Commerce would

weight average the standard deviations of the two groups based on sales quantities.  Commerce

has chosen to use a simple average and, consequently, has not addressed the basis of weighting

the standard deviations (*i.e.*, the number of observations or the sales quantities) of the two

groups.  *See Mid Continent V*, 31 F. 4th at 1381 n.6 (recognizing that the basis for weight

averaging was not before the Court for review because Commerce had rejected weighted

averaging); *Mid Continent VI*, 628 F. Supp. 3d at 1320 n.3 ("Commerce also argues against the

alternative weighting proposals advanced by PT and the Court of Appeals.  Because Commerce

has not elected to use either method on remand, the court does not reach the relative merits of

using either a single standard deviation or PT's proposed equation.  Moreover, even if the

alternate proposals were fully supported by the literature, this support would not necessarily

detract from Commerce's choice of the simple average." (internal citations omitted)).

Taiwan Respondents also argue that Dr. Cohen defines reliability as precision, which

reflects its standard error or the amount that a sample's mean may deviate from the population's

mean.  TR. Cmts. at 10.  Commerce agrees that Dr. Cohen equated reliability with precision and

that precision is dependent upon sample size when a parameter is estimated based on sampled data.  Remand Redetermination at 10 (citing *Cohen* at 6 ("The reliability (or precision) of a sample value is the closeness with which it can be expected to approximate the relevant population value. … {I}t is always dependent upon the size of the sample." (emphasis in original); *Cohen* at 7 ("The nature of the dependence of reliability upon n {*i.e.*, sample size} is obvious from the illustrative formulas, and, indeed, intuitively.  The larger the sample size, other things being equal, the smaller the error and the greater the reliability or precision of the results.")).  Because record evidence demonstrates that reliability is dependent on sample size, *i.e.*, the standard deviations of sample groups of equal sizes are equally reliable, and because the standard deviations based on full populations are also equally (*i.e.*, 100 percent) reliable, notwithstanding the populations may be of unequal sizes, Commerce reasonably found that a simple average is appropriate.  *Id*. at 22.

Taiwan Respondents argue that "the reliability of samples cannot be readily compared to the reliability of a full population" because a sample's precision depends on multiple factors, "let alone be a reason why the standard deviation yardstick of a full population can be based on simple averaging of the SDs of two unequal groups."  TR Cmts. at 10-11.  This is incorrect.  Commerce explained that the standard deviations calculated based on groups of equal sample size have the same reliability, and the standard deviations calculated based on full populations also have the same reliability.  Because the reliability of each value is equal when the sample sizes are equal, a simple average is reasonable.  Remand Redetermination at 11.  In contrast, when the sample sizes differ, the reliability of the parameters calculated based on sampled data

differ, and a weighted average of the standard deviations is appropriate.[6]  Remand
Redetermination at 11-12.  Taiwan Respondents' argument ignores the fact that Dr. Cohen
defines reliability or precision as "the closeness with which {a sample value} can be expected to
approximate the relevant population value."  *Cohen* at 6.  "The reliability of an estimated
parameter based on sampled data may be dependent on many factors, but it is *always* dependent
on the number of observations in the sampled data, *i.e.*, the sample size (*n*)."  Remand
Redetermination at 21 (emphasis added).  *See also Cohen* at 6.  Consequently, the standard
deviations calculated on two samples with equal sample size, when compared to each other, are
equally reliable.  Remand Redetermination at 11.  Furthermore, Commerce does not state that the
reliability of the estimated standard deviations based on sampled data are "100% reliable," but
rather that these estimated values are equally reliable in relation to each other.  Indeed, by
definition, these estimated values are not "100% reliable" because they are ***estimates*** of the
actual values of the standard deviations of the two groups.  *Id.*

  Taiwan Respondents further argue that the fact that each group has zero errors is not
related to the size of each group.  TR Cmts. at 11.  However, this argument does not detract from
Commerce's reasonable explanation.  Taiwan Respondents fail to explain how "zero errors"
differs from "perfectly reliable" or "100% reliable."  Indeed, Taiwan Respondents argument here
supports Commerce's reasonable explanation.  When the calculated standard deviations are
based on the full populations of prices in each group, irrespective of the number of observations

---

[6]  The Federal Circuit held that "Commerce ha{d} not explained why the basic choice of
weighted averaging of unequal-size groups fails to apply to the present context."  *Mid Continent
V*, 31 F.4th at 1380.  Commerce does not dispute that when the standard deviations are estimated
based upon sampled data, then the calculation of the pooled standard deviation should be based
on the weighted average of those estimates.  *See, e.g.*, *Ellis* at 10 ("If {the population standard
deviation} is unknown, some approximate value must be used instead"), 26-27 n.8 and n.9.

in each group, there are "zero errors," the calculated values are the actual standard deviations of each population, and the ability of the values to represent the standard deviations of each population is perfectly reliable.  As Commerce stated in the remand redetermination, "{t}he number of observations in the population does not affect the reliability of a value of a parameter (*e.g.*, the standard deviation) of the population."  Remand Redetermination at 23.  Accordingly, as in the case of equal sample sizes, it is reasonable to use a simple average because the standard deviations are "perfectly reliable" when based on full populations.

Fourth, Taiwan Respondents attempt to equate Commerce's position regarding equal reliability to Commerce's discussion in the second remand redetermination of "equally rational" and "equally genuine," which the Federal Circuit reasoned do not support Commerce's use of a simple average.  TR Cmts. at 11.[7]  They argue that the fact that the test group and the comparison group of full population may be equally reliable provides no reason for using a simple average when computing the pooled standard deviation.  *Id*.  Taiwan Respondents disagree with Commerce's explanation and assert that Commerce "fails in its attempt to create a distinction between reliability, rationality and genuineness, since such distinction does not exist." *Id*. at 11-12.  They argue that Commerce's position in this remand has the same defects and that a respondent's pricing behavior cannot be separated from the data.  *Id*. at 11.  However, Commerce's arguments about reliability are "based on the characteristic of the data rather than the pricing behavior of the respondents."  Remand Redetermination at 27.  Although the data may reveal pricing behavior, reliability is a general statistical concept regarding the data.  As Taiwan Respondents concede, rationality and genuineness are not statistical concepts and do not

---

[7]  Taiwan Respondents refer to "*Mid Continent III*"; however, the correct citation is to *Mid Continent V*, 31 F.4th at 1379.

have clear definitions in the academic literature.  TR Cmts. at 12 n.11.  *See also Cohen* at 6.  In short, the only commonality between the terms is Commerce's use of the adjective "equally" and, thus Taiwan Respondents' argument equating the "rationality" and "genuineness" of a respondent's pricing behavior with the "reliability" of parameters calculated for a group of data (whether that group represents a full population or a sample) lacks merit.

Finally, Taiwan Respondents argue that the test and comparison groups "do not have independent existences" and that each sale is a member of multiple test and comparison groups such that a particular sale will have more or less weight depending on which group the sale falls into and which group is designated as the test or comparison group.  TR Cmts. at 12-13.  The statute requires Commerce to examine whether "there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time."  19 U.S.C. § 1677f-1(d)(1)(B)(i).  To examine the pattern requirement, Commerce uses the Cohen's *d* test to determine whether the prices to a given purchaser, region, or time period differ significantly.  Remand Redetermination at 5.  In performing its duty under the statute to determine whether prices differ significantly, Commerce splits the U.S. sales into individual test and comparison groups comprising all prices of comparable merchandise to a given purchaser, region, or time period.  Remand Redetermination at 5, 55.  Each iteration of the Cohen's *d* test represents a separate determination whether the prices to the test group differ significantly from the prices to the comparison group.  Every iteration of the Cohen's *d* test represents a different determination whether the prices to a separate test group differ significantly from the prices to a different comparison group.  The "weight" (whether by observation or sale quantity) of each sale price within each test group and comparison group is reflected in the weighted-average mean and weighted standard deviation of each group which is

used to calculate the Cohen's *d* coefficient.  Thus, the "weight" of each sale price is accounted

for in Commerce's Cohen's *d* test.  Remand Redetermination at 14, 55.  Under Commerce's

Cohen's *d* test; a sale will fall into a test group once for each of the three categories tested, *i.e.*,

by purchaser, by region, and by time period.  Further, each sale will fall into one or more

comparison groups that will depend on the number of sales to other purchasers, in other regions,

and during other time periods.  Taiwan Respondents state that "a particular sale will receive

more weight than other sales for certain comparisons . . . while in other comparisons the same

sale will receive a low weight."  TR Cmts. at 12.  However, in each test and comparison group,

each sale is weighted when calculating the mean and standard deviation of each test and

comparison group.  Remand Redetermination at 55.  Thus, the "weights" of each sale are

reflected in the mean and standard deviation of each group.

      C.     Taiwan Respondents' Arguments Regarding Use Of A Weighted Average Do Not
            Undermine The Reasonableness Of Commerce's Use Of A Simple Average

Taiwan Respondents argue that (1) administrative practice and judicial precedent support

reliance on a weighted averaging, TR Cmts. at 13-16, and (2) weighted averaging leads to

reasonable results and simple averaging does not, *id*. at 17-29.  These arguments are unavailing.

Taiwan Respondents' argument that Commerce's differential pricing analysis is

"substantially similar" to Commerce's dumping margin calculation and administrative and court

cases prefer weighted averages over simple averaging even in complex analysis, TR Cmts. 13-

16, is premised on a false equivalence.  Specifically, Taiwan Respondents erroneously equate

Commerce's Cohen's *d* test with the calculation of a respondent's weighted-average dumping

margin.  The calculation for Commerce's weighted-average dumping margin is not the Cohen's

*d* test.  Remand Redetermination at 54-55.  The weighted-average dumping margin has the total

value of U.S. sales as the denominator.  The statute defines the dumping margin as the "amount

by which normal value exceeds the export price or constructed export price" and the weighted

average dumping margin as the "percentage determined by dividing the aggregate dumping

margins determined by the aggregate export prices and constructed export prices{.}"  19 U.S.C.

§ 1673; 19 U.S.C. § 1677(35)(B).  Neither the calculation of individual dumping margins, nor

the aggregation of these dumping margins to calculate the weighted-average dumping margin

involves the advanced statistical concepts at issue in this case, such as standard deviations or a

measure of the dispersion of prices within two groups.

Commerce uses the Cohen's *d* test to examine the difference in the mean prices between

the test group and the comparison group and determines whether that difference is significant

based on the variances of the prices within the two groups.  Remand Redetermination at 55.

Taiwan Respondents disregard the purpose of the Cohen's *d* test.  The Cohen's *d* test does not

examine "dumping," includes no comparison with normal values, and only involves an analysis

of U.S. prices.  PDM at 11; Remand Redetermination at 54-55.  Indeed, to determine whether

dumping exists requires both a U.S. price and a normal value (*i.e.*, home market price, third

country price, or constructed value).  Remand Redetermination at 55.

Therefore, Taiwan Respondents reliance on judicial and administrative decisions

involving the use of weight averaging in the context of determining individual dumping margins

as supporting the use of weight averaging over simple averaging here, TR Cmts. at 15, is

misplaced.  These decisions are inapposite because they do not involve the advanced statistical

concepts at issue in this case.  Remand Redetermination at 54-55.

Taiwan Respondents argue that five graphic examples demonstrate that weight averaging

is reasonable and simple averaging is not, and that low quantities create distortions.  TR Cmts. at

17-29.  However, the "only differences are the results themselves, and the arithmetic logic that

different outcomes result when different weights are used to combine the standard deviations in the denominator of the Cohen's *d* coefficient." Remand Redetermination at 51-52. To determine whether the differences in prices are significant, Commerce compares the Cohen's *d* coefficient to the 0.8 threshold. PDM at 11. However, the graphical representations do not show whether a given set of compared prices represents a Cohen's *d* coefficient larger or smaller than the 0.8 threshold. Remand Redetermination at 52. Therefore, the graphical representations do not express whether the data represented in the graphics differ significantly. "In other words, there is no visual distinction between any of the graphical representations of the test and comparison group prices which would lead a reasonable observer to recognize that one difference in prices pass the Cohen's *d* test and another difference in prices does not pass the Cohen's *d* test, irrespective of whether a simple average or a weighted average is used." *Id.*

The graphical representations only demonstrate an arithmetic tautology. As Commerce explained:

> When the weights for averaging two values change from being identical (*e.g.*, one) to being non-equal values, the results will change. When the weights are based on the sales quantities of each group, the smaller group will have less weight than the larger group, and the value being average (*i.e.*, the standard deviation) will have a smaller impact on the calculated average, and conversely the value of the larger group will have a larger impact. If the standard deviation of the smaller group is small, then the calculated average will be larger and the Cohen's *d* coefficient will be smaller. If the standard deviation for the smaller group is larger, then the calculated average will be smaller and the Cohen's *d* coefficient will be larger.

*Id.* at 52-53.

Taiwan Respondent explained how weighting would work and relied on the results to argue that the methodology is reasonable. TR Cmts. at 17-27. However, the results do not make a methodology reasonable. Remand Redetermination at 53. As Commerce explained, weighting

is appropriate when the sample sizes of the groups of sampled data are not equal because the group with a larger sample size has greater reliability and more weight is given to that group. *Id*. at 12.  Thus, the weights reflect the relative reliability of the standard deviation from the two groups. *Id*.  However, because both groups are populations that are equally reliable, Commerce uses a simple average. *Id*. at 13.

Taiwan Respondents argue that Commerce has not analyzed the record or rebutted their examples and, therefore, Commerce's determination is not supported by substantial evidence. TR Cmts. at 29-30.  However, Taiwan Respondents' argument is belied by Commerce's remand redetermination, which shows that Commerce analyzed the record and specifically addressed the relevance of Taiwan Respondents' examples.  Commerce found that the graphical representations do not demonstrate whether a set of prices are significantly different.  Remand Redetermination at 52-53.  Commerce also found that Taiwan Respondents' description of the mechanics of weighting is an "arithmetic tautology," and that "{r}eliance on such arithmetic logic to invent support for the reasonableness of a weighted average is without merit." *Id*. Furthermore, Commerce explained that with sample groups of unequal size, weights reflect the relative reliability of the standard deviation from the two groups. *Id*. at 12.  Weighting is appropriate when the sample sizes of the groups are not equal because the group with a larger sample size has greater reliability and, consequently, more weight is given to that group. *Id*. Here, however, because both groups are full populations that are equally reliable, Commerce uses a simple average. *Id*. at 13.  Moreover, Commerce based its explanation for using a simple average on evidence on the record.  Reliability is a general statistical principle, and Commerce's analysis of the sample size requirements for simple and weighted averages and reliability is based upon the record evidence, which includes the academic literature. *Id*. at 10-13.

27

D.    Commerce Reasonably Found That A Single Standard Deviation Is Not
      Appropriate For Commerce's Cohen's *d* Test

Finally, Taiwan Respondents argue that the Federal Circuit concluded that the academic

literature supports the use of a single standard deviation of the prices in the test and comparison

groups combined to calculate the denominator of the Cohen's *d* test.  TR Cmts. at 7.  The Federal

Circuit also expressly stated that "an agency is not duty-bound to follow published literature{.}"

*Mid Continent V*, 31 F.4th at 1381.

Nevertheless, Commerce addressed the Federal Circuit's conclusion that the "seemingly

preferred way" to calculate the Cohen's *d* denominator is the standard deviation of the combined

prices of both the test and comparison groups.  Remand Redetermination at 13-17.  Commerce

explained that Dr. Cohen distinguished between the two populations and groups whose

differences were being examined, stating that the denominator of the Cohen's *d* coefficient

should be the standard deviation of one of the populations when the standard deviations of the

two populations are equal.  *Id.* at 14 (citing *Cohen* at 20, 27).  Further, Professor Coe warned that

a single standard deviation of the combined data would create problems because the "yardstick"

by which the difference in the means is measured would include not only the variances in the

data within the two groups, but also would include the difference between the two groups.  *Id.* at

15-16.  As a result, the single standard deviation will increase when the difference in the means

between the two groups increases despite there being no change in the variances within the two

groups.  *Id.* at 17.  In contrast, both the simple average and weighted average of the standard

deviations of the two groups will remain constant even as the difference in the means between

the two groups increases or decreases.  *Id.* at 17.

Taiwan Respondents argue that Commerce ignores that the Federal Circuit has found that

the literature supports the single standard deviation, that the test and comparison group are not

different datasets, and that the differences are arbitrary.  TR Cmts. at 30-31.  Perplexingly,

Taiwan Respondents then state that the single standard deviation does not necessarily conform to

the academic literature.  *Id*. at 31-32.  In any event, Commerce explained why a single standard

deviation is not appropriate for Commerce's Cohen's *d* test.  In particular, the academic literature

supports that the two groups in Commerce's analysis are separate from one another.  Remand

Redetermination at 14-15.  For example, Dr. Cohen's formulation of effect size defines the

denominator as "either the standard deviation of either population A or the standard deviation of

population B when the standard deviation of population A is assumed to be equal to the standard

deviation of population B."  Remand Redetermination at 14 (citing Cohen at 20, 27).  Therefore,

the denominator in Cohen's equation 2.2.1 and 2.2.2 is either the standard deviation of

population A or the standard deviation of population B, but it is not the standard deviation of

populations A and B combined.  Remand Redetermination at 14.  Moreover, when Professor Coe

discusses standard deviation, he first suggests using the standard deviation of one group, Glass's

delta or ∆, which is the standard deviation of the control group.  *Coe* at 6.  *See also Ellis* at 10

(explaining that the denominator of Glass's delta is the standard deviation of the control group).

Professor Coe then states that the pooled estimate of standard deviation is "an average of the

standard deviations of the experimental and control groups (Equation 4)."  *Coe* at 6.  Professor

Coe noted "that this is not the same as the standard deviation of all the values in both groups

'pooled' together."  *Id*. at 6.

Commerce explained that "whereas the pooled standard deviation reflects only the

variation in the data within each group, the 'single standard deviation' not only reflects the

variation of the data within each group, but also the difference in the means between the two

groups."  Remand Redetermination at 17.  This means that even when there is no change in the

variance or dispersion in the data within each of the two groups, an increase in the difference of the means would increase the single standard deviation.  *Id*.  The value of a pooled standard deviation, whether simple or weighted average, will remain constant because it is based upon the relationship or spread of data within each group, whereas the value of a single standard deviation will vary with the difference in the means between the two groups.  *Id*. at 17, 41-43, Appendix (showing that when the difference in the means between the two groups vary but the variance of each group remains the same, the weighted average and simple average in blue and purple respectively remain constant while the full population single standard deviation[8] in brown varies).  "Therefore, the option to use a single standard deviation of all data when the data are explicitly separated into two separate populations is not a reasonable approach for Commerce's Cohen's *d* test."  *Id*. at 17.

Additionally, although both the simple average and weighted average will remain constant and will not reflect the difference in the means between the two groups, as explained above, Commerce determined that a simple average was a reasonable method of calculating the denominator of the Cohen's *d* coefficient based upon reliability and for a separate set of reasons than the reasons Commerce found that a single standard deviation was not appropriate.  *Id*. at 10-13.

Taiwan Respondents contend that Commerce's rationale for rejecting the single standard deviation is also why a simple average fails.  TR Cmts. at 31.  However, Taiwan Respondents fail to explain or support this contention; therefore, the contention should be rejected.  Taiwan Respondents argue that ANOVA does not support simple averaging.  *Id*. at 31-32.  However,

---

[8] Technically, the numbers in the boxes are the variances.  The standard deviations are the numbers next to them, but the same observation applies to the standard deviations as it does with the variances.

"Taiwan Respondents fail to explain how an ANOVA analysis is relevant to Commerce's analysis of the difference in the mean prices, either based on the academic literature or otherwise." Remand Redetermination at 59. Therefore, this contention should fail. Moreover, ANOVA is used with Dr. Cohen's $f$ coefficient, which "is used to measure the dispersion of means among three or more groups." *Ellis* at 12.

Commerce's determination that a single standard deviation is not appropriate for Commerce's Cohen's $d$ test is reasonable and supported by substantial evidence because unlike a simple or weighted average, a single standard deviation includes the variation between the groups (*i.e.*, an amount which accounts for the difference in the means), as well as the dispersion of the data within each of the groups.

## CONCLUSION

For these reasons, we respectfully request that the Court sustain Commerce's remand redetermination and enter judgment in favor of the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

/s/ Patricia M. McCarthy
PATRICIA M. MCCARTHY
Director

OF COUNSEL:                              /s/ Mikki Cottet
                                        MIKKI COTTET
VANIA WANG                              Senior Trial Counsel
Senior Attorney                         U.S. Department of Justice
U.S. Department of Commerce             Civil Division, Commercial Litigation Branch
Office of the Chief Counsel for         Classification Unit, 8th Floor
Trade Enforcement & Compliance          P.O. Box 480, Ben Franklin Station
Washington, DC 20230                    Washington, DC 20044
                                        Telephone: (202) 307-0962
                                        Facsimile: (202) 514-7965
November 15, 2023                       Attorneys for Defendant, United States

<u>**CERTIFICATE OF SERVICE**</u>

I, Mikki Cottet, hereby certify that on this day, November 15, 2023, I electronically filed a copy of the foregoing using the CM/ECF system, which sent a notification of such filing to all counsel of record.

<u>/s/ Mikki Cottet</u>

## <u>CERTIFICATE OF COMPLIANCE</u>

I, MIKKI COTTET, a Senior Trial Counsel in the Office of the Assistant Attorney General, Civil Division, Commercial Litigation Branch, am responsible for filing the foregoing response to comments, relying upon the Microsoft Word Word-Count feature of the word processing system used to prepare the brief, including text, footnotes, and headings, certify that this brief complies with the word count limitation of the U.S. Court of International Trade Standard Chambers Procedures and contains 9,853 words.

<u>/s/ Mikki Cottet</u>