UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE CLAIRE R. KELLY

|  |  |
|---|---|
| MID CONTINENT STEEL & WIRE, INC., et al.,<br><br>Plaintiff and Consolidated Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>PT ENTERPRISE INC., et al.,<br><br>Defendant-Intervenors and Consolidated Defendant Intervenor. | Consol. Court No. 15-00213<br><br>Public Version |

MID CONTINENT STEEL & WIRE, INC.'S REPLY TO COMMENTS
ON FINAL REMAND RESULTS

Adam H. Gordon
Jennifer M. Smith
Benjamin J. Bay
**THE BRISTOL GROUP PLLC**
1707 L Street NW
Suite 570
Washington, DC 20036
(202) 991-2700
*Counsel to Mid Continent Steel & Wire, Inc.,*

Dated: November 15, 2023

**TABLE OF CONTENTS**

TABLE OF CONTENTS ..................................................................................................................ii

TABLE OF AUTHORITIES ......................................................................................................... iii

I.   INTRODUCTION ............................................................................................................... 1

II.  DISCUSSION ...................................................................................................................... 1

    A.   Taiwan Respondents' Request for a Directed Remand Is Not Justified ............................ 2

    B.   Commerce Adequately Supported Its Use of a Simple Average in the Denominator in the Cohen's *d* Measure in Its Differential Pricing Analysis ........................................................ 3

    C.   Using the Standard Deviation of the Entire Population in the Denominator Is Also Inappropriate ..................................................................................................................... 8

    D.   Commerce's Use of a Variation of the Cohen's *d* Measure is an Appropriate Exercise of Its Discretion, and if Its Discretionary Choice with Regard to the Use of a Simple Average Is Overridden, It Should Be Entitled to Make Other Changes to Its Differential Pricing Methodology ....................................................................................................... 10

III. CONCLUSION .................................................................................................................. 12

# TABLE OF AUTHORITIES

## CASES

*CS Wind Vietnam Co. v. United States*,
832 F.3d 1367, 1374 (Fed. Cir. 2016) ............................................................................. 3

*Good Samaritan Hosp. v. Shalala*,
508 U.S. 402, 417 (1993) ................................................................................................. 2

*INS v. Cardoza–Fonseca,*
480 U.S. 421, 446 n. 30 (1987) ........................................................................................ 2

*Marmen Inc., Marmen Energie Inc., and Marmen Energy Co., v. United States*,
Court No. 20-00169 Slip Op. 21-148 (CIT Oct. 22, 2021) ........................................... 12

*Mid Continent Steel & Wire, Inc. v United States*,
31 F.4th 1367 (Fed. Cir. 2022) .............................................................................. 1, 9, 13

*Mid Continent Steel & Wire, Inc. v United States*,
628 F. Supp. 3d 1316 (CIT 2023) ........................................................................ 1, 3, 13

*Olympic Adhesives, Inc. v. United States*,
899 F.2d 1565, 1574–75 (Fed. Cir. 1990) ....................................................................... 3

*Smith–Corona v. United States*,
713 F.2d 1568, 1571 (Fed. Cir. 1983) ........................................................................... 12

*Tung Mung Dev. Co. v. United States*,
25 C.I.T. 752 (2001) ......................................................................................................... 2

## STATUTES

19 U.S.C. 1677f-1(d)(1)(B)(i) ............................................................................... 2, 10, 11

## AGENCY DECISIONS

Final Results of Redetermination Pursuant to Court Remand, Certain Steel Nails from Taiwan,
*Mid Continent Steel & Wire, Inc. v. United States*,
Consol. Court No. 15-213 (CIT April 3, 2023) ..................................................... passim

## I. INTRODUCTION

On behalf of Mid Continent Steel & Wire, Inc. ("Mid Continent"), we submit this reply to comments in opposition to Final Remand Results filed by Defendant-Intervenors PT Enterprise Inc., Pro-Team Coil Nail Enterprise Inc., Unicatch Industrial Co., Ltd., WTA International Co., Ltd., Zon Mon Co., Ltd., Hor Liang Industrial Corp., President Industrial Inc., and Liang Chyuan Industrial Co., Ltd. (collectively, "Taiwan Respondents" or "PT"), and in support of the Final Remand Results issued by the Department of Commerce ("Commerce") (PD 13). *See* Taiwan Respondents' Comments on Results of Redetermination Pursuant to Court Remand (CM/ECF Doc. No. 209) (Oct. 2, 2023) ("*Taiwan Respondents' Comments*"); Final Results of Redetermination Pursuant to Court Remand, Certain Steel Nails from Taiwan, *Mid Continent Steel & Wire, Inc. v. United States*, Consol. Court No. 15-213 (CIT April 3, 2023) (Aug. 31, 2023) ("*Final Remand Results*"). These comments are timely submitted pursuant to the Court's Amended Scheduling Order, dated October 19, 2023 (CM/ECF Doc. No. 211).

## II. DISCUSSION

Mid Continent supports Commerce's *Final Remand Results* and respectfully submits that they should be affirmed. Commerce provided additional reasoning using general statistical principles to address this court's concerns about the use of a simple average in the calculation of the denominator of the Cohen's $d$ coefficient as part of the differential pricing analysis. Commerce properly addressed this court's comments and concerns as outlined in *Mid Continent Steel & Wire, Inc. v United States*, 628 F. Supp. 3d 1316 (CIT 2023) (*Mid Continent VI*), and furthermore, its remand sufficiently addressed the points raised by the Federal Circuit's opinion in *Mid Continent Steel & Wire, Inc. v United States*, 31 F.4th 1367 (Fed. Cir. 2022) (*Mid Continent V*). In sum, Commerce, beyond relying only on the academic literature, has

1

demonstrated that use of a simple average for the purpose described above is consistent with the statute, supported in the academic literature and by statistical principles, and reasonable in its examination of whether prices differ significantly pursuant to section 777A(d)(1)(B)(i) of the Tariff Act of 1930, as amended (the "Act").

### A.     Taiwan Respondents' Request for a Directed Remand Is Not Justified

The *Taiwan Respondents' Comments* attempt to portray the *Final Remand Results* in a highly prejudicial manner, stating that:

> this Court should remand this case to Commerce with express instructions to calculate the denominator yardstick of the Cohen's d equation in its differential pricing ("DP") analysis either by weighted averaging the standard deviations ("SD") of the Test Group and the Comparison Group or by relying on the (transaction-weighted) SD of the entire population. Commerce, having already failed three times to justify reliance on SA, is not entitled to the same deference accorded Commerce when this Court analyzed its initial decision. And if this Court decides that Commerce's fourth justification similarly falls short, Commerce should not be accorded another chance.

*Taiwan Respondents' Comments* at 2.  This request is inappropriate and relies upon judicial precedent that is of limited relevance to the present set of circumstances.  *Id.*[1]  The cited cases all dealt with instances where an agency's position had been inconsistent or had deviated from its original stance.  In contrast, Commerce has been entirely consistent in defending the application of the Cohen's *d* measure in its differential pricing methodology and has maintained a consistent rationale for doing so.  In implementing the Federal Circuit's directive, and this court's

---

[1] *Citing INS v. Cardoza–Fonseca,* 480 U.S. 421, 446 n. 30 (1987) ("An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is entitled to considerably less deference than a consistently held agency view.") (quotation marks omitted); *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 417 (1993) ("{T}he consistency of an agency's position is a factor in assessing the weight that position is due."); *Tung Mung Dev. Co. v. United States*, 25 C.I.T. 752 (2001) ("The case for judicial deference is less compelling with respect to agency positions that are inconsistent with previously held views.").

subsequent instructions as expressed in *Mid Continent VI*, it is thus unsurprising that Commerce relied upon additional evidence and reasoning in the record in order to defend its <u>consistent</u> position that the use of a simple average is an appropriate implementation of its authority under the governing statute. The other two cases cited by Taiwan Respondents are similarly inapposite. *Id.*[2] Both the *Olympic* and *CS Wind* cases dealt with case-specific minutiae and not the application of an overarching methodological concept, as is the case here.

PT's portrayal of this litigation should thus be viewed with a jaundiced eye. More to the point, Taiwan Respondents have not pointed to any manner in which the *Final Remand Results* are inconsistent with Commerce's prior explanations. If anything, the *Final Remand Results* bolsters the agency's consistent support of the use of a simple average in the denominator of the Cohen's *d* measure. Commerce thus properly, and in Mid Continent's view, effectively, responded to this court's instructions in *Mid Continent VI*. Commerce's *Final Remand Results* are entitled to *Chevron* deference as the administering authority of the antidumping statute.

    **B.**    **Commerce Adequately Supported Its Use of a Simple Average in the Denominator in the Cohen's *d* Measure in Its Differential Pricing Analysis**

The following language from the *Final Remand Results* is key in framing the issue before the court:

> Neither Dr. Cohen, nor Dr. Ellis, nor Professor Coe opined on the application of the concept of effect size to examine whether prices differ

---

[2] *Citing Olympic Adhesives, Inc. v. United States*, 899 F.2d 1565, 1574–75 (Fed. Cir. 1990) ("Due to the passage of time, Extraco's 1981 exit from the production of bone glues, the lack of any evidence supporting the fictitious home market sales allegation, and in the interests of judicial economy, we remand this cause to the Court of International Trade with instructions to direct the ITA to assess antidumping duties in accord with the margins determined in the preliminary investigation for the years in question.") ("*Olympic*"); *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1374 (Fed. Cir. 2016) ("*CS Wind*") ("Because the reason Commerce offers for using the packed weights is without record support, we find Commerce's choice to be unsupported by substantial evidence. We therefore reverse the Court of International Trade's affirmance of that choice and direct Commerce to use the manufacturer-reported weights in its calculation.").

3

> significantly among purchasers, regions or time periods under the antidumping statute. Nor could one reasonably expect an academic author to be omniscient and describe all possible applications of his or her concepts, including the situation addressed by Commerce in the use of its Cohen's *d* test. Similarly, these academic authors do not know the myriad situations in which their concepts may be applied. Such expectations are unrealistic that any applications must be preordained by an academic author rather than their concepts being adapted and applied in situations unimagined by the original authors. Nonetheless, these academicians did describe the general principles behind both the concept of effect size and its place in research and data analysis which Commerce has applied in its differential pricing analysis. Commerce has followed these principles in conceptualizing and applying the Cohen's *d* test.

*Final Remand Results* at 57. Commerce correctly implemented the Cohen's *d* measure given the circumstances it faces in its antidumping cases. Commerce's purpose in using the Cohen's *d* measure is to calculate a standardized expression of mean differences to measure the effect by which two populations' average prices differ. This also is the main purpose for the development of Cohen's *d* as described by Cohen himself: measuring the effect to which two populations' average values differ. For Commerce's purposes, the two groups to be compared are determined for each discrete category of products subject to the antidumping proceeding (each "control number", or CONNUM) by selecting the sales to an individual purchaser that are then compared to the sales to all other purchasers, the sales in a specific region compared to those in all other regions, or the sales in a specific time period compared to the sales in all other time periods. The analysis is repeated for all purchasers, regions, and time periods to produce different versions of the *d* measure that are used to evaluate whether patterns of "significantly"[3] differing prices exist in a complete population of U.S. sales made by the foreign producer or exporter. All sales of

---

[3] This is significance in the plain language sense, not in the statistical sense, as no distributional test is performed.

each CONNUM are used in each of these analyses.[4]  Therefore, this is a population-to-population comparison, and no statistical sampling, or estimation, is performed or needed.

Commerce's methodology reflects this reality:

> In Commerce's application of the Cohen's *d* test, Commerce uses the full populations of data, *i.e.*, all prices of comparable merchandise to a given purchaser, region, or time period (*i.e.*, the test group) and all prices of comparable merchandise to all other purchasers, regions, or time periods (*i.e.*, the comparison group).  As a result, the standard deviations calculated for the test and comparison groups each have a reliability of 100 percent, *i.e.*, "the closeness with which {the calculated value} can be expected to approximate the relevant population value."  In other words, the reliability of the calculated standard deviations based on the full population of sale prices to each group is identical.  Because the reliability of the standard deviations based on full populations is equal, to calculate the denominator of the Cohen's *d* coefficient, Commerce finds that it is reasonable to weight these standard deviations equally, *i.e.*, a simple average, as presented in Dr. Cohen's equation 2.3.2, just as when the reliability is equal for standard deviations based on sampled data with equal sample sizes.

*Final Remand Results* at 12 (footnote omitted).  In contrast, PT's insistence on the use of weighted average of the two groups' standard deviations ("SDs") in the denominator of the Cohen's *d* measure using is unwarranted.  PT would assign weight based on the amount in kilograms of the sales falling within each group.  *Taiwan Respondents' Comments* at 17-30.  This approach would be statistical malpractice.  Neither the academic literature, nor general statistical principles support this approach.  What matters is the observed pricing <u>behavior</u>, which is what is being measured and analyzed by the Cohen's *d* test.  The use of a simple average is entirely appropriate in instances when dealing with two groups of different population size but of

---

[4] Commerce then sums the volume of the sales whose Cohen's *d* measure exceeds 0.8 and uses that to determine whether the volume of sales whose prices differ significantly requires changes to the methodology used to calculate the margin of dumping.

equal importance, as is the case in Commerce's differential pricing analysis with the test and comparison groups.

PT attempts to show how use of a simple average leads to irregular results while the use of a weighted average does not, via five different illustrative examples. *Taiwan Respondents' Comments* at 19-24. The first of these examples uses hypothetical data, while the remaining four are based on PT's actual sales data. PT's self-selected examples comprise a miniscule fraction of the full universe of its sales. The kilogram quantities of its examples are denoted by the "Q Test" and "Q Comp" columns (*i.e.*, the quantities of the test and comparison groups, respectively). PT's U.S. sales database consists of [       ] sales observations totaling [              ] kilograms.[5] The data in Figures 2 and 4 comprise just [    ] percent of PT's sales by volume, the data in Figure 3 comprise [    ] percent by volume, and the data in Figure 4 comprise [    ] percent by volume; in total, the sales quantity for PT's self-selected examples amounts to just [         ] kilograms, or [    ] percent of PT's total sales quantity – a *de minimis* amount. These examples, which PT doubtlessly chose to serve its purposes, can hardly be considered representative.

If anything, the [    ] percent figure <u>understates</u> the <u>lack of representativeness</u> of PT's examples. This is because, as discussed above on pages 4-5, each sale is considered multiple times within the comparisons made in the differential pricing methodology. In other words, the [    ] sales were used a total of [     ] times in the base groups: [      ] by region, [   ] by period, and [     ] by purchaser.[6] PT did not provide the total number of sales observations

---

[5] *See* Memorandum to the File, from Erin Kearney, Program Manager, AD/CVD Operations, Office VI, *Placing Margin Calculations on the Record* (July 11, 2022) (ACCESS Barcode: 4262242) at Attachment 5. The total kilogram quantity was calculated by summing the column QTY2U in PT's U.S. sales database.

[6] *Id.* at Attachment 2 (specifically, pages 91, 102, and 112 of the SAS log printout).

considered within its four examples using actual data or other basic details (*e.g.*, whether the examples were based on comparison by customer, purchases, or time period), thus preventing a thorough and transparent analysis of its methodologies and results.  Nonetheless, based on the limited information PT did provide, one can at least ascertain the number of observations in the comparison (base) groups in PT's second and fourth examples.  In the second example, there are 13 observations in the comparison group, and in the fourth example, there are two.  Thus, in sum, sales observations comprising the comparison groups in two of the examples used by PT rely on a grand total of [     ] percent of the times PT's sales observations were used overall in the base groups for the differential pricing analysis.

Independent of the lack of representativeness of PT's self-selected examples, Commerce effectively refuted PT's arguments with the explanations it provided on pages 51-54 of the *Final Remand Results*.  In sum, Commerce has demonstrated that a simple average is appropriate for use in the Cohen's *d* test as part of the differential pricing analysis.

Mid Continent again notes that PT's proposal of using a weighted average based on the physical weights of sales within each group as the denominator of *d* opens the door to manipulation.  For example, if a foreign supplier sells a product to purchaser, region, or in time period $B$ and does so with a large contrasting volume $W_A$ relative to $W_B$.  Since $W_A$ is in the numerator of the denominator, this has the effect of lowering Cohen's *d* compared to using the simple average.  So even if $m_A - m_B$ is relatively large, this supplier has the ability to manipulate the measure of *d* by changing the relative volume since this method gives more weight to standard deviations from smaller groups when those smaller groups are from larger sales.  Consider the following two scenarios where the mean price difference ($m_A$ and $m_B$) and the

within-group standard deviations ($\sigma^2_A$ and $\sigma^2_B$) remain the same but the volume ($W_A$ and $W_B$) for the higher priced group sales is increased:

$$m_A = 4.3, m_B = 3, \sigma^2_A = 3, \sigma^2_B = 2, W_A = 10, W_B = 10$$

$$d_W = \frac{4.3 - 3}{\sqrt{\frac{10}{10+10} \times 3 + \frac{10}{10+10} \times 2}} = 0.8221922$$

$$m_A = 4.3, m_B = 3, \sigma^2_A = 3, \sigma^2_B = 2, W_A = 30, W_B = 10$$

$$d_W = \frac{4.3 - 3}{\sqrt{\frac{30}{30+10} \times 3 + \frac{10}{30+10} \times 2}} = 0.7839295$$

As this shows, in the first case the value of Cohen's *d* exceeds the "large" effect size 0.8 threshold, but with the same pricing difference the manipulated volume value in the calculation of *d* does not. Obviously, this is a simplified example, but it illustrates that a supplier can manipulate sales volume to alter the value of *d* when this approach is used. Given the prevalence and sophistication of many respondents' "dump-proofing" activities, this scenario is not far-fetched. It is certainly possible to hide price manipulation as a seller. In contrast, a simple average, as currently used by Commerce, limits the potential for manipulation. In short, Commerce's approach represents a reasonable, discretionary choice to fulfill its statutory authority, enhance the effectiveness of the antidumping laws, and mitigate against manipulation.

### C.  Using the Standard Deviation of the Entire Population in the Denominator Is Also Inappropriate

In the opinion underlying the current phase of litigation, the Federal Circuit stated that:

> Commerce has not explained why the basic choice of weighted averaging of unequal-size groups fails to apply to the present context. The cited literature nowhere suggests simple averaging for unequal-size groups. Indeed, when the entire population is known, the cited literature points toward using the standard deviation of the entire population as the denominator in Cohen's *d* – which Commerce has not done.

8

*Mid Continent V*, 31 F.4th at 1380.  Commerce summed up the reasons not to use the standard deviation of the entire population in a succinct manner, stating:

> the option to use a single standard deviation of all data when the data are explicitly separated into two separate populations is not a reasonable approach for Commerce's Cohen's *d* test. The single standard deviation causes the denominator of the Cohen's *d* coefficient to reflect not just the dispersion of the data within each group, but also the dispersion of the data between the two groups. Commerce uses effect size, the result of the Cohen's *d* test, to examine the difference in the mean prices to each group relative only to the dispersion of prices within both groups. The significance in the difference in the mean prices cannot be accurately gauged when that difference in the prices between the two groups is part of the "yardstick" used to assess that difference as achieved with a single standard deviation . . ..

*Final Remand Results* at 17-18.  As this shows, the proposal by the Federal Circuit to use the standard deviation of the entire population is not appropriate given the context of Commerce's analysis.

PT argues that Commerce failed to recognize certain aspects pertaining to the use of the single standard deviation of the entire population.  *Taiwan Respondents' Comments* at 30-31.  PT's arguments are not persuasive.  PT claims that

> Commerce also fails to recognize that the Cohen's *d* Test Group and Comparison Group are not distinctly different datasets.  As discussed above, each sale (i.e., count) is a member of multiple groups, both test and comparison.  Thus, the dispersion of the data between each group changes depending on the composition of the group.  These differences are arbitrary (and unpredictable) factors in Commerce's DP analysis.  They have little or no economic meaning but are merely artifacts of the economically arbitrary splitting and re-splitting of one population of transaction data into various test and comparison groups.

*Id*.  The "arbitrary" differences PT takes issue with here in fact reflect that statutory directive to analyze whether the prices of a particular product differ by customer, region, or time period.[7]  By

---

[7] *See* Section 777A(d)(1)(B)(i) of the Tariff Act of 1930, as amended (the "Act") (19 U.S.C. 1677f-1(d)(1)(B)(i)).

taking issue with "economically arbitrary splitting and re-splitting," PT is in effect arguing against the statute itself in the way it directs Commerce to analyze targeted dumping.

    PT goes on to claim that

> relying on the standard deviation for the entire population is consistent with weighted averaging insofar as both methodologies accord equal weight to each kilogram of nails being analyzed regardless of the group in which the sale falls. Because both methodologies accord equal weight to each kilogram sold, and because both methodologies are otherwise consistent with Cohen's *d* methodology for determining whether there are significant differences between two groups of data, both methodologies are reasonable.
>
> In contrast, in the SA methodology, a particular sale will receive more weight than other sales for certain comparisons, thereby strongly influencing the outcome, while in other comparisons the same sale will receive a low weight, thereby having little influence on the outcome. As a result, SA is an unreasonable and economically meaningless methodology for determining whether there are significant differences between prices, leading to unreasonable results.

*Id*. at 31. PT's notion that weighted average is somehow consistent with using the standard deviation of the entire population is also unsupported. In fact, its notion is entirely results-driven as using the standard deviation of the entire population would also result in a *de minimis* margin. Again, the goal of Commerce's differential pricing methodology is to compare the mean price values of two groups, irrespective of the total quantity in kilograms of the sales within each group, and somehow standardize them to assess the difference between their respective means. A simple average accomplishes this, whereas using a single standard deviation would be an inappropriate commingling, as explained by Commerce. *Final Remand Results* at 17-18.

    **D.**    **Commerce's Use of a Variation of the Cohen's *d* Measure is an Appropriate Exercise of Its Discretion, and if Its Discretionary Choice with Regard to the Use of a Simple Average Is Overridden, It Should Be Entitled to Make Other Changes to Its Differential Pricing Methodology**

    Conceptually, the goal of Commerce's differential pricing methodology is to compare the mean price values of two groups and somehow standardize them to assess the difference between

their respective means.  Commerce thus need not be wedded to strictly defined labels in implementing its differential pricing methodology.  The methodology should not be beholden to follow certain pre-defined instructions that are applicable to sample-based studies, but not to the situation facing Commerce, where it has complete population data at its disposal and seeks to fulfill a statutorily defined objective.

As the parties and the courts have observed, even what is narrowly defined as Cohen's *d* measure itself has variations depending on the circumstances of the available data.  Commerce enjoys significant discretion in crafting and implementing its methodologies, and in this area deserves and receives the greatest deference, for obvious reasons.  Commerce has gone to great lengths to explain its use of a variation of Cohen's *d* measure given the circumstances of the data and the specific purpose of the analysis.  Put another way, Commerce's discretionary choice to use a "simple average" in calculating the denominator in a variation of the Cohen's *d* measure should be described for what it is:  a discretionary choice made in order to maximize the effectiveness of the antidumping methodology, to best effectuate the Act's requirement to assess whether "there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly"[8] independent of quantities, and to minimize or eliminate a party's ability to manipulate their data to exploit the methodology and mask dumping.  The courts have long held that Commerce's ability to make discretionary decisions in crafting its methodologies is substantial.  *See Smith–Corona v. United States*, 713 F.2d 1568, 1571 (Fed. Cir. 1983) ("The Secretary has broad discretion in executing the {anti-dumping} law.").

---

[8] *See* Section 777A(d)(1)(B)(i) of the Tariff Act of 1930, as amended (the "Act") (19 U.S.C. 1677f-1(d)(1)(B)(i)).

Further to this point, given the context in which Commerce uses the Cohen's *d* measure in its differential pricing analysis, and the fact that Commerce deals with the entire population of sales at issue, as a matter of the interlocking discretionary policy choices underlying its differential pricing methodology, Commerce reasonably could adopt the medium effect size threshold of 0.5 rather than the large effect size threshold of 0.8 as the agency currently does, especially if the courts find its explanation for the use of a simple average in the denominator of the Cohen's *d* measure unavailing.  In another recent remand redetermination Commerce itself has observed that it reasonably could choose the 0.5 threshold: "Commerce could have also used the medium 0.5 threshold as it 'is conceived as one large enough to be visible to the naked eye.'"[9]  While the effect size threshold values are somewhat arbitrary and should not be interpreted rigidly, benchmarks are nonetheless necessary because each finding is novel given the circumstances underlying it.  Given that a respondent company is in control of its pricing behavior, the impact of any manipulation could be further curtailed by using a lower effect size threshold.  Commerce should consider adopting the 0.5 effect size threshold in its differential pricing methodology, especially if the Federal Circuit mandates changes to other discretionary choices made as a matter of policy in Commerce's carefully balanced methodology, such as the use a simple average when calculating the denominator of the Cohen's *d* analysis.

### III.   CONCLUSION

For the reasons discussed above, Mid Continent fully supports Commerce's determination that its use of a simple average in the denominator of the Cohen's *d* calculation is reasonable given not only its statutory directive and authority, but also the nature and

---

[9] *See Marmen Inc., Marmen Energie Inc., and Marmen Energy Co., v. United States*, Court No. 20-00169 Slip Op. 21-148 (CIT Oct. 22, 2021), Final Results of Redetermination Pursuant to Court Remand (May 26, 2022), *citing Cohen* at 26.

circumstances of the data. Commerce also properly found that neither the use of a weighted average, as proposed by PT, nor the standard deviation of the entire population, would be appropriate. With respect to considering an alternative effect size threshold, Commerce did not take a position because doing so was unnecessary at this time. Nonetheless, Commerce has the innate administrative flexibility to do so as a discretionary policy choice it is entitled to make as the administering authority of the antidumping law. Commerce has provided adequate explanations for why its determination is in accordance with law and supported by substantial evidence, and its *Final Remand Results* addressed the issues and concerns expressed by the Federal Circuit in *Mid Continent V* and by this court in *Mid Continent VI*.

        Respectfully submitted,

        */s/ Adam H. Gordon*
        Adam H. Gordon
        Jennifer M. Smith
        Benjamin J. Bay
        **THE BRISTOL GROUP PLLC**
        1707 L Street, NW
        Suite 570
        Washington, DC 20036

        *Counsel to Mid Continent Steel & Wire, Inc.*

Dated: November 15, 2023

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that these comments comply with the word limitation requirement. The word count for Plaintiff Mid Continent Steel & Wire, Inc.'s Comments in Support of Final Remand Results, as computed by The Bristol Group PLLC's word processing system Microsoft Word for Microsoft 365, is 4,161 words, below the 10,000-word limit pursuant to Standard Chambers Procedures 2(B)(1)(b).

/s/ Adam H. Gordon
Adam H. Gordon
**THE BRISTOL GROUP PLLC**
*Counsel to Mid Continent Steel & Wire, Inc.*

Dated: November 15, 2023

**CERTIFICATE OF SERVICE**

    I hereby certify that on the 15th day of November, 2023, I electronically filed a copy of the forgoing using the CM/ECF system, which sent a notification of such filing to counsel of record for all parties.

                                                      */s/ Adam H. Gordon*
                                                      Adam H. Gordon