A-583-854
Remand
Fed. Cir. No. 24-1556
POI: 04/01/2013 – 03/31/2014
**Public Document**
E&C/OVI: Team

*Mid Continent Steel & Wire, Inc. v. United States*,
**Consol. Court No. 15-213 (CIT December 23, 2025)**
**Certain Steel Nails from Taiwan**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.  SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of redetermination pursuant to the opinion and remand order of the U.S. Court of International Trade (CIT), in *Mid Continent Steel & Wire, Inc. v. United States*, Consol. Court No. 15-00213, ECF No. 225, issued on December 23, 2025.  This action arises out of the *Final Determination* in the less-than-fair-value (LTFV) investigation of certain steel nails (nails) from Taiwan.[1]  The period of investigation (POI) is April 1, 2013, through March 31, 2014.

These final results of redetermination concern one principal issue in the LTFV investigation of nails from Taiwan:  Commerce's revised differential pricing analysis, in which Commerce's discontinued the use of the Cohen's $d$ test and the alternative mixed comparison method.

Pursuant to the U.S. Court of Appeals for the Federal Circuit's (Federal Circuit) granting of Commerce's voluntary remand request for Commerce's *Amended Final Determination*,[2]

---

[1] *See Certain Steel Nails from Taiwan:  Final Determination of Sales at Less Than Fair Value*, 80 FR 28959 (May 20, 2015) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM).
[2] *See Certain Steel Nails from Taiwan: Notice of Court Decision Not in Harmony With Final Determination in Less Than Fair Value Investigation and Notice of Amended Final Determination*, 82 FR 55090 (November 20, 2017) (*Amended Final Determination*).

Commerce has reconsidered its application of the Cohen's *d* test as part of its differential pricing analysis. As a result of our analysis, we have made revisions to the margin calculations with respect to PT Enterprise Inc. and Pro-Team Coil Nail Enterprise Inc. (collectively, PT)[3] from the *First Final Redetermination*,[4] which itself resulted in a change from an estimated weighted-average dumping margin of 2.24 percent in the *Final Determination* to an estimated weighted-average dumping margin of 2.16 percent in the *First Final Redetermination*.[5] Further, the estimated weighted-average dumping margin for all other producers and exporters change from 2.24 percent to 2.16 percent from the *Final Determination* to the *First Final Redetermination*, respectively.[6] The changes in this second final redetermination result in an estimated weighted-average dumping margin of 4.88 percent for both PT and for all other producers and exporters.

## II.    BACKGROUND

In the *Final Determination*, Commerce calculated an estimated weighted-average dumping margin for PT based on the alternative mixed comparison method. The Taiwan Plaintiffs challenged Commerce's use of a simple average to calculate the denominator of the Cohen's *d* coefficient for the Cohen's *d* test in its differential pricing analysis, which resulted in the application of the alternative mixed comparison method in the *Final Determination* and the *Amended Final Determination* before this Court. The Federal Circuit granted Commerce's

---

[3] The plaintiffs before the court are PT Enterprise Inc., Pro-Team Coil Nail Enterprise Inc., Unicatch Industrial Co., Ltd., WTA International Co., Ltd., Zon Mon Co., Ltd., Hor Liang Industrial Corp., President Industrial Inc., and Liang Chyuan Industrial Co., Ltd (collectively, the Taiwan Plaintiffs).

[4] *See Mid Continent Steel & Wire, Inc. v. United States*, 219 F.Supp.3d 1326 (CIT 2017); *see also Final Results of Redetermination Pursuant to Court Remand, Mid Continent Steel & Wire, Inc. et al. v. United States*, Court No. 15-00213 (CIT March 23, 2017), dated June 21, 2017 (*First Final Redetermination*), available at https://access.trade.gov/FinalRemandRedetermination. The CIT remanded the calculation of the general and administrative (G&A) expenses ratio, which Commerce recalculated in the *First Final Redetermination*. The CIT affirmed Commerce's recalculation of the G&A ratio in *Mid Continent Steel & Wire, Inc. v. United States*, 273 F.Supp.3d 1161 (CIT 2017).

[5] *See Certain Steel Nails from Taiwan: Notice of Court Decision Not in Harmony With Final Determination in Less Than Fair Value Investigation and Notice of Amended Final Determination*, 82 FR 55090, 55091 (November 20, 2017) (*Amended Final Determination*), and accompanying IDM.

[6] *Id.*

request for a voluntary remand concerning the *Amended Final Determination* so that Commerce could set forth an alternative policy analysis.[7]

In *Marmen*,[8] the Federal Circuit held that it is unreasonable for Commerce to use the current Cohen's $d$ test as part of its differential pricing analysis when the test is applied to data that do not satisfy the statistical criteria of normal distribution, equal variability, and equally and sufficiently numerous observations.[9]  In doing so, the Federal Circuit held that "Commerce may re-perform a differential pricing analysis, and that analysis may not rely on Cohen's $d$ test for data sets like those here {*i.e.*, the data underlying the differential pricing analysis in the Marmen investigation that the Federal Circuit found do not conform to the three statistical criteria}," but it also held that Commerce may develop and justify a different analytical approach for evaluating whether price differences among purchasers, regions, or time periods are significant.[10]  On December 2, 2025, the Federal Circuit granted Commerce's request for a voluntary remand in this case for Commerce to set forth an alternative policy analysis.[11]

On February 11, 2026, Commerce released its Draft Redetermination to interested parties.[12]  On March 6, 2026, Commerce received comments from the Mid Continent and the Taiwan Plaintiffs.[13]  Commerce responds to these comments below.

---

[7] *See Mid Continent Steel & Wire, Inc. v. United States*, Ct. No. 24-1556, ECF No. 99.

[8] *See Marmen Inc., et al. v. United States*, 134 F.4th 1334 (Fed Cir. 2025) (*Marmen*).

[9] *Id.*, 134 F.4th at 1338; *see also Stupp Corp. v. United States*, No. 23-1663, 2025 WL 1178392 (Fed. Cir. April 23, 2025)) (non-precedential) (*Stupp IV*) (citing *Marmen*); *Mid Continent Steel & Wire, Inc. v. United States*, 2025 U.S. App. LEXIS 31306 (Fed. Cir. 2025) (*Mid Continent*).

[10] *See Marmen*, 134 F.4th at 1338 (*emphasis added*).

[11] *See Mid Continent Steel & Wire, Inc. v. United States*, Ct. No. 24-1556, ECF No. 99.

[12] *See* Draft Results of Redetermination Pursuant to Court Remand, *Mid Continent Steel & Wire, Inc. v. United States*, Consol. Court No. 15-213 (CIT December 23, 2025), dated February 11, 2026 (Draft Redetermination).

[13] *See* Mid Continent's Letter, "Comments on Draft Results of Redetermination Pursuant to Court Remand in *Mid Continent Steel & Wire, Inc. v. United States*, Consol. Court No. 15-213 (CIT Dec. 23, 2025), dated March 6, 2026 (Mid Continent's Draft Redetermination Comments); *see also* Taiwan Plaintiff's' Letter, "Comments on Draft Results of Redetermination Pursuant to Court Remand in *Mid Continent Steel & Wire, Inc. v. United States*, Consol. Court No. 15-213 (CIT December 23, 2025) (Taiwan Plaintiffs' Draft Redetermination Comments).

After considering the comments raised by interested parties, Commerce has made no changes to the Draft Redetermination with regard to its revised differential pricing analysis for these final results of redetermination. As a result, the estimated weighted-average dumping margins for PT and for all other producers and exporters both remain at 4.88 percent.[14]

**III.  ANALYSIS**

**I.  Commerce's Application of the Cohen's *d* Test**

Following the Federal Circuit's decisions in *Marmen* and *Stupp*, Commerce sought information and public comment on alternatives to the Cohen's *d* test as part of its differential pricing analysis under section 777A(d)(1)(B)(i) of the Tariff Act of 1930, as amended (the Act), to identify whether prices for comparable merchandise differ significantly among purchasers, regions, and time periods.[15]  To comply with the Federal Circuit's holding, Commerce discontinued the use of the Cohen's *d* test in administrative proceedings and adopted a new test for evaluating whether price differences among purchasers, regions, or time periods are significant.[16]  Additionally, and concurrent with this change, Commerce discontinued the use of the "mixed method" in administrative proceedings.  In its revised differential pricing analysis, Commerce adopted the "price difference test" as part of its differential pricing analysis to determine whether prices differ significantly.  Accordingly, for these final results of redetermination, in light of Commerce's revised approach in administrative proceedings pursuant to the Federal Circuit's remand order in *Marmen,*  Commerce reconsidered, and has discontinued

---

[14] *See* Memorandum, "Draft Fifth Remand Analysis Memorandum for PT Enterprise Inc.," dated February 11, 2026 (PT Draft Calculation Memorandum).

[15] *See Alternatives to the Use of Cohen's d; Request for Comment,* 90 FR 21277 (May 19, 2025).

[16] *See, e.g., Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2022–2023,* 90 FR 30050 (July 8, 2025), and accompanying IDM at 2-5; *Certain Corrosion-Resistant Steel Products from the United Arab Emirates: Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances,* 90 FR 42226 (August 29, 2025), and accompanying IDM at Comment 2.

its application of the Cohen's *d* test to PT's U.S. sales data, and, in the alternative, applied the "price difference test," and has discontinued the use of the mixed method as detailed below.

### i. Comparisons to Normal Value

Pursuant to section 773(a) of the Act and 19 CFR 351.414(c)(1) and (d), in order to determine whether PT's sales of the subject merchandise from Taiwan to the United States were made at less than normal value (NV), Commerce compared the export price (EP) to the NV as described in the "Export Price" and "Normal Value" sections of the *Preliminary Determination*.[17]

### 1. Determination of Comparison Method

Pursuant to 19 CFR 351.414(c)(1), Commerce calculates a weighted-average dumping margin by comparing weighted-average NVs to weighted-average EPs (or constructed export price (CEP)) (*i.e.*, the average-to-average (A-to-A) method) unless the Secretary determines that another method is appropriate in a particular situation. In a LTFV investigation, Commerce examines whether to compare weighted-average NVs with the EPs (or CEPs) of individual sales (*i.e.*, the A-to-T method) as an alternative comparison method using an analysis consistent with section 777A(d)(1)(B) of the Act.

In numerous investigations and administrative reviews, Commerce has applied a "differential pricing" analysis for determining whether application of the A-to-T method is appropriate in a particular situation, consistent with 19 CFR 351.414(c)(1) and section 777A(d)(1)(B) of the Act. Commerce finds that the differential pricing analysis is instructive for purposes of examining whether to apply an alternative comparison method here. Commerce will

---

[17] *See Certain Steel Nails from Taiwan: Negative Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 79 FR 78053 (December 29, 2014) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM) at 9 and 12-13.

continue to evaluate its approach in this area based on comments received and the application of the differential pricing analysis on a case-by-case basis, and on Commerce's additional experience with addressing the potential masking of dumping that can occur when Commerce uses the A-to-A method in calculating a respondent's weighted-average dumping margin.

The differential pricing analysis used here examines whether there exists a pattern of prices for comparable merchandise that differ significantly among purchasers, regions, or time periods. The analysis evaluates all U.S. sales by purchaser, region, and time period to determine whether a pattern of prices that differ significantly exists. If such a pattern is found, then the differential pricing analysis evaluates whether such differences can be taken into account when using the A-to-A method to calculate the weighted-average dumping margin. The analysis incorporates default group definitions for purchasers, regions, time periods, and comparable merchandise. Purchasers are based on the reported consolidated customer codes. Regions are defined using the reported destination code (*i.e.*, ZIP code) and are grouped into regions based upon standard definitions published by the U.S. Census Bureau. Time periods are defined by the quarter within the POI based upon the reported date of sale. For purposes of analyzing sales transactions by purchaser, region and time period, comparable merchandise is defined using the product control number (CONNUM) and all characteristics of the U.S. sales, other than purchaser, region, and time period, that Commerce uses in making comparisons between EP (or CEP) and NV for the individual dumping margins.

In the first stage of the differential pricing analysis used here, the "price difference test" is applied to determine whether prices differ significantly. For comparable merchandise, the price difference test examines whether the weighted-average net price to a given purchaser, region or time period is within two percent of the weighted average net price to all other

purchasers, regions or time periods. If the weighted-average net price to the given purchaser, region or time period falls outside of the plus or minus two percent band around the weighted-average net price to all other purchasers, regions or time periods, then the prices to that given purchaser, region or time period are found to differ significantly and those sales to the given purchaser, region or time period pass the price difference test.

Next, the "ratio test" assesses the extent of the significant price differences for all U.S. sales as measured by the price difference test. The ratio test calculates the ratio of the total value of sales that pass the price difference test to the total value of sales by the respondent in the United States during the POI. If 33 percent or less of the total value of sales passes the price difference test, then the results of the price difference and ratio tests do not support consideration of the A-to-T method. If more than 33 percent of the total value of U.S. sales passes the price difference test, then Commerce will find that a pattern of prices existed during the POI. Consequently, Commerce will examine whether there is a meaningful difference in the weighted-average dumping margins calculated using the standard A-to-A method and using the alternative A-to-T method.

If both tests in the first stage (*i.e.*, the price difference test and the ratio test) demonstrate the existence of a pattern of prices that differ significantly such that the A-to-T method could be considered, then in the second stage of the differential pricing analysis, Commerce examines whether using only the A-to-A method can account for such differences. In considering this question, Commerce examines whether using the A-to-T method yields a meaningful difference in the weighted-average dumping margin as compared to that resulting from the use of the A-to-A method. If the difference between the two calculations is meaningful, then this demonstrates that the A-to-A method cannot account for differences in the respondent's pricing behavior in the

U.S. market, such as those observed in this analysis, and, therefore, use of the A-to-T method may be appropriate.  A difference in the weighted-average dumping margins is considered meaningful if:  (1) there is a 25 percent relative change in the weighted-average dumping margins between the A-to-A method and the A-to-T method where both rates are above the *de minimis* threshold; or (2) the resulting weighted-average dumping margins between the A-to-A method and the A-to-T method move across the *de minimis* threshold.

### 2.  Results of the Differential Pricing Analysis

For PT, based on the results of the differential pricing analysis, Commerce finds that 89.84 percent of the value of U.S. sales pass the price difference test,[18] and confirms the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods.  Further, Commerce determines that the A-to-A method cannot account for such differences because the weighted-average dumping margin crosses the *de minimis* threshold when calculated using the A-to-A method and when calculated using the A-to-T method.  Thus, for these final results of redetermination, Commerce is applying the A-to-T method to calculate the weighted-average dumping margin for PT.

## IV.  INTERESTED PARTY COMMENTS

On February 11, 2026, Commerce issued its Draft Redetermination and provided interested parties an opportunity to comment.[19]  Commerce received comments from the Mid Continent and the Taiwan Plaintiffs.  Mid Continent supports the revisions Commerce made to its differential pricing analysis in the Draft Redetermination, with which we agree and do not further address below.[20]  The Taiwan Plaintiffs' arguments contesting Commerce's use of the

---

[18] *See* PT Draft Calculation Memorandum at 4.
[19] *See* Draft Redetermination.
[20] *See* Mid Continent's Draft Redetermination Comments at 2-5.

price difference test and discontinuation of the mixed method are addressed below. After considering the comments from the Taiwan Plaintiffs, we made no changes to our calculations in the Draft Redetermination and continue to use the revised differential pricing analysis for these final results of redetermination.

**Comment 1:  Commerce's Authority To Rely On The A-to-T Method Is Limited By The Statute And SAA**

The following is a verbatim executive summary of argument submitted by the Taiwan Plaintiffs. For further details, *see* Taiwan Plaintiffs' Draft Redetermination Comments at 6-10.

> The statutory language and SAA expressly limit Commerce's authority to rely on the {A-to-T method} to cases where there is a "pattern of prices that differ significantly among purchasers, regions, or time periods," and expressly require that Commerce "proceed on a case-by-case basis," rather than relying on a one size fits all approach. In its implementing regulations Commerce expressly stated that it "plans to employ common statistical methods in its targeted dumping determinations in order to ensure that the test is applied on a consistent basis and in a manner that ensures transparency and predictability to all parties concerned" and that it" will ensure that parties have an opportunity to explain whether a particular pattern of export prices or constructed export prices constitutes targeted dumping. 62 FR 27296-01 (May 19, 1997). Commerce did not follow these principles in its Draft {Redetermination}.[21]

**Commerce's Position**:

Section 777A(d)(1)(B) of the Act permits Commerce to use the alternative, A-to-T method as the basis for a weighted-average dumping margin if the two requirements provided for in section 777A(d)(1)(B)(i) and (ii) of the Act, the "pattern" requirement and the "meaningful difference" requirement, respectively, are met. The purpose of section 777A(d)(1)(B) of the Act is to address Commerce's concerns that dumping may be masked:

> Section 229 of the bill {*i.e.*, the Uruguay Round Agreements Act} adds new section 777A(d) to implement the provisions of the Agreement regarding the use of average normal values and export prices for purposes of calculating dumping margins. Although current U.S. law permits the use of averages on both sides of the dumping equation, Commerce's preferred practice has been to compare an average normal

---

[21] *See* Taiwan Plaintiffs' Draft Redetermination Comments at 2.

value to individual export prices in investigations and reviews. In part, the reluctance to use an {A-to-A} methodology has been based on a concern that such a methodology could conceal "targeted dumping."[22]

Accordingly, when Commerce determines whether the subject merchandise is being sold in the United States at less than NV, and the weighted-average dumping margin calculated based on the A-to-A method cannot account for masked, or "targeted," dumping, section 777A(d)(1)(B) of the Act provides Commerce with an alternative comparison methodology, *i.e.*, the A-to-T method, to address such distortions to ensure an accurate weighted-average dumping margin.

Commerce's price difference test conforms with Congress' intent that Commerce determines whether prices differ significantly on a "case-by-case basis."[23] The SAA states that, "in determining whether a pattern of significant price differences exist, Commerce will proceed on a case-by-case basis, because small differences may be significant for one industry or one type of product but not for another."[24] Commerce's "price difference test" examines whether the weighted-average net price to a given purchaser, region, or time period is within two percent of the weighted-average net price to all other purchasers, regions, or time periods. Thus, whether the prices to a given purchasers, regions, and time periods differ significantly is determined relative to the weighted-average net price to all other purchasers, regions, or time periods. As a result, the data on which Commerce relies in performing the price difference test changes on a case-by-case basis, *i.e.*, specific to the respondent's pricing of comparable merchandise to all other purchasers, regions, or time periods, and Commerce's analysis therefore conforms with

---

[22] *See* Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 316, 103d Cong., 2d Session (1994) (SAA), at 842.
[23] *See* section 777A(d)(1)(B) of the Act; *see also* SAA at 843.
[24] *See* SAA at 843.

Congress' intent that an analysis of whether a pattern of prices exists be carried out on a case-by-case basis.

The test does not stipulate an absolute value as a threshold (*e.g.*, $5 per kg) to define "differ significantly," but depends upon a threshold that measures the relative difference (*i.e.*, a percentage) on a comparison-by-comparison basis where the threshold is calculated as plus or minus two percent of the weighted-average net prices to all other purchasers, regions, or time periods. Because the difference between the weighted-average net price to a given purchaser, region, or time period and the weighted-average net price to all other purchasers, regions, or time periods is measured relative to the weighted-average net price to all other purchasers, regions, or time periods, the price difference test is not a brightline test.

Moreover, the Taiwan Plaintiffs cite to portions of the 1997 regulations and the preamble for those regulations that have been withdrawn.[25] As Commerce has gained experience in addressing masked dumping and the application of the alternative A-to-T method, it has revised its practice, including the withdrawal of the regulations which were promulgated with no such experience. As such, the provisions of those regulations are no longer part of Commerce's practice in addressing masked dumping.

**Comment 2: Commerce's Practice To Follow The Statute**

The following is a verbatim executive summary of argument submitted by the Taiwan Plaintiffs. For further details, *see* Taiwan Plaintiffs' Draft Redetermination Comments at 10-14.

> Prior to its adoption of the two percent price difference test, Commerce relied on three tests to determine whether there is a "{sic} pattern of prices that differ significantly among purchasers, regions, or time periods: P/2, Nails and Cohens *d*. Each of these tests constituted a good faith attempt to follow the literal language and purpose of the targeting law. For example, the P/2 test was used when the

---

[25] *See* Taiwan Plaintiffs' Draft Redetermination Comments at 10-12 (citing *Antidumping Duties; Countervailing Duties*; 62 FR 27296 (May 19,1997) and *Withdrawal of the Regulatory Provisions Governing Targeted Dumping in Antidumping Duty Investigations,* 73 FR 74930 (December 10, 2008)).

observed pattern was very clear, and there was no systematic explanation of why this pattern could be accounted for through those other factors. Commerce then decided that the P/2 test did not apply to all cases since the "two-percent price difference threshold does not adequately account for price variations specific to the market in question. In so doing, the P/2 test may find targeted dumping in many cases when arguably no such dumping is occurring." Commerce cannot apply to {sic} two percent test, which it had previously rejected without a reasoned explanation justifying a return to this old, discarded methodology.[26]

**Commerce's Position**: We disagree with the Taiwan Plaintiffs that the price difference test "does not even attempt to follow the statutory language, SAA, implementing regulations or {Commerce's} previous attempts to create a test which conforms to law."[27] The Federal Circuit remanded this case "to Commerce so that Commerce may consider an alternative methodology for analyzing whether there is 'a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time' under 19 U.S.C. § 1677f-1(d)(1)(B)(i)."[28] As explained below, in conformity with *Marmen*, Commerce's use of a price difference test reasonably fulfills the statutory requirement to identify prices that differ significantly pursuant to section 777A(d)(1)(B)(i) of the Act.

Contrary to Taiwan Plaintiffs' opinion, Commerce has never used the "P/2 test" as part of its differential pricing analysis. The P/2 test and the price difference test are not equivalent to each other. The P/2 test examined whether the weighted-average U.S. prices of allegedly "targeted" sales were two percent lower than the weighted-average U.S. prices of non-targeted sales with the stated aim of identifying "targeted dumping." As discussed below, the P/2 test was the basis for the petitioner's targeted dumping allegation in *Coated Free Sheet from Korea*.[29]

---

[26] *See* Taiwan Plaintiffs' Draft Redetermination Comments at 3.
[27] *Id.* at 15.
[28] *See Mid Continent Steel & Wire, Inc. v. United States*, 2025 U.S. App. LEXIS 31306 (Fed. Cir. December 2, 2025).
[29] *See Notice of Final Determination of Sales at Less Than Fair Value: Coated Free Sheet Paper from the Republic of Korea*, 72 FR 60630 (October 25, 2007) *(Coated Free Sheet from Korea)*, and accompanying IDM at Comment 1.

Given Commerce's lack of experience at that time in addressing section 777A(d)(1)(B) of the Act, Commerce relied on the petitioner's analysis in that investigation.[30]  However, in the following LTFV investigations in which the petitioner submitted a similar targeted dumping allegation, Commerce developed its own analysis to address section 777A(d)(1)(B) of the Act, *i.e.*, the "Nails Test."[31]  Commerce found that the P/2 test is not "a reliable indicator that {obvious} *targeted dumping* has occurred…"[32]

Finally, Commerce has substantially more experience than in 2008.  In *Coated Free Sheet from Korea*, Commerce employed the P/2 test to examine whether use of an alternative comparison method was permitted and addressed petitioner's targeted dumping allegation.[33]  Subsequently, in the *Nails from China* final determination, Commerce explained:

> Prior to {*Coated Free Sheet from Korea*}, {Commerce's} only experience with analyzing targeted dumping in an antidumping duty investigation was the case-specific analysis in the court remand that followed the antidumping investigation of certain pasta from Italy (*see Borden, Inc., Gooch Foods, Inc., and Hershey Foods Corp. V. United States*, Slip Op. 99-50, CIT, June 4, 1999), also referred to as the "Pasta Test."  The petitioner's allegations of targeted dumping in {*Coated Free Sheet from Korea*} presented {Commerce} with a host of issues that it had not previously confronted.  Given the short time available in that proceeding to address these issues, {Commerce} stated:

> In the years since the Pasta Test was developed, {Commerce} has had no further experience analyzing targeting and we are examining how the Pasta Test standards and thresholds could be modified in developing a standard practice for addressing targeting allegations. In view of {Commerce}'s uncertainty regarding the general applicability of the Pasta Test standards, the overall lack of case precedent on this matter, and the unique circumstances of this case, {Commerce} accepts the petitioner's targeting allegation without endorsing the petitioner's test standards and procedures as a general practice.[34]

---

[30] *Id.*
[31] *See Certain Steel Nails from the People's Republic of China: Final Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances,* 73 FR 33977 (June 16, 2008) (*Nails from China*), and accompanying IDM.
[32] *Id.* at 23 (emphasis added).
[33] *See Coated Free Sheet from Korea* IDM; *see also Coated Free Sheet Paper from the Republic of Korea:  Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination,* 72 FR 30766 (June 4, 2007).
[34] *See Nails from China* IDM at Comment 1 (citing *Coated Free Sheet from Korea* IDM at Comment 2).

At the same time, {Commerce} signaled its intention to develop a standardized targeted dumping test to replace the P/2 test for application in subsequent investigations. Thus, while allowing the petitioner's targeted dumping allegation to proceed to conclusion in {*Coated Free Sheet from Korea* }, {Commerce} simultaneously announced in {*Coated Free Sheet from Korea* } at Comment 2 that it would develop "a new, more standardized test" (*i.e.*, a replacement for the P/2 test) through a proceeding open to public input, which we initiated simultaneously with the publication of {*Coated Free Sheet from Korea*}. *See* {*Targeted Dumping in Antidumping Investigations; Request for Comment*, 72 FR 60651 (October 25, 2007)}.[35]

As such, Commerce introduced a new analysis, what became known as the "Nails Test," to examine whether the statutory requirements under section 777A(d)(1)(B)(i) and (ii) were satisfied.[36] Afterwards, Commerce would replace the Nails Test with a methodology called the "differential pricing analysis."[37] Specifically, Commerce stated:

> While the Nails Test is a statutorily consistent and statistically sound methodology for identifying whether the average-to-transaction method might be appropriate, {Commerce} has continued to seek to refine its approach with respect to the use of an alternative comparison method. Given {Commerce} 's experience over the last several years, and based on {Commerce} 's further research, analysis and consideration of the numerous comments and suggestions on what guidelines, thresholds, and tests should be used in determining whether to apply an alternative comparison method based on the average-to-transaction method, {Commerce} is developing a new approach for determining whether application of such a comparison method is appropriate in a particular segment of a proceeding pursuant to 19 CFR 351.414(c)(1) and consistent with section 777A(d)(1)(B) of the Act. The new approach is referred to as the "differential pricing" analysis, as a more precise characterization of the purpose and application of section 777A(d)(1)(B) of the Act.[38]

After performing the differential pricing analysis since 2013, Commerce has continued to gain experience in addressing the statutory requirements provided under section 777A(d)(1)(B) of the

---

[35] *Id.* at Comment 1.

[36] *See*, *e.g.*, *Certain Steel Nails from the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances and Postponement of Final Determination*, 73 FR 3928 (January 23, 2008) (*Nails from China Prelim*).

[37] *See Differential Pricing Analysis; Request for Comments,* 79 FR 26720, 26722 (May 9, 2014) (*Differential Pricing Analysis*); *see also Xanthan Gum from the People's Republic of China: Final Determination of Sales at Less Than Fair Value,* 78 FR 33351 (June 4, 2013) (*Xanthan Gum*).

[38] *See Differential Pricing Analysis*, 79 FR at 26722.

Act.  With the issuance of the mandate following *Marmen*,[39] Commerce introduced the price difference test to determine whether prices for comparable merchandise differ significantly among purchasers, regions, or time periods.  In contrast to the P/2 test described above, the price difference test examines whether U.S. prices differ significantly among purchasers, regions, and time periods.  Specifically, the price difference test examines whether the weighted-average U.S. price to a given purchaser, region, or time period is within two percent of the weighted average U.S. price to all other purchasers, regions, or time periods.  If the difference between the two weighted-average prices is within two percent of the weighted-average U.S. price to all other purchasers, then the sale prices to the individual purchaser, region, or time period do not differ significantly.  Alternatively, if the difference is two percent or greater, or two percent or less, then the sale prices to the individual purchaser, region, or time period do differ significantly.

The only common aspect of the P/2 test and the price difference test is the two percent threshold.  However, the P/2 test only examines whether prices to alleged "targets" are at least two percent lower than the prices for all other sales, whereas the price difference test considers whether prices to each purchaser, region, or time period are at least two percent higher or lower than the prices for all other sales.  As discussed above, the price difference test shares the two percent threshold with the arms-length test (with the same four percent band around the price), which is the basis for whether the prices of comparison market sales made to an affiliate are at arm's length.  Thus, the price difference test is simply a different test than the P/2 test.

Lastly, we find the Taiwan Plaintiffs' position to be inapposite, that, if Commerce changed the calculation of the denominator of the Cohen's *d* coefficient, then the "Cohen's *d* {test} conforms to law if it is modified in this manner."[40]  The Federal Circuit held in *Marmen*

---

[39] *See Marmen*, 134 F.4th at 1343-1348.
[40] *See* Taiwan Plaintiffs Draft Redetermination Comments at 13.

that Commerce's use of the Cohen's *d* test requires that the underlying price data be "normally distributed, equally variable, and equally and sufficiently numerous."[41] Further, the Federal Circuit held that "Commerce may re-perform a differential pricing analysis , and that analysis may not rely on {the} Cohen's *d* test for data sets like those here {*i.e.*, that do not meet the three criteria identified by the Federal Circuit}."[42] Neither Commerce, nor the Taiwan Plaintiffs, nor this Court may ignore the Federal Circuit's precedential holding.

**Comment 3: The Price Difference Test Conforms To Law And Commerce's Practice**

The following is a verbatim executive summary of argument submitted by the Taiwan Plaintiffs. For further details, *see* Taiwan Plaintiffs' Draft Redetermination Comments at 14-18.

> The two percent test constitutes a giant step backward. The two percent Price Difference test does not even attempt to follow the statutory language, SAA, implementing regulations or {Commerce}'s previous attempts to create a test which conforms to law. It is not grounded in standard and appropriate statistical techniques. It ignores case-specific facts and circumstances. It is grounded on many of the same principles that resulted in the Federal Circuit, in Marmen, Stupp, and this case, to reject Cohen's *d*. It leads to absurd results.[43]
>
> Patterns do not exist when average prices to the same customer (or in the same region or time period) are sometimes higher, sometimes lower, and often within two percent of the comparison-group prices for the relevant products. In adopting the Nails Test, {Commerce} decided that the P/2 Test could not be applied in all cases since "it relies on a single, bright-line price threshold of two percent to define targeted dumping that does not account for price variations specific to the market in question." In this case, {Commerce} has expressly repudiated its decision in *Nails from the UAE,* without even attempting to provide a reasoned explanation. Unless {Commerce} is able to explain its 180 degree about face in its Final Results, its decision will not withstand judicial scrutiny and will be overturned.[44]

**Commerce's Position**: We disagree. The term "significantly" is "open-ended." In *Garg Tube Export*,[45] the CIT found that "{t}he text of the statute and its legislative history indicate that

---

[41] *See Marmen*, 134 F.4th at 1348.
[42] *See Marmen*, 134 F.4th at 1348.
[43] *See* Taiwan Plaintiffs Draft Redetermination Comments at 3.
[44] *Id.* at 3.
[45] *See Garg Tube Export LLP v. United States*, 740 F.Supp.3d 1355, 1366-67 (CIT 2024) (*Garg Tube Export*).

Congress gave Commerce flexibility by its use of the open-ended term 'differ significantly.'" First, the CIT explained that "Congress' mandate to Commerce to assess not merely whether prices differ, but whether they differ 'significantly' necessarily affords Commerce flexibility to assess the degree of difference depending on the particular context."[46] Next, the CIT observed that the SAA provides that Commerce will proceed on a case-by-case basis, which confirms the flexibility provided by the words of the statute.[47] Finally, the CIT found that the context in which the phrase "differ significantly" appears, alongside the subsection that allows Commerce to decline taking into account insignificant adjustments, section 777A(a) of the Act, and another subsection that exclusively allows Commerce to select averages and statistically valid samples, section 777A(b) of the Act, further confirms that Congress meant to afford the agency with flexibility and discretion.[48] Therefore, the CIT held that "Congress delegated to Commerce the power to use its discretion when determining whether prices differ significantly under {section 777A of the Act}."[49]

The Federal Circuit held that its "conclusion, of course, does not preclude Commerce from fashioning and justifying" a different analysis instead of "Cohen's analysis of group differences as long as the resulting analysis is itself justified as sound for gauging differences in the data sets at issue."[50] Indeed, the Federal Circuit stated "Commerce may re-perform a differential pricing analysis," and the differential pricing analysis involves quantitative analysis

---

[46] *Id.*, 740 F.Supp.3d. at 1367.
[47] *Id.* (citing Statement of Administrative Action (SAA), H.R. Doc. No. 103 – 316, vol. 1 (1994) at 843).
[48] *Id.*
[49] *Id.*
[50] *See Marmen,* 134 F.4th at 1348; *see also Stupp Corp. v. United States,* No. 23-1663, 2025 WL 1178392 (Fed. Cir. April 23, 2025) at *3 ("Additionally, the Court remanded this very case nearly four years ago to give Commerce an opportunity to explain why meeting these assumptions is not necessary and, as *Marmen* well and thoroughly describes, Commerce did not do so in a particularly persuasive manner. *Id.* at 15-23. And this case does not call on us to assess the broader question of whether Commerce can ever reasonably rely on rules of thumb that are not statistically grounded".)

such as the ratio test and the meaningful difference test. Thus, we disagree with the respondents that Commerce is bound by a particular interpretation of "differs significantly" such that it cannot exercise the discretion afforded to it by Congress to implement the price difference test pursuant to the statute.

Further, the purpose of section 777A(d)(1)(B) of the Act is to provide an alternative comparison method when one of the standard comparison methods provided for under section 777A(d)(1)(A) of the Act (*e.g.*, the A-to-A method[51]) masks dumping through offsetting lower prices with higher prices.[52] As such, the pattern requirement, section 777A(d)(1)(B)(i) of the Act, requires that Commerce identify that conditions are present in the respondent's pricing behavior in the U.S. market where masked dumping could be occurring, *i.e.*, where lower prices offset higher prices where prices differ significantly. This canary-in-the-coal-mine analysis should reasonably identify conditions where the margin calculations based on the A-to-A method could fail to unearth masked dumping. Commerce's use of a two-percent threshold correlates with other parts of its margin calculations which are found to "differ significantly," and, therefore, Commerce finds that the two-percent threshold in the price difference test is reasonable.

A two-percent threshold is used by Commerce in other contexts and is consistent with other aspects of Commerce's practice in antidumping proceedings. For example, in the arm's-length test conducted pursuant to 19 CFR 351.403(c), Commerce finds that sales between affiliated parties in the comparison market are not at arm's length and fall outside the ordinary course of trade if the average, product-specific, comparison market prices to an affiliated

---

[51] As the transaction-to-transaction method is only used in "unusual situations," we will only reference the A-to-A method. *See* 19 CFR 351.414(c)(2).
[52] *See* SAA at 842.

customer are not within a range of 98 to 102 percent of the average, product-specific, comparison market prices to unaffiliated customers (*i.e.*, a plus or minus a two-percent difference from the weighted-average price to unaffiliated customers). In fact, Commerce has found that average prices to an affiliated customer that differ by two percent or more, and, therefore, fail the arm's-length test, "differ significantly" from market prices.[53] When the prices to an affiliated customer are not at arm's length, Commerce finds that such sales are outside of the ordinary course of trade. The distinction between being within or outside of the ordinary course of trade is a significant difference, as sales which are found to be outside the ordinary course of trade are excluded from Commerce's margin calculations, *e.g.*, excluded from the calculation of NV.

Further, pursuant to sections 733(b)(3) and 735(a)(4) of the Act, the *de minimis* threshold for an estimated weighted-average dumping margin in an investigation is two percent. In other words, an estimated weighted-average dumping margin of at least two percent is significant, and not zero, whereas an estimated weighted-average dumping margin that is less than two percent, (*i.e.*, *de minimis*), results in a determination that sales are not at LTFV. Commerce has synonymously referred to non-*de minimis* levels of dumping as a "significant" amount of dumping.[54] If a weighted-average difference of two percent between U.S. prices and normal value is significant enough to warrant an affirmative determination of sales at LTFV, then it is reasonable to conclude that a two-percent difference in U.S. prices -- *the same U.S. prices that are used in comparison with normal value* -- is significant within the context of section

---

[53] *See Large Diameter Welded Pipe from the Republic of Turkey: Final Determination of Sales at Less Than Fair Value,* 84 FR 6382 (February 27, 2019), and accompanying IDM at Comment 4 ("the prices at issue differ significantly from the prices charged to an unaffiliated company (*i.e.*, they are not within 98 to 102 percent of the price charged for or by an unaffiliated party), which leads us to conclude that these prices are affected by the relationship between Borusan and Borusan Logistik")).
[54] *See Circular Welded Non-Alloy Steel Pipe from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 FR 26401 (June 6, 2019), and accompanying IDM at Comment 2 ("Under scenario (4), there is a significant (*i.e.*, non-*de minimis*) amount of dumping...").

777A(d)(1)(B)(i) of the Act. Furthermore, in an administrative review such as is at issue in this litigation, the *de minimis* threshold is one half of one (0.5) percent, which suggests that the two percent threshold from investigations is more conservative, *i.e.*, a higher threshold for defining a significant difference, and indicates a level of significance that is much greater than the level of significance when the assessment of antidumping duties are at issue.[55]

Moreover, the Taiwan Plaintiffs misunderstand how Commerce's differential pricing analysis functions. The price difference test determines whether prices differ significantly; the ratio test determines whether there is a pattern. The ratio test is consistent with the ordinary meaning of the word "pattern," which is "a frequent or widespread incidence."[56] Therefore, more than 33 percent of the value of PT's U.S. sales must pass the price difference test before Commerce determines that there is a pattern. As such, if 33 percent or less of the sales value for the U.S. sales pass the price difference test, then Commerce will find that there is no evidence that a pattern exists. Additionally, when prices differ significantly, that means there are higher priced sales and lower priced sales. As such, the fact that some sales are above the two percent threshold and some sales are below the two-percent threshold contribute to the existence of a pattern.

The Federal Circuit has upheld Commerce's ratio test as a reasonable method for addressing the pattern requirement of section 777A(d)(1)(B)(i) of the Act and has held that

---

[55] *See* 19 CFR 351.106(c) (providing that, in an administrative review, Commerce will treat as *de minimis* any weighted-average dumping margin that is less than 0.5 percent and will liquidate without regard to antidumping duties all entries during the relevant period of review, but dumping duties will be collected if the weighted-average dumping margin is 0.5 percent or more).

[56] *See* Pattern, Merriam-Webster Online Dictionary, available at https://www.merriam-webster.com/dictionary/pattern (last visited March 11, 2026).

Commerce "has discretion to determine a reasonable methodology to implement the statutory directive."[57]

Moreover, the Federal Circuit has rejected the argument that the statute requires Commerce "to determine the reasons why there is a pattern of export prices for comparable merchandise that differs significantly among purchasers, regions, or time periods{.}"[58] The Federal Circuit agreed with the CIT that there is no intent requirement in the statute and that requiring Commerce to determine the intent of targeted dumping "would create a tremendous burden on Commerce that is not required or suggested by the statute."[59] Neither the ratio test nor the price difference test is required to determine either the reasons why there is a pattern or why prices differ significantly. Therefore, Commerce does not need to ascertain the reason or reasons to justify that there is a pattern of prices that differ significantly.

**Comment 4: Targeted Dumping Does Not Exist When Comparison Group Prices Are Lower Than Test Group Prices**

The following is a verbatim executive summary of argument submitted by the Taiwan Plaintiffs. For further details, *see* Taiwan Plaintiffs' Draft Redetermination Comments at 19.

> Targeted dumping means that prices to certain customers, regions or time periods are targeted, *i.e.*, sold at lower prices than prices to the Comparison Group. If the price norm in the Comparison Group is lower than the prices in the Test Group, then the Test Group is not being targeted. This requirement was abandoned when {Commerce} relied on Cohens *d*, a statistically valid, albeit flawed, differential pricing analysis. Now that {Commerce} has abandoned its attempt to rely on a statistically valid test, it is required to limit targeted sales to Test Group targeted sales.[60]

---

[57] *See Stupp Corp. v. United States*, 5 F.4th 1341, 1354 (Fed. Cir. 2021) (*Stupp III*); *see also Dillinger France S.A. v. United States*, 981 F.3d 1318 (Fed. Cir. 2020) (*Dillinger*).

[58] *See JBF RAK LLC v. United States*, 790 F.3d 1358, 1368 (Fed. Cir. 2015) (*JBF RAK*); *see also Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. United States*, 608 Fed. Appx. 948, 949 (Fed. Cir. 2015) (*Borusan*) (non-precedential); and *Nan Ya Plastics Corp., Ltd. v. United States*, 128 F.Supp.3d 1345 (CIT 2015) (*Nan Ya*).

[59] *See JBF RAK*, 790 F.3d at 1368.

[60] *See* Taiwan Plaintiffs Draft Redetermination Comments at 3-4.

**Commerce's Position**: The Taiwan Plaintiffs misunderstand that "targeted dumping" is related to the price difference test or to the statutory requirement that there is a pattern of prices that differ significantly among purchasers, regions, or periods of time. Likewise, the Taiwan Plaintiffs likewise conflate the P/2 Test used to identify "targeted dumping" and the price difference test which identifies when prices differ significantly. "Targeted," or masked, dumping occurs when non-dumped sales mask sales at less than fair value.[61] The statutory requirement for a pattern of U.S. prices that differ significantly among purchasers, regions, or periods of time does not determine whether there is masked dumping or whether there is dumping at all. To determine dumping, the difference between U.S. price and normal value is required, and the statutory requirement for a pattern only looks at differences among U.S. prices. Rather, section 777A(d)(1)(B)(i) of the Act, requires that Commerce identify that conditions are present in the respondent's pricing behavior in the U.S. market where masked dumping *could be* or is *potentially* occurring, *i.e.* whether there is a pattern of prices that differ significantly among purchasers, regions, or time periods.[62]

Further, test group prices that are higher than the comparison group price are equally capable of representing conditions for masking as test group prices that are lower than the comparison group prices. Masked dumping occurs when higher prices offset lower prices. Accordingly, higher prices are just as relevant to masked dumping as lower prices, and both must be considered when examining whether there is a pattern of prices that differ significantly. Therefore, the Taiwan Plaintiffs' logic is without merit.

---

[61] *See Timken Co. v. United States*, 354 F.3d 1334, 1343 (Fed. Cir. 2004); *Apex Frozen Foods Pvt. Ltd v. United States*, 862 F.3d 1337, 1341 (Fed. Cir. 2017) (*Apex*).
[62] *See*, *e.g.*, *Apex*, 862 F.3d at 1345.

**Comment 5:  Whether Masked Dumping Exists When Test Group Prices Fall Within The Standard Deviation Of Comparison Group Prices**.

The following is a verbatim executive summary of argument submitted by the Taiwan Plaintiffs.  For further details, *see* Taiwan Plaintiffs' Draft Redetermination Comments at 23.

The two percent price difference becomes meaningless when Test Group prices fall squarely within the standard deviation of Comparison Group prices.[63]

**Commerce's Position**:  As discussed above, neither the price difference test nor considering whether there exists a pattern of prices that differ significantly bears any relationship to whether there is "targeted," or masked dumping when using the A-to-A method.  There is no comparison of U.S. prices with normal value when addressing the pattern requirement.  When a pattern of prices is found, it only establishes that conditions exist in the respondent's pricing behavior in the U.S. market which could lead to masked dumping, not whether masked dumping is present when using the A-to-A method or whether that masked dumping is meaningful.

We disagree with the analyses that  Taiwan Plaintiffs purport to support the "absurdity of finding that these sales are targeted."  In Exhibit One, the Taiwan Plaintiffs recycle diagrams from the calculation of the Cohen's *d* coefficient which plot prices for various test and comparison groups.  The fact that such prices overlap each other is neither surprising nor evidence of "absurdity."  The diagrams demonstrate that the average prices for each group differ, both within each group and between the two groups; both evidence of circumstances where higher prices may offset lower prices such that there is masked dumping.  The alternative to using average U.S. prices with the A-to-A method is to use individual U.S. sale prices with the A-to-T method, and these diagrams appear to visually demonstrate where offsetting would occur within averaging groups, and also between averaging groups.

---

[63] *See* Taiwan Plaintiffs' Draft Redetermination Comments at 4.

With Exhibit Two, the Taiwan Plaintiffs appear to use a standard deviation of all prices rather than the two-percent threshold used in the price difference test to demonstrate, based on their alternative analysis, that fewer U.S. sales are found to be at prices that differ significantly. Notwithstanding this alternative approach, Commerce has explained above why the two-percent threshold is a reasonable measure of significance. The Taiwan Plaintiffs provide no support for their alternative analysis except from the lower proportion of U.S. sales that are found to be at prices that differ significantly. Accordingly, we are unpersuaded to adopt the Taiwan Plaintiffs' alternative approach.

**Comment 6:  Targeted Dumping Does Not Exist When Test Group Sales Are Not Dumped**

The following is a verbatim executive summary of argument submitted by the Taiwan Plaintiffs. For further details, *see* Taiwan Plaintiffs' Draft Redetermination Comments at 19.

> An affirmative finding of targeted dumping requires that the low-priced Test Group sales are being sold at dumped prices. Targeted dumping cannot exist if there is no dumping. Test Group prices which exceed normal value, by definition, are not injurious. Again, while this limitation arguably does not exist under a standard and appropriate statistical test and differential pricing analysis, {Commerce}'s two percent price difference test is not a statistical test. Thus, now that {Commerce} has abandoned its attempt to rely on a statistically valid test, it is required to limit targeted sales to sales that are dumped.[64]

**Commerce's Position**: The Taiwan Plaintiffs continue to make claims without any support or explanation. Moreover, The Taiwan Plaintiffs' misunderstanding of the statutory requirements continues unabated. Commerce does not measure "targeted" or masked dumping in the price difference and ratio tests; rather it examines whether there exists a pattern of prices that differ significantly which is evidence that masked dumping may be occurring as a result of the respondent's pricing behavior in the U.S. market. The statute does not require Commerce to determine whether dumping, masked or otherwise, is occurring when determining whether there

---

[64] *Id*.

is a pattern of prices that differ significantly among purchasers, regions, or periods of time.[65]

Masked dumping occurs when higher priced offset lower priced, dumped sales, which may be found as part of the subsequent meaningful difference test if a pattern of prices is found to exist as evidence of the potential for masked dumping.

We agree with the Taiwan Plaintiffs that the price difference test is not a statistical test in that it makes inferences that the results of an analysis of sampled data are representative of the population as a whole; however, there is no requirement in the statute or in the regulations for such an analysis. The price difference test analyzes the respondent's U.S. prices to determine whether the differences in prices are significant among purchasers, regions or time period, pursuant to section 777A(d)(1)(B)(i) of the Act. As discussed above, this analysis is similar to other aspects of Commerce's dumping analysis, including a two-percent threshold as a measure of a significant difference. Accordingly, we find that the argument from the Taiwan Plaintiffs is unpersuasive.

**Comment 7: Targeted Dumping By Customer Does Not Exists Based On The Facts In This Case**

The following is a verbatim executive summary of argument submitted by the Taiwan Plaintiffs. For further details, *see* Taiwan Plaintiffs' Draft Redetermination Comments at 20.

> Ninety-nine percent of PT's sales during the {POI} were to one customer while the remaining, de minimis one percent were to other customers. The limited number of customers and the dramatic difference in sales to PT's primary customer and its secondary customers, eliminate the possibility of targeted dumping by customer.[66]

**Commerce's Position**: Neither the price difference test nor the consideration of whether there exists a pattern of prices that differ significantly bears any relationship to whether there is "the

---

[65] *See JBF RAK*, 790 F.3d at 1368; *see also Borusan* , 608 Fed. Appx. at 949; and *Nan Ya*, 128 F.Supp.3d at 1345.
[66] *See* Taiwan Plaintiffs Draft Redetermination Comments at 4.

possibility of targeted dumping by customer."[67]  As discussed above, there is no comparison of U.S. prices with normal value when examining whether prices differ significantly among purchasers, or regions, or time periods.  When a pattern of prices is found, it only establishes that conditions exist in the respondent's pricing behavior in the U.S. market which could lead to masked dumping, not whether masked dumping is present when using the A-to-A method or whether that masked dumping is meaningful.

Further, the application of the A-to-A method is not by customer.  The averaging group for U.S. prices (and comparison market prices for normal value) is defined by the product (*i.e.*, CONNUM) and other characteristics of the respondent's sales of subject merchandise, *e.g.*, the level-of-trade.  The A-to-A method, and similarly the A-to-T method, does not calculate dumping margins by customer or purchaser.  After comparing the U.S. price with normal value, Commerce aggregates these comparison results to calculate the respondent's weighted-average dumping margin for the respondent.  Customer, or purchaser, is not relevant to Commerce's calculation of individual dumping margins or the weighted-average dumping margin.  Therefore, the Taiwan Plaintiffs linking of dumping to purchaser is misplaced as a respondent's purchasers are not relevant to Commerce's calculation of a respondent's weighted-average dumping margin, and whether the A-to-A method can account for the total amount of dumping in the respondent's pricing behavior in the U.S. market.

**Comment 8:  Targeted Dumping By Time Period Does Not Exist Based On The Facts In This Case**

The following is a verbatim executive summary of argument submitted by the Taiwan Plaintiffs.  For further details, *see* Taiwan Plaintiffs' Draft Redetermination Comments at 20-21.

> PT's prices declined from QTR01 to QTR02 and remained at a constant lower level in QTR03 and QTR04. Notwithstanding the price stability during the POI, the Price

---

[67] *Id.*

Difference test resulted in a 76.42 percent pass rate. This high rate arises because QTR01 is compared to each of the other calendar quarters, yielding false positives in light of the price stability in QTR02, 03 and 04.[68]

**Commerce's Position**: We disagree with the Taiwan Plaintiffs' conclusion that the price difference test results in "false positives"[69] given PT's quarterly pricing pattern over the period of investigation. The Taiwan Plaintiffs state that PT's prices in the first quarter (QTR01) decline in the second quarter (QTR02) and then prices remain constant in the third and fourth quarters (QTR03 and QTR04, respectively). The Taiwan Plaintiffs then find that the price difference test's results that 76-percent of the sales value passes (*i.e.*, are at prices that differ significantly) because QTR01 prices are compared to each of QTR02, QTR03 and QTR04 prices, concluding that this result is a "false positive." The Taiwan Plaintiffs' logic demonstrates that they do not understand the analysis and that their logic is without merit. The differential price test makes a single comparison of the average of prices in QTR01 with the average of prices in QTR02, QTR03 and QTR04, another comparison of the average of prices in QTR02 with the average of prices in QTR01, QTR03 and QTR04, and so forth. The implied fault of the results of the price difference test by the Taiwan Plaintiffs is itself a "false positive" and without merit.

**Comment 9: The Unlawful Discontinuation of the Mixed Method**

The following is the verbatim executive summary of argument submitted by the Taiwan Plaintiffs. For further details, *see* Taiwan Plaintiffs' Draft Redetermination Comments at 22.

The Price Difference test eliminates the mixed methodology, in which AT was not applied to the entire database when between 33 and 66 percent of U.S. sales "pass" the significant price difference test. In the absence of some explanation why the change in the test for "significance" also requires a change in the consequences of finding a 33-perccent "pass" rate in the "Ratio Test," {Commerce}'s elimination

---

[68] *Id*.

[69] Commerce understands that the Taiwan Plaintiffs use the term "false positives" to simply mean that they disagree with the results of the price difference test, *i.e.*, that the finding the prices differ significantly is false; and that the Taiwan Plaintiffs do not use the term "false positive" in the meaning of a statistical analysis where the results of an analysis based on sample data falsely confirm the null hypothesis.

of the "mixed methodology" is beyond the scope of its authority in this proceeding.[70]

**Commerce's Position**:  The mixed method was introduced when Commerce adopted the Cohen's *d* test.[71]  The statute does not require Commerce to use a "mixed" method as an alternative comparison methodology.  While the statute permits Commerce's previous policy that adopted a hybrid version of two available comparison methodologies, Commerce's new practice in administrative proceedings aligns more closely with the statutory text, which permits Commerce to use the A-to-T method when certain conditions set forth in sections 777A(d)(1)(B)(i) and (ii) of the Act are satisfied.  In light of the foregoing, Commerce does not consider it necessary to continue to use the mixed method, particularly when discontinuation of the mixed method enhances the ability to address masked dumping, which is consistent with the objective of the statute, and more closely aligns with the statutory language that expressly authorizes the use of the A-to-T comparison method when the conditions set forth in section 777A(d)(1)(B) of the Act are satisfied.  The Federal Circuit explained that "Commerce should have the opportunity to set forth an alternative policy analysis, which may then be subject to judicial review." [72]  Here, Commerce has explained its change in policy.[73]

### Comment 10: Commerce's Test Relies On An Inadequate Number Of Data Points and Does Not Exclude Outliers

The following is a verbatim executive summary of argument submitted by the Taiwan Plaintiffs.  For further details, *see* Taiwan Plaintiffs' Draft Redetermination Comments at 23.

> The Price Difference test relies on comparisons with an inadequate number of data points — including in its analysis test or comparison groups consisting of only two transactions.  Such an analysis is incapable of determining whether observed price

---

[70] *See* Taiwan Plaintiffs' Draft Redetermination Comments at 4-5.
[71] *See Xanthan Gum* IDM at 28.
[72] *See Mid Continent Steel & Wire, Inc. v. United States*, Ct. No. 24-1556, ECF No. 99.
[73] *See SKF USA Inc. v. United States*, 630 F.3d 1365, 1377 (Fed. Cir. 2011) (affirming Commerce's change in practice because of its reasoned explanation).

differences reflect a true pattern, and not just random processes. The test also includes obvious outliers, which cannot possibly be part of a pattern. An example of an outlier sale.[74]

**Commerce's Position**: The Taiwan Plaintiffs fail to explain why the number of data points is inadequate, nor do they support their claim. Further, the Taiwan Plaintiffs fail to support their assertion that Commerce remove outliers, "which cannot possibly be part of a pattern."[75] The Taiwan Plaintiffs fail to provide justification for ignoring certain U.S. sale prices from the price difference test when all U.S. sales are used to calculate the respondent's weighted-average dumping margin. Further, the Taiwan Plaintiffs do not define what would constitute an outlier but rather points to an alleged example with no explanation, and they merely imply that the presence of alleged outliers would distort the results of the price difference test. Accordingly, we find that the arguments by the Taiwan Plaintiffs are meritless.

### Comment 11: Commerce's Test Creates "False Positives" By Relying On Identical Data For Three Tests

The following is a verbatim executive summary of argument submitted by the Taiwan Plaintiffs. For further details, *see* Taiwan Plaintiffs' Draft Redetermination Comments at 23.

> The Draft Results conducts three distinct tests for price correlations: one by purchaser, one by region, and one by time period. This multiple testing triples the likelihood that random processes will give rise to positive results. Thus, Commerce should rely on a 6 percent threshold.[76]

**Commerce's Position**: Commerce's price difference test does not look for "price correlations." Instead, the price difference test determines whether the weighted-average net price to a given purchaser or region, or time period differs significantly from the weighted-average net price of sales to all other purchasers, regions, or time periods. While we agree that the price difference

---

[74] *See* Taiwan Plaintiffs' Draft Redetermination Comments at 5.
[75] *Id.* at 23.
[76] *Id.* at 5.

test separately identifies where prices differ significantly between purchasers, regions, and time periods, when these results are aggregated in the ratio test, if a given sale is found to pass the price difference test, then the value of that sale is only counted once in the total value of sales which pass the price difference test, i.e., sales whose prices differ significantly. Thus, there is no double or triple counting of a given sale in the numerator of the ratio test.

The Federal Circuit has held that the ratio test is a reasonable method for addressing the pattern requirement of section 777A(d)(1)(B)(i) of the Act, and that "there is no statutory language telling Commerce how to detect patterns of significantly differing export prices, much less how to aggregate and quantify pricing comparisons across product groups in order to select a statutorily defined comparison method. Commerce therefore has discretion to determine a reasonable methodology to implement the statutory directive."[77] In *Dillinger*, the Federal Circuit addressed arguments that Commerce's ratio test fails to implement the pattern requirement because Commerce aggregates prices found to differ among different purchasers, different regions, and different time periods, into a single pattern. In construing section 777A(d)(1)(B)(i) of the Act, the Federal Circuit held that Commerce's "aggregation" methodology is a proper interpretation of the pattern requirement.[78]

We find the Taiwan Plaintiffs argument unpersuasive because it is only based on Taiwan Plaintiffs' simplistic, illogical assertion that the two-percent threshold in the price difference test should be increased threefold because the ratio test aggregates the results of the of the price difference test by purchaser, region and time period while eliminating all overlap between these three categories.

---

[77] *See Stupp III,* 5 F.4th at 1354.
[78] *See Dillinger*, 981 F.3d at 1325-26

**Comment 12: Commerce's Test Yields Abnormally High Pass Rates**

The following is a verbatim executive summary of argument submitted by the Taiwan Plaintiffs. For further details, *see* Taiwan Plaintiffs' Draft Redetermination Comments at 23-24.

> Commerce's two percent price difference test yields an abnormally high pass rate of 89.84 percent in this investigation, over twice as high as the pass rate under Cohen's *d*. Any "test" that results in the same finding on nearly every occasion it is applied cannot be considered reasonable, as it tests for nothing at all. Such absurd results also fail to conform with the plain meaning of the statutory term "significantly."[79]

**Commerce's Position**: We disagree with the Taiwan Plaintiffs. This argument implies that Commerce engages in results-oriented analysis and should look to the results for whether a methodology is reasonable. It also implies there must a specific amount of determinations in which Commerce should not find that prices differ significantly. Neither of these assumptions are correct. Commerce implemented the price difference test as a means of performing its post-*Marmen* analysis regarding whether prices "differ significantly among purchasers, regions, or periods of time" in accordance with section 771A(d)(1)(B)(i) of the Act. The test establishes a methodology that can be used to carry out the statute's intended purpose on a case-by-case basis, and the Taiwan Plaintiffs themselves demonstrate that the test does not guarantee a particular outcome. Contrary to the Taiwan Plaintiffs claims, Commerce implemented a methodology that uses measures of significance that are consistent with various other sections of the statute that rely on a two-percent threshold. Thus, the fact that Commerce finds prices that differ significantly among purchasers, regions, or time periods indicates that Commerce is carrying out a case-by-case analysis as envisioned in the SAA. Moreover, considering that the Federal Circuit held that certain statistical assumptions were required in order to apply the Cohen's *d* test, the increased finding of prices that differ significantly under the price difference test may

---

[79] *See* Taiwan Plaintiffs' Draft Redetermination Comments at 5.

indicate that Commerce's Cohen's *d* test did not detect significant price differences as fulsomely as truly exist in the respondent's pricing behavior in the U.S. market.

**Comment 13: Whether Commerce Should Adjust Its Price Difference Test**

The following is a verbatim executive summary of argument submitted by the Taiwan Plaintiffs. For further details, *see* Taiwan Plaintiffs' Draft Redetermination Comments at 24-25.

> Rather than relying on a test which is facially unreasonable and will be rejected by the courts, thereby necessitating additional lengthy and time-consuming litigation, Commerce should adjust its Price Difference test in its Final Results in a manner which will create a test which conforms to law. Insofar as all of the adjustments proposed by Taiwan Respondents should be combined and insofar as Commerce should replace its 2 percent test with a 6 percent test, in its Final Remand decision Commerce should calculate PT margins using AA without zeroing. PT's margin then will be *de minimis*, and Commerce will be required by law to revoke the ADD Order on Steel Nails from Taiwan.[80]

**Commerce's Position**: Commerce has explained why each of the Taiwan Plaintiffs' adjustments are unpersuasive and has explained why its revised differential pricing analysis is reasonable and in accordance with law. Accordingly, we disagree with the Taiwan Plaintiffs that Commerce should calculate PT's estimated weighted-average dumping margin using the A-to-A method for these final results of redetermination.

## V.    FINAL RESULTS OF REDETERMINATION

In consideration of the Court's *Remand Order*, we have continued to use the price difference test as a part of the revised differential pricing analysis to determine whether prices differ significantly. We have also discontinued the use of the "mixed method" in our application of the revised differential pricing analysis. As a result, there is no change from the Draft Redetermination for these final results of redetermination. The estimated weighted-average dumping margin for PT and all other producers and exporters is 4.88 percent. Because the

---

[80] *Id*.

estimated weighted-average dumping margin for PT and for all other producers and exporters are different from those in the *Amended Final Determination*, we intend to issue a *Timken* notice[81] and an amended final determination should the Court sustain these final results of redetermination.

5/15/2026

X _____

Signed by: CHRISTOPHER ABBOTT

Christopher Abbott
Deputy Assistant Secretary
  for Policy and Negotiations,
  performing the non-exclusive function and duties
  of the Assistant Secretary for Enforcement and Compliance

---

[81] *See Timken Co. v. United States*, 893 F.2d 337 (Fed. Cir. 1990) (*Timken*).