# UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE**

| | |
|---|---|
| MID CONTINENT STEEL & WIRE, INC., ) | |
| ) | |
| Plaintiff/Consolidated ) | |
| Defendant-Intervenor, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES, ) | Consolidated Court No. 15-00213 |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| PT ENTERPRISE INC., *et al.*, ) | |
| ) | |
| Defendant-Intervenors/ ) | |
| Consolidated Plaintiffs. ) | |

## CONSOLIDATED PLAINTIFFS TAIWAN RESPONDENTS COMMENTS ON RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND

Ned H. Marshak
Andrew T. Schutz*

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

599 Lexington Ave, 39th Floor
New York, New York 10022
(212) 557-4000
-and-
*1201 New York Ave., NW, Suite 650
Washington, DC 20005
(202) 786-6881

*Counsel for PT Enterprise, Inc., Pro-Team Coil Nail Enterprise Inc., Unicatch Industrial Co., Ltd., WTA International Co., Ltd., Zon Mon Co., Ltd., Hor Liang Industrial Corp., President Industrial Inc.* and *Liang Chyuan Industrial Co., Ltd.*

Dated: July 13, 2026

## TABLE OF CONTENTS

TARGETED DUMPING: THE STATUTORY MANDATE AND HISTORY OF COMMERCE'S PRACTICE ................................................................................... 2

STANDARD OF REVIEW ........................................................................................... 9

ARGUMENT ................................................................................................................ 11

    A.    COMMERCE'S TEST DOES NOT RELY ON A PATTERN ................................ 12

    B.    TWO PERCENT IS NOT A SIGNIFICANT PRICE DIFFERENCE ....................... 14

    C.    THE 2% TEST IMPROPERLY CONSIDERS PRICE DIFFERENCES TO BE SIGNIFICANT WHEN TEST GROUP PRICES ARE NOT DUMPED OR ARE HIGHER THAN COMPARISON GROUP PRICES ........................................................................... 18

    D.    THE 2% TEST IMPROPERLY CONSIDERS PRICE DIFFERENCES TO BE SIGNIFICANT WHEN INDIVIDUAL TEST GROUP PRICES ARE INDISTINGUSHABLE FROM COMPARISON GROUP PRICES ................................... 20

    E.    THE TWO PERCENT TEST DOES NOT ACCOUNT FOR OUTLIERS ................... 23

    F.    THE 2% TEST IGNORES THE FACT THAT 99% OF SALES ARE TO ONE CUSTOMER ............................................................................................................. 25

    G.    THE 2% TEST IGNORES THE FACT THAT QUARTERLY PRICES WERE STABLE ..................................................................................................................... 26

    H.    THE 2% TEST ELIMINATES THE MIXED METHODOLOGY ............................ 26

    I.    COMMERCE'S TEST CREATES FALSE POSITIVES BY RELYING ON IDENTICAL DATA FOR THREE TESTS ........................................................................ 27

    J.    COMMERCE'S TEST YIELDS ABNORMALLY HIGH PASS RATES ................... 27

    K.    THIS COURT SHOULD EITHER REJECT THE 2% TEST OR ORDER COMMERCE TO ADJUST ITS PRICE DIFFERENCE TEST TO CONFORM TO LAW 28

CONCLUSION ........................................................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AK Steel Corp. v. United States*,
  192 F.3d 1367 (Fed. Cir. 1999)..................................................................................17

*Algoma Steel Corp. v. United States*,
  865 F.2d 240 (Fed. Cir. 1989)....................................................................................10

*Committee for Fairly Traded Venezuelan Cement v. United States*,
  372 F.3d 1284 (Fed. Cir. 2004)..................................................................................17

*Consolidated Bearings Co. v. United States*,
  348 F.3d 997 (Fed. Cir. 2003)....................................................................................17

*Creswell Trading Co., Inc. v. United States*,
  15 F.3d 1054 (Fed. Cir. 1994)....................................................................................13

*D&L Supply Co. v. United States*,
  22 CIT 539 (1998) ......................................................................................................10

*Garg Tube Exp. LLP v. United States*,
  740 F. Supp. 3d 1355 (Ct. Int'l Trade 2024) ...............................................................9

*Hyundai Electronics Co., Ltd. v. United States*,
  53 F.Supp.2d 1334 (CIT 1999)..................................................................................17

*I.N.S. v. Cardoza Fonseca*,
  480 U.S. 421 (1987)....................................................................................................10

*Jacobi Carbons AB v. United States*,
  365 F. Supp. 3d 1344 (Ct. Int'l Trade 2019) ............................................................20

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024)......................................................................................................9

*Marmen Inc. v. United States*,
  134 F. 4th 1334 (Fed. Cir. 2025) ...........................................................................8, 11

*Marmen Inc. v United States*,
  No. 20-00169, 2026 WL 1726609 (Ct. Int'l Trade June 15, 2026) ...........................10

*Masters, Mates and Pilots Maritime Advancement, Training, Education and
  Safety Program v. Department of Commerce*,
  729 F.2d 748 (Fed. Cir. 1984)....................................................................................17

*Mid Continent Steel & Wire, Inc. v. United States*,
 No. 2024-1556, 2025 WL 3458947 (Fed. Cir. Dec. 2, 2025) ................................................... 8

*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.*,
 463 U.S. 29 (1983) ........................................................................................................... 17

*N.L.R.B. v. United Food and Commercial Workers Union, Local 23, AFL-CIO*,
 484 U.S. 112, 108 S. Ct. 413, 98 L. Ed. 2d 429 (1987) ............................................... 10

*Pitsker v. Off. of Pers. Mgmt.*,
 234 F.3d 1378 (Fed. Cir. 2000) ...................................................................................... 25

*Sorrells v. United States*,
 287 U.S. 435 (1932) ........................................................................................................ 25

*Stupp Corp. v. United States*,
 No. 2023-1663, 2025 WL 1178392 (Fed. Cir. Apr. 23, 2025) ................................. 8, 11, 26, 27

*Timex V.I. v. United States*,
 157 F.3d 879 (Fed. Cir. 1998) ........................................................................................ 25

*Timken Co. v. United States*,
 179 F. Supp. 3d 1168 (Ct. Int'l Trade 2016) ................................................................ 25

*Toyo Kohan Co. v. United States*,
 No. 24-00261, 2026 WL 1459170 (Ct. Int'l Trade May 22, 2026) .............................. 10

*U.S. Steel Corp. v. United States*,
 621 F.3d 1351 (Fed. Cir. 2010) ................................................................................... 3, 18

*Union Steel v. U.S.*,
 713 F.3d 1101 (Fed. Cir. 2013) ........................................................................................ 2

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*,
 716 F.3d 1370 (Fed. Cir. 2013) ............................................................................... 11, 16, 25

*Zhejiang Native Produce & Animal By-Prods. Imp. & Exp. Corp. v. United States*,
 33 C.I.T. 1125 (2009) ...................................................................................................... 16

**Regulations**

19 C.F.R. § 351.414 ........................................................................................................... 2, 3

**Statutes**

19 U.S.C. § 1677 .......................................................................................................... *passim*

19 U.S.C. § 3512 ................................................................................................................... 9

**Administrative Decisions**

*Administrative Review of the Antidumping Duty Order On Crystalline Silicon Photovoltaic Cells, Whether Or Not Assembled Into Modules, From the People's Republic of China*, 91 ITADOC 37951 (June 24, 2026) .........................................16

*Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27296 (May 19, 1997)..............4, 9, 10

*Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Duty Proceedings; Final Modification*, 77 Fed. Reg. 8101-01 (Feb. 14, 2012).........................................................5

*Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin During an Antidumping Investigation; Final Modification*, 71 Fed. Reg. 77,722 (Dec. 27, 2006) ......................................................................................5

*Certain Steel Nails from the People's Republic of China: Final Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 Fed. Reg. 33,977 (June 16, 2008).................................................7

*Certain Steel Nails from the United Arab Emirates: Notice of Final Determination of Sales at Not Less Than Fair Value,* 73 Fed. Reg. 33,985 (June 16, 2008)..........................................................................................................7

*Differential Pricing Analysis; Request for Comments*, 79 Fed. Reg. 26,720, 26,722 (May 9, 2014).............................................................................................7

*Fresh Winter Strawberries from Mexico,* USITC Inv. No. 731-TA-1770 (Mar. 1, 2026) .......................................................15

*Notice of Final Determination of Sales at Less Than Fair Value: Coated Free Sheet Paper from the Republic of Korea,* 72 Fed. Reg. 60,630 (Oct. 25, 2007) .................6, 13

*Sodium Metal from France: Notice of Final Determination of Sales at Less Than Fair Value and Negative Critical Circumstances,* 73 Fed. Reg. 62,252 (Oct. 20, 2008) ....................................................................................................................7

*Utility Scale Wind Towers from Canada Final Results of Redetermination Pursuant to Court Remand* (Dept of Commerce, May 26, 2022)..........................................14

*Withdrawal of the Regulatory Provisions Governing Targeted Dumping in Antidumping Duty Investigations*, 73 Fed. Reg. 74,930 (Dec. 10, 2008) ..................................6

*Xanthan Gum from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 78 Fed. Reg. 33,351 (June 4, 2013) ......................................... 12-13

**Other Authorities**

BLACK'S LAW DICTIONARY (12th ed. 2024) ................................................................................12

STATEMENT OF ADMINISTRATIVE ACTION, H.R. Doc. No. 103-316, reprinted in
  1994 U.S.C.C.A.N. 4040 .................................................................................. *passim*

Tariff Act of 1930 § 777 ...........................................................................................1, 2

## UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE:  THE HONORABLE CLAIRE R. KELLY, JUDGE

| | | |
|---|---|---|
| MID CONTINENT STEEL & WIRE, INC., | ) | |
| | ) | |
| Plaintiff/Consolidated Defendant-Intervenor, | ) ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES, | ) | Consolidated Court No. 15-00213 |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| PT ENTERPRISE INC., *et al.*, | ) | |
| | ) | |
| Defendant-Intervenors/ Consolidated Plaintiffs. | ) ) | |

## CONSOLIDATED PLAINTIFFS TAIWAN RESPONDENTS COMMENTS ON RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND

These comments are filed on behalf of our clients, Taiwan Respondents,[1] in response to the Department of Commerce's ("Commerce" or "Department") Final Results of Redetermination Pursuant to Court Remand, dated May 15, 2026 (ECF 231) (5Rem PR 1) ("Remand"). In its Remand, Commerce relied on a two percent price difference test ("2% Test") to determine whether there is a "pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time," as required by section 777A(d)(1)(B)(i), Tariff Act of 1930, as amended ("the Act"). Remand at 32. In applying this test, Commerce also "discontinued the use of the 'mixed methodology' in

---

[1] PT Enterprise Inc., Pro-Team Coil Nail Enterprise Inc., Unicatch Industrial Co., Ltd., WTA International Co., Ltd., Zon Mon Co., Ltd., Hor Liang Industrial Corp., President Industrial Inc., and Liang Chyuan Industrial Co., Ltd. ("Taiwan Respondents" or "PT," the mandatory respondent whose database was subjected to the Cohen's *d* methodology).

{its} application of the revised differential pricing analysis." *Id.* As discussed below, Commerce's Remand is unsupported by substantial evidence and is contrary to law.

## TARGETED DUMPING: THE STATUTORY MANDATE AND HISTORY OF COMMERCE'S PRACTICE

Statutory authority whether to rely on an average-to-average ("AA") or average-to-transaction ("AT") methodology in calculating antidumping duty ("ADD") margins is found in 19 U.S.C. § 1677f-l(d)(l)(A)-(B). The statute's "general" rule directs Commerce to rely on AA, in which Commerce compares a foreign producer's weighted-average normal values ("NV") with its weighted-average export prices to the United States, after adjusting NV and export prices, as required by law. *Id.* The comparison is made by creating "comparable merchandise" product groups, commonly known as CONNUMs, and comparing NVs and export prices within each designated CONNUM. *See Union Steel v. U.S.*, 713 F.3d 1101 (Fed. Cir. 2013) at n.4; 19 C.F.R. § 351.414(b). Commerce determines the dumping margin and extended dumping margin (*i.e.*, per unit dumping margin multiplied by sales quantity to the United States) for each CONNUM. Margins are positive if NV is greater than adjusted U.S. price and are negative if adjusted U.S. price is greater than NV. The CONNUM-specific dumping amounts are summed and then divided by the total U.S. sales value to determine the total weighted average ("WA") dumping margin. Under AA, negative dumping margins in individual sales in a CONNUM offset positive dumping margins of sales within that same CONNUM and negative dumping in one CONNUM offsets positive dumping in another CONNUM.

An exception to the AA methodology is authorized by 19 U.S.C. § 1677f-1(d)(1)(B), whenever Commerce determines that an alternative methodology is needed to remedy "targeted dumping." Targeted dumping occurs when an exporter's sales prices of "comparable merchandise" sold to the United States "differ{s} significantly among purchasers, regions, or

2

periods of time." *U.S. Steel Corp. v. United States*, 621 F.3d 1351, 1359 (Fed. Cir. 2010) (quoting 19 U.S.C. § 1677f-1(d)(1)(B) (2012)). In these circumstances, relying on AA could "conceal targeted dumping"; that is, where "an exporter may sell at a dumped price to particular customers or regions, while selling at higher prices to other customers or regions." STATEMENT OF ADMINISTRATIVE ACTION, H.R. Doc. No. 103-316, at 842, reprinted in 1994 U.S.C.C.A.N. 4040, 4178 ("TAA").

To remedy targeted dumping, 19 U.S.C. § 1677f-1(d)(1)(B) authorizes Commerce to rely on the AT methodology. Under AT, Commerce compares each *individual* U.S. sales price of merchandise within a given CONNUM with the weighted average NV calculated for that same CONNUM. 19 C.F.R. § 351.414(b)(3). The dumping amounts for each individual U.S. transaction within a CONNUM are summed to determine the amount of dumping for that CONNUM, and any negative dumping margins for a sale are "zeroed" out when summing the dumping amount within a CONNUM; i.e., negative dumping amounts cannot offset positive dumping amounts. The dumping amounts for each CONNUM are then summed to determine the WA dumping margin.

Commerce is not allowed to rely on the AT methodology unless two statutory criteria are satisfied:

> (i) there is a **pattern of export prices** (or constructed export prices) for comparable merchandise that **differ significantly** among purchasers, regions, or periods of time, and
>
> (ii) the administering authority explains why such differences cannot be taken into account using {AA or TT}.

19 U.S.C. § 1677f-1(d)(1)(B) (emphasis added). The issue in this remand is whether, in light of the record in this case, Commerce's reliance on the 2% Test is a legally permissible methodology to determine whether there is a pattern of significant price differences. As discussed below, it is

3

not.

The reason why Congress created the targeted dumping AT exception to the general AA rule is found in the 1994 SAA.

> New section 777A(d)(1)(B) provides for a comparison of average normal values to individual export prices or constructed export prices in situations where an average-to-average or transaction-to-transaction methodology cannot account for a pattern of prices that differ significantly among purchasers, regions, or time periods, i.e., **where targeted dumping may be occurring**. Before relying on this methodology, however, Commerce must establish and provide an explanation why it cannot account for such differences through the use of an average-to-average or transaction-to-transaction comparison. In addition, the Administration intends that in determining whether a pattern of significant price differences exist, **Commerce will proceed on a case-by-case basis, because small differences may be significant for one industry or one type of product, but not for another**. (emphasis added)

H.R. Doc. No. 103-316 at 842, reprinted in 1994 U.S.C.C.A.N. 4040, 4178 (1994). Thus, Congress was clear that AT can only be used "where targeted dumping may be occurring," by determining whether there is a "pattern of prices that differ significantly among purchasers, regions, or time periods." *Id*. The SAA then mandated that in deciding whether a pattern exists and whether prices differ significantly, the Department "*will* proceed on a case-by-case basis," rather than relying on a one size fits all approach. *Id*.

In Regulations promulgated immediately after enactment of the 1994 URAA, Commerce advised that it would administer the targeted dumping statute "through the use of, among other things, standard and appropriate statistical techniques," by employing "common statistical methods" to ensure "transparency and predictability" and that "parties have an opportunity to explain whether a particular pattern of export prices or constructed export prices constitutes targeted dumping." *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27296, 27374 (May 19, 1997).

The difference between relying on AA or AT did not have a significant impact on ADD margins in 1994 when the Uruguay Round Agreements Act ("URAA") was enacted. This was because Commerce's policy at that time was to "zero" negative margins in both initial investigations and annual reviews. Then, in December 2006, Commerce changed its policy. It stated that "in response to the {WTO} panel's report in US - Zeroing (EC)," Commerce "will no longer make average-to-average comparisons in investigations without providing offsets for non-dumped comparisons." *Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin During an Antidumping Investigation; Final Modification*, 71 Fed. Reg. 77,722 (Dec. 27, 2006). Four years later, in February 2012, in response to WTO Appellate Body decisions, Commerce revised its Regulations by eliminating zeroing in annual reviews. *Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Duty Proceedings; Final Modification*, 77 Fed. Reg. 8101-01 (Feb. 14, 2012). Commerce stated that it normally would rely on the AA methodology, but that it would continue to apply "exceptional or alternative comparison methods that are determined appropriate to address case-specific circumstances," including relying on AT, with zeroing, when the conditions of 19 U.S.C. § 1677f-1(d)(1)(B) are satisfied. *Id.*

In administering the law, Commerce until now has attempted to create a reasonable statistical test to determine whether U.S. sales were targeted, which would result in reliance on AT with zeroing, rather than AA w/o zeroing. In 2007, after it abandoned reliance on AT with zeroing in investigations, Commerce, in *Coated Free Sheet Paper*, applied a 2 percent price difference test to determine whether a company had engaged in targeted dumping. Commerce reasoned:

> The petitioner presents what it calls its P/2 test. The test proposes that **where the weighted-average net price to an alleged targeted purchaser**

> **or region is more than 2 percent lower than the weighted-average net price to non-targeted purchasers or regions in control number (CONNUM)/month combinations representing a preponderance of the targeted quantity, a "pattern" of "significant" price differences should be found to exist.**
>
> {Petitioner's} analysis shows a clear pattern of price differences between targeted and non-targeted customers (or regions, as appropriate). . . . These graphs show that the **targeted prices were consistently lower than the non-targeted prices on a month-to-month basis, even though average prices fluctuated over the POI. Moreover, this pattern is consistent across products, months, and for individual transactions**. . . .
>
> In this case, the **observed pattern is very clear, and there is no systematic explanation of why this pattern could be accounted for through those other factors**.
>
> In view of the Department's uncertainty regarding the general applicability of the <u>Pasta</u> Test standards, the overall lack of case precedent on this matter, and the unique circumstances of this case, the Department accepts the petitioner's targeting allegation without endorsing the petitioner's test standards and procedures as a general practice. (emphasis added).

*Notice of Final Determination of Sales at Less Than Fair Value: Coated Free Sheet Paper from the Republic of Korea,* 72 Fed. Reg. 60,630 (Oct. 25, 2007), and accompanying Issues & Decision Memorandum at General Comment 2 (emphasis added). In 2008, Commerce withdrew its targeting Regulations. *Withdrawal of the Regulatory Provisions Governing Targeted Dumping in Antidumping Duty Investigations*, 73 Fed. Reg. 74,930, 74,931 (Dec. 10, 2008) ("Because the provisions are applicable to ongoing antidumping investigations, and because the application of the provisions can act to deny relief to domestic industries suffering material injury from unfairly traded imports, immediate revocation is necessary to ensure the proper and efficient operation of the antidumping law and to provide the relief intended by Congress."). It also decided to abandon the 2 percent test used in *Coated Free Sheet Paper*. In *Steel Nails from the People's Republic of China*, Commerce stated:

> ... [T]he two-percent price difference threshold **does not adequately**

6

**account for price variations specific to the market** in question. In so doing, the **P/2 test may find targeted dumping in many cases when arguably no such dumping is occurring**. Thus, we do not find the results of this test to be a reliable indicator that "obvious" targeted dumping has occurred.

*Certain Steel Nails from the People's Republic of China: Final Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 Fed. Reg. 33,977 (June 16, 2008), and accompanying Issues & Decision Memorandum at Comment 7 (emphasis added). In *Steel Nails from the UAE*, the Department stated:

> The P/2 test relies on a single, bright-line price threshold of two percent to define targeted dumping that does not account for price variations specific to the market in question.

*Certain Steel Nails from the United Arab Emirates: Notice of Final Determination of Sales at Not Less Than Fair Value,* 73 Fed. Reg. 33,985 (June 16, 2008), and accompanying Issues and Decision Memorandum at 22, 24;[2] Shortly after Commerce began relying on AA without zeroing for Annual Reviews, Commerce replaced the *Nails Test* with a differential pricing analysis, based on Cohen's *d.*

> While the **Nails test is a statutorily consistent and statistically sound methodology** for identifying whether the average-to-transaction method might be appropriate, the Department has continued to seek to refine its approach with respect to the use of an alternative comparison method. . . .The **new approach is referred to as the "differential pricing" analysis, as a more precise characterization of the purpose and application** of section 777A(d)(1)(B) of the Act. (emphasis added).

*Differential Pricing Analysis; Request for Comments*, 79 Fed. Reg. 26,720, 26,722 (May 9, 2014).

Commerce relied on Cohen's *d* from 2014 through 2025, when it was found to be

---

[2] *See also Sodium Metal from France: Notice of Final Determination of Sales at Less Than Fair Value and Negative Critical Circumstances,* 73 Fed. Reg. 62,252 (Oct. 20, 2008), and accompanying Issues and Decision Memorandum at 10 ("The two-percent price difference threshold advocated by the petitioner does not account for price variations specific to the market in question.").

contrary to law by the Federal Circuit in *Marmen* and *Stupp. Marmen Inc. v. United States*, 134 F. 4th 1334 (Fed. Cir. 2025); *Stupp Corp. v. United States*, No. 2023-1663, 2025 WL 1178392 (Fed. Cir. Apr. 23, 2025)

At the same time as the *Stupp* and *Marmen* plaintiffs were challenging the legality of Cohen's *d*, Taiwan Respondents, in this litigation, were asking this court to modify Cohen's *d* by calculating the standard deviation denominator based on the weighted average ("WA") of the standard deviations ("SD") of the WA prices in the test and comparison subgroups (or the SD for the entire population) rather than the simple average ("SA") of the two groups. Taiwan Respondents believe that Cohen's *d* conforms to law if it is modified in this manner. In support of its claim Taiwan Respondents filed six briefs and reply briefs with this Court[3] and four briefs and reply briefs at the Federal Circuit.[4] This Court issued six decisions in this case,[5] and the Federal Circuit issued two decisions on the merits (reversing the CIT).[6] In its third and final decision, the Federal Circuit affirmed Commerce's decision to abandon Cohen's *d*, rather than modify this methodology, as Taiwan Respondents had requested for the past decade. ECF 223 (12/2/25). The Federal Circuit noted that "Commerce should have the opportunity to set forth an alternative policy analysis, which may then be subject to judicial review." *Mid Continent Steel &*

---

[3] Rule 56.2 Motion for Judgment Upon the Agency Record (Feb. 26, 2016), ECF 29/30; Response Brief in Opposition of Plaintiff's Motion for Judgment Upon the Agency Record (Aug. 13, 2016), ECF 48/49; Comments on Remand Results (July 21, 2017), ECF 99; Comments on Remand Results (July 28, 2020), ECF 150; Comments on Remand Results (Dec. 13, 2022), ECF 188; Comments on Remand Results (Oct. 2, 2023), ECF 209.
[4] Response Brief, *Mid Continent Steel & Wire v. United States*, No. 18-1229 (Fed. Cir. Apr. 4, 2018), ECF 37; Opening Brief, *Mid Continent Steel & Wire v. United States*, No. 18-1229 (Fed. Cir. Aug. 16, 2018), ECF 52/53; Reply Brief, *Mid Continent Steel & Wire v. United States*, No. 18-1229 (Fed. Cir. Dec. 19, 2018), ECF 76; Opening Brief, *Mid Continent Steel & Wire v. United States*, No. 21-1747 (Fed. Cir. July 2, 2021), ECF 16; Reply Brief, *Mid Continent Steel & Wire v. United States*, No. 21-1747 (Fed. Cir. Sept. 3, 2021), ECF 23; Opening Brief, *Mid Continent Steel & Wire, Inc. v. United States*, No. 24-1556 (Fed. Cir. June 30, 2024), ECF 30; Reply Brief, *Mid Continent Steel & Wire, Inc. v. United States*, No. 24-1556 (Fed. Cir. October 3, 2024), ECF 56.
[5] Slip Op 17-31 (Mar. 23, 2017), ECF 89; Slip Op 17-135 (Oct. 4, 2017), ECF 111; Slip Op 2016 (Feb. 7, 2020), ECF 139; Slip Op 21-4 (Jan. 8, 2021), ECF 170; Slip Op 23-45 (Apr. 3, 2023), ECF 201; Slip Op 24-15 (Dec. 12, 2024), ECF 219.
[6] Decision (Oct. 3, 2019), ECF 130; Decision (Apr. 21, 2022), ECF 174.

*Wire, Inc. v. United States*, No. 2024-1556, 2025 WL 3458947 (Fed. Cir. Dec. 2, 2025).

### STANDARD OF REVIEW

In *Garg Tube Exp. LLP v. United States*, 740 F. Supp. 3d 1355, 1365–66 (Ct. Int'l Trade 2024) this Court rejected plaintiff's argument that *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) should apply in analyzing the legality of Cohen's *d.* The Court reasoned that "the text of the statute and its legislative history indicate that Congress gave Commerce flexibility by its use of the open-ended term 'differ significantly.'" *Id*. Plaintiffs respectfully disagree with this analysis. As discussed, the TAA expressly stated that in deciding whether to rely on AA or AT, "Commerce will proceed on a case-by-case basis, because small differences may be significant for one industry or one type of product, but not for another," while in the implementing Regulations, Commerce reasoned that parties should "have an opportunity to explain whether a particular pattern of export prices or constructed export prices constitutes targeted dumping." H.R. Doc. No. 103-316 at 842; 19 U.S.C. § 3512(d) (Congress designated the SAA as "an authoritative expression by the United States concerning the interpretation of the Uruguay Round Agreements and this Act."); *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27296, 27374. These statements reveal that Commerce does not have unfettered discretion to define the term "significant price difference." Thus, this Court should "exercise {its} independent judgment in deciding whether an agency has acted within its statutory authority" using "traditional tools of statutory interpretation," by examining the "statute's text, structure, and legislative history, and apply{ing} the relevant canons of interpretation." *Garg Tube Exp. LLP*, 740 F. Supp. 3d at 1365.

Moreover, even if this court concludes that *Loper Bright* does not apply, the 2% Test should be accorded limited deference. "An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a

consistently held agency view." *I.N.S. v. Cardoza Fonseca*, 480 U.S. 421, 446, n.30 (1987). Courts also should "consider the consistency with which an agency interpretation has been applied, and whether the interpretation was contemporaneous with the enactment of the statute being construed." *N.L.R.B. v. United Food and Commercial Workers Union, Local 23, AFL-CIO*, 484 U.S. 112, 124, n.20 108 S. Ct. 413, 98 L. Ed. 2d 429 (1987). These factors apply to this case, in which Commerce's 2% Test represents the agency's fourth attempt to conform its practice to its statutory mandate, and is distinctly different from the agency's contemporaneous interpretation, enacted nearly 30 years ago in 1997 which expressly recognized that respondents should "have an opportunity to explain whether a particular pattern of export prices or constructed export prices constitutes targeted dumping." *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27296, 27374.

Finally, Taiwan Respondents respectfully submit that *Marmen Inc. v United States*, No. 20-00169, 2026 WL 1726609 (Ct. Int'l Trade June 15, 2026) and *Toyo Kohan Co. v. United States,* No. 24-00261, 2026 WL 1459170 (Ct. Int'l Trade May 22, 2026) were wrongly decided, or at the very least, readily distinguishable from the instant appeal.[7] The *Marmen* and *Toyo Kohan* courts did not discuss the reasons why 2% is a reasonable standard, and these opinions did not address the issues raised in these Comments. *Toyo Kohan Co.,* 2026 WL 1459170 at *9. The Toyo Kohan court reasoned that plaintiff "has not suggested what route Commerce should take and has not shown that Commerce has unreasonably implemented the statutory directive of section 1677f-1(d)(1)(B)." Taiwan Respondents have made the requisite "showing" and have expressly suggested how the 2% Test can be modified to comply with the law in light of the facts

---

[7] *See Algoma Steel Corp. v. United States*, 865 F.2d 240, 243 (Fed. Cir. 1989) ("among trial courts it is unusual for one judge to be bound by the decisions of another and, if it is to occur, such a rule should be stated somewhere. That is not done here"); *see also D&L Supply Co. v. United States*, 22 CIT 539, 540 (1998) ("the Court notes that it is not bound by a decision of another judge of the same court, although such a decision may be persuasive precedent").

in this case.

Moreover, Taiwan Respondents argue that applying the 2% Test to the facts in this case is not supported by substantial evidence, regardless of whether the test generally is reasonable. In *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013), the Federal Circuit discussed the appropriate remedy when a methodology is challenged as contrary to both the law and the evidence:

> Nevertheless, '[w]hile various methodologies are permitted by the statute, it is possible for the application of a particular methodology to be unreasonable in a given case.' . . Although Commerce may be permitted to use a simple average methodology to calculate the separate rate, the circumstances of this case renders a simple average of a *de minimis* and AFA China-wide rate unreasonable as applied. Similarly, a review of the administrative record reveals a lack of substantial evidence showing that such a determination reflects economic reality.

In short, even if the 2% Test may be used in certain cases, and Taiwan Respondents respectfully submit that its cannot, relying on this test in this case leads to a result which is not supported by substantial evidence.

## ARGUMENT

Commerce's decision to rely on the 2% Test constitutes a giant step backward. This test does not even attempt to follow the statutory language, SAA, implementing regulations or Commerce's previous attempts to create a statistically sound methodology. It is not grounded on standard and appropriate statistical techniques. It ignores case-specific facts and circumstances. It relies on many of the same principles that resulted in the Federal Circuit, in *Marmen*, *Stupp*, and this case, to reject Cohen's *d*.  It leads to absurd results.  The reasons why the two percent Price Difference test should be rejected are discussed below.

11

### A.    COMMERCE'S TEST DOES NOT RELY ON A PATTERN

U.S. law requires that AT without zeroing cannot be used to calculate margins unless there is a **pattern of export prices** (or constructed export prices) for comparable merchandise. 19 U.S.C. § 1677f-1(d)(1)(B). In *Coated Free Sheet Paper*, the Department determined that based on the record in that case "the observed pattern is very clear, and there is no systematic explanation of why this pattern could be accounted for through those other factors".

In contrast, based on the facts of this case, the 2% Test does not distinguish true "patterns" from random fluctuations. A pattern is "the repeated or regular way in which something happens or is done." *Pattern*, THE BRITANNICA DICTIONARY, https://www.britannica.com/dictionary/pattern (last visited July 10, 2026).  It is "a mode of behavior or series of acts that are *recognizably consistent*." *Pattern*, BLACK'S LAW DICTIONARY (12th ed. 2024) (emphasis added).  Prices that *differ* among purchasers, regions, or time periods are not patterns unless the observed price differences are not the result of random processes. A "pattern" may involve prices for test-group sales to a single customer (or in a single region or time period) being consistently *lower* than prices for comparison-group sales.  Or a "pattern" may involve prices for these test-group sales to a single customer (or in a single region or time period) being consistently *higher* than the prices for comparison-group sales.  Patterns do not exist when average prices to the same customer (or in the same region or time period) are sometimes higher, sometimes lower, and often within two percent of the comparison-group prices for the relevant products.

Indeed, Commerce has recognized that an affirmative finding of targeting requires that a respondent's prices follow a pattern. In *Xanthan Gum from the People's Republic of China,* the Department reasoned:

12

> [F]inding such a pattern of prices that differ significantly among purchasers, regions, or periods of time, signals that the exporter **is discriminating between purchasers, regions, or periods of time** within the U.S. market rather than following a more uniform pricing behavior. Where the evidence indicates that the exporter is **engaged in a discriminating pricing** behavior, there is cause to continue with the analysis to determine whether masked dumping is occurring.

*Final Determination of Sales at Less Than Fair Value*, 78 Fed. Reg. 33,351 (June 4, 2013), and accompanying IDM at 26 (emphasis added). Commerce has the burden to establish that the results of its Price Difference test are not arbitrary but instead are based on a recognizable pattern that is grounded in substantial evidence. *See e.g.*, *Creswell Trading Co., Inc. v. United States*, 15 F.3d 1054, 1060-61 (Fed. Cir. 1994) ("The 'if' clause … sets forth on its face a statutory condition that Commerce must establish before it may exercise its right to levy a countervailing duty against an investigated party, as opposed to an exception into which that party must prove its actions fall. The ultimate burden of proof is thus upon Commerce to establish by a preponderance of the evidence that the statutory condition has been satisfied"). Significantly, Commerce refused to apply the P/T test to proceedings after *Coated Free Sheet Paper*, because it recognized that the requisite pattern did not exist; i.e., that "the two-percent price difference threshold does not adequately account for price variations specific to the market in question." 72 Fed. Reg. 60,630.

In sum, a "pattern" exists within the meaning of the statute only when substantial evidence supports Commerce's decision that any observed price differences do not merely reflect random fluctuations. In this case, Commerce's decision is not based on substantial evidence that there is a pattern of price differences. Record evidence, as further discussed below, and as confirmed by the data in the **Attachment** to this Brief, confirms that there is no clearly defined pattern of comparison market underselling, either by customer, time period or region.

13

## B.     TWO PERCENT IS NOT A SIGNIFICANT PRICE DIFFERENCE

The 2% Test does not satisfy the statutory requirement that prices must be significantly different. The plain meaning of the adjective "significantly" is "in a way that is easy to see or by a large amount," "sufficiently great or important to be worthy of attention; noteworthy; consequential, influential," or simply "in a significant manner {or} to a significant degree." *Significantly*, CAMBRIDGE ONLINE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/significantly (last visited July 10, 2026); *Significantly*, MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/significantly (last visited July 10, 2026). Dictionary definitions of "significant" include "having meaning, *especially*: full of import," "having or likely to have influence or effect: important," and "likely caused by something other than mere chance." *Significant*, MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/significant (last visited July 10, 2026); *see also Significant*, CAMBRIDGE ONLINE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/significant (last visited July 10, 2026) (defining "significant" to mean "important or noticeable).

Commerce's Remand concludes that two percent is significant in this case without relying on any evidence to support this conclusion. Commerce relied on a two percent difference (the P/T Test) in *Coated Free Sheet Paper* because targeted prices in that case "were consistently lower than the non-targeted prices on a month-to-month basis," in a "very clear" pattern that was "consistent across products, months, and for individual transactions," and in the absence of a "systematic explanation of why this pattern could be accounted for through those other factors." See also *Utility Scale Wind Towers from Canada Final Results of Redetermination Pursuant to Court Remand* at 36 (Barcode: 4245692 ) (Dept of Commerce, May 26, 2022) (citing the SAA at

14

843) (confirming that "the magnitude of the difference does not determine whether the difference is 'significant' as the SAA instructs that 'Commerce will proceed on a case-by-case basis, because small differences may be significant for one industry or one type of product, but not for another.'"). In adopting the *Nails* Test, Commerce decided that the P/2 Test could not be applied in all cases since "it relies on a single, bright-line price threshold of two percent to define targeted dumping that does not account for price variations specific to the market in question." *See Nails from the UAE*. That analysis applies to this case.

In this case, Commerce attempts to distinguish its decision in *Nails from the UAE,* arguing that the "P/2 test only examines whether prices to alleged 'targets' are at least two percent lower than the prices for all other sales, whereas the price difference test considers whether prices to each purchaser, region, or time period are at least two percent higher or lower than the prices for all other sales." Remand at 15. This distinction is without a difference. Two percent is two percent – whether higher or lower. And, as discussed below, the fact that allegedly targeted prices are higher than comparison group prices is the antithesis of masked dumping.

Commerce also fails in its attempt to establish that two percent is significant. Two percent is not a magic number. That the term significant may be "open ended" and that a "two-percent threshold is used by Commerce in other contexts" (e.g., arm's length test and de minimis standard) does not constitute substantial evidence that two percent is a substantial difference based on the facts in this case. *Id*. at 16; 18-19. In fact, certain ADD decisions are based on a three percent test and others on a five percent test. *See Fresh Winter Strawberries from Mexico*, USITC Inv. No. 731-TA-1770 (Mar. 1, 2026) ("Pursuant to section 771(24) of the Tariff Act, imports from a subject country of merchandise corresponding to a domestic like product that account for less than 3 percent of all such merchandise imported into the United States during the

most recent 12 months for which data are available preceding the filing of the petition shall be deemed negligible."); *Issues and Decision Memorandum For the Final Results of the Administrative Review of the Antidumping Duty Order On Certain Steel Nails From the Republic of Korea; 2023-2024*, 91 ITADOC 37390 (June 23, 2026) ("In any event, the statute establishes a bright-line test for home market viability. The home market is viable where aggregate home market sales of the foreign like product equal at least five percent of U.S. sales."); *Decision Memorandum For the Preliminary Results of the 2023-2024 Administrative Review of the Antidumping Duty Order On Crystalline Silicon Photovoltaic Cells, Whether Or Not Assembled Into Modules, From the People's Republic of China*, 91 ITADOC 37951 (June 24, 2026) ("Section 771(33) of the Act identifies that the following persons that shall be considered 'affiliated' or 'affiliated persons': . . .(E) any person directly or indirectly owning, controlling, or holding with power to vote, five percent or more of the outstanding voting stock or shares of any organization and such organization.").

Open-endedness does not allow Commerce to ignore its mandate to support its decisions by substantial evidence, common sense, and economic reality in light of the facts in a particular case. E.g*., Zhejiang Native Produce & Animal By-Prods. Imp. & Exp. Corp. v. United States*, 33 C.I.T. 1125, 1130 (2009) ("By contrast, the number of exporters and producers initially involved in this review, four, does not appear to satisfy the requirement that the number be "large" under any ordinary understanding of that word."); *Yangzhou Bestpak Gifts & Crafts Co.*, 716 F.3d at 1378 ("Nevertheless, '{w}hile various methodologies are permitted by the statute, it is possible for the application of a particular methodology to be unreasonable in a given case.'. . . .'[f]orm should be disregarded for substance and the emphasis should be on economic reality.'").

Moreover, contrary to Commerce's claim, the 2% Test is a "brightline test." Remand at

16

11. This test does not allow Commerce to conduct a case-specific analysis of the circumstances of sales in a particular industry. *Id*. at 10-11 (Commerce argues that "the data on which Commerce relies in performing the price difference test changes on a case-by-case basis, *i.e.*, specific to the respondent's pricing of comparable merchandise to all other purchasers, regions, or time periods, and Commerce's analysis therefore conforms with Congress' intent that an analysis of whether a pattern of prices exists be carried out on a case-by-case basis."). Like the term "substantial", the term significant, "does not imply a specific number or cut-off," since "what may be substantial in one situation may not be in another situation." *Committee for Fairly Traded Venezuelan Cement v. United States*, 372 F.3d 1284 (Fed. Cir. 2004); *see also AK Steel Corp. v. United States*, 192 F.3d 1367 (Fed. Cir. 1999) ("Determinations of disproportionality and dominant use are not subject to rigid rules, but rather must be determined on a case-by-case basis taking into account all the facts and circumstances of a particular case."); *Hyundai Electronics Co., Ltd. v. United States*, 53 F.Supp.2d 1334 (CIT 1999) ("The 'not likely' calculus is not a mathematical formula, but rather a fact-intensive, case-by-case determination.").

In sum, Commerce has not established that two percent is significant and fails in its attempt to distinguish its previous decision that a two percent difference is not significant. *See, e.g.*, *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 57 (1983) (Finding that "an agency changing its course must supply a reasoned analysis" for the change); *Masters, Mates and Pilots Maritime Advancement, Training, Education and Safety Program v. Department of Commerce,* 729 F.2d 748, 755 (Fed. Cir. 1984) ("An agency is obligated to follow precedent, and if it chooses to change, it must explain why."); *Consolidated Bearings Co. v. United States,* 348 F.3d 997 (Fed. Cir. 2003) ("If that analysis shows that Commerce acted differently in this case than it has consistently acted in similar circumstances

17

without reasonable explanation, then Commerce's actions will have been arbitrary.").

### C. THE 2% TEST IMPROPERLY CONSIDERS PRICE DIFFERENCES TO BE SIGNIFICANT WHEN TEST GROUP PRICES ARE NOT DUMPED OR ARE HIGHER THAN COMPARISON GROUP PRICES

Commerce's 2% test does not differentiate between sales which are sold at dumped prices and those which are not, or between Test Group prices which are above or below Comparison Group prices. These failures need to be corrected in order for the 2% Test to be supported by substantial evidence.

Targeted dumping means that prices to certain customers, regions, or time periods are targeted, i.e., sold at lower prices than prices to the Comparison Group. *U.S. Steel Corp.*, 621 F.3d 1351, 1359. If the price norm in the Comparison Group is lower than the prices in the Test Group, then the Test Group is not being targeted. *Id*. This requirement was abandoned when Commerce relied on Cohens *d*, a statistically valid, albeit flawed, differential pricing analysis. Now that Commerce has abandoned its attempt to rely on a statistically valid test, it is required to limit targeted sales to Test Group targeted sales.

Similarly, an affirmative finding of targeted dumping requires that the low-priced Test Group sales are being sold at dumped prices. Targeted dumping cannot exist if there is no dumping. Test Group prices which exceed normal value, by definition, are not injurious. Again, while this limitation arguably does not exist under a standard and appropriate statistical test and differential pricing analysis, Commerce's 2% Test is not a statistical test. Thus, now that Commerce has abandoned its attempt to rely on a statistically valid test, it is required to limit targeted sales to sales that are dumped.

In its Remand, Commerce rejected these arguments. Commerce claimed that "test group prices that are higher than the comparison group price are equally capable of representing

18

conditions for masking as test group prices that are lower than the comparison group prices."
Remand at 22. According to Commerce "higher prices are just as relevant to masked dumping as
lower prices, and both must be considered when examining whether there is a pattern of prices
that differ significantly." *Id*. Commerce similarly dismissed Taiwan Respondents argument that
non-dumped prices cannot be significant, reasoning that "{t}he statute does not require
Commerce to determine whether dumping, masked or otherwise, is occurring when determining
whether there is a pattern of prices that differ significantly among purchasers, regions, or periods
of time." *Id*. at 24. According to Commerce, "{w}hen a pattern of prices is found, it only
establishes that conditions exist in the respondent's pricing behavior in the U.S. market which
could lead to masked dumping, not whether masked dumping is present when using the A-to-A
method or whether that masked dumping is meaningful." *Id* at 23.

This Court should reject Commerce's rationale. As discussed in the SAA and as
Commerce recognizes in this decision, the 2% Test is designed to prevent masked dumping. A
pass in the Test should constitute "evidence that masked dumping may be occurring as a result of
the respondent's pricing behavior in the U.S. market." *Id*. at 24. "Masked dumping occurs when
higher priced offset lower priced, dumped sales." *Id*. The test separates sales into Test Groups
(i.e., discrete sales groups whose injurious prices are being masked) and Comparison Groups
(i.e., the remaining sales whose higher prices are responsible for the masking). Thus, contrary to
Commerce's claim "test group prices that are higher than the comparison group price
are **….{not}….** equally capable of representing conditions for masking as test group prices that
are lower than the comparison group prices," and "{t}he statute **{clearly}** does ~~{not}~~ require
Commerce to determine whether dumping, masked or otherwise, is occurring when determining
whether there is a pattern of prices that differ significantly among purchasers, regions, or periods

19

of time." *Id*. at 22-24. In the absence of lower priced Test Groups and Test Groups sold at dumped prices, the "pattern of prices that differ significantly among purchasers, regions, or periods of time" cannot possibly constitute evidence of targeted dumping. *Id*. at 22. And if the pattern cannot support the ultimate finding, that pattern cannot be used as evidence leading to the conclusion.

The Court's analysis in *Jacobi Carbons AB v. United States*, 365 F. Supp. 3d 1344, 1351–52 (Ct. Int'l Trade 2019), is equally applicable to this case:

> Commerce has effectively divorced the term "significant" from the term "production" and applied its interpretation of "significant" without the context and explanation necessary to ensure that its determination is not arbitrary. Although Commerce is within its discretion to define "significant" as "noticeably or measurably large," . . . Commerce has not supplied the court with a well-reasoned explanation supporting its consideration of total exports as a substitute for production. Overall, the agency has failed to interpret or apply the statutory criterion in its entirety and has not supported its determination that Thailand is a significant producer with substantial evidence.

Similarly, the 2% Test "effectively divorce{s} the term 'significant' from the term . . . {masked dumping} . . . and applie{s} its interpretation of 'significant' without the context and explanation necessary to ensure that its determination is not arbitrary." *Id*. For these reasons, this Court should reject the 2% Test or, alternatively, require that Commerce modify the test so that CONNUMs in which Test Group prices exceed Comparison Group prices and in which Test Group prices are not dumped cannot constitute sales that pass the test.

**D.    THE 2% TEST IMPROPERLY CONSIDERS PRICE DIFFERENCES TO BE SIGNIFICANT WHEN INDIVIDUAL TEST GROUP PRICES ARE INDISTINGUSHABLE FROM COMPARISON GROUP PRICES**

The 2% Test becomes meaningless when Test Group prices fall squarely within the standard deviation of Comparison Group prices. The two examples set forth below show how the 2% test skews the results. The first example consists of hypothetical data; the second represents a

20

CONNUM in PT's database. These examples were previously submitted to Commerce, this Court, and the Federal Circuit to show why Commerce's reliance on a simple average methodology to calculate the denominator in the Cohen's d analysis was fundamentally flawed.[8] They also show the inherent flaws of the 2% Test.

*Figure 1  Hypothetical Data Illustrating Visual Comparison of Pricing Patterns and SDs*
**Hypothetical Example Discussed in *Mid Continent III***



## DATA AND METHODOLOGY[9]

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|
| Q Test | Q Comp | WA Price Test | WA Price Comp | Price Difference | Price Range Test | Price Range Comp | SD Test | SD Comp |
| 10 | 1000 | $1.50 | $1.75 | $0.25 (16.6%) | $1.46 - $1.54 | $1.00 - $2.46 | $0.04 | $0.40 |

---

[8] *See* Comments of Taiwan Respondents on Draft Redetermination Pursuant to Court Remand, Mar. 6, 2026 (5Rem PR 2).

[9] The columns in this table and the four other tables set forth below contain the following information: **(1-2)** "Q Test and Q Comp": quantity, in kilograms (kg), in the Test Group and the Comparison Group. **(3 – 4)** "WA Price

**Source: Appx1132-1134; Appx656, Appx782-786. (5Rem PR 2 at 31).**

CONNUM 127014570111, West Region

*Figure 3: Actual Data*



| Q Test | Q Comp | WA Price Test | WA Price Comp | Price Difference | Price Range Test | Price Range Comp | SD Test | SD Comp |
|---|---|---|---|---|---|---|---|---|
| 11,252 | 125,623 | 1.13220 | 1.16903 | 0.03683 (3.25%) | 1.12508 – 1.19807 | 1.11335 – 1.72100 | 0.01831 | 0.05910 |

**Source: Appx1143, Appx1192-1202. (5Rem PR 2 at 34).**

These examples show the weighted mean prices in each group and plot the data in a way

---

Test" and "WA Price Comp": weighted average price, in $/kg, in the Test Group and the weighted average price, in $/kg, in the Comparison Group. **(5)** "Price Difference": Difference in price, in $/kg, between the WA Price Comp and WA Price Test (5 = 4 – 3). **(6 – 7)** "Price Range Test" and "Price Range Comp": high and low prices, in $/kg, in the Test Group and the Comparison Group. **(8-9)**: "SD Test" and "SD Comp": standard deviation, in $/kg, in the Test Group and the Comparison Group.

that reveals how the prices are spread within each group and the transaction quantities of each sale. The unit prices are accurately indicated by the horizontal locations of the circular symbols. The transaction quantities are proportional to the areas of the same symbols. Two vertical colored lines depict the weighted group means. In these examples, the differences in weighted average prices are $0.25/kg and $0.37/kg, respectively. The percentage differences are 16.7% and 3.25%.

This visual display of spreads and weights reveals how the 2% Test skews the results. Commerce does not argue that the absolute price differences establish whether the difference is significant; rather, Commerce claims that the significance of the difference is determined by the percentage difference between the two weighted average sale prices. Remand at 15. The fundamental flaw in this methodology is evidenced by viewing the illustrations. In each figure the test group prices fall squarely within the spread of the comparison group prices; i.e., highest and lowest Test Group prices fall within the Comparison Group price spread. Test Group sales prices are no different than Comparison Group sales prices. In fact, any of the Test Group red dots plausibly could have arisen by swapping these dots with the Comparison Group gray or blue dots. All red dots fit comfortably in the range of the Comparison Group prices — indicating the economic pricing patterns of the groups are similar; i.e., that there are no targeted sales prices. This visualization corresponds to the intended meaning of targeted – also known as masked – dumping. There clearly is no significant difference between prices. Commerce's blind claim to the contrary is wrong.

### E.    THE TWO PERCENT TEST DOES NOT ACCOUNT FOR OUTLIERS

In contrast to Figures 1 and 3 above, Figure 5 below displays a pattern of visually apparent price differences that the 2% Test does not address.

23

**Figure 5 -small quantity with outlier sale; large SD**
CONNUM 127033572121 MIDWEST Region
*Figure 5 Actual Data*



| Q Test | Q Comp | WA Price Test | WA Price Comp | Price Diff. | Price Range Test | Price Range Comp | SD Test | SD Comp |
|---|---|---|---|---|---|---|---|---|
| 5757.50 | 78448.70 | 1.87084 | 1.83523 | 0.03561 | 1.82569-2.15165 | 1.82177 – 1.94873 | 0.10599 | 0.01742 |

**Source: Appx956-964, Appx1813. 5Rem PR 2 at 36.**

In Figure 5, the price difference is $0.03561, which is 1.94% of the weighted average Comparison group price. Thus, Commerce's 2% Test categorizes this comparison as "no-pass." This favorable result was caused by one extreme outlier. The same no-pass result also will occur when, hypothetically, the extremely *high* Test Group transaction price is replaced by an extremely *low* Test Group price. Such an extremely low-priced sale should be treated as evidence of targeted dumping, but Commerce's test allows small transactions at extremely unusual prices to hide behind weighted average prices. In other words, the 2% Test's failure to correctly account for extreme prices of individual sales (both high and low) leads to unwarranted results (pass or no pass).

This Court should not ignore these results. They confirm that the 2% Test does not

achieve the statutory goal of determining whether prices in two groups are substantially different. In contrast, these examples show that the 2% Test leads to absurd results and accordingly cannot be sustained. *See Sorrells v. United States*, 287 U.S. 435, 446 (1932) (explaining a statutory interpretation cannot be upheld "at the expense of the reason of the law and producing absurd consequences."); *Pitsker v. Off. of Pers. Mgmt.,* 234 F.3d 1378, 1383 (Fed. Cir. 2000) ("OPM's requirement also violates the canon of statutory construction that an interpretation that causes absurd results is to be avoided if at all possible."); *Timex V.I. v. United States*, 157 F.3d 879, 886 (Fed. Cir. 1998) ("a statutory construction that causes absurd results is to be avoided if at all possible"); *Yangzhou Bestpak Gifts & Crafts Co.,* 716 F.3d at 1378.

### F. THE 2% TEST IGNORES THE FACT THAT 99% OF SALES ARE TO ONE CUSTOMER

Ninety-nine percent of PT's sales during the period of investigation ("POI") were to one customer while the remaining, de minimis one percent were to other customers. *See* **Exhibit One**, showing that 8140 of 8246 observations were to PT's primary customer. The limited number of customers and the dramatic difference in sales to PT's primary customer and its secondary customers eliminate the possibility of targeted dumping by customer. Moreover, for multiple CONNUMs, sales quantities to the smaller customers were miniscule compared to sales quantities to the primary customer, further eliminating the possibility of targeting.

In *Timken Co. v. United States*, 179 F. Supp. 3d 1168, 1179 (Ct. Int'l Trade 2016), the CIT discussed the reasons why Commerce is required to consider these unique facts at this time:

> The Federal Circuit's opinion in *JBF RAK* does not appear to speak to a situation where a respondent actually demonstrates that the price differences are not the result of targeting. Although the Federal Circuit expressed concern that 'requiring Commerce to determine the intent of a targeted dumping respondent would create a tremendous burden on Commerce that is not required or suggested by the statute,' . . .such a burden might not exist where a respondent itself provides that information. Indeed, faced with the Statement of Administrative Action's ("SAA") clear expression that the alternative comparison methodology is typically employed to address targeted dumping, the

substantial evidence standard might require a different result. . . . This is not the case before the court.

### G.     THE 2% TEST IGNORES THE FACT THAT QUARTERLY PRICES WERE STABLE

During the POI, PT's quarterly prices declined as follows.

| Quarter | Quarterly Average Test group prices | % |
|---------|------|------|
| QTR01 | 1.74 | 100% |
| QTR02 | 1.69 | 97% |
| QTR03 | 1.65 | 95% |
| QTR04 | 1.65 | 95% |

Source: 5Rem PR 2 at Exhibit Two, Tab 5, "Period."

Thus, prices declined from QTR01 to QTR02 and remained at a constant lower level in QTR03 and QTR04. Notwithstanding the price stability during the POI, the 2% Test resulted in a 76.42 percent pass rate. This high rate arises because QTR01 is compared to each of the other calendar quarters, yielding false positives in light of the price stability in QTR02, 03, and 04.

This pricing pattern reveals that quarterly price differences are not the result of targeting; thus, Commerce should conclude that targeting does not exist when PT's prices are steady in three quarters of the POI.

### H.     THE 2% TEST ELIMINATES THE MIXED METHODOLOGY

The 2% test eliminates the mixed methodology, in which AT was not applied to the entire database when between 33 and 66 percent of U.S. sales "pass" the significant price difference test. In the absence of some explanation why the change in the test for "significance" also requires a change in the consequences of finding a 33-perccent "pass" rate in the "Ratio Test," the Department's elimination of the "mixed methodology" is beyond the scope of its authority in this proceeding. In *Stupp*, the Federal Circuit upheld the mixed methodology, stating that it was reasonable to apply the AT method to all sales if it found 66% of sales were "significantly

different" because "when two-thirds or more of a respondent's sales are at prices that differ significantly, then the extent of these sales is so pervasive that" the normal average to average method would not permit Commerce "to separate the effect of the sales where prices differ significantly from those where prices do not differ significantly." 5 F.4th 1341 at 1355. The *Stupp* court also stated that when it "finds that between one third and two thirds of U.S. sales are at prices that differ significantly … the effect of this pattern can reasonably be separated from sales whose prices do not differ significantly." *Id*. Commerce has provided no justification for why this rationale no longer applies and why it now is appropriate to apply the AT method when it finds that merely 33% of sales "differ significantly."

## I.    COMMERCE'S TEST CREATES FALSE POSITIVES BY RELYING ON IDENTICAL DATA FOR THREE TESTS

The 2% Test conducts three distinct tests for price correlations:  one by purchaser, one by region, and one by time period.  This multiple testing triples the likelihood that random processes will give rise to positive results.  In order to correct this error, the analysis should reduce the criterion used to assess whether results are significant by one-third (that is, by dividing the desired level of alpha by three).  This would require changing the threshold for the determination of significance from two percent to six percent. Test results using a six percent threshold are found in 5Rem PR 2 at Exhibit Two, Tab 1, "Test 6%." These show a 42.31% pass rate, even without applying any of the adjustments discussed in these comments.

## J.    COMMERCE'S TEST YIELDS ABNORMALLY HIGH PASS RATES

The 2% Test yields an abnormally high pass rate of 89.84 percent in this investigation, over twice as high as the pass rate under Cohen's *d* (42.7%). It is our understanding that similar high pass rights have been found in virtually all proceedings, in the absence of unique circumstances (e.g., sales to one customer, at one price throughout the POI/POR). Any "test" that

27

results in the same finding on nearly every occasion it is applied cannot be considered reasonable, as it tests for nothing at all. Such absurd results also fail to conform with the plain meaning of the statutory term "significantly." A test that is passed by virtually every comparison fails to give the results "a particular meaning;" nor is it a "consequential" result or one "that signifies or indicates something." When virtually all prices are found to "differ significantly," the statutory term loses its meaning.

At the very least, these results show that there is something wrong with Commerce's test – an exception should not swallow a general rule.

**K.     THIS COURT SHOULD EITHER REJECT THE 2% TEST OR ORDER COMMERCE TO ADJUST ITS PRICE DIFFERENCE TEST TO CONFORM TO LAW**

As discussed in detail above, Taiwan Respondents submit that Commerce's 2% Test is unreasonable as a matter of law. However, even if this court concludes that the 2% Test may be appropriate in certain circumstances, Commerce's decision cannot be sustained unless this Court also concludes that Commerce has established that based on the facts in this case, the 2% Test leads to a reasonable result and is supported by substantial evidence.

Alternatively, this Court's remand instructions could allow Commerce to retain the 2% Test provided that it adjusts the results to conforms to law. These adjustments, as calculated in the **Attachment,** are set forth below.

1.  Price Difference should be six percent. Tab 1.

2.  Test Group sales which are not dumped are not targeted. Tab 2.

3.  Test Group sales are not targeted when Test Group prices are higher than Comparison Group prices. Tab 3.

4.  Sales prices to one major customer cannot be targeted by customer when compared to small quantity sales to small customers. Tab 4.

5.  Stable prices over three calendar quarters cannot be targeted for all three quarters. Tab 5.

6.  Test Group prices which fall within the standard deviation of Comparison Group prices are not targeted. Tab 6.

7.  Commerce should apply the mixed methodology.

When these changes are implemented, the data will show that PT did not engage in targeted dumping. For example, set forth below are the pass rates if Commerce modifies its Price Difference test by combining adjustments 2 (non-dumped sales), 3 (test group prices higher than comparison group prices) and 6 (test group prices within standard deviation of comparison group prices), as discussed above.

| Adjustments | 2 & 3 | 2 & 6 | 3 & 6 | 2 & 3 & 6 |
|---|---|---|---|---|
| Pass rate | 37.18% | 26.49% | 28.60% | 18.75% |

Source: 5Rem PR 2 at **Exhibit Two**, Tab 7, "Combinations."

Insofar as all six adjustments should be combined (including 4 & 5), and insofar as Commerce should replace its 2 percent test with a 6 percent test, Commerce, in its next decision on remand, should calculate PT margins using AA without zeroing. PT's margin then will be *de minimis*, and Commerce will be required by law to revoke the ADD Order on Steel Nails from Taiwan.

**CONCLUSION**

Accordingly, Taiwan Respondents ask this Court to remand this matter to Commerce with instructions to either reject the 2% test or apply that test in a reasonable manner, consistent with the Court's analysis.

Respectfully Submitted,

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

*/s/Ned H. Marshak*
Ned H. Marshak

Andrew T. Schutz

*Counsel for PT Enterprise, Inc., Pro-Team Coil Nail Enterprise Inc., Unicatch Industrial Co., Ltd., WTA International Co., Ltd., Zon Mon Co., Ltd., Hor Liang Industrial Corp., President Industrial Inc.* and *Liang Chyuan Industrial Co., Ltd.*

Dated: July 13, 2026

30

## CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Consolidated Plaintiff's Remand Comments as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word, is 8,767 words, less than the 10,000 word limit.


*/s/ Ned H. Marshak*
Ned H. Marshak


Dated: July 13, 2026

Attachment

Differential Pricing Analysis Summary (2% Test)

| | | | Number of Tests | Number of passing Tests |
|---|---|---|---|---|
| TOTAL_VALUE | 25,742,517.68 | USD | | |
| PASS_VALUE | 23,128,359.81 | USD | | |
| PASS_PERIOD_VALUE | 19,671,447.56 | USD | | |
| PASS_PURCHASER_VALUE | 11,105,930.81 | USD | | |
| PASS_REGION_VALUE | 12,692,223.74 | USD | | |
| PERCENT_VALUE_PASSING | 89.84 | % | | |
| PERCENT_PERIOD_PASSING | 76.42 | % | 556 | 381 |
| PERCENT_PURCHASER_PASSING | 43.14 | % | 103 | 80 |
| PERCENT_REGION_PASSING | 49.30 | % | 392 | 208 |

For comparison, result of  Cohen's D :

| | | | Number of Tests | Number of passing Tests |
|---|---|---|---|---|
| TOTAL_VALUE | 25,742,517.68 | USD | | |
| PASS_VALUE | 10,880,836.15 | USD | | |
| PASS_PERIOD_VALUE | 9,588,684.78 | USD | | |
| PASS_PURCHASER_VALUE | 535,327.53 | USD | | |
| PASS_REGION_VALUE | 1,996,743.86 | USD | | |
| PERCENT_VALUE_PASSING | 42.27 | % | | |
| PERCENT_PERIOD_PASSING | 37.25 | % | 556 | 223 |
| PERCENT_PURCHASER_PASSING | 2.08 | % | 103 | 20 |
| PERCENT_REGION_PASSING | 7.76 | % | 392 | 105 |

0) Overview

Differential Pricing Analysis Summary performed with 6%

|  |  |  | Number of Tests | Number of passing Tests |
|---|---|---|---|---|
| TOTAL_VALUE | 25,742,517.68 | USD |  |  |
| PASS_VALUE | 10,892,903.08 | USD |  |  |
| PASS_PERIOD_VALUE | 5,231,325.08 | USD |  |  |
| PASS_PURCHASER_VALUE | 7,661,200.32 | USD |  |  |
| PASS_REGION_VALUE | 1,237,112.33 | USD |  |  |
| PERCENT_VALUE_PASSING | 42.31 | % |  |  |
| PERCENT_PERIOD_PASSING | 20.32 | % | 556 | 112 |
| PERCENT_PURCHASER_PASSING | 29.76 | % | 103 | 52 |
| PERCENT_REGION_PASSING | 4.81 | % | 392 | 83 |

Additional Rule:
The test is performed with 6% rather than 2%.

1) Test 6%

Differential Pricing Analysis Summary and non-dumped sales are automatic "No Pass"

| | | |
|---|---|---|
| TOTAL_VALUE | 25,742,517.68 | USD |
| PASS_VALUE | 12,181,518.79 | USD |
| PASS_PERIOD_VALUE | 10,331,714.20 | USD |
| PASS_PURCHASER_VALUE | 6,103,211.36 | USD |
| PASS_REGION_VALUE | 6,481,771.98 | USD |
| PERCENT_VALUE_PASSING | 47.32 | % |
| PERCENT_PERIOD_PASSING | 40.13 | % |
| PERCENT_PURCHASER_PASSING | 23.71 | % |
| PERCENT_REGION_PASSING | 25.18 | % |

Additional Rule:

Any sale with a negative dumping margin is an automatic "No Pass".

2) Not dumped

Differential Pricing Analysis Summary  with an additional test versus the Test Group price

|  |  |  | Number of Tests | Number of passing Tests |
|---|---|---|---|---|
| TOTAL_VALUE | 25,742,517.68 | USD |  |  |
| PASS_VALUE | 17,076,254.31 | USD |  |  |
| PASS_PERIOD_VALUE | 10,631,952.36 | USD |  |  |
| PASS_PURCHASER_VALUE | 7,245,559.70 | USD |  |  |
| PASS_REGION_VALUE | 6,135,616.33 | USD |  |  |
| PERCENT_VALUE_PASSING | 66.33 | % |  |  |
| PERCENT_PERIOD_PASSING | 41.30 | % | 556 | 207 |
| PERCENT_PURCHASER_PASSING | 28.15 | % | 103 | 43 |
| PERCENT_REGION_PASSING | 23.83 | % | 392 | 109 |

Additional Rule:
Test Group sales are "No Pass" if the Test Group price is higher than the Comparison Group Price.

3) Price Comparison

Differential Pricing Analysis Summary with Purchaser Test removed

| | | | Number of Tests | Number of passing Tests |
|---|---|---|---|---|
| TOTAL_VALUE | 25,742,517.68 | USD | | |
| PASS_VALUE | 22,103,099.16 | USD | | |
| PASS_PERIOD_VALUE | 19,671,447.56 | USD | | |
| PASS_PURCHASER_VALUE | | | | |
| PASS_REGION_VALUE | 12,692,223.74 | USD | | |
| PERCENT_VALUE_PASSING | 85.86 | % | | |
| PERCENT_PERIOD_PASSING | 76.42 | % | 556 | 381 |
| PERCENT_PURCHASER_PASSING | | | | |
| PERCENT_REGION_PASSING | 49.30 | % | 392 | 208 |

Additional Rule:

Purchaser Test is removed because 99% of all sales are made to one customer.

Frequency tables:

| Purchaser | Transactions | % | |
|---|---|---|---|
| 1 | 8140 | 99% | skewed! |
| 2 | 53 | 1% | |
| 3 | 26 | 0% | |
| 4 | 4 | 0% | |
| 5 | 9 | 0% | |
| 6 | 14 | 0% | |
| Grand Total | 8246 | 100% | |

| Period | Transactions | % |
|---|---|---|
| QTR01 | 2416 | 29% |
| QTR02 | 1661 | 20% |
| QTR03 | 1780 | 22% |
| QTR04 | 2389 | 29% |
| Grand Total | 8246 | 100% |

| Region | Transactions | % |
|---|---|---|
| MIDWEST | 2677 | 32% |
| NORTHEAST | 1091 | 13% |
| SOUTH | 2812 | 34% |
| WEST | 1666 | 20% |
| Grand Total | 8246 | 100% |

4) Purchaser

Differential Pricing Analysis Summary with Period Test removed

| | | | Number of Tests | Number of passing Tests |
|---|---|---|---|---|
| TOTAL_VALUE | 25,742,517.68 | USD | | |
| PASS_VALUE | 17,506,831.63 | USD | | |
| PASS_PERIOD_VALUE | 19,671,447.56 | USD | | |
| PASS_PURCHASER_VALUE | 11,105,930.81 | USD | | |
| PASS_REGION_VALUE | 12,692,223.74 | USD | | |
| PERCENT_VALUE_PASSING | 68.01 | % | | |
| PERCENT_PERIOD_PASSING | | | | |
| PERCENT_PURCHASER_PASSING | 43.14 | % | 103 | 80 |
| PERCENT_REGION_PASSING | 49.30 | % | 392 | 208 |

Additional Rule:
Period Test is removed. Explanantion see below.

Analysis:
101 CONNUMs out of 164 CONNUMs sold have an average price in every quarter.
For those CONNUMs a simple average price has been calculated.
The table below shows a pattern with a price drop and a consolidation at a lower level.
Such a pattern will always result in a large number of positive test results.
The price drop can be caused by multiple reasons, for example a change in raw material prices.

| Quarter | Quarterly Average Test group prices | % |
|---|---|---|
| QTR01 | 1.74 | 100% |
| QTR02 | 1.69 | 97% |
| QTR03 | 1.65 | 95% |
| QTR04 | 1.65 | 95% |

5) Period

Differential Pricing Analysis Summary with an additional test versus the CONNUM standard deviation

| | | | Number of Tests | Number of passing Tests |
|---|---|---|---|---|
| TOTAL_VALUE | 25,742,517.68 | USD | | |
| PASS_VALUE | 11,200,374.91 | USD | | |
| PASS_PERIOD_VALUE | 5,578,887.73 | USD | | |
| PASS_PURCHASER_VALUE | 7,127,955.73 | USD | | |
| PASS_REGION_VALUE | 1,339,630.19 | USD | | |
| PERCENT_VALUE_PASSING | 43.51 | % | | |
| PERCENT_PERIOD_PASSING | 21.67 | % | 556 | 202 |
| PERCENT_PURCHASER_PASSING | 27.69 | % | 103 | 58 |
| PERCENT_REGION_PASSING | 5.20 | % | 392 | 99 |

Additional Rule:

The price difference is measured versus the CONNUM standard deviation.

If the price difference in the test is within the CONNUM standard deviation, the test result is "No Pass".

6)  CONNUM STD DEV

Differential Pricing Analysis Summary (2% Test)

| | Combine 2) and 3) | Combine 2) and 6) | Combine 3) and 6) | Combine 2), 3), and 6) | |
|---|---|---|---|---|---|
| | 2) Non-dumped sales are automatic "No Pass" and 3) Test Group sales are "No Pass" if the Test Group price is higher than the Comparison Group Price. | 2) Non-dumped sales are automatic "No Pass" and 6) If the price difference in the test is within the CONNUM standard deviation, the test result is "No Pass". | 3) Test Group sales are "No Pass" if the Test Group price is higher than the Comparison Group Price. and 6) If the price difference in the test is within the CONNUM standard deviation, the test result is "No Pass". | 2) Non-dumped sales are automatic "No Pass" and 3) Test Group sales are "No Pass" if the Test Group price is higher than the Comparison Group Price. and 6) If the price difference in the test is within the CONNUM standard deviation, the test result is "No Pass". | |
| TOTAL_VALUE | 25,742,517.68 | 25,742,517.68 | 25,742,517.68 | 25,742,517.68 | USD |
| PASS_VALUE | 9,569,955.90 | 6,819,863.87 | 7,362,960.18 | 4,826,324.40 | USD |
| PASS_PERIOD_VALUE | 5,978,156.52 | 3,079,706.12 | 756,929.66 | 448,994.75 | USD |
| PASS_PURCHASER_VALUE | 4,459,471.08 | 4,414,804.18 | 6,370,842.35 | 4,191,186.45 | USD |
| PASS_REGION_VALUE | 3,741,391.71 | 905,588.89 | 419,707.35 | 335,628.82 | USD |
| PERCENT_VALUE_PASSING | 37.18 | 26.49 | 28.60 | 18.75 | % |
| PERCENT_PERIOD_PASSING | 23.22 | 11.96 | 2.94 | 1.74 | % |
| PERCENT_PURCHASER_PASSING | 17.32 | 17.15 | 24.75 | 16.28 | % |
| PERCENT_REGION_PASSING | 14.53 | 3.52 | 1.63 | 1.30 | % |

7) Combinations

Attachment
Website Printouts

*Pattern*, THE BRITANNICA DICTIONARY,

https://www.britannica.com/dictionary/pattern

(last visited July 10, 2026)

# pattern

5 ENTRIES FOUND:

**pattern** (noun)
**pattern** (verb)
**patterned** (adjective)

---

<sup>1</sup> pattern   /ˈpætən/ 🔊 *noun*

*plural* **patterns**

**Britannica Dictionary definition of PATTERN**

[count]

**1 :** a repeated form or design especially that is used to decorate something

- The dishes have a floral *pattern* around the rim.
- The fabric comes in different colors and *patterns*.
- The rug is decorated with a geometric *pattern*.
- The shadows made a *pattern* of lines on the ground.

— see *color picture* on THIS PAGE

**2 a :** the regular and repeated way in which something happens or is done

- They are studying behavior *patterns* among high-school students.
- Analysts are noticing different spending *patterns* by consumers.
- The trees followed a characteristic *pattern* of growth.

[+] more examples

**b :** something that happens in a regular and repeated way

- We have to find a way to break the *pattern* of violence. [=to make the violence stop]

**3 :** a shape or model that is used as a guide for making something

- a **dress pattern** [=a large piece of paper that is used as a guide for cutting the cloth to make a dress]

---

<sup>2</sup> pattern   /ˈpætən/ *verb*

**patterns**; **patterned**; **patterning**

**Britannica Dictionary definition of PATTERN**

[+ object]

**1 :** to make or design (something) so that it is similar to something else of the same type — usually used as *(be) patterned* + *on* or (*US*) *after*

- Her garden **is patterned on** [=*modeled on*] one she saw on her travels.
- The new program **is patterned after** an earlier one.

**2 :** to decorate or mark (something) with a design **:** to form a pattern on (something)

- Animal tracks *patterned* the mud.

**pattern yourself on** *or US* **pattern yourself after**

**:** to try to be like and to behave like (someone you admire)

- When he started his own business, he *patterned himself after* [=*modeled himself after*] his father. [=he tried to do the things that his father would do]

Case 1:15-cv-00213-CRK    Document 240    Filed 07/13/26    Page 50 of 93

*Significant*, CAMBRIDGE ONLINE DICTIONARY,

https://https://dictionary.cambridge.org/us/

dictionary/english/significant

(last visited July 10, 2026)

  **Cambridge Dictionary**


**Instant AI value.**
**Without leaving iManage.**
Put legal AI to
work today.


*Meaning of **significant** in English*

# significant

***adjective***

**US**  /sɪɡˈnɪf.ə.kᵊnt/  **UK**  /sɪɡˈnɪf.ɪ.kᵊnt/

---

**significant** *adjective* **(IMPORTANT)**

<span style="color:gray">Add to word list</span>

 **B2**

(also **significative**)

## important or noticeable:

- *There has been a significant increase in the number of women students in recent years.*

- *The talks between the USA and the USSR were very significant **for** the relationship between the two countries.*

- *There was no significative change of blood pressure.*

– **Thesaurus: synonyms, antonyms, and examples**

**having great effect or influence**

important *It was one of the most important legal cases of the century.*

big *This is a big game tonight - if we lose, we won't be in the playoffs.*

major *This is a major decision so we'd better get it right.*

significant *Did he make any significant changes to my suggestions?*

**See more results »**



  

**+ SMART Vocabulary: related words and phrases**

---

**significant** *adjective* **(SPECIAL MEANING)**



**having a special meaning:**

- *She looked at him across the table and gave him a significant smile.*

- *Do you think **it**'s significant **that** he hasn't replied to my letter yet?*

**+ SMART Vocabulary: related words and phrases**

---

*(Definition of **significant** from the **Cambridge Advanced Learner's Dictionary & Thesaurus** © Cambridge University Press)*

**significant** | INTERMEDIATE ENGLISH

# significant

*adjective*

US 🔊  /sɪɡˈnɪf·ɪ·kənt/

Add to word list ☰

**important, large, or great, esp. in leading to a different result or to an important change:**

- *This election reaffirms a significant shift of the center of power.*

- *Marriage is a significant commitment.*

## significance

***noun*** [ ∪ ] **US** 🔊  /sɪɡˈnɪf·ɪ·kəns/

- *The full significance of space exploration may not be understood for many years to come.*



 **Cambridge Dictionary**

**EXAMPLES of significant**

# significant

Thus, the finding that 30-45 ppm of the increase happened in just a few centuries was *significant*.

*From Phys.Org*

So far, the savings have been pretty *significant*.

*From Business Insider*

The world has really changed in *significant* and encouraging ways.

*From TIME*

Do you expect any *significant* changes to come of it?

*From The New York Review of Books*

But, especially if combined with other steps, it would be a *significant* step forward.

*From Heritage.org*

The market has gone up 10 percent in three weeks and that's pretty *significant*.

*From CNBC*

The women reported a *significant* increase in the number of words that their kids understood and vocalized.

*From NPR*

To be sure, the current level of $5.15 billion in fees last year is *significant*.

*From Dallas Morning News*

It went from 34 to 35.8 percent among men, and from 30 to 30.7 percent among women -- not a *significant* difference.

*From Slate Magazine*

But this is not the right time or place to discuss a *significant* force increase.

*From Los Angeles Times*

However, no *significant* accidents, damage or injuries were reported, authorities said.

Case 1:15-cv-00213-CRK    Document 240    Filed 07/13/26    Page 55 of 93

Cambridge Dictionary

Here are some *significant* changes the bill would make, along with some myths about the proposed law.

*From Plain Dealer*

It's never too late to get on the same page with your *significant* other.

*From Huffington Post*

He didn't stand to gain any *significant* amount of money with a fire.

*From Washington Post*

It is hard to know what social change taking place today will be the most *significant* in the long term.

*From Huffington Post*

These examples are from corpora and from sources on the web. Any opinions in the examples do not represent the opinion of the Cambridge Dictionary editors or of Cambridge University Press or its licensors.

What is the pronunciation of *significant*?

## Translations of **significant**

in Chinese (Traditional)

重要, 重要的, 顯著的…

See more

in Chinese (Simplified)

重要, 重要的, 显著的…

See more

in Spanish

significativo, importante, significativo/va [masculine-feminine…

See more

in Portuguese

significativo, sensível, importante…

See more

in more languages

Case 1:15-cv-00213-CRK     Document 240     Filed 07/13/26     Page 56 of 93



Need a translator?

Get a quick, free translation!

🔤 **Translator tool**

| **Browse** |
| --- |
| signed and sealed *idiom* |
| signer |
| signet ring |
| significance |
| **significant** |
| significant digits |
| significant figures |
| significant other |
| significantly |

 





**More meanings of *significant***

**−** **All**

non-significant

significant digits

significant figures

significant other

significant digits, at significant figures

significant figures, at significant digits

**See all meanings**

Case 1:15-cv-00213-CRK    Document 240    Filed 07/13/26    Page 58 of 93



 

WORD OF THE DAY

# staycation

UK 🔊 /steɪˈkeɪ.ʃᵊn/ US 🔊 /steɪˈkeɪ.ʃᵊn/

a holiday that you take at home or near your home rather than travelling to another place

**About this**

☰ Contents

✨ AI Assistant

To top

Case 1:15-cv-00213-CRK　Document 240　Filed 07/13/26　Page 59 of 93



BLOG

## Tall, dark, and handsome: using trinomials

July 08, 2026

**Read More**



NEW WORDS

# omega block

July 06, 2026

**More new words**

Case 1:15-cv-00213-CRK   Document 240   Filed 07/13/26   Page 61 of 93

  





LEARN ✚

DEVELOP ✚

ABOUT ✚



© Cambridge University Press & Assessment 2026

*Significant*, MERRIAM-WEBSTER ONLINE DICTIONARY,

https://www.merriam-webster.com/dictionary/

significant (last visited July 10, 2026)

7/10/26, 5:21 PM
Case 1:15-cv-00213-CRK
SIGNIFICANT Definition & Meaning - Merriam-Webster
Document 240
Filed 07/13/26
Page 65 of 93



# significant *adjective*

sig·nif·i·cant    sig-ˈni-fi-kənt 🔊

Synonyms of *significant*



**1** : having meaning

> … collected every stamp that included a map of any *significant* detail.
> — Gayle Turim

*especially* : full of import : **SUGGESTIVE**

> a *significant* glance

> It is *significant* that she never mentioned him.

❓ Take our 3 question quiz on **significant** ›

**2 a** : having or likely to have influence or effect : **IMPORTANT**

> a *significant* piece of legislation

> a *significant* event in the history of our nation

*also* : large enough to be noticed or to have an effect

> a *significant* number of layoffs

> producing *significant* profits

**b** : likely caused by something other than mere chance

> statistically *significant* correlation between vitamin deficiency and disease

Case 1:15-cv-00213-CRK    Document 240    Filed 07/13/26    Page 66 of 93



**Relevance** ■■□□

major

important

historic

big

substantial

See All Synonyms & Antonyms in Thesaurus ›

## Examples of *significant* in a Sentence

Historians of ancient gender have seen this as crucially **significant**. Women in antiquity were by definition so disempowered that the authority of a new female ruler could only be captured by representing her in the guise of a man. Or so the argument goes.

— Mary Beard, *New York Review of Books*, 12 Feb. 2009

While Congress will take a **significant** role in designing new regulation and is not likely to rubber-stamp the administration's proposals, momentum is strong for the creation of comprehensive financial reform.

— Marc I. Seltzer et al., *Commonweal*, 19 June 2009

A new study on women and the media from the University of Missouri-Columbia shows that overweight women and women with eating disorders are not the only ones negatively affected by unrealistic advertisements (as previous studies have indicated). After viewing images of models, women of all sizes reported a **significant** decrease in satisfaction with their weight, hair, physical shape and sexual attractiveness.

— *Ms.*, Summer 2007

One of [Charles] Darwin's most extraordinary qualities was his ability to recognize when a scientific question could not be answered because of the limitations of the science of his day. He knew, for instance, that during his lifetime, no **significant** progress would be made on the question of how life began.

— Amy Stewart, *Wilson Quarterly*, Winter 2004



**Definition**    Synonyms    Example Sentences    Word History    Phrases Containing    Rhy

## Recent Examples on the Web

ⓘ **Examples are automatically compiled from online sources to show current usage.** Read More

The Fire Safe Council and forestry herbicide experts stressed that when herbicide is used, crews take ***significant*** precautions to protect ecosystems and communities.

— *Los Angeles Times*, 9 July 2026  ↗

Because patients were already receiving treatment for this, adding Wainua on top of standard of care didn't show a ***significant*** extra benefit to the overall group.

— Elsa Ohlen,angelica Peebles, *CNBC*, 9 July 2026  ↗

Collectively, these venues drive ***significant*** traffic to uptown, Singleton said.

— *Charlotte Observer*, 9 July 2026  ↗

The Museum's collection includes ***significant*** holdings of contemporary global art and important examples of historical art, particularly 18th- and 19th-century American art and works on paper.

— Leslie Anderson, *The Orlando Sentinel*, 9 July 2026  ↗

See All Example Sentences for *significant* ›

## Word History

### Etymology

Latin *significant-, significans*, present participle of *significare* to signify

### First Known Use

1566, in the meaning defined at  sense 1



See more words from the same year

## Phrases Containing *significant*

significant digit                              significant other

## Rhymes for *significant*

insignificant                              nonsignificant

See All Rhymes for *significant* ›

## Browse Nearby Words

significancy            **significant**                significant digit

See All Nearby Words ›



## Cite this Entry

**Style**  [ MLA ▾ ]

"Significant." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/significant. Accessed 10 Jul. 2026.

⎘Copy Citation

## Kids Definition

# significant *adjective*

sig·nif·i·cant    ( sig-ˈnif-i-kənt 🔊 )

**1** : having much importance

**2** : probably caused by something other than chance

    a statistically *significant* relationship between vitamin deficiency and disease

**3** : having meaning and especially a hidden or special meaning

    gave us a *significant* wink

- **significantly** *adverb*

## Etymology

from Latin *significant-, significans,* present participle of *significare* "to signify, indicate," from *signum* "mark, sign, image" — related to SIGN

SIGNIFICANT Definition & Meaning - Merriam-Webster

Definition     Synonyms     Example Sentences     Word History     Phrases Containing     Rhy

# significant *adjective*

sig·nif·i·cant     ( sig-ˈnif-i-kənt ◀ᴼ)

**:** probably caused by something other than mere chance

> a statistically *significant* correlation between diet and disease

## significantly *adverb*

> **More from Merriam-Webster on *significant***

Nglish: Translation of *significant* for Spanish Speakers

Last Updated: 10 Jul 2026 - Updated example sentences

## Love words? Need even more definitions?

Subscribe to America's largest dictionary and get thousands more definitions and advanced search—ad free!

**MERRIAM-WEBSTER UNABRIDGED**



## Definition    Synonyms    Example Sentences    Word History    Phrases Containing    Rhy

## More from Merriam-Webster



**Top Lookups**
Next refresh: 20

1  **dirigo**

2  **hero-worshiping**

3  **fortnight**

4  **best**

5  **smileful**

6  **OK**

7  **bluebottle**



**WORD OF THE DAY**

## effulgence 🔊

See Definitions and Examples »

Get Word of the Day daily email!

Your email addre    **SUBSCRIBE**

SIGNIFICANT Definition & Meaning - Merriam-Webster



Definition    Synonyms    Example Sentences    Word History    Phrases Containing    Rhy

**14 Phobias You Probably Haven't Heard Of**

**The Longest Long Words List**

## Games & Quizzes

### Quordle
Can you solve 4 words at once?

**Play**

### Blossom
Pick the best words!

**Play**

**Definition**  Synonyms  Example Sentences  Word History  Phrases Containing  Rhy

## The Missing Letter

A daily crossword with a twist

**Play**

## Contradictory Words Quiz

Pick out which word means one thing...and the opp...

**Take the quiz**

**See All**

**Learn a new word every day. Delivered to your inbox!**

Your email address

**SUBSCRIBE**

Help | About Us | Advertising Info | Contact Us | Privacy Policy | Terms of Use

© 2026 Merriam-Webster, Incorporated



*Significantly*, MERRIAM-WEBSTER ONLINE DICTIONARY,

https://www.merriam-webster.com/dictionary/

significantly (last visited July 10, 2026);



# significantly _adverb_

sig·nif·i·cant·ly  ( sig-ˈni-fi-kənt-lē ◄ )

Synonyms of _significantly_

**1** : in a significant manner **:** to a significant degree

> the salaries differed _significantly_

> **?** Take our 3 question quiz on **_significantly_** ›

**2** : it is significant

> _significantly_, they were on time

## Examples of _significantly_ in a Sentence

> People who smoke have a **_significantly_** greater risk of developing lung cancer than people who don't.

> Another store sold the game for a **_significantly_** lower price.

> If you take my advice, your chances of winning will increase **_significantly_**.

> He looked **_significantly_** in her direction when he said that some of us are not doing our jobs.



## Definition          Example Sentences          Word History          Rhymes          Entries Near          Show More ⌄

improbable.

— Ewan Spence, *Forbes.com*, 6 July 2026 ⬈

The licensing process for these stenographers is **significantly** longer and more difficult than what voice writers undergo.

— Sonja Sharp, *Los Angeles Times*, 6 July 2026 ⬈

Early introductions **significantly** reduce aggression between males and females, leading to more successful breeding outcomes.

— Julianna Bragg, *CNN Money*, 5 July 2026 ⬈

Since the two quantities moved differently, the exciton binding energy grew **significantly** with increasing spacer length.

— Rupendra Brahambhatt, *Interesting Engineering*, 5 July 2026 ⬈

See All Example Sentences for *significantly* ›

## Word History

### First Known Use

1577, in the meaning defined at sense 1

### Time Traveler

**The first known use of *significantly* was in 1577**

See more words from the same year

## Rhymes for *significantly*



**Definition**     Example Sentences     Word History     Rhymes     Entries Near     Show More ⌄

See All Rhymes for *significantly* ›

## Browse Nearby Words

significant digit        **significantly**        significant other

See All Nearby Words ›

## Cite this Entry

**Style**    | MLA ⌄ |

"Significantly." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/significantly. Accessed 10 Jul. 2026.

⧉ Copy Citation

## More from Merriam-Webster on *significantly*

Thesaurus: All synonyms and antonyms for *significantly*

Last Updated: 6 Jul 2026 - Updated example sentences

## Definition    Example Sentences    Word History    Rhymes    Entries Near    Show More ⌄

Subscribe to America's largest dictionary and get thousands more definitions and advanced search—ad free!

**MERRIAM-WEBSTER UNABRIDGED**

## More from Merriam-Webster



**Top Lookups**
Next refresh: 9

1  **dirigo**

2  **fortnight**

3  **hero-worshiping**

4  **take something as a...**

5  **codswallop**

6  **high**

**Definition**    Example Sentences    Word History    Rhymes    Entries Near    Show More ⌄



**WORD OF THE DAY**

**effulgence** 🔊

See Definitions and Examples »

Get Word of the Day daily email!

| Your email addre | **SUBSCRIBE** |

## Popular

**Is that lie 'bald-faced' or 'bold-faced'?**

**14 Phobias You Probably Haven't Heard Of**

**The Longest Long Words List**

## Games & Quizzes



Definition    Example Sentences    Word History    Rhymes    Entries Near    Show More ⌄



### Quordle
Can you solve 4 words at once?

**Play**



### Blossom
Pick the best words!

**Play**



### The Missing Letter
A daily crossword with a twist

**Play**



### Contradictory Words Quiz
Pick out which word means one thing...and the opp...

**Take the quiz**

**See All** ›



© 2026 Merriam-Webster, Incorporated

*Significantly*, CAMBRIDGE ONLINE DICTIONARY,

https://dictionary.cambridge.org/us/dictionary/

english/significantly

(last visited July 10, 2026)

Case 1:15-cv-00213-CRK    Document 240    Filed 07/13/26    Page 84 of 93

  

*Meaning of **significantly** in English*



# significantly

**adverb**

US  /sɪɡˈnɪf.ə.kᵊnt.li/  UK 🔊 /sɪɡˈnɪf.ɪ.kᵊnt.li/

---

**significantly** *adverb* (IMPORTANT)

<span>Add to word list ☰</span>

**B2**

## in a way that is easy to see or by a large amount:

• *My piano playing has improved significantly since I started with a new teacher.*

> **− Fewer examples**
> • *Employment levels are unlikely to rise significantly before the end of next year.*
> • *They expanded their retail operations significantly during the 1980s.*
> • *Studies suggest that regular intake of the vitamin significantly improves brain function.*
> • *Hotdesking allows a company to have significantly smaller premises.*
> • *High winds significantly hampered the plane's acceleration.*

> **+ SMART Vocabulary: related words and phrases**

---

**significantly** *adverb* (SPECIAL MEANING)



## in a way that suggests a special meaning:



 

**+ SMART Vocabulary: related words and phrases**

---

*(Definition of **significantly** from the **Cambridge Advanced Learner's Dictionary & Thesaurus** © Cambridge University Press)*

**significantly** | INTERMEDIATE ENGLISH

# significantly

***adverb***

US  /sɪɡˈnɪf·ɪ·kənt·li/

Add to word list ☰

## by a large amount:

- *Our prison population has significantly increased in the last ten years.*

- *Men are making significantly more money than women at the same professional level.*

---

*(Definition of **significantly** from the **Cambridge Academic Content Dictionary** © Cambridge University Press)*

EXAMPLES of **significantly**

# significantly

But the actual number is believed to be *significantly* higher because many more cases almost certainly go unreported.

*From Huffington Post*

But there was a big difference between the groups: those in the low-dose group were *significantly* less likely to fall.

*From CBS News*                                                                                          💬

Skin thickness varies *significantly* from person to person, and in different places on the same individual.

*From Slate Magazine*                                                                                    💬

It's no surprise that small car volume is down *significantly* year over year.



And some have changed schools or been suspended or expelled so many times that they're *significantly* behind their peers, both academically and emotionally.

*From The Atlantic*

From the start, the government of this emerging state wanted to do something to immediately and *significantly* improve people's lives.

*From WIRED*

Any contact with air would allow bacteria to grow and *significantly* increase the potential for contamination.

*From Chicago Tribune*

Since then, the mission for the site has changed *significantly*.

*From VentureBeat*

The explanation was not *significantly* challenged by the news media.

*From Washington Times*

It's going to be *significantly* improved versus what the experience was in the old facility.

*From New York Daily News*

Women who exercised less than an hour a day were *significantly* more likely to gain at least five pounds.

*From Washington Post*

Government policy mistakes *significantly* raise the prices of consumer goods.

*From Heritage.org*

The numbers make clear that veterans tend to be homeless *significantly* longer than non-veterans, even after accounting for age.

*From Huffington Post*

These examples are from corpora and from sources on the web. Any opinions in the examples do not represent the opinion of the Cambridge Dictionary editors or of Cambridge University Press or its licensors.

## What is the pronunciation of *significantly*?  ›

## Translations of **significantly**

See more

in Chinese (Simplified)

重要, 显著地, 相当数量地…

See more

in Spanish

de modo significativo, sensiblemente, lo cual es significativo…

See more

in Portuguese

significativamente, sensivelmente…

See more

in more languages ⌄

## Need a translator?

Get a quick, free translation!

**Translator tool**

## Browse

significant

significant digits

significant figures

significant other

**significantly**

signification

significative

signified

signifier







 

WORD OF THE DAY

# staycation

UK 🔊 /steɪˈkeɪ.ʃᵊn/ US 🔊 /steɪˈkeɪ.ʃᵊn/

a holiday that you take at home or near your home rather than travelling to another place

**About this**



Contents        ✨ AI Assistant        To top ⊕

BLOG

## Tall, dark, and handsome: using trinomials

July 08, 2026

Case 1:15-cv-00213-CRK    Document 240    Filed 07/13/26    Page 90 of 93

NEW WORDS

# omega block

July 06, 2026

**More new words**

Case 1:15-cv-00213-CRK   Document 240   Filed 07/13/26   Page 91 of 93








DEVELOP                                              +

ABOUT                                               +

© Cambridge University Press & Assessment 2026