UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| MID CONTINENT STEEL & WIRE, INC., *et al.*,<br><br>Plaintiff and Consolidated Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>PT ENTERPRISE INC., *et al.*,<br><br>Defendant-Intervenors and<br>Consolidated Defendant-Intervenor. | Consol. Court No. 15-00213 |

ORDER

Upon consideration of the Department of Commerce's final results of redetermination pursuant to remand, all responses thereto, and all other pertinent papers, it is hereby

ORDERED that the remand redetermination is sustained; and it is further

ORDERED that final judgment is entered in favor of the United States.

Dated: ________________, 2026
New York, NY

________________________________
CLAIRE R. KELLY, JUDGE

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

| | | |
|---|---|---|
| MID CONTINENT STEEL & WIRE, INC., *et al.*, | ) | |
| Plaintiff and Consolidated Plaintiffs, | ) | |
| v. | ) | Consol. Court No. 15-00213 |
| UNITED STATES, | ) | |
| Defendant, | ) | |
| and | ) | |
| PT ENTERPRISE INC., *et al.*, | ) | |
| Defendant-Intervenors and Consolidated Defendant-Intervenor. | ) | |

DEFENDANT'S RESPONSE TO COMMENTS ON THE
DEPARTMENT OF COMMERCE'S FINAL RESULTS OF REDETERMINATION

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

CLAUDIA BURKE
Deputy Director

DOUGLAS G. EDELSCHICK
Assistant Director
Commercial Litigation Branch
Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Tel: (202) 353-9303

Attorneys for Defendant United States

Of Counsel:

VANIA WANG
Senior Counsel
Office of the Chief Counsel
for Trade Enforcement & Compliance
Department of Commerce

September 30, 2026

# TABLE OF CONTENTS

**Page:**

TABLE OF AUTHORITIES ..... ii

BACKGROUND ..... 2

I. Statutory Framework ..... 2

II. The Federal Circuit Invalidates The Cohen's d Test In *Marmen* ..... 4

III. Commerce Changes Its Administrative Practice After *Marmen* ..... 6

IV. Commerce Followed Its New Practice On Remand ..... 8

ARGUMENT ..... 9

I. Standard of Review ..... 9

II. Commerce's Remand Redetermination Complies With The Federal Circuit Decision In *Marmen* and the Remand Order ..... 10

III. Commerce's Revised Differential Pricing Analysis Is Reasonable And Lawful ..... 10

A. The Statutory Language Grants Commerce Discretion ..... 11

B. The Price Difference Test Reasonably Determines Significant Price Differences ..... 16

C. Taiwan Plaintiffs' Remaining Price Difference Test Arguments Are Meritless ..... 22

D. Commerce's Discontinuance Of The Mixed Method Was Within The Scope Of The Remand And Was Reasonably Explained ..... 29

CONCLUSION ..... 33

# TABLE OF AUTHORITIES

**Cases:** **Page(s):**

*Am. Silicon Techs. v. United States*, 63 F. Supp. 2d 1324 (Ct. Int'l Trade 1999) ........................29

*Apex Frozen Foods Priv. Ltd. v. United States*, 862 F.3d 1322 (Fed. Cir. 2017) (*Apex I*)..7, 31, 32

*Apex Frozen Foods Priv. Ltd. v. United States*, 862 F.3d 1337 (Fed. Cir. 2017) (*Apex II*) ........3, 4

*Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States*,
102 F.4th 1252 (Fed. Cir. 2024) (*Asemesa*)............................................................ 12-15

*Bethlehem Steel Corp. v. United States*, 223 F. Supp. 2d 1372 (Ct. Int'l Trade 2002) ..................9

*Bio-Lab, Inc. v. United States*, 776 F. Supp. 3d 1315 (Ct. Int'l Trade 2025).........................13, 15

*Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. Am. Cast Iron Pipe Co.*,
5 F.4th 1367 (Fed. Cir. 2021) (*Borusan II*)...............................................................13

*Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. United States*,
608 F. App'x 948 (Fed. Cir. 2015) (*Borusan*) .......................................................... 26-27

*BYD (H.K.) Co. v. United States*, 785 F. Supp. 3d 1359 (Ct. Int'l Trade 2025).....................12, 13

*Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938) .........................................................................9

*Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607 (1966).........................................................................9

*Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034 (Fed. Cir. 1996) ...............................................13

*Garg Tube Export LLP v. United States*, 740 F. Supp. 3d 1355 (Ct. Int'l Trade 2024)..........14, 15

*Gov't of Canada v. United States*, Consol. Ct. No. 23-00187, Slip Op. 26-82, 2026 Ct.
Intl. Trade LEXIS 90, 2026 WL 2161176 (Ct. Int'l Trade July 27, 2026)...................2, 18

*JBF RAK LLC v. United States*, 790 F.3d 1358 (Fed. Cir. 2015) ...............................................26

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) .........................................11, 12, 15

*MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349 (Ct. Int'l Trade 2015).......................9

*Melamine Chemicals, Inc. v. United States*, 732 F.2d 924 (Fed. Cir. 1984) ...............................13

*Marmen Inc. v. United States*, 134 F.4th 1334 (Fed. Cir. 2025) (*Marmen*) ...4-6, 10-11, 18, 28, 31

*Marmen Inc. v. United States*, No. 20-00169, Slip Op. 2026-62,
2026 Ct. Intl. Trade LEXIS 72, 2026 WL 1726609
(Ct. Int'l Trade June 15, 2026) (*Marmen II*)........................................ 2, 11, 17, 22, 29-31

**TABLE OF AUTHORITIES (continued)**

**Cases (continued):** **Page(s):**

*Maquilacero S.A. De C.V. v. United States*, Consol. Ct. No. 23-00091, Slip Op. 26-111, 2026 Ct. Intl. Trade LEXIS 136, 2026 WL 2692171 (Ct. Int'l Trade Sept. 14, 2026)........2

*Mosaic Co. v. United States*, 160 F.4th 1340 (Fed. Cir. 2025)................................................9, 12

*Nan Ya Plastics Corp., Ltd. v. United States*, 128 F.Supp.3d 1345 (Ct. Int'l Trade 2015) ...........26

*Nexteel Co. v. United States*, 28 F.4th 1226 (Fed. Cir. 2022).......................................................13

*Nippon Steel Corp. v. United States*, 458 F.3d 1345 (Fed. Cir. 2006)............................................9

*Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378 (Fed. Cir. 2014)........................21

*Russello v. United States*, 464 U.S. 16 (1983) ..................................................................24

*Samsung Electronics Co. v. United States*, 72 F. Supp. 3d 1359 (Ct. Int'l Trade 2015)..............32

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty., CO*, 605 U.S. 168 (2025) .................................9

*Smith-Corona Group v. United States*, 713 F.2d 1571 (Fed. Cir. 1983) ......................................13

*Stupp Corp. v. United States*, 5 F.4th 1341 (Fed. Cir. 2021) (*Stupp*) ................................3, 11, 16

*Stupp Corp. v. United States*, Consol. Ct. No. 15-00334, Slip Op. 26-113, 2026 Ct. Intl. Trade LEXIS 139, 2026 WL 2722698 (Ct. Int'l Trade Sept. 15, 2026) (*Stupp II*) .............. 2, 10, 12, 13, 15, 17-20, 22, 23, 29, 30

*Timken Co. v. United States*, 179 F. Supp. 3d 1168 (Ct. Int'l Trade 2016)..................................26

*Toyo Kohan Co. v. United States*, Slip Op. 2026-54, 2026 Ct. Intl. Trade LEXIS 64, 2026 WL 1459170 (Ct. Int'l Trade May 22, 2026).......................................................2, 11, 12, 15, 17, 21, 24

*Union Steel v. United States*, 713 F.3d 1101 (Fed. Cir. 2013).....................................................30

*Universal Tube & Plastic Indus. v. United States*, Consol Ct. No. 23-00113, Slip Op. 26-98, 2026 Ct. Intl. Trade LEXIS 122, 2026 WL 2428416 (Ct. Int'l Trade Aug. 19, 2026)..2, 18

*Ventura Coastal LLC v. United States*, 736 F. Supp. 3d 1342 (Ct. Int'l Trade 2024)...................15

**Statutes And Legislative History:**

19 U.S.C. § 1516a ...........................................................................................................9

19 U.S.C. § 1673 ........................................................................................................2, 3

## TABLE OF AUTHORITIES (continued)

**Statutes And Legislative History (continued):** **Page(s):**


19 U.S.C. § 1673b ....... 17, 19

19 U.S.C. § 1673d ....... 17, 19

19 U.S.C. § 1677-2 ....... 15

19 U.S.C. § 1677a ....... 3

19 U.S.C. § 1677b ....... 3

19 U.S.C. § 1677f-1 ....... *passim*

28 U.S.C. § 2639 ....... 9

Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1 (1994) (SAA) ....... 3-4, 7, 14, 15, 30


**Regulations:**


19 C.F.R. § 351.403 ....... 16, 19

19 C.F.R. § 351.414 ....... 3


**Administrative Determinations:**


*Certain Steel Nails from the People's Republic of China*, 73 Fed. Reg. 33,977 (Dep't of Commerce June 16, 2008) ....... 31, 32

*Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea*, 90 Fed. Reg. 30,050 (Dep't of Commerce July 8, 2025) ....... 6

*Xanthan Gum from the People's Republic of China*, 78 Fed. Reg. 33351 (Dep't of Commerce June 4, 2013) ....... 5


**Other Authorities:**


*Alternatives to the Use of Cohen's d; Request for Comment*, 90 Fed. Reg. 21,277 (Dep't of Commerce May 19, 2025) ....... 6

*Differential Pricing Analysis; Request for Comments*, 79 Fed. Reg. 26,720 (Dep't of Commerce May 9, 2014) ....... 4-5

*Non-Application of Previously Withdrawn Regulatory Provisions Governing Targeted Dumping in Antidumping Duty Investigations*, 79 Fed. Reg. 22,371 (Dep't of Commerce Apr. 22, 2014) ....... 18, 23

**TABLE OF AUTHORITIES (continued)**

**Other Authorities (continued):** **Page(s):**

*Withdrawal of the Regulatory Provisions Governing Targeted Dumping in Antidumping Duty Investigations*, 73 Fed. Reg. 74,930 (Dep't of Commerce Dec. 10, 2008)...............18

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| MID CONTINENT STEEL & WIRE, INC., *et al.*,<br><br>Plaintiff and Consolidated Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>PT ENTERPRISE INC., *et al.*,<br><br>Defendant-Intervenors and<br>Consolidated Defendant-Intervenor. | Consol. Court No. 15-00213 |

DEFENDANT'S RESPONSE TO COMMENTS ON THE
DEPARTMENT OF COMMERCE'S FINAL RESULTS OF REDETERMINATION

Defendant, the United States, respectfully submits this response to comments filed by consolidated plaintiffs concerning the final results of redetermination by the United States Department of Commerce (Commerce).[1] *See* Remand Redetermination, May 15, 2026, ECF No. 231; Pls. Comments, July 13, 2026, ECF No. 240. The Court should sustain the remand

[1] We use the term "Taiwan Plaintiffs" to collectively refer to the following consolidated plaintiffs: (1) PT Enterprise Inc. and Pro-Team Coil Nail Enterprise Inc. (collectively, PT); and (2) Unicatch Industrial Co., Ltd., WTA International Co., Ltd., Zon Mon Co., Ltd., Hor Liang Industrial Corp., President Industrial Inc., and Liang Chyuan Industrial Co., Ltd. The Taiwan Plaintiffs refer to themselves as the "Taiwan Respondents" (ECF No. 240), but we use different terminology because among them, only PT was a respondent during the underlying investigation. The remaining plaintiff, Mid Continent Steel & Wire, Inc., submitted comments in support of the remand redetermination (ECF No. 239) that do not require a response.

redetermination because it is in accordance with law, is supported by substantial evidence, and complies with the Court's remand order.

On remand, Commerce discontinued the use of Cohen's *d* test and applied its revised differential pricing analysis. The Court has sustained Commerce's revised differential pricing analysis six times. *See Stupp Corp. v. United States*, Consol. Ct. No. 15-00334, Slip Op. 26-113, 2026 Ct. Intl. Trade LEXIS 139, 2026 WL 2722698 (Ct. Int'l Trade Sept. 15, 2026) (*Stupp II*); *Maquilacero S.A. De C.V. v. United States*, Consol. Ct. No. 23-00091, Slip Op. 26-111, 2026 Ct. Intl. Trade LEXIS 136, 2026 WL 2692171 (Ct. Int'l Trade Sept. 14, 2026); *Universal Tube & Plastic Indus. v. United States*, Consol Ct. No. 23-00113, Slip Op. 26-98, 2026 Ct. Intl. Trade LEXIS 122, 2026 WL 2428416 (Ct. Int'l Trade Aug. 19, 2026); *Gov't of Canada v. United States*, Consol. Ct. No. 23-00187, Slip Op. 26-82, 2026 Ct. Intl. Trade LEXIS 90, 2026 WL 2161176 (Ct. Int'l Trade July 27, 2026); *Marmen Inc. v. United States*, Consol. Ct. No. 20-00169, Slip Op. 26-62, 2026 Ct. Intl. Trade LEXIS 72, 2026 WL 1726609 (Ct. Int'l Trade June 15, 2026) (*Marmen II*); *Toyo Kohan Co. v. United States*, Ct. 24-00261, Slip Op. 26-54, 2026 Ct. Intl. Trade LEXIS 64, 2026 WL 1459170 (Ct. Int'l Trade May 22, 2026). These recent decisions largely are dispositive of the issues presented in this case.

## BACKGROUND

### I. Statutory Framework

The Tariff Act of 1930, as amended, establishes a regime to address unfair trade practices. The antidumping provisions provide relief for injury to domestic manufacturers by imposing remedial duties upon imports of foreign products that are sold in the United States at less than fair value. 19 U.S.C. § 1673. By statute, Commerce must evaluate whether imported products are sold in the United States at unfairly low prices. *Id.* If Commerce concludes that the U.S. sales are "at less than fair value" – meaning that the products are dumped into the U.S.

market, and if the International Trade Commission (ITC) concludes that a U.S. industry has been injured by such unfair pricing, then Commerce will direct U.S. Customs and Border Protection to assess an "antidumping duty." *Id.* A sale generally is at "less than fair value" when the price charged in the U.S. market – the "U.S. price" – is less than the "normal value," generally the price charged in the comparison market. 19 U.S.C. §§ 1677a(a)-(b), 1677b(a)(l)(B)(i). The antidumping duty is equal to the "amount by which the normal value exceeds the {U.S. price} for the merchandise." 19 U.S.C. § 1673.

In determining whether subject merchandise is being sold at less than fair value, Commerce compares "the weighted average of the normal values to the weighted average of the export (and constructed export prices) for comparable merchandise" unless it determines another method is appropriate. 19 U.S.C. § 1677f-1(d)(1)(A)(i); 19 C.F.R. § 351.414(c)(1). Under this average-to-average (A-to-A) method, Commerce compares the weighted average of a respondent's comparison market sale prices during the investigation period to the weighted average of the respondent's U.S. sales prices during the same period. 19 C.F.R. § 351.414(b)(1).

One downside of the A-to-A method is that it may fail to detect instances of "targeted" or "masked" dumping, which may occur when an exporter sells at a dumped price to some customers, regions, or time periods, while selling at higher prices to other customers, regions, or time periods. *See Stupp Corp. v. United States*, 5 F.4th 1341, 1345 (Fed. Cir. 2021) (*Stupp*) (citing *Apex Frozen Foods Priv. Ltd. v. United States*, 862 F.3d 1337, 1341 (Fed. Cir. 2017) (*Apex II*)). When Commerce uses the A-to-A method, higher-priced U.S. sales can mask these lower-priced U.S. sales that are dumped, which could potentially leave the domestic industry without a remedy from unfair trade practices. *See* Statement of Administrative Action (SAA), H.R. Doc. No. 103-316, vol. 1 (1994) at 842, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4178 ("In

part, the reluctance to use an average-to-average methodology has been based on a concern that such a methodology could conceal 'targeted dumping.' In such situations, an exporter may sell at a dumped price to particular customers or regions, while selling at higher prices to other customers or regions."). If the full extent of dumping is masked, then the domestic industry may not receive the relief that the statute affords when the calculated weighted-average dumping margin based on the A-to-A method falls below the *de minimis* threshold.

Congress addressed this problem by enacting 19 U.S.C. § 1677f-1(d)(1)(B). *See Apex II*, 862 F.3d at 1342. Section 1677f-1(d)(1)(B) allows Commerce to compare "the weighted average of the normal values to {U.S. prices} of individual transactions {A-to-T} for comparable merchandise if (i) there is a pattern of {U.S. prices} for comparable merchandise that differ significantly among purchasers, regions or periods of time, and (ii) {Commerce} explains why such differences cannot be taken into account using {the A-to-A method or transaction-to-transaction method}." 19 U.S.C. § 1677f-1(d)(1)(B)(i)-(ii). But Congress did not specify *how* Commerce was to determine whether there exists a pattern of prices that differs significantly among purchasers, regions, or time. Nor did Congress mandate that Commerce use statistical tests or techniques in determining if conditions specified in 19 U.S.C. § 1677f-1(d)(1)(B) exist. The SAA explains that Commerce should proceed "on a case-by-case basis, because small differences may be significant for one industry or one type of product, but not for another." SAA at 843.

II. <u>The Federal Circuit Invalidates The Cohen's *d* Test In *Marmen*</u>

Beginning in 2013, Commerce had used the Cohen's *d* test in all antidumping proceedings to evaluate whether U.S. prices differ significantly within the meaning of 19 U.S.C. § 1677f-1(d)(1)(B)(i). *See Differential Pricing Analysis; Request for Comments*, 79 Fed. Reg. 26,720, 26,722-23 & n.12 (Dep't of Commerce May 9, 2014) (citing six proceedings applying

the Cohen's *d* test, including *Xanthan Gum from the People's Republic of China*, 78 Fed. Reg. 33,351 (Dep't of Commerce June 4, 2013) (final AD determination), and accompanying Issues and Decision Memorandum (IDM) comment 3)). Commerce also used a ratio test to assesses the extent of the significant price differences for all U.S. sales as measured by the Cohen's *d* test. *Id.* at 26,722-23. If the Cohen's *d* test and the ratio test demonstrated the existence of a pattern of prices that differed significantly such that an alternative comparison method should be considered, then Commerce examined whether using only the A-to-A method can appropriately account for such differences. *Id.* at 26,723. In considering this question, Commerce determined whether using an alternative comparison method (such as the A-to-T method) yielded a meaningful difference in the weighted-average dumping margin as compared to that resulting from the use of the A-to-A method. *Id.* Together, the Cohen's *d* test, the ratio test, and the meaningful difference test, comprised Commerce's differential pricing analysis, *id.*, until *Marmen*. *Marmen Inc. v. United States*, 134 F.4th 1334 (Fed. Cir. 2025) (*Marmen*)

In *Marmen*, the Federal Circuit reviewed Commerce's application of the Cohen's *d* test as part of the agency's differential pricing analysis. The Federal Circuit held that "it was unreasonable to rely on Cohen's *d* test to determine whether prices differ significantly" when the underlying data did not satisfy certain statistical assumptions. *Marmen*, 134 F.4th at 1348. The Federal Circuit further held that on remand "Commerce may re-perform a differential pricing analysis, and that analysis may not rely on Cohen's *d* test for data sets like those here." *Id.* The Federal Circuit subsequently granted our motion for a voluntary remand in this case (*Mid Continent Nail*), stating that "Commerce should have the opportunity to set forth an alternative policy analysis, which may then be subject to judicial review." ECF No. 223. After the Federal Circuit issued the mandate, this Court remanded this case to Commerce. ECF No. 224, 225.

III. Commerce Changes Its Administrative Practice After *Marmen*

*Marmen* had a profound effect on Commerce's practice, affecting hundreds of segments of antidumping proceedings. Consistent with 19 U.S.C. § 1677f-1(d)(1)(B), Commerce applies its differential pricing analysis to determine which comparison method – A-to-A or A-to-T – is appropriate. Because, as a practical matter, the statistical assumptions discussed by the Federal Circuit in *Marmen* are unlikely to be valid in a respondent's pricing data, the Federal Circuit's decision to condition the use of the Cohen's *d* test on such assumptions effectively has rendered the Cohen's *d* test unusable as part of the differential pricing analysis.

Following the Federal Circuit's decision in *Marmen*, Commerce changed its practice. First, Commerce sought information and public comment on alternatives to the Cohen's *d* test as part of its differential pricing analysis under 19 U.S.C. § 1677f-1(d)(1)(B)(i), to identify whether prices for comparable merchandise differ significantly among purchasers, regions, and time periods. *Alternatives to the Use of Cohen's d; Request for Comment*, 90 Fed. Reg. 21,277 (Dep't of Commerce May 19, 2025). To comply with the Federal Circuit's holding in *Marmen*, Commerce discontinued the use of the Cohen's *d* test in antidumping proceedings and adopted the "price difference" test as the new approach for determining whether price differences among purchasers, regions, or time periods are significant. *See*, *e.g.*, *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea*, 90 Fed. Reg. 30,050 (Dep't of Commerce July 8, 2025) (final results 2022-2023 admin. review), and accompanying IDM at 2-5 (applying the price difference test for the first time). Additionally, and concurrent with this change, Commerce also discontinued the use of the "mixed method" – a hybrid version of two available comparison methods (A-to-A and A-to-T) – in antidumping proceedings, aligning its practice more closely with the statutory language, which does not reference the "mixed method" and authorizes Commerce to use the A-to-T method if certain conditions are satisfied. 19 U.S.C.

§ 1677f-1(d)(1)(B). In other words, Commerce has discontinued the use of the Cohen's *d* test and the "mixed method" as a matter of administrative policy for all antidumping proceedings, and has introduced the price difference test to examine whether U.S. prices differ significantly.

Under Commerce's new practice, the revised differential pricing analysis operates as follows. In the first stage, the price difference test is applied to determine whether prices for comparable merchandise differ significantly. Remand Redetermination 6-7. Under the price difference test, "{i}f the weighted-average net price to the given purchaser, region or time period falls outside of the plus or minus two percent band around the weighted-average net price to all other purchasers, regions or time periods, then the prices to that given purchaser, region or time period are found to differ significantly and those sales to the given purchaser, region or time period pass the price difference test." *Id.* at 7.

Next, the ratio test assesses the extent of the significant price differences for all U.S. sales as measured by the price difference test. Remand Redetermination 7. The ratio test calculates the ratio of the total value of sales that pass the price difference test to the total value of sales by the respondent in the United States during the period of investigation or review. *Id.* If 33 percent or less of the total value of sales passes the price difference test, then the results of the price difference and ratio tests do not support consideration of the A-to-T method. *Id.* If more than 33 percent of the total value of U.S. sales passes the price difference test, then Commerce will find evidence that a pattern of prices existed during the relevant period.[2] *Id.*

---

[2] Masked dumping is more likely to occur where there is a pattern of prices that differ significantly as contemplated by the statute. *See Apex Frozen Foods Priv. Ltd. v. United States*, 862 F.3d 1322, 1327 (Fed. Cir. 2017) (*Apex I*) (citing 19 U.S.C. § 1677f-1(d)(1)(B); SAA at 843).

Finally, if the price difference test and ratio test demonstrate evidence of a pattern of prices that differ significantly such that the A-to-T method may be considered, Commerce will examine whether there is a meaningful difference in the weighted-average dumping margins calculated using the standard A-to-A method and using the alternative A-to-T method. Remand Redetermination 7. If the difference between the two calculations is meaningful, then this demonstrates that the A-to-A method cannot account for differences in the respondent's pricing behavior in the U.S. market, such as those observed in this analysis, and, therefore, use of the A-to-T method may be appropriate. *Id.* at 7-8. A difference in the weighted-average dumping margins is considered meaningful if: (1) there is a 25 percent relative change in the weighted-average dumping margins between the A-to-A method and the A-to-T method where both rates are above the *de minimis* threshold; or (2) the resulting weighted-average dumping margins between the A-to-A method and the A-to-T method move across the *de minimis* threshold. *Id.* at 8.

IV. <u>Commerce Followed Its New Practice On Remand</u>

On remand, following its new practice, Commerce applied the "price difference" and "ratio" tests and found that 89.84 percent of PT's U.S. sales (by value) passed the price difference test, which "confirms the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods." Remand Redetermination 8. Commerce then applied the meaningful difference test and found that the A-to-A method cannot account for differences in PT's pricing behavior in the U.S. market "because the weighted-average dumping margin crosses the *de minimis* threshold when calculated using the A-to-A method and when calculated using the alternative A-to-T method." *Id.* Accordingly, consistent with 19 U.S.C. § 1677f-1(d)(1)(B), Commerce applied the A-to-T comparison method to PT's U.S. sales and

calculated a weighted-average dumping margin for PT of 4.88 percent and an all-others rate of 4.88 percent. *Id.* at 4, 32.

ARGUMENT

I. Standard Of Review

Commerce's decisions are "presumed to be correct." 28 U.S.C. § 2639(a)(1). "The same standard of review applies to the review of a remand determination as to the review of the original determination." *Bethlehem Steel Corp. v. United States*, 223 F. Supp. 2d 1372, 1375 (Ct. Int'l Trade 2002). Accordingly, the Court will sustain Commerce's redetermination if it is "in accordance with the remand order," and is "supported by substantial evidence and otherwise in accordance with law." *MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1355 (Ct. Int'l Trade 2015) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). The possibility of drawing inconsistent conclusions from the record does not prevent an agency's finding from being supported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). The substantial evidence standard is a "high barrier to reversal." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted).

Moreover, "'when an agency exercises discretion granted by a statute, judicial review is typically conducted under the Administrative Procedure Act's deferential arbitrary-and-capricious standard.'" *Mosaic Co. v. United States*, 160 F.4th 1340, 1346 (Fed. Cir. 2025) (quoting *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., CO*, 605 U.S. 168, 179-80 (2025)).

II. Commerce's Remand Redetermination Complies With The Federal Circuit Decision In *Marmen* and the Remand Order

The Court directed Commerce to file a remand redetermination in the wake of *Marmen*. ECF Nos. 225, 228. In *Marmen*, the Federal Circuit held that "it was unreasonable to rely on the Cohen's *d* test to determine whether prices differ significantly when the underlying data is not normally distributed, equally variable, and equally and sufficiently numerous." *Marmen*, 134 F.4th at 1348. Additionally, the Federal Circuit held that "{o}n remand, Commerce may re-perform *a* differential pricing analysis, and that analysis may not rely on Cohen's *d* test for data sets like those here." *Id.* (emphasis added). After *Marmen*, the Federal Circuit recognized that Commerce had changed its practice and remanded this case for Commerce to "have the opportunity to set forth an alternative policy analysis, which may then be subject to judicial review." ECF No. 223. That is exactly what Commerce did on remand in this case. Following its new practice, Commerce performed a revised differential pricing analysis – without relying on the Cohen's *d* test – consistent with *Marmen*. Remand Redetermination 4. As noted above, the Court repeatedly has sustained Commerce's new practice as consistent with the Federal Circuit's remand decision in *Marmen*. *See*, *e.g.*, *Stupp II*, Slip Op. at 13-15.

III. Commerce's Revised Differential Pricing Analysis Is Reasonable And Lawful

Commerce's remand redetermination is reasonable and lawful. The statutory language gives Commerce discretion and flexibility in addressing 19 USC § 1677f-1(d)(1)(B)(i), and Commerce reasonably replaced the Cohen's *d* test with the price difference test and discontinued the mixed method. Commerce's price difference test reasonably uses a two percent threshold to determine significance as it has in other parts of its practice.

A. The Statutory Language Grants Commerce Discretion

Taiwan Plaintiffs argue that *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 454 (2024), changed the standard of review for Commerce's differential pricing analysis. Pls. Comments 9-10. *Loper Bright* does not disturb the standard for reviewing Commerce's differential pricing analysis. *See Stupp*, 5 F.4th at 1353 ("Our precedents make clear that the relevant standard for reviewing Commerce's selection of statistical tests and numerical cutoffs is reasonableness."); *Marmen*, 134 F.4th at 1338 (same). Indeed, as explained in *Marmen*, "this case begins where *Stupp* ended – Was it *unreasonable* for Commerce to use Cohen's *d* test as part of its differential pricing analysis." *Marmen*, 134 F.4th at 1345 (emphasis added). The Federal Circuit's application of the reasonableness standard was the basis for remanding that case. *See Marmen*, 134 F.4th at 1348 (holding that "it was *unreasonable* to rely on Cohen's *d* test to determine whether prices differ significantly") (emphasis added). The Federal Circuit's use of the reasonableness standard in *Marmen* – post-*Loper Bright* – demonstrates that *Loper Bright* has not changed the standard for reviewing Commerce's differential pricing analysis.

Moreover, this Court recently applied the reasonableness standard of review in *Toyo Kohan*, Slip Op. at 21, in which the Court held that a plaintiff had "not shown that Commerce has unreasonably implemented the statutory directive of section 1677f-1(d)(1)(B)," and in *Marmen II*, Slip Op. at 12, where this Court reviewed Commerce's remand redetermination for that case and the price difference test "under the reasonableness standard." Consistent with the Federal Circuit's decision in *Marmen*, this Court's subsequent use of the reasonableness standard in *Toyo Kohan* and *Marmen II* – post-*Loper Bright* – confirms that *Loper Bright* has not changed the standard for reviewing Commerce's differential pricing analysis.

Additionally, the continued use of the reasonableness standard comports with this Court's finding that the language of the statute gives Commerce flexibility and discretion. *See*, *e.g.*, *Stupp II*, Slip Op. at 8 n.3 ("Congress has delegated to Commerce "the power to use its discretion when determining whether prices differ significantly.") (cleaned up); *id.* ("Terms like 'significant,' 'appropriate' and 'comparable' in a statute delegate broad authority to Commerce, providing flexibility."); *Toyo Kohan*, Slip Op. at 16 n.12 ("Because the text and legislative history of this subsection of the statute confirm that Congress intended that Commerce have discretion in making the relevant determination, the Federal Circuit's holding in *Stupp I* is undisturbed by the Supreme Court's holding in *Loper Bright*."). When an agency exercises discretion granted by a statute, judicial review is typically conducted under a deferential standard. *Mosaic*, 160 F.4th at 1346. "'Under that standard, a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained.'" *Id.*

The statutory provision at issue here, 19 U.S.C. § 1677f-1(d)(1)(B)(i), stating that "there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time," is written in general terms. This indicates that Congress "intended to delegate the question of whether particular facts satisfy the statute's requirements to Commerce." *See Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States*, 102 F.4th 1252, 1259 (Fed. Cir. 2024) (*Asemesa*).

Indeed, the Supreme Court "did not throw out the administrative discretion baby with the *Chevron* deference bathwater." *BYD (H.K.) Co. v. United States*, 785 F. Supp. 3d 1359, 1377 (Ct. Int'l Trade 2025). As this Court has recognized, "{i}t will sometimes be the case that the best reading of the statute is that it delegates discretionary authority to an agency. Broad and

open-ended grants of authority … are incapable of precise definition not because they are ambiguous, but because they unambiguously convey discretion." *Id.* As this Court concluded, "{i}n those circumstances … the {C}ourt's role is to ensure that the {agency's} action is both reasonable and reasonably explained." *Id.*

Here, there is such an open-ended grant of authority through use of "general" statutory language. *See Asemesa*, 102 F.4th at 1261. As the Federal Circuit has recognized, the statute is often written in general terms because Congress is not "prescient" and cannot anticipate in legislation all the factual and legal intricacies that may arise in each proceeding. *See Melamine Chemicals, Inc. v. United States*, 732 F.2d 924, 930 (Fed. Cir. 1984). For this reason, Commerce has "broad discretion in executing the law" in line with the "general standards" set by Congress. *Smith-Corona Group v. United States*, 713 F.2d 1568, 1571 (Fed. Cir. 1983) (decided one year prior to *Chevron*). Commerce's discretion to develop methodologies within its delegated authority to carry out general statutory directives is distinct from *Chevron* deference. *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996) (internal citations omitted, applying this distinct deference separately from and concurrently with *Chevron* deference in force); *accord Nexteel Co. v. United States*, 28 F.4th 1226, 1239 (Fed. Cir. 2022) ("Commerce has selected a methodology consistent with the statutory language, which we afford greater deference than under the *Chevron* framework") (citing *Fujitsu*, 88 F.3d at 1039); *Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. Am. Cast Iron Pipe Co.*, 5 F.4th 1367, 1374-75 (Fed. Cir. 2021) (*Borusan II*). Therefore, terms such as "significant," "appropriate," or "comparable" are indefinite, open-ended, or general terms that implicitly delegate authority to Commerce and leave Commerce with flexibility. *Stupp II*, Slip Op. at 8 n.3 (citing *Bio-Lab, Inc. v. United States*, 776 F. Supp. 3d 1315, 1329 (Ct. Int'l Trade 2025)). The provision at issue here,

19 U.S.C. § 1677f-1(d)(1)(B), is written in general terms that leave open-ended how Commerce may assess whether a "pattern" exists and whether prices differ "significantly" – indicating that Congress "intended to delegate the question of whether particular facts satisfy the statute's requirements to Commerce." *See Asemesa*, 102 F.4th at 1259.

This Court reached the same conclusion in *Garg Tube Export LLP v. United States*, 740 F. Supp. 3d 1355 (Ct. Int'l Trade 2024), when addressing the statutory requirement that there be a pattern of prices that "differ significantly" among purchasers, regions, or time periods. In *Garg Tube*, this Court held that "{t}he text of the statute and its legislative history indicate that Congress gave Commerce flexibility by its use of the open-ended term 'differ significantly.'" 740 F. Supp. 3d at 1366-67. As the Court explained, "Congress' mandate to Commerce to assess not merely whether prices differ, but whether they differ 'significantly' necessarily affords Commerce flexibility to assess the degree of difference depending on the particular context." *Id.* at 1367. The Court added that the SAA provides that Commerce will proceed on a case-by-case basis, which confirms the flexibility provided by the words of the statute. *Id.* (citing SAA at 843). Finally, the Court explained that the context in which the phrase "differ significantly" appears, alongside the subsection that allows Commerce to decline taking into account insignificant adjustments, 19 U.S.C. § 1677f-1(a), and another subsection that exclusively allows Commerce to select averages and statistically valid samples, 19 U.S.C. § 1677f-1(b), further confirms that Congress meant to afford the agency with flexibility and discretion. *Id.* Therefore, the Court held that "Congress delegated to Commerce the power to use its discretion when determining whether prices differ significantly under 19 U.S.C. § 1677f-1." *Id.* The Court also interpreted the case-by-case language of the SAA to allow Commerce flexibility, and this flexibility was confirmed by the statutory context in 19 U.S.C. § 1677f-1, which gives

Commerce "flexibility and discretion" for sampling, selecting averages, and declining to make adjustments that are insignificant. *Id.*

Moreover, the term "significantly" is similar to the term "substantially," which was at issue in *Asemesa*, where the Federal Circuit held that Congress invokes its "ability to delegate power under broad general directives" by using nonspecific statutory language. The Federal Circuit explained that Congress's use of the term "substantially dependent" in 19 U.S.C. § 1677-2, as opposed to specifying a minimum percentage, reflected "an expression of its well-considered judgment as to the degree of administrative authority which it was necessary to grant." *Asamesa,* 102 F.4th at 1259-60; *see also* 19 U.S.C. § 1677-2. The Federal Circuit declined to apply *Chevron* in reaching its determination, explaining that "{b}ecause we regard the term 'substantially dependent' as general but not ambiguous, we believe this case is more properly viewed as one involving implied delegation of adjudicative authority to the agency rather than deference to the agency's interpretation of an ambiguous statute." *Asamesa,* 102 F.4th at 1261. Additionally, in *Toyo Kohan*, in sustaining Commerce's price difference test and that two percent reasonably determines that prices differ significantly, this Court continued to find that "{t}he language of the statute affords Commerce discretion to fashion its methodology" and that the SAA confirmed Congress's delegation of authority. *Toyo Kohan*, Slip Op. at 16 n.12 and 20. Furthermore, decisions from this Court have continued to acknowledge that "significant" is an open-ended term. *See*, *e.g.*, *Stupp II*, Slip Op. at 8 n.3; *Bio-Lab*, 776 F. Supp. 3d at 1329 (citing *Loper Bright* and *Ventura Coastal LLC v. United States*, 736 F. Supp. 3d 1342, 1356 (Ct. Int'l Trade 2024)).

Nevertheless, Taiwan Plaintiffs argue that because 19 U.S.C. § 1677f-1(d)(1)(B) is an exception under the statute, Commerce has not satisfied its burden of proof based upon

substantial evidence. Pls. Comments 11-13, 16. However, as explained above, the standard of review is reasonableness. Moreover, the Federal Circuit rejected Taiwan Plaintiffs' argument in *Stupp*, 5 F.4th at 1354. The Federal Circuit held that the plaintiff "wrongly attempt{ed} to place the burden on Commerce to justify the use of that test as a matter of substantial evidence in light of the facts of this case." *Id.* The Federal Circuit explained that "Commerce's burden in selecting a methodology for detecting patterns of significantly differing export prices is reasonableness as a matter of law, not substantial evidence on the factual record." *Id.* Therefore, the Federal Circuit held that the "appropriate standard for reviewing Commerce's differential pricing analysis and the specific components of that methodology is therefore reasonableness." *Id.* Commerce satisfied the statutory requirements by applying a reasonable differential pricing methodology to the record evidence of PT's U.S. prices in this investigation.

B. The Price Difference Test Reasonably Determines Significant Price Differences

Under the price difference test, "{i}f the weighted-average net price to the given purchaser, region or time period falls outside of the plus or minus two percent band around the weighted-average net price to all other purchasers, regions or time periods, then the prices to that given purchaser, region or time period are found to differ significantly and those sales to the given purchaser, region or time period pass the price difference test." Remand Redetermination 7. Commerce explained the reasons for adopting this numerical threshold in the price difference test as a reasonable measure of significance. *Id.* at 9-21. Specifically, Commerce explained that this threshold is used in the arm's-length test conducted pursuant to 19 C.F.R. § 351.403(c), which determines whether sales prices made by a respondent to an affiliated party in the comparison market are made in the ordinary course of trade, and, therefore, usable in Commerce's margin calculations. *Id.* at 18-19. Commerce also explained that under 19 U.S.C.

§ 1673b(3) and 19 U.S.C. § 1673d(a)(4), "the *de minimis* threshold for an estimated weighted-average dumping margin in an investigation is two percent." *Id.* at 19-20. Commerce added that this threshold is higher than the *de minimis* threshold in an administrative review, which suggests that the two percent threshold in an investigation is a more conservative measure. *Id.* at 20. This cogent and reasonable explanation belies Taiwan Plaintiffs' argument that Commerce did not sufficiently explain why two percent is an appropriate measure of whether U.S. prices differ significantly. Pls. Comments 17.

Taiwan Plaintiffs' additional complaints about the price difference test fundamentally misunderstand Commerce's differential pricing analysis. They complain that the price difference test does not distinguish patterns from random fluctuations. Pls. Comments 12-13. However, the price difference test determines whether prices differ significantly, whereas the ratio test determines whether there is a pattern. Remand Redetermination 20. This Court recently rejected a substantially identical argument: "the price difference test – which has replaced the Cohen's *d* test and is just the first step of Commerce's differential pricing analysis – aims to determine whether prices differ significantly, not whether a pattern exists." *Toyo Kohan*, Slip Op. at 19; *see also Stupp II*, Slip Op. at 11-12; *Marmen II*, Slip Op. at 8-9, 21.

Taiwan Plaintiffs argue that *Marmen II* and *Toyo Kohan* were wrongly decided, did not discuss why two percent is reasonable, and had different arguments raised. Pls. Comments 10. However, in *Marmen II*, the Court concluded that "Commerce's adoption of the 2% threshold in the first stage of its differential pricing analysis in the new 'price difference test' is reasonable." *Marmen II*, Slip Op. at 17. The Court in *Marmen II* sustained Commerce's explanation that the two percent threshold was consistent with the same threshold in the arm's-length test and the *de minimis* threshold in the statute. *Marmen II*, Slip Op. at 15-16. *Government of Canada* and

*Universal* similarly sustained Commerce's two percent threshold as reasonable. *Gov't of Canada*, Slip Op. at 17; *Universal*, Slip Op. at 23. Additionally, in *Stupp II*, the Court stated that "Commerce reasonably considers its experience with measuring significance in other contexts to select a two-percent threshold for the price difference test." *Stupp II*, Slip Op. at 9-11. The Court has rejected Taiwan Plaintiffs' attenuated arguments – many times over.

Next, Taiwan Plaintiffs argue that because Commerce has revised its methodology for the fourth time, Commerce is entitled to less deference, quoting the preamble to Commerce's withdrawn "targeted dumping" regulations. Pls. Comments 9-10. However, the Federal Circuit evaluated Commerce's methodology using the reasonableness standard in *Marmen*, and Commerce revised its differential pricing analysis to comply with that decision. Moreover, in withdrawing the "targeted dumping" regulations, Commerce explained that those regulations had been promulgated without the benefit of experience. *Withdrawal of the Regulatory Provisions Governing Targeted Dumping in Antidumping Duty Investigations*, 73 Fed. Reg. 74,930, 74,931 (Dep't of Commerce Dec. 10, 2008). Indeed, "{s}ince 2008, {Commerce} has continued to develop its practice based on its case-by-case experience and, as a result of parties' comments in those proceedings, it has revised its approach in a reasoned and purposeful manner," and Commerce's increased experience in implementing 19 U.S.C. 1677f-1(d)(1)(B) led Commerce to introduce Commerce's differential pricing analysis. *Non-Application of Previously Withdrawn Regulatory Provisions Governing Targeted Dumping in Antidumping Duty Investigations*, 79 Fed. Reg. 22,371, 22,376 (Dep't of Commerce Apr. 22, 2014). Commerce's differential pricing analysis had to evolve further in light of *Marmen*.

Taiwan Plaintiffs also argue that the price difference test does not satisfy the dictionary definition of significant. Pls. Comments 14. However, Commerce explained the reasons for

adopting this numerical threshold as a reasonable measure of significance. Remand Redetermination 18-20. Commerce explained that this threshold is used in the arm's-length test conducted pursuant to 19 C.F.R. § 351.403(c), which determines whether prices made to affiliated parties in the comparison market are made in the ordinary course of trade, and, therefore, usable in Commerce's margin calculations. *Id.* at 18-19. Additionally, Commerce explained that under 19 U.S.C. § 1673b(3) and 19 U.S.C. § 1673d(a)(4), "the *de minimis* threshold for an estimated weighted-average dumping margin in an investigation is two percent." *Id.* at 19. This two percent threshold in an investigation is significant because it determines whether conditions exist for imposing an antidumping duty order and collecting antidumping duties. Commerce routinely referred to non-*de minimis* levels of dumping as a "significant amount of dumping." Remand Redetermination 19 (citations omitted). Therefore, the price difference test is consistent with the Taiwan Plaintiffs' proffered dictionary definition of significant – "sufficiently great or important to be worthy of attention; noteworthy; consequential, influential" – because determinations that sales are outside the ordinary course of trade or dumping above the *de minimis* threshold means that two percent is sufficiently great or important, noteworthy, consequential, or influential. *See* Pls. Comments 14. The Court recently sustained Commerce's explanation. *Stupp II*, Slip Op. at 11 ("Both examples Commerce provides, its arm's length test to calculate normal value and the *de minimis* test established by Congress, identify two percent as a difference that is significant. Adopting a standard based on past experience in a similar context is reasonable in this instance.") (citations omitted).

Even so, Taiwan Plaintiffs assert that the use of two percent in other contexts does not constitute substantial evidence that two percent is a substantial difference. Pls. Comments 15. Taiwan Plaintiffs also assert that there are antidumping duty thresholds based upon three percent

or five percent, such as negligibility, home market viability, and affiliation. *Id.* at 15-16. However, as explained above, the standard of review is reasonableness, not substantial evidence. It was reasonable for Commerce to adopt the two percent *de minimis* threshold for investigations that was established by Congress and the same threshold from the arm's-length test that involves a comparison of prices to determine whether a sale is outside the ordinary course of trade. The fact there are other potential thresholds does not render Commerce's use of the two percent threshold to determine whether prices differ significantly unreasonable. The statute gives Commerce broad discretion, and Commerce's use of the two percent threshold for the price difference test is within its discretion.

Taiwan Plaintiffs argue further that Commerce abandoned the P/2 test because of the two percent threshold used. Pls. Comments 5-7, 14-15. The Court already has rejected this argument, which ignores the differences between P/2 test and differential pricing analysis. *Stupp II*, Slip Op. at 11 & n. 4 ("SeAH's argument fails because the P/2 test specifically determined whether there was targeted dumping, and the two percent test is one step out of three in the differential pricing analysis."). Here, Commerce explained that the P/2 test and the price difference test are not the same. Remand Redetermination 12. "The P/2 test examined whether the weighted-average U.S. prices of allegedly 'targeted' sales were two percent lower than the weighted-average U.S. prices of non-targeted sales *with the stated aim of identifying 'targeted dumping.'*" *Id.* (emphasis added). In contrast, the price difference test examines whether U.S. prices differ significantly – *i.e.*, whether the weighted-average U.S. price to a given purchaser, region, or time period is within two percent of the weighted average U.S. price to all other purchasers, regions, or time periods – within the context of a differential pricing analysis that also includes the ratio test and the meaningful difference test. *Id.* at 15. As Commerce

explained, "{t}he only common aspect of the P/2 test and the price difference test is the two percent threshold." *Id.* The price difference test shares the two percent threshold with the arm's-length test with the same four percent band around the price, which is the basis for whether the prices of comparison market sales made to an affiliate are at arm's length, and the *de minimis* threshold. *Id.*

Addressing a similar contention, in *Toyo Kohan*, the Court stated that "{w}hether Commerce previously used and rejected the two percent price difference test does not influence the court's reasoning on the reasonableness of the test." *Toyo Kohan*, at 12 n. 9 (citing *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1387 (Fed. Cir. 2014)). Indeed, Commerce is not using the P/2 test as part of the revised differential pricing analysis, and Commerce's decision to not adopt the P/2 test in prior antidumping investigations a long time ago does not show that the price difference test is unreasonable. As Commerce explained, 20 years ago when it relied on the P/2 test, the agency lacked experience in addressing 19 U.S.C. § 1677f-1(d)(1)(B). Since that time, Commerce has gained experience, changing its approach to addressing 19 U.S.C. § 1677f-1(d)(1)(B). Remand Redetermination 12-15. For example, the P/2 test only looked at prices lower than the average price to identify allegedly "target dumped" sales. *Id.* at 12. However, the P/2 test included no comparison with normal value, and therefore despite its stated goal of identifying "targeted dumping" was fundamentally incapable of identifying dumping of any sort. It is manifest that Commerce's approach has evolved considerably since then with the benefit of additional experience. Here, Commerce re-evaluated the two percent threshold and recognizes that a percentage is a measure of relative difference, and two percent is a reasonable measure of significance as shown in the arm's-length test and as the *de minimis* threshold in investigations. Remand Redetermination 18-20.

Finally, Taiwan Plaintiffs contend that the price difference test does not allow Commerce to conduct case-specific analysis of the circumstances of sales in a particular industry and that like substantial, what may be significant in one situation may not be in another situation. Pls. Comments 16-17. However, Commerce applies its differential pricing analysis, including the price difference test, on a case-by-case basis to respondent-specific data. In other words, "the data on which Commerce relies in performing the price difference test changes on a case-by-case basis, *i.e.*, specific to the respondent's pricing of comparable merchandise to all other purchasers, regions, or time periods." Remand Redetermination 10. Commerce explained that the price difference test "does not stipulate an absolute value as a threshold (*e.g.*, $5 per kg) to define 'differ significantly,' but depends upon a threshold that measures the relative difference (*i.e.*, a percentage) on a comparison-by-comparison basis where the threshold is calculated as plus or minus two percent of the weighted-average net prices to all other purchasers, regions, or time periods." Remand Redetermination 11. Commerce concluded that "{b}ecause the difference between the weighted-average net price to a given purchaser, region, or time period and the weighted-average net price to all other purchasers, regions, or time periods is measured relative to the weighted-average net price to all other purchasers, regions, or time periods, the price difference test is not a brightline test." Remand Redetermination 11. Indeed, in *Marmen II*, this Court held that Commerce's price difference test is applied on a case-by-case basis. *Marmen II*, Slip Op. at 24; *accord Stupp II*, Slip Op. at 9 (Ct. Int'l Trade Sept. 15, 2026) ("Commerce ensures a differential price analysis that differentiates on a case-by-case basis.").

C. Taiwan Plaintiffs' Remaining Price Difference Test Arguments Are Meritless

Taiwan Plaintiffs argue that the price difference test improperly considers higher prices and that Commerce must limit sales because it is not relying on a statistically valid test. Pls. Comments 18. Taiwan Plaintiffs also argue that the price difference test is designed to prevent

masked dumping and that the price difference test divorces the term significant from masked dumping. Pls. Comments 19-20. However, Taiwan Plaintiffs continue to misunderstand Commerce's differential pricing analysis relative to the statute and Congress's concern regarding masked dumping. Because an examination of dumping requires both normal value and U.S. price, Commerce does not examine dumping, masked or otherwise, under the first statutory prerequisite, 19 U.S.C. § 1677f-1(d)(1)(B)(i), which only concerns the differences between U.S. prices. Remand Redetermination 24-26; *Non-Application of Previously Withdrawn Regulatory Provisions Governing Targeted Dumping in Antidumping Duty Investigations*, 79 Fed. Reg. at 22,376 ("a determination of 'dumping' is not encompassed within the analysis that establishes whether a pattern of prices that differ significantly exists"). Instead, Commerce examines masked dumping occurring in the A-to-A method in the second statutory requirement, 19 U.S.C. § 1677f-1(d)(1)(B)(ii), requiring Commerce to explain why A-to-A cannot account for price differences exhibited in the respondent's U.S. pricing behavior. Remand Redetermination 7-8. The price difference test determines whether U.S. prices differ significantly under the first statutory requirement. *Id.* at 6. As Commerce explained, when there is a pattern of prices that differ significantly, this is evidence that conditions exist where masked dumping may be occurring because masked dumping occurs when higher-priced sales offset lower priced, dumped sales. *Id.* at 24-25. Therefore, higher-priced U.S. sales are relevant as they may offset dumping for lower-priced U.S. sales.

Additionally, neither the statute nor the regulations require a statistical test. Remand Redetermination 25. As this Court has recently held, *Stupp II*, Slip Op. at 11, the statute does not specify how Commerce may determine that a pattern exists and whether prices differ significantly, let alone require the use of specific statistical techniques. 19 U.S.C. § 1677f-

1(d)(1)(B). Had Congress intended to restrict Commerce to a given statistical analysis in 19 U.S.C. § 1677f-1(d)(1)(B)(i), it would have done so expressly, as it has done elsewhere in the Tariff Act. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("{W}here Congress includes particular language in one section of a statute but omits it in another ..., it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."); *compare* 19 U.S.C. § 1677f-1(d)(1)(B)(i), *with* 19 U.S.C. §§ 1677f-1(a)-(b). Additionally, in *Toyo Kohan*, because the language of the statute affords Commerce discretion to fashion its methodology, this Court rejected the argument that the price difference test forgoes any statistical or analytical rigor. *Toyo Kohan*, Slip Op. at 20-21.

Taiwan Plaintiffs argue further that the price difference test is meaningless because the test group prices are within the standard deviation of the comparison group prices and their graphs visually show that the price difference test skews results. Pls. Comments 20-23. However, the fact that prices may overlap is neither surprising nor evidence that the price difference test skews results. As Commerce explained, "{t}he diagrams demonstrate that the average prices for each group differ, both within each group and between the two groups; both evidence of circumstances where higher prices may offset lower prices such that there is masked dumping." Remand Redetermination 23. The alternative to using average U.S. prices with the A-to-A method is to use individual U.S. sale prices with the A-to-T method, and these diagrams appear to visually demonstrate where offsetting would occur within averaging groups, and also between averaging groups. *Id.* at 23. Commerce used a reasonable analytical methodology and threshold to determine whether prices differ significantly rather than resort to subjective interpretations of visual graphs.

Next, Taiwan Plaintiffs argue that the price difference test does not account for outliers, claiming that the graph shows that outliers result in no passes that are unwarranted. Pls. Comments 23-25. However, Taiwan Plaintiffs do not define what would constitute an outlier. *See* Remand Redetermination 29. Taiwan Plaintiffs characterize certain prices as outliers with no criteria and claim that the presence of alleged outliers would distort the results of the price difference test. *See id.* Additionally, Commerce uses the entire universe of sales to determine whether the average price for a particular customer, region, or time period differ significantly from the average price of all other sales. As such, each iteration of the price difference test uses the same universe of sales and Commerce does not prejudge whether a price differs significantly, as Commerce has explained previously. *See* Final Remand Redetermination at 20, *Stupp Corp v. United States*, Consol Ct. No. 15-00334, March 16, 2026, ECF No. 278.

Taiwan Plaintiffs also argue that 99 percent of PT's sales were to one customer, such that "targeted" or masked dumping by the customer supposedly was impossible. Pls. Comments 25. This argument is inapposite. The price difference test does not determine whether "targeted" or masked dumping is occurring. Remand Redetermination 25. As discussed above, the price difference test determines whether prices differ significantly. The existence of a pattern of prices that differ significantly also does not determine whether dumping of any kind is occurring because there is no comparison of U.S. prices with normal value. *Id.* at 25. "When a pattern of prices is found, it only establishes that conditions exist in the respondent's pricing behavior in the U.S. market which could lead to masked dumping, not whether masked dumping is present when using the A-to-A method or whether that masked dumping is meaningful." *Id.* at 25-26. And regardless, Taiwan Plaintiffs concede that not all of PT's U.S. sales were to a single

customer, and under the statute Commerce separately considers the potential for masked dumping among purchasers, regions, and periods of time. 19 U.S.C. § 1677f-1(d)(1)(B)(i).

Taiwan Plaintiffs also misplace reliance upon *Timken Co. v. United States*, 179 F.Supp.3d 1168, 1179 n.12 (Ct. Int'l Trade 2016). However, *Timken* followed in the wake of *JBF RAK*, where JBF RAK had argued that it was arbitrary, capricious and an abuse of discretion for Commerce to refuse to consider evidence which would tend to establish that the pattern of prices was not due to "targeted sales" but, instead, was for a valid business purpose. *JBF RAK*, 790 F.3d at 1368. The Federal Circuit rejected this argument and held that "Section 1677f-1(d)(1)(B) does not require Commerce to determine reasons why there is a pattern of export prices for comparable merchandise that differs significantly among purchasers, regions, or time periods{.}" *See JBF RAK*, 790 F.3d at 1368. In *Timken*, this Court followed, as it must, the Federal Circuit's decision in *JBF RAK*. *Timken,* 179 F.Supp.3d at 1179 ("in the light of the Federal Circuit's decision, whether NTN's U.S. sales were not intentionally targeted or *whether the price differences were due to an external factor*, such as shifting exchange rates, Commerce's methodology lawfully identifies a pattern of export prices that differ significantly.") (emphasis added) (citations omitted). Similarly, in *Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. United States*, 608 F. App'x 948, 949 (Fed. Cir. 2015) (nonprecedential op.) (*Borusan*), the Federal Circuit found that "{n}othing in the language of the statute requires Commerce to take the extra analytical step proposed by Borusan – consideration of Borusan's alternate explanations for the pricing patterns observed through use of" an alternative methodology. Additionally, in *Nan Ya Plastics Corp., Ltd. v. United States*, 128 F.Supp.3d 1345 (Ct. Int'l Trade 2015), based upon *JBF RAK* and *Borusan*, this Court found that "Commerce is under no obligation to consider

evidence that factors other than targeted dumping may account for price patterns that the agency identifies through targeted dumping analyses." *Id.* at 1357-58.

Regardless, Taiwan Plaintiffs have not demonstrated that prices to one customer are not masking dumped sales to another customer. Rather, they argue that the sales to one customer are too miniscule for "targeting" or masked dumping to occur. However, masked dumping can occur even with smaller amounts. The amount of dumping masked in the A-to-A method and whether that amount is meaningful is examined in the meaningful difference test, not the price difference test.

Next, Taiwan Plaintiffs argue that quarterly prices were stable between three quarters and the first quarter is the cause of the differences among time periods, which created "false positives." Pls. Comments 26. However, Taiwan Plaintiffs misunderstand Commerce's analysis. The price difference test compares the average of prices in one quarter with the average of prices in all other quarters. So, it compares "the average of prices in QTR01 with the average of prices in QTR02, QTR03 and QTR04, another comparison of the average of prices in QTR02 with the average of prices in QTR01, QTR03 and QTR04, and so forth." Remand Redetermination 27. As such, the universe of sales for each iteration of the test remains the same.

Nevertheless, Taiwan Plaintiffs argue further that the price difference test creates "false positives" because it supposedly looks for price correlations among purchasers, regions, and time periods distinctly. Pls. Comments 27. However, Commerce made clear that the price difference test does not look for price correlations, and that "the price difference test determines whether the weighted-average net price to a given purchaser or region, or time period differs significantly from the weighted-average net price of sales to all other purchasers, regions, or time periods."

Remand Redetermination 29. The price difference test is not a statistical test. Taiwan Plaintiffs do not explain how or why the price difference test would create "false positives" when conducted distinctly for purchasers, regions, and time periods. In any event, although "the price difference test separately identifies where prices differ significantly between purchasers, regions, and time periods, when these results are aggregated in the ratio test, if a given sale is found to pass the price difference test, then the value of that sale is only counted once in the total value of sales which pass the price difference test, i.e., sales whose prices differ significantly." Remand Redetermination 29-30. Therefore, Commerce explained that there is no double or triple counting of a given sale in the numerator of the ratio test. *Id.* at 30.

Taiwan Plaintiffs also argue that the price difference test yields a relatively high pass rate of 89.84 percent when compared to the pass rate under the Cohen's *d t*est. Pls. Comments 27-28. However, because the Federal Circuit invalidated the Cohen's *d* test, finding it "unsound as a gauge of the group difference," Taiwan Plaintiffs' attempt to use it as a benchmark in assessing the reasonableness of the price difference test is intellectually unsound. *Marmen*, 134 F.4th at 1348. Moreover, Taiwan Plaintiffs' argument implies that there should be a maximum number of sales which Commerce should find to differ significantly. These results-oriented and self-serving arguments fail to show that Commerce's price difference test is unreasonable.

Taiwan Plaintiffs' proposed adjustments to the price difference test are based upon their meritless arguments discussed above. Pls. Comments 28-29. In short, the statute affords discretion to Commerce to fashion a test, not to Taiwan Plaintiffs. Commerce's price difference test reasonably determines whether U.S. prices differ significantly.

D. Commerce's Discontinuance Of The Mixed Method Was Within The Scope Of The Remand And Was Reasonably Explained

Taiwan Plaintiffs argue that Commerce's discontinuance of the mixed method is beyond the scope of its authority. Pls. Comments 26. The Court recently rejected virtually identical arguments in *Stupp II*, Slip Op. at 12-15. Likewise, in this case, the Federal Circuit stated that "Commerce should have the opportunity to set forth an alternative policy analysis, which may then be subject to judicial review." ECF No. 223. Commerce did so following its current practice of applying the revised differential pricing analysis in all proceedings. *See Am. Silicon Techs. v. United States*, 63 F. Supp. 2d 1324, 1332 (Ct. Int'l Trade 1999) (holding that "it is especially important for all parties that consistent methods be sustained when possible" and that "the agency demonstrated a consistent administrative practice which is reasonable and permitted by the statute."). Notwithstanding Taiwan Plaintiffs' persistence, this is the same revised differential pricing analysis that the Court has sustained six separate times, as noted above.

Moreover, Commerce cogently explained why it discontinued its use of the mixed method as part of the overall change to its administrative practice with respect to its differential pricing analysis. Remand Redetermination 28. Although the statute permitted Commerce's old policy of using the hybrid version of the two available comparison methods, which Commerce used as a matter of administrative discretion, the mixed method is not statutorily required. To align more closely with the statute, Commerce has discontinued the mixed method as a matter of administrative policy for all its antidumping proceedings. *Id.* Accordingly, Commerce is applying its revised differential pricing methodology including its discontinuation of the mixed method consistently across all segments, including remand redeterminations. Further, in *Marmen II*, relying on the statutory language and legislative history, this Court held that Commerce permissibly revised its differential pricing analysis to discontinue the mixed method

and that Commerce provided a reasonable explanation for abandoning the mixed method. *Marmen II*, Slip Op. at 21. The Court reached the same holding in *Stupp II*, Slip Op. at 17-18.

Additionally, Commerce explained that the discontinuation of the mixed method enhances the ability to address masked dumping. Remand Redetermination 28. The purpose of section 1677f-1(d)(1)(B) is to permit Commerce to address masked dumping. *See* SAA at 842-83; *see also Union Steel v. United States*, 713 F.3d 1101, 1108-09 (Fed. Cir. 2013) (explaining that the A-to-A method "masks individual transaction prices below normal value with other above normal value prices within the same averaging group" and the "average-to-transaction comparison methodology thus reveals individual dumping."). Indeed, the Court sustained Commerce's decision to discontinue the mixed method in *Stupp II*, explaining that "Commerce's choice to apply an A-to-T comparison to all sales once significant price differences exceed 33 percent of the total value of all sales, rather than only those which fail the price difference test, to deter targeted dumping, is reasonable because of the underlying remedial purpose of the antidumping duty regime." *Stupp II*, Slip Op. at 17.

Nevertheless, Taiwan Plaintiffs argue that the mixed method was upheld in *Stupp I*. Pls. Comments 26-27. However, the mixed method did not determine whether a pattern existed because Commerce previously employed the mixed method only *after* the "ratio test" had confirmed there was a pattern. In both versions of the differential pricing analysis, Commerce finds that a pattern exists when more than 33 percent of the total sales value of the sales that are at prices that differ significantly. Once the existence of the requisite pattern was established, Commerce examined whether the A-to-A method could account for the price differences exhibited in the respondent's U.S. pricing behavior by comparing the weighted-average dumping margin calculated using the A-to-A method and an alternative comparison method. As a matter

of its discretion, Commerce considered the mixed method as an alternative comparison methodology when between 33 percent and 66 percent of the sales value of the respondent's U.S. sales were found to be at prices that differ significantly, which was neither required nor prohibited by the statute. After Commerce discontinued the mixed method, Commerce considered application of the A-to-T method as the applicable alternative comparison method for all sales when more than 33 percent of the sales value are found to be at prices that differ significantly for all of its antidumping proceedings, including this redetermination. Additionally, the plaintiff in *Marmen II* also raised *Stupp I* in arguing against the discontinuance of the mixed method, but this Court found that the Federal Circuit in *Marmen* permitted Commerce to revisit its differential pricing analysis and that Commerce gave a reasonable explanation for the discontinuance of the mixed method. *Marmen II*, Slip Op. at 21.

Further, the Federal Circuit sustained a substantially similar approach of applying the A-to-T method to all sales when addressing this issue in the context of the *Nails* test, a predecessor to the differential pricing methodology. *See Apex Frozen Foods Priv. Ltd. v. United States*, 862 F.3d 1322, 1333 (Fed. Cir. 2017) (*Apex I*) (expressly rejecting the argument that the statute limits the A-to-T method to only sales that were found to be "targeted" under the previous "Nails test" and cannot be applied to the remaining sales, explaining: "The statute defines the preconditions for applying the {A-to-T method}, but it does not limit in any way the application of the {A-to-T method}, should the preconditions be met."); *see also Certain Steel Nails from the People's Republic of China*, 73 Fed. Reg. 33,977 (Dep't of Commerce June 16, 2008). Thus, *Stupp I* upholding the ratio test does not prevent Commerce from discontinuing the mixed method, which was merely one of the possible alternative comparison methodologies that Commerce has discretion to consider once evidence has been found that a pattern of prices existed.

Indeed, both the Federal Circuit and this Court have previously affirmed Commerce's application of the A-to-T method to all U.S. sales "to remedy masked dumping" under the Nails test. *See Apex I*, 862 F.3d at 1333; *Samsung Electronics Co. v. United States*, 72 F. Supp. 3d 1359, 1375 (Ct. Int'l Trade 2015) (*Samsung*). In *Samsung*, for example, this Court assessed whether Commerce's application of the A-to-T method to all U.S. sales under the Nails test was consistent with the statute. *Samsung*, 72 F. Supp. 3d at 1373-76. The plaintiffs in *Samsung* had argued (1) that Commerce could not apply the A-to-T method to U.S. sales not passing the Nails test because "the phrase such differences does not apply to those other transactions that do not have such differences," *id.* at 1374, and (2) that the statute "creates a strong presumption for using the A-to-A or T-to-T methodologies because the A-to-T methodology is a limited exception." *Id.* at 1375.

This Court disagreed with the plaintiffs in *Samsung*. Analyzing 19 U.S.C. §§ 1677f-1(d)(1)(B)(i) and (ii), this Court held that the statute establishes "preconditions that must exist before Commerce may apply the A-to-T methodology." *Id.* at 1374-75. It also held that the statutory language, does not "instruct Commerce on how to apply the A-to-T methodology" after the preconditions are met. Rather, 19 U.S.C. § 1677f-1(d)(1)(B) "permits Commerce to {apply the A-to-T method} without specifying whether those export prices or constructed prices must be drawn only from targeted sales." *Id.* at 1375. The Federal Circuit reached substantially the same conclusion in *Apex I*, 862 F.3d at 1333. Although Commerce has continued to refine various aspects of its differential pricing analysis over the years, the broad discretion conveyed in the statute remains the same. Here, Taiwan Plaintiffs do not (and cannot) identify any statutory language prohibiting Commerce from applying the A-to-T method to all U.S. sales under circumstances presented here or any unreasonableness in Commerce's decision to discontinue

the mixed method and apply the A-to-T method to all U.S. sales once a pattern of prices that differ significantly has been identified.

CONCLUSION

For these reasons, we respectfully request that the Court sustain Commerce's remand redetermination and enter judgment in favor of the United States.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

CLAUDIA BURKE
Deputy Director

s/ Douglas G. Edelschick
DOUGLAS G. EDELSCHICK
Assistant Director
Commercial Litigation Branch
Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Tel: (202) 353-9303

Attorneys for Defendant United States

Of Counsel:

VANIA WANG
Senior Counsel
Office of the Chief Counsel
for Trade Enforcement & Compliance
Department of Commerce

September 30, 2026

CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the word limitation of Court of International Trade Standard Chambers Procedures § 2(B)(1) and contains 9,828 words, excluding the parts of the brief exempted from the word limitation. In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.

s/ Douglas G. Edelschick