**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE CLAIRE R. KELLY**

| | | |
|---|---|---|
| **MID CONTINENT STEEL & WIRE, INC., et al.,**<br><br>**Plaintiff and Consolidated Plaintiffs,**<br><br>**v.**<br><br>**UNITED STATES,**<br><br>**Defendant,**<br><br>**and**<br><br>**PT ENTERPRISE INC., et al.,**<br><br>**Defendant-Intervenors and Consolidated Defendant-Intervenor.** | ) | **Consol. Court No. 15-00213** |

**RESPONSE OF DEFENDANT-INTERVENOR MID CONTINENT STEEL & WIRE, INC. TO CONSOLIDATED TAWAIN RESPONDENTS' COMMENTS ON FINAL REMAND RESULTS**

Adam H. Gordon, Esq.
Benjamin J. Bay, Esq.
**THE BRISTOL GROUP PLLC**
1707 L Street, NW
Suite 1050
Washington, DC 20036
(202) 991-2700
*Counsel to Mid Continent Steel & Wire, Inc.*

Dated: September 30, 2026

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ ii

I. INTRODUCTION ........ 1

II. LITIGATION BACKGROUND ........ 2

III. COMMERCE'S *REMAND RESULTS* ARE LAWFUL AND IN ACCORDANCE WITH LAW ........ 3

A. Commerce's Price Difference Test And Abandonment Of The Mixed Methodology In Its Ratio Test Have Been Affirmed By The CIT Multiple Times ........ 3

B. Commerce's Price Difference Test Is Reasonable And Lawful ........ 8

1. Commerce's price difference test is not the P/2 test ........ 8

2. Commerce reasonably considered other AD tests in determining if prices differences were significant ........ 14

3. Taiwan Respondents' additional arguments do not undermine the reasonableness of Commerce price difference test. ........ 19

C. Commerce's Determination To Abandon The Mixed Method In Its Ratio Test Was In Accordance With Law ........ 24

IV. CONCLUSION ........ 26

## TABLE OF AUTHORITIES

### CASES

*Garg Tube Export LLP v. United States*,
740 F. Supp. 3d 1355 (Ct. Int'l Trade 2024) .......... 14, 15

*Government of Canada v. United States*,
No. 23-00187, slip op. 26-82 (Ct. Int'l Trade July 27, 2026) .......... 4, 5, 17, 25

*Maquilacero S.A. de C.V. and Tecnicas de Fluidos S.A. de C.V. v. United States*,
No. 23-00091, slip op. 26-11 (Ct. Int'l Trade Sept. 14, 2026) .......... *passim*

*Marmen Inc. v. United States*,
134 F.4th 1334 (Fed. Cir. 2025) .......... *passim*

*Marmen Inc. v. United States*,
Consol. Ct. No. 20-00169, slip op. 26-62 (Ct. Int'l Trade June 15, 2026) .......... 4, 17, 25

*Mid Continent Steel & Wire, Inc. v. United States*,
Court No. 2024-1556 (Fed. Cir. Dec. 2, 2025) .......... 2

*Stupp Corp. v. United States*,
5 F. 4th 1341 (Fed. Cir. 2021) .......... 4

*Stupp Corp. v. United States*,
No. 23-1663, 2025 WL 1178392 (Fed. Cir. Apr. 23, 2025) (non-precedential) .......... 3

*Stupp Corp. et. al. v. United States*,
Consol. Ct. No. 15-00334, slip op. 26-113 (Sept. 15, 2026) .......... *passim*

*Toyo Kohan Co., Ltd., v. United States*,
No. 24-00261, slip op. 26-54 (Ct. Int'l Trade May 22, 2026) .......... 4

*Universal Tube and Plastic Industries, Ltd. v. United States*,
No. 23-00113, slip op. 26-98 (Ct. Int'l Trade Aug. 19, 2026) .......... *passim*

### STATUTES

19 U.S.C. § 1673b(b)(3) .......... 16

19 U.S.C. § 1673d(a)(4) .......... 16

19 U.S.C. § 1677f-1 .......... *passim*

19 U.S.C. § 1677f-1(d)(1)(B) .......... 2, 8, 13, 20

19 U.S.C. § 1677f-1(d)(1)(B)(i) .......... 2, 8, 13

19 U.S.C. § 1677f-1(d)(1)(B)(ii) .......... 13

**REGULATIONS**

19 C.F.R. § 351.403(c) .......... 16

**ADMINISTRATIVE DETERMINATIONS & PUBLICATIONS**

*Alternatives to the Use of Cohen's d; Request for Comment*,
90 Fed. Reg. 21,277 (Dep't of Commerce May 19, 2025) .......... 3, 11

*Certain Steel Nails from the People's Republic of China* (fin. determ.),
73 Fed. Reg. 33,977 (Dept. of Commerce June 16, 2008), and accompanying Issues and Decision Memorandum .......... 9, 10, 12

*Coated Free Sheet Paper from the Republic of Korea* (fin. determ.),
72 Fed. Reg. 60,630 (Dep't. of Commerce Oct. 25, 2007) and accompanying Issues and Decision Memorandum .......... 9, 12

*Targeted Dumping in Antidumping Investigations; Request for Comment*,
72 Fed. Reg. 60,651 (Oct. 25, 2007) .......... 9

**OTHER AUTHORITIES**

Statement of Administrative Action,
H.R. Doc. No. 103-316, vol. 1 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040 .......... 15, 18

## I. INTRODUCTION

On behalf of Mid Continent Steel & Wire, Inc. ("Mid Continent"), we submit this response to the comments filed with the United States Court of International Trade ("CIT") by plaintiffs PT Enterprise Inc., *et. al.* ("Taiwan Respondents"), on July 13, 2026, in opposition to the *Remand Results* issued by the U.S. Department of Commerce ("Commerce"). Final Results of Redetermination Pursuant to Court Remand, Certain Steel Nails from Taiwan, *Mid Continent Steel & Wire, Inc. v. United States*, Consol. Court No. 15-213 (Ct. Int'l Trade Dec. 23, 2025) (May 15, 2026) (CM/ECF Doc. No. 231) ("*Remand Results*"); *Consolidated Plaintiffs Taiwan Respondents' Comments on Results of Redetermination Pursuant to Court Remand* (Jul. 13, 2026) (CM/ECF Doc. No. 240) ("*TR Comments*").

In their comments, Taiwan Respondents request that the Court order another remand and instruct Commerce to abandon the revised differential pricing analysis set forth in its *Remand Results*. Despite multiple CIT decisions that have recently affirmed that same revised differential pricing analysis as reasonable and lawful, Taiwan Respondents argue that those decisions "were wrongly decided, or at the very least, readily distinguishable from the instant appeal." *TR Comments* at 10. In sum, Taiwan Respondents challenge Commerce's new "price difference test" and its determination on remand to eliminate the "mixed methodology," claiming that both changes to Commerce's differential pricing analysis are unlawful. *TR Comments* at 11-29.

As demonstrated below, and as already affirmed by the CIT in six different holdings, the price difference test applied by Commerce on remand is lawful and consistent with the holdings of the Court of Appeals for the Federal Circuit ("Federal Circuit") in *Marmen Inc. v. United States*, 134 F.4th 1334, 1345 (Fed. Cir. 2025) ("*Marmen I*"). Furthermore, Commerce's

determination to eliminate the "mixed methodology" is also permissible under *Marmen I* and otherwise within its lawful discretion. Accordingly, the Court should sustain the contested *Remand Results* in their entirety.

## II. LITIGATION BACKGROUND

In this litigation, Commerce requested a voluntary remand to reconsider its differential pricing analysis in accordance with the holding of the Federal Circuit in *Marmen I*. In *Marmen I*, the Federal Circuit held that it was unreasonable for Commerce to use the Cohen's *d* test in analyzing whether there is a pattern of export prices, or constructed export prices, for comparable merchandise that differ significantly among purchasers, regions, or period of time under 19 U.S.C. § 1677f-1(d)(1)(B)(i). *Id.*[1] The Federal Circuit also held that Commerce could, on remand, develop and justify a new and different analytical approach for such an evaluation. *Id.* at 1,338.

On December 2, 2025, the Federal Circuit vacated the appealed CIT decision and granted the requested remand, holding in its Order that Commerce "should have the opportunity to set forth an alternative policy analysis." *Mid Continent Steel & Wire, Inc. v. United States*, Court No. 2024-1556 (Fed. Cir. Dec. 2, 2025) (CM/ECF Doc. No. 223) ("*Mid Continent CAFC Order*").

In the *Remand Results*, Commerce revised its differential pricing analysis – discontinuing the use of the Cohen's *d* test as well as the mixed comparison method. In place of the Cohen's *d* test, Commerce applied its price difference test, a reasonable approach firmly based on pre-

[1] *See also id.* at 1348 ("For the reasons above, and those explained in *Stupp*, we conclude that it was unreasonable to rely on Cohen's *d* test to determine whether prices differ significantly when the underlying data is not normally distributed, equally variable, and equally and sufficiently numerous").

existing practice, developed via a deliberative process, and involving comments from multiple parties. *See Alternatives to the Use of Cohen's d; Request for Comment*, 90 Fed. Reg. 21,277 (Dep't of Commerce May 19, 2025) ("*Cohen's d Alternatives Requests*"). *See also* https://www.regulations.gov/docket/ITA-2025-0004/comments (website with public comments).

On January 13, 2026, this Court issued its initial Scheduling Order, allowing parties to file comments on the *Remand Results*, (CM/ECF Doc. No. 228). On July 13, 2026, Mid Content filed comments with the Court in support of the *Remand Results*, while Taiwan Respondents filed comments opposing the *Remand Results*. *Mid Continent Steel & Wire, Inc.'s Comments on Final Remand Results* (Jul. 13, 2026) (CM/ECF Doc. No. 239) (*MCSW Comments*); *TR Comments*.

On August 5, 2026, the Court issued its Amended Scheduling Order, allowing parties to respond to comments on the *Remand Results* by September 30, 2026. (CM/ECF Doc. No. 244). Mid Continent is filing this response to Taiwan Respondents' comments in accordance with the Amended Scheduling Order.

## III. COMMERCE'S *REMAND RESULTS* ARE LAWFUL AND IN ACCORDANCE WITH LAW

### A. Commerce's Price Difference Test And Abandonment Of The Mixed Methodology In Its Ratio Test Have Been Affirmed By The CIT Multiple Times

As Mid Continent explained in its July 13 comments to the Court, the *Remand Results* are consistent with the Federal Circuit's holding in *Marmen I*, as well as *Stupp Corp. v. United States*, No. 23-1663, 2025 WL 1178392 (Fed. Cir. Apr. 23, 2025) (non-precedential) ("*Stupp I*"). *MCSW Comments* at 2.

Furthermore, as Mid Continent also explained in its comments, at that time the CIT had already upheld the same price difference test used by Commerce in the *Remand Results* in two

separate decisions as reasonable and in accordance with *Marmen I*. *Marmen Inc. v. United States*, Consol. Ct. No. 20-00169, slip op. 26-62 (Ct. Int'l Trade June 15, 2026) ("*Marmen II*"); *Toyo Kohan Co., Ltd., v. United States*, No. 24-00261, slip op. 26-54 (Ct. Int'l Trade May 22, 2026) ("*Toyo Kohan*").[2] *MCSW Comments* at 2 – 6. In addition, in *Marmen II*, the CIT also affirmed Commerce's decision to discontinue the use of the mixed method as part of its ratio test, finding that Commerce's decision to remove the mixed method from its differential pricing analysis "was reasonable when refashioning a new analytical framework to implement 19 U.S.C. § 1677f-1(d)(1)(B)." *MCSW Comments at 6 (citing Marmen II* at 25, that was itself citing *Marmen I*, 134 F.4th at 1,348).

Since the filing of Mid Continent's July comments in this appeal, five additional decisions have been issued by the CIT affirming the lawfulness of Commerce's price difference test, as well as Commerce's decision to eliminate the use of the mixed method analysis as part of its ratio test.

In *Government of Canada v. United States*, No. 23-00187, slip op. 26-82 (Ct. Int'l Trade July 27, 2026) ("*Government of Canada*"), the court had remanded the case to Commerce to bring it into compliance with the Federal Circuit's mandate in *Marmen I*. On remand, "Commerce discontinued its use of the Cohen's *d* test and reformulated its differential pricing analysis to consist of three steps: (1) a new "price difference test" in place of the prior Cohen's *d*

---

[2] The Federal Circuit has held that the relevant standard for reviewing Commerce's selection of statistical tests and numerical cutoffs is one of "reasonableness." *Stupp Corp. v. United States*, 5 F. 4th 1341, 1353 (Fed. Cir. 2021) ("Our precedents make clear that the relevant standard for reviewing Commerce's selection of statistical tests and numerical cutoffs is reasonableness, not substantial evidence."); *Marmen I*, 134 F.4th at 1345 (analyzing the Cohen's *d* test under the reasonableness standard).

test; (2) the "ratio test;" and (3) the "meaningful difference test."" *Government of Canada*, slip op. at 6.

The court rejected plaintiffs' arguments challenging Commerce's new price difference test – arguments that largely mirror Taiwan Respondents' opposition comments in this appeal. *See id.* at 10-19. The court held that "Commerce's adoption of the 2% threshold in the first stage of its differential pricing analysis in the new 'price difference test' is reasonable and complies" with the Federal Circuit's holding in *Marmen I*. *Id.* at 17.

Furthermore, the court held that the "absence of statutory language referring to a mixed method supports Commerce's determination to discontinue the use of its 'mixed method.'" *Id.* at 21. In sum, the court found that Commerce provided a reasonable explanation for abandoning the mixed method and applying the ratio test, and that on remand Commerce complied with the Federal Circuit's holding in *Marmen I*. *Id.*

On August 19, 2026, in *Universal Tube and Plastic Industries, Ltd. v. United States*, No. 23-00113, slip op. 26-98 (Ct. Int'l Trade Aug. 19, 2026) ("*Universal Tube*"), the CIT sustained Commerce's remand redetermination as in accordance with *Marmen I*, holding that "Commerce's adoption of the 2% threshold in the first stage of its differential pricing analysis in the new 'price difference test'" was "reasonable." *Id.* at 23. The court held that because Commerce had applied its new price difference test "on a case-by-case basis and determined that 95.71% of the value of U.S. sales for Universal passed the 'price difference test,' Commerce reasonably determined that prices differed significantly." *Id.* at 29.

Furthermore, the court in *Universal Tube* concluded that "Commerce provided a reasonable explanation for abandoning the 'mixed method' and applying the 'ratio test.'" *Id.* at 26. The court found that Commerce's decision to modify its ratio test accordingly "was

reasonable when refashioning a new analytical framework to implement 19 U.S.C. 1677f-1(d)(1)(B)." *Id.* at 30.

Similarly, on September 14, 2026, the court again affirmed Commerce's price difference test and abandonment of the mixed method in its application of the "ratio test" in *Maquilacero S.A. de C.V. and Tecnicas de Fluidos S.A. de C.V. v. United States*, No. 23-00091, slip op. 26-11 (Ct. Int'l Trade Sept. 14, 2026) ("*Maquilacero*"). The court held that Commerce's new price difference test was reasonable and in accordance with law and that its decision to "alter its 'mixed method' within its differential pricing analysis was reasonable when refashioning a new analytical framework to implement 19 U.S.C. § 1677f-1(d)(1)(B)." *Id.* at 23.

Subsequently, this court again sustained both the price difference test in its "significance" test and abandonment of the mixed method in the "ratio" test in *Stupp Corp. et. al. v. United States*, Consol. Ct. No. 15-00334, slip op. 26-113 (Sept. 15, 2026) ("*Stupp II*"). This court held that the use of a percentage in the price difference test satisfied the directive of the legislative history for Commerce to proceed on a "case-by-case basis" and that Commerce reasonably considered "its experience with measuring significance in other contexts to select a two-percent threshold for the price difference test." *Id.* at 9-11. In addition, this Court held that Commerce's decision to abandon the mixed methodology in the ratio test was reasonable because it aligned with the statutory test and would serve the goal of deterring targeted dumping, which the Court held was consistent with the underlying remedial purpose of the antidumping duty regime. *Id.* at 17.

Thus, in accordance with *Marmen I & II*, *Stupp*, *Toyo Kohan*, *Government of Canada*, *Universal Tube, Maquilacero,* and *Stupp II,* the Court should affirm Commerce's lawful

application of its price difference test and elimination of the mixed method as part of its ratio test in the *Remand Results*.

Taiwan Respondents argue that *Marmen II* and *Toyo Kohan* were "wrongly decided" because they claim that the courts in those cases did not "discuss the reasons" Commerce's price difference test "is a reasonable standard." *TR Comments* at 10. Presumably, they would make similar arguments with respect to the *Government of Canada*, *Universal Tube*, *Maquilacero*, and *Stupp II* as well, as each affirmed Commerce's analysis based on similar reasoning and legal citations.

In addition, Taiwan Respondents claim that even if the CIT was correct in those cases that the application of the price difference test was reasonable, the application of the price difference test in this appeal is allegedly not supported by substantial evidence on the record of this case. *Id.* at 11.

Finally, with respect to Commerce's elimination of the mixed methodology, Taiwan Respondents claim that those court holdings were wrongly decided because Commerce "has provided no justification" for "why it now is appropriate to apply the AT method when it finds that merely 33% of sales 'differ significantly.'" *Id.* at 27.

Taiwan Respondents are incorrect in all respects. The CIT has explained why Commerce's use of a price difference test is not only reasonable, but lawful, in six different decisions. In addition, Commerce has repeatedly explained why its methodology is reasonable and continues to do so in this litigation on remand.

In addition, there are no facts on the record of this challenged proceeding that would distinguish it from the cases previously before the Court, and nothing the Taiwan Respondents

have argued undermines the reasonableness of the application of the price difference test in the investigation at issue.

Furthermore, like the remand before the court in this case, in four remands affirmed by the CIT, Commerce has explained on remand why it eliminated the mixed methodology from the ratio test, and each of the courts held that such an explanation was reasonable.

There simply is no merit to Taiwan Respondents' arguments in their comments to the Court, and the court should reject their request that it order yet another remand redetermination. Instead, the court should affirm the *Remand Results* as supported by substantial evidence and otherwise in accordance with law.

**B. Commerce's Price Difference Test Is Reasonable And Lawful**

19 U.S.C. § 1677f-1(d)(1)(B)(i) allows Commerce to calculate an antidumping ("AD") margin comparing a weighted average of normal values to the export prices of individual transactions for comparable merchandise if "there is a pattern of export prices (or constructed export prices") for comparable merchandise that differ ***significantly*** among purchasers, regions, or period of time." (emphasis added). In determining how to measure if differences in patterns are significant, Commerce has, over time, applied multiple tests, including, most recently, the Cohen's *d* test. As noted above, in the *Remand Results*, Commerce discontinued its application of the Cohen's *d* test in the Taiwan Respondents' AD margin calculations, consistent with the Federal Circuit's holding in *Marmen I*, and replaced it with its price difference test. *Remand Results* at 5-6.

**1. Commerce's price difference test is not the P/2 test**

Taiwan Respondents attempt to conflate Commerce's new price difference test with one of Commerce's earliest tests for significance, the "P/2 test," but they are not the same. The P/2

test was applied only once, in the 2007 AD investigation of *Coated Free Sheet Paper from Korea*. *Coated Free Sheet Paper from the Republic of Korea* (fin. determ.), 72 Fed. Reg. 60,630 (Dep't. of Commerce Oct. 25, 2007) and accompanying Issues and Decision Memorandum at 36-37 ("*Coated Free Sheet Paper from Korea*").

Commerce stated that it was not going to establish a test in that investigation that would apply universally "because small differences may be significant for one industry or one type of product, but not for another." *Id.* Commerce determined that because coated free sheet paper was a "commodity product sold in a competitive market," it was logical under a P/2 test to find a difference in prices among comparable products to be "significant" if prices outside of targeted purchasers or regions exceeded prices within the targeted purchasers or regions by 2% or more. *Id.* In other words, the P/2 test considered only whether the prices to the alleged targeted groups were 2% lower (*i.e.*, the test was one-directional). Rather than identify the potentially "targeted" customers and regions using a formula or calculations, the domestic industry alleged the makeup of the two groups, and Commerce conducted its 2% comparison analysis of those two groups. *Id.*

On the same day that Commerce's final determination in *Coated Free Sheet Paper from Korea* was published in the *Federal Register*, Commerce published a request for comments on a more standardized test to apply in addressing targeted dumping. *Targeted Dumping in Antidumping Investigations; Request for Comment*, 72 Fed. Reg. 60,651 (Oct. 25, 2007).

Eight months later, Commerce issued its final determination in the AD investigation covering *Certain Steel Nails from China*. *Certain Steel Nails from the People's Republic of China* (fin. determ.), 73 Fed. Reg. 33,977 (Dept. of Commerce June 16, 2008), and accompanying Issues and Decision Memorandum at 5-25 ("*Certain Steel Nails from China*"). In

that investigation, Commerce applied a new targeted dumping methodology, which became known as the "*Nails* test." Commerce explained that the P/2 test had collapsed the pattern and significant difference requirements, and its new *Nails* test separated those requirements into two tests used to determine if there were significant price differences (a "gap test") and if a pattern existed (a "standard deviation test"). *Id*. at 23-25.

Notably, under the *Nails* test, if the total sales value that met the standard deviation test exceeded 33 percent of the sales value to the alleged target of the identical merchandise, then Commerce determined a pattern existed. *Id*. at 19-20.

The *Nails* test was later replaced by Commerce's differential pricing analysis, and for several years, under the differential pricing analysis, Commerce used the Cohen's *d* test to measure if there were significant price differences. However, following *Marmen I*, as reflected now on remand, Commerce revised its practice to now use a price difference test for that purpose. Notably, under Commerce's differential pricing analysis, both tests for determining significant price differences, unlike the P/2 test, continued to analyze the significance element separately from the pattern element (measured through the ratio test), and also retain the 33 percent value indicator of a pattern, as initially implemented in the *Nails* investigation. *See, e.g., Remand Results* at 6- 7.

In *Marmen I*, the Federal Circuit acknowledged that it has affirmed the reasonableness of Commerce's differential pricing analysis, but it determined that Commerce's use of Cohen's *d* to determine if there was a pattern of significant price differences was flawed. Specifically, it concluded that "it was unreasonable to rely on {the} Cohen's *d* test to determine whether prices differ significantly when the underlying data is not normally distributed, equally variable, and equally and sufficiently numerous." *Marmen I*, 134 F.4th at 1,348. The court stated that on

remand Commerce could "re-perform a differential pricing analysis" but that the analysis could not rely on the Cohen's *d* test "for data sets like those here." *Id*.

Accordingly, on May 19, 2025, Commerce published a *Federal Register* notice requesting comments on alternatives to the use of the Cohen's *d* test in its differential pricing analysis. Commerce received numerous comments from the public which it considered in determining a new methodology. *Cohen's d Alternatives Requests,* 90 Fed. Reg at 21,277.

Commerce's new methodology evaluates *all* U.S. sales, and "incorporates default group definitions" for purchasers (based on reported consolidated customer codes), regions (based on zip codes), and time periods (defined by the quarter within the period of investigation based on the reported date of sale). *Remand Results* at 6. In doing so, it determines whether or not the "weighted-average net price to the given purchaser, region or time period falls outside of the plus-or-minus two percent band around the weighted average net price to all other purchasers, regions, or time periods" and if it does, Commerce determines that those prices "differ significantly" and therefore "pass the price difference test." *Id.* at 7. Commerce then applies its ratio test to determine the extent of the significant price differences. *Id.*

Taiwan Respondents repeatedly refer to Commerce's new test as a "two percent" test in their arguments, but that description is inaccurate. If anything, it is a "four percent" test, because Commerce considers prices in a band that is both two percent greater, as well as two percent lower, clearly distinct from the P/2 test.

Furthermore, Taiwan Respondents attempt to portray the price difference test as the same or similar to the P/2 test, referring to the differences as a "distinction without a difference." *TR Comments* at 15. In the most charitable view, that claim is blatantly inaccurate, and considered plainly, it is outright disingenuous. As shown above, with the P/2 test, Commerce only

compared sales to the alleged targeted purchasers or regions to sales outside of the alleged targeted groups. *Coated Free Sheet Paper from Korea* at 36-37; *Remand Results* at 12; *Maquilacero*, slip op. at 14 n.3; *Stupp II*, slip op. at 11 n.4.

Furthermore, Commerce did not separate its significance and pattern tests in the P/2 test as it did in *Nails* and the differential pricing methodology that followed. *Certain Steel Nails from China* at 19-22; *Stupp II*, slip op. at 11, n. 4. In other words, there was no ratio test under the P/2 test to determine if a pattern of significant price differences existed.

In addition, the P/2 test only addressed situations in which prices in the targeted groups were *lower* than those outside of the targeted groups. It did not consider or address the concept of potential masked dumping when test group prices are higher than the comparison group. *Remand Results* at 22.

As Commerce explained in the *Remand Results*, masked dumping is a situation in which "non-dumped sales mask sales at less than fair value." *Remand Results* at 22. It is assessed only *after* Commerce has determined there are significant differences in prices *and* that a pattern exists, at which time it considers if the weighted-average-to-weighted-average ("A-A") methodology or weighted-average-to-transaction ("A-T") methodology is appropriate to address targeted or "masked" dumping. *Id*. As Commerce explained, "higher prices are just as relevant to masked dumping as lower prices, and both must be considered when examining whether there is a pattern of prices that difference significantly." *Id.*

Although the term "targeted dumping" is not found in the statute, Taiwan Respondents argue that in applying the pattern and significance tests, "an affirmative finding of targeted dumping ***requires*** that the low-priced Test Group sales are being sold at dumped prices." *TR*

*Comments* at 18 (emphasis added). Yet in no way does 19 U.S.C. § 1677f-1(d)(1)(B)(i) mandate that specific scenario as a "requirement" in applying the pattern and significant tests.

Instead, the statute allows Commerce to calculate an AD margin comparing a weighted average of normal values to the export prices of individual transactions for comparable merchandise if there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or period of time. To be clear, the statute does not mandate that Commerce only address a situation in which a pattern of prices are *too high* within the targeted group (thereby potentially masking the dumping of those transactions outside of the targeted group), or only address the situation in which the prices are *too low* (wherein transactions with the targeted group are being dumped and transactions outside of the targeted group are potentially the ones "masking" the dumping). Instead, if a pattern exists of prices that differ significantly in either direction among the targeted groups, the statute allows Commerce to consider whether the use of A-T comparisons are appropriate (to address masked dumping), or if such significant price differences can be "taken into account" using A-A comparisons. 19 U.S.C. § 1677f-1(d)(1)(B)(ii).

Taiwan Respondents argue that a "pattern" does not exist when prices to the same region, time period, or customer are "sometimes higher" and "sometimes lower." *TR Comments* at 12. It is a peculiar argument, not based in the facts on the record before Commerce, and apparently a red herring, with the apparent goal, again, of confusing the Court as to the content of Commerce's actual test.

Commerce never claimed that it was finding a pattern to exist when prices were "sometimes" high and "sometimes" low. Commerce explained that under its significant difference test the goal is to determine whether a pattern of significant price differences exists,

whether a pattern was one of high prices or one of low prices. *Remand Results* at 21-25. Commerce's price difference test, which looks at test group prices which are plus-or-minus 2% from comparison group prices, accomplishes this goal.

On the other hand, the P/2 test was one-directional and did not achieve that same goal. Accordingly, on this basis as well, Commerce correctly concluded that the "P/2 test and the price difference test are not equivalent to each other." *Remand Results* at 12. Taiwan Respondents' attempt to conflate the two should therefore be dismissed.

**2. Commerce reasonably considered other AD tests in determining if prices differences were significant**

Taiwan Respondents devote an extensive amount of their comments to the argument that a plus-or-minus 2%- test is "not a significant price difference." *TR Comments* at 14. They state that Commerce relied on the test without any evidence to support its conclusion that the price difference test is appropriate to determine the significance of price differences. *Id.* Taiwan Respondents' claims in this regard largely ignore the flexibility which Congress provided to Commerce to determine if prices differ significantly and dismiss outright the examples Commerce included on remand in which it uses a plus-or-minus 2% test to determine significance in other capacities in administering the AD law. There is no merit to Taiwan Respondents' "significance" arguments and in no way do they undermine the reasonableness of Commerce's adoption of the significance price difference test on remand.

As this court explained in *Garg Tube Export LLP v. United States*, 740 F. Supp. 3d 1355, 1366-67 (Ct. Int'l Trade 2024) ("*Garg Tube*"), "{t}he text of the statute and its legislative history indicate that Congress gave Commerce flexibility by its use of the open-ended term "differ significantly." The word "significantly," in particular "is an open-ended qualifier, akin to 'appropriate' or 'reasonable,'" and Congress's mandate to assess if prices differed significantly

in the statute "necessarily affords Commerce flexibility to assess the degree of difference depending on the particular context." *Id.* at 1,367. As this court also pointed out, the statute further uses the word "may," which made "clear that Commerce would be exercising discretion in determining whether prices 'differ significantly.'" *Id.*

Similarly, as this court explained in *Garg Tube*, in the Statement of Administrative Action ("SAA") Congress stated that Commerce would "proceed on a case -by-case basis," in determining if a "pattern of significant prices differences" existed, thereby indicating that "Congress delegated to Commerce the power to use its discretion when determining whether prices differ significantly under 19 U.S.C. § 1677f-1." *Id.* (citing the SAA, H.R. Doc. No. 103-316, vol 1 at 843 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4177-78).

Acknowledging this court's conclusions in *Garg Tube*, Taiwan Respondents nonetheless state in their comments that they "disagree" with this court's analysis. *TR Comments* at 9. However, the analysis that Taiwan Respondents advocate that the court conduct is, in fact, the same analysis the court applied in *Garg Tube.* Taiwan Respondents argue that the court should "use traditional tools of statutory interpretation." In *Garg Tube* the court analyzed such traditional tools; including the text of the statute, the context of other statutory provisions, and the legislative history of 19 U.S.C. § 1677f-1. *TR Comments* at 9; *Garg Tube* at 1,367. Furthermore, Taiwan Respondents confusingly state that Commerce "does not have unfettered discretion to define the term 'significant price difference,'" inferring that *Garg Tube* stands for the proposition that Commerce's discretion is unfettered – yet nowhere in *Garg Tube* did this court ever reach that conclusion. *TR Comments* at 9; *Garg Tube* at 1,367.

In fact, it is evident that the only reason the Taiwan Respondents disagree with this court's conclusions in *Garg Tube* is because if the *Remand Results* are considered under such a

deferential analysis, then they will be correctly affirmed by this court as reasonable and supported by substantial evidence on the record. *See Remand Results* at 16-17 (discussing *Garg Tube*). *See also Stupp II*, slip op. at 8 n.3 (acknowledging that Congress "delegated to Commerce" the power to use its discretion when determining if prices differ significantly through the use of terms like "significant," "appropriate" and "comparable" in the statute).

In support of its decision to use a plus-or-minus 2% test, Commerce explained on remand that such a test "correlates with other parts of its margin calculations which are found to 'differ significantly.'" *Remand Results* at 18. For example, Commerce explained that when considering sales between affiliated parties in comparison markets, Commerce will determine those sales are not made at an arm's length under 19 C.F.R. § 351.403(c) "if the average, product-specific, comparison market prices" to the affiliated customer "are not within a range of 98 to 102 percent of the average, product-specific comparison market prices to unaffiliated customers (*i.e.*, at plus- or-minus a two-percent difference from the weighted-average price to unaffiliated customers)." *Remand Results* at 18-19. If the sales are outside of that 4-percent band, Commerce will exclude those transactions from its AD calculations, while if they are within the 4-percent band, Commerce will use those transactions in its calculations. Like in the case of Commerce's differential pricing analysis, the arms-length test is a comparison of prices in an AD calculation, and therefore a reasonable parallel analysis to consider for purposes of determining if prices are "significantly different" in Commerce's differential pricing test.

Furthermore, Commerce also pointed to 19 U.S.C.§§ 1673b(b)(3) and 1673d(a)(4), where Congress codified that in AD investigations, "a weighted average dumping margin is *de minimis* if the administering authority determines that it is less than 2 percent *ad valorem*." 19 U.S.C. § 1673b(b)(3). *Remand Results* at 19. Relatedly, Commerce explained that in past proceedings

it has "synonymously referred to non-*de minimis* levels of dumping as a 'significant' amount of dumping." *Id.* (citing *Circular Welded Non-Alloy Steel Pipe from the Republic of Korea*, 84 Fed. Reg. 26,401 (fin. res.), and accompanying Issues and Decision Memorandum at 20-35). As Commerce concluded, if "a weighted-average of two percent between U.S. prices and normal value is significant enough to warrant an affirmative determination of sales at {less-than-fair-value}, then it is reasonable to conclude that a two-percent difference in U.S. prices – the same U.S. prices that are used in comparison with normal value – is significant within the context of {19 U.S.C. § 1677f-1(d)(1)(B)(i)}." *Remand Results* at 20.

Notably, Commerce pointed to these same correlative examples in the remands before the CIT in *Marmen II*, *Government of Canada*, *Universal Tube*, *Maquilacero* and *Stupp II*. In each case the CIT held that Commerce's adoption of the plus-or-minus 2% price different test was reasonable. *See Marmen II*, slip op. at 15-17, *Government of Canada*, slip op. at 14-17, *Universal Tube*, slip op. at 20-23, *Maquilacero*, slip op. at 11-15, and *Stupp II*, slip op. at 9-11 ("Adopting a standard based on past experience in a similar context is reasonable in this instance" (citing *Tri Union Frozen Prods., Inc. v. United States*, 163 F. Supp. 3d 1255, 1308 (Ct. Int'l Trade 2016), *aff'd* 741 F. App'x 801 (Fed. Cir. 2018)).

Taiwan Respondents argue that Commerce's use of a plus-or-minus 2% test for the arm's length test and a 2% test for the *de minimis* standard does not necessarily mean the test is reasonable in this case. *TR Comments* at 15. Taiwan Respondents point to other percentage tests, such as a 3% test for negligibility of imports, a 5% test for stock ownership to control an affiliated party, and a 5% test for home market sale viability. *Id.* at 16. Nonetheless, the mere fact that there are other percentages used in various tests in AD proceedings in no way takes

away from the reasonableness of Commerce's consideration of the plus-or-minus 2% test to determine if differences in prices between purchasers, regions or time periods are significant.

Moreover, all of the examples mentioned by Taiwan Respondents are clearly different in that they do not involve a comparison of prices, unlike both Commerce's arm's-length test and the 2% *de minimis* margin threshold. In that regard, of all of these tests, Commerce's price difference test is most akin to Commerce's arm's-length test. After all, it makes intrinsic sense that if a plus-or-minus 2% threshold is appropriate to evaluate prices in the comparison market for purposes of the arm's-length test, that same band is also appropriate to evaluate whether prices in the U.S. market differ "significantly" between the test and comparison groups.

In addition, Taiwan Respondents point to the SAA, which states that "in determining whether a pattern of significant price differences exist, Commerce will proceed on a case-by-case basis, because small differences may be significant for one industry or one type of product but not another." The Taiwan Respondents argue that Commerce's "2 % Test is a 'brightline test,' that "does not allow Commerce to conduct a case-specific analysis of the circumstances of sales in a particular industry." SAA at 842; *TR Comments* at 16-17. As Commerce explained in the remand, however, that claim is simply not correct.

Commerce has not set up an absolute value or "brightline" litmus test, untethered to the facts of the record. Instead, the price difference test applies "a threshold that measures the relative difference (*i.e.*, a percentage) on a comparison basis." *Remand Results* at 11. In other words, the price difference being measured will, in fact, change on a case-by-case basis, depending on the universe of prices on the record.

Significantly, the CIT in both *Maquilacero* and *Stupp II* rejected the same "case-by-case" claims made by the Taiwan Respondents. *Maquilacero*, slip op. at 12-13; *Stupp II*, slip op. at 9.

As this court explained in *Stupp II*, a "percentage 'measures relative differences on a case-by-case basis rather than absolute ones, and therefore accounts for industry differences as envisioned by the SAA.'" *Stupp II*, slip op. at 9. Far from preventing Commerce from conducting its analysis on a case-specific basis, this court correctly determined that the use of a percentage to determine if there is a significant price difference among purchasers, regions, or time periods "ensures a differential price analysis that differentiates on a case-by-case basis." *Id.*

For the reasons explained above, and as Commerce stated in the *Remand Results*, "the price difference tests conforms to law and Commerce's practice." *Remand Results* at 16.

**3. Taiwan Respondents' additional arguments do not undermine the reasonableness of Commerce price difference test.**

In furtherance of their challenges to Commerce's price difference test, Taiwan Respondents provide several unpersuasive arguments that Commerce appropriately addressed in the *Remand Results*.

First, Taiwan Respondents "recycle diagrams from the calculation of the Cohen's *d* coefficient which plot prices for various tests and comparison groups," and argue that because "prices fall within the standard deviation of comparison group prices" using the price difference test, such an overlap "skews the results." *Remand Results* at 23; *TR Comments* at 20-23.

As Commerce explained, the "fact that such prices overlap each other is neither surprising nor evidence of 'absurdity.' The diagrams demonstrate that the average prices for each group differ, both within each group and between the two groups; both evidence of circumstances where higher prices may offset lower prices such that there is masked dumping." *Remand Results* at 23. Indeed, Commerce concluded that, if anything, "these diagrams visually demonstrate where" "higher prices may offset lower prices" "within average groups, and also between averaging groups." *Id.* Such information would support the use of the A-T method to

address masked dumping, rather than suggest that A-A should be used, as advocated by the Taiwan Respondents. *See id*.

In addition, Commerce addressed the second chart provided by the Taiwan Respondents, which was based on an alternative, cherry-picked means of determining significant price differences favorable to the outcome Taiwan Respondents seek. *See Remand Response* at 24. Commerce explained that simply because there was a "lower proportion of U.S. sales that are found to be at prices that differ significantly" using that methodology rather than the price difference test, did not mean that the price difference test was unreasonable. *Id.*

As this court has held, 19 U.S.C. § 1677f-1(d)(1)(B) does not require the use of a statistical test, nor does it require that Commerce use a particular method dependent on the standard deviation of all prices to measure the significance of price differences. *Stupp II* at 11. The issue before the court is whether Commerce's use of a plus-or-minus 2% test to assess the significance of price differences on remand was reasonable. As explained above, Commerce's price difference test is reasonable, and Taiwan Respondents' standard deviation arguments should be dismissed as meritless.

Second, Taiwan Respondents criticize Commerce's differential pricing analysis for analyzing price differences among all U.S. sales, claiming that Commerce's price difference test should "account" for "extreme prices of individual sales (both high and low)." *TR Comments* at 23-25. In short, Taiwan Respondents argue that Commerce's analysis leads to "absurd results" because it includes all sales in its significant differences test. *Id.* at 25.

However, as Commerce explained on remand, Taiwan Respondents' "outlier" argument is largely meaningless. They provide no definition or measurement of what sales should be considered "outliers," and they fail to support their claim that such alleged outliers "cannot

possibly be part of a pattern." *Remand Results* at 29. Instead, they provide an analysis based on a single transaction selected for a single CONNUM[3] in comparisons for a single region, and provide no context for the alleged outlying sale. *TR Comments* at 24-25. It is very possible that there were commercial reasons for the price of that transaction – information to which the Taiwan Respondents would have access, given that the information comes from their own data – yet they provided none of that context in their comments.

If that sale was a valid, commercial transaction, then there is no legitimate reason that Commerce should be required to remove that sale, or other high or low transactions, from its price significance analysis, as advocated by the Taiwan Respondents. Furthermore, there is no reason that Commerce should be required to waste time and resources on analyzing such sales to determine if they meet some undefined concept of being an "outlier," deserving of exclusion from Commerce's analysis.

Accordingly, there is no merit to Taiwan Respondents' "outlier" claim, and Commerce was correct in stating that there is no evidence on the record that the presence of this sale, or others that might be higher or lower than many, would lead to distortions in the price difference test. *Remand Results* at 29.

Third, Taiwan Respondents observe that the vast majority of PT Enterprise's sales during the period of investigation were to a single customer. *TR Comments* at 25-26. They claim that this fact undermines the effectiveness of the price difference test because they alleged it would "eliminate the possibility of targeted dumping by customer." *Id.*

---

[3] A "CONNUM" or control number is a multi-digit number, akin to a SKU, whose digits represent specific physical characteristics of a particular model of merchandise.

However, as Commerce explained on remand, "there is no comparison of U.S. prices with normal value when examining whether prices differ significantly among purchasers, or regions, or time periods." *Remand Results* at 26. A determination of significant price differences, or even a pattern of prices in the U.S. market, only establishes that conditions exist that "could lead to masked dumping," but does not "bear any relationship" to whether targeted dumping actually exists. *Id.* at 25-26. Thus, when Commerce makes a masked dumping determination through its "meaningful difference" analysis of A-A comparisons, that analysis is not done on a customer or purchaser-specific basis, but is conducted among aggregated U.S. prices. *Id.* at 26. Accordingly, the "respondent's purchasers are not relevant to Commerce's calculation of a respondent's weighted-average dumping margin, and whether the A-to-A method can account for the total amount of dumping in the respondent's pricing behavior in the U.S. market." *Id.*

There is no merit to the Taiwan Respondent's argument that number of sales to a single customer has any relevance to the reasonableness of Commerce's price differences test.

Fourth, Taiwan Respondents argue that the price differences test is unreasonable because it "yielded false positives" when first quarterly prices declined, while other quarter prices remained stable. *TR Comments* at 26.

However, Commerce explained on remand that this argument demonstrates that the Taiwan Respondents "do not understand the analysis and that their logic is without merit," because no "false positive" resulted from Commerce's analysis. *Remand Results* at 27. As Commerce explained, it not only compared an average of first quarter sales with the average of prices in the second, third and fourth quarters, but it also compared second quarter sales with the first, third and fourth quarters, third quarter sales with the first, second and fourth quarters, and

fourth quarter sales with the other three quarters. *Id.* Thus, no "false positives" could result if each quarter was compared to all quarters. Accordingly, there is no merit to the Taiwan Respondents quarterly prices claim.

Fifth, Taiwan Respondents claim that Commerce "triples" the chance that it will have positive results because it "conducts three distinct tests for price correlations: one by purchaser, one by region, and one by time period." *TR Comments* at 27.

Commerce explained on remand that this was not a correct description of the differential pricing test – it does not look for "price correlations," but "separately identifies where prices differ significantly between purchasers, regions and time periods," and when those results are subsequently aggregated in the ratio test, the value of a sale that is found to have passed the price difference test will be "only counted once in the total value of sales which pass the price difference test, *i.e.*, sales whose prices differ significantly." *Remand Results* at 30.

Accordingly, as there is "no double or triple counting of a given sale in the numerator of the ratio test," there is no merit to Taiwan Respondent's baseless claims that Commerce's test "creates false positives" through the use of three different comparison tests. *Id; TR Comment*s at 27.

Sixth and finally, Taiwan Respondents argue that the price difference test "yields an abnormally high pass rate" and therefore prices cannot be reasonably found to "differ significantly" if that applies to "virtually all prices." *TR Comments* at 27-28. In response, Commerce explained that its price difference tests established a methodology that is consistent with the statute and legislative history, as well as consistent with the Federal Circuit's holding in *Marmen I*. *Remand Results* at 31-32. In addition, as explained above, the CIT has now upheld the reasonableness of that methodology in six different cases – *Marmen II*, *Toyo Kohan*,

*Government of Canada*, *Universal Tube*, *Maquilacero,* and *Stupp II*. Moreover, as Commerce pointed out on remand, even the Taiwan Respondents have demonstrated "that the test does not guarantee a particular outcome," as their own numbers reflect comparisons that did not pass the differential pricing test. *Id.* at 31. Accordingly, there is no merit to the Taiwan Respondent's argument that the Court should reject Commerce's price difference test as unreasonable merely because a large number of transactions have passed Commerce's differential pricing test.

### C. Commerce's Determination To Abandon The Mixed Method In Its Ratio Test Was In Accordance With Law

In addition to challenging the lawfulness of Commerce's price difference test, the Taiwan Respondents also argue that Commerce's abandonment of the mixed method on remand was "beyond the scope of its authority in this proceeding." *TR Comments* at 26. The Taiwan Respondents claim that Commerce "provided no justification for why this rationale no longer applies and why it now is appropriate to apply the A-T method when it finds that merely 33% of sales 'differ significantly.'" *Id.* at 27.

For the reasons explained by Commerce on remand, as well as explained in multiple CIT holdings on the same issue, this Court should affirm Commerce's abandonment of the mixed method from its ratio test as lawful.

Commerce explained in the *Remand Results* that it introduced the mixed method (which applied when 33 to 66 percent of U.S. sales were determined to have significant price differences) when it adopted the Cohen's *d* test, and that such an interim analysis was never require by the statute or Commerce's regulations. *Remand Results* at 28. Commerce determined that abandoning the hybrid version of two available comparison methodologies actually enhanced its ability to address masked dumping and more closely aligned its practice with the text of the statute. *Id.* The Federal Circuit in this case explained that "Commerce should have

the opportunity to set forth an alternative policy analysis, which may then be subject to judicial review," so Commerce determined to take that opportunity on remand and revise its policy analysis accordingly. *Id.* (*citing Mid Content CAFC Order*). Commerce's *Remand Results* provided a justifiable reason for its change, and it was consistent with the Federal Circuit's Order in this case.

Furthermore, in five different decisions the CIT has now affirmed Commerce's abandonment of the mixed method as consistent with the Federal Circuit's holding in *Marmen I*, and otherwise consistent with Commerce's authority to revise its practice as long as that practice is consistent with its statute and regulations. *See Marmen II*, slip op. at 21-25; *Government of Canada*, slip op. at 19-22; *Universal Tube*, slip op. at 23-26; *Maquilacero*, slip op. at 18-21; *Stupp II*, slip op. at 12-18.

As this court explained in *Stupp II*, the courts have "consistently found that agencies possess broad authority to reconsider the record before them and formulate an appropriate approach consistent with the power given to them by Congress." *Stupp II*, slip op. at 13 (citing *Sec. & Exch. Comm'n v. Chenery Corp*., 332 U.S. 194, 201 (1947)). With respect to its abandonment of the mixed method, the court held in *Stupp II* that because the Federal Circuit had affirmed that the 33 percent threshold identified a pattern under the statute, "Commerce's choice to apply an A-to-T comparison to all sales once significant price differences exceed 33 percent of the total value of all sales, rather than only those which fail the price difference test, to deter targeted dumping, is reasonable because of the underlying remedial purpose of the antidumping regime." *Stupp II*, slip op. at 17.

Commerce's decision to abandon the mixed method in its ratio test was not only consistent with the Federal Circuit's orders in this case and *Marmen I*, but it was also consistent

with the CIT's holdings in each of those four cases affirming the agency's statutory authority to make that exact modification to its differential pricing analysis. Accordingly, this court should affirm Commerce's abandonment of the mixed method and reject the Taiwan Respondents' claim that Commerce had no authority to make such a change in the *Remand Results*.

## IV. CONCLUSION

For the reasons discussed above, Mid Continent respectfully requests that the court reject the Taiwan Respondents' comments in opposition to Commerce's *Remand Result*s and hold that the *Remand Results* are supported by substantial evidence on the record, in compliance with the Federal Circuit's holding in *Marmen I*, and otherwise in accordance with law.

Respectfully submitted,

*/s/ Adam H. Gordon*
Adam H. Gordon, Esq.
Benjamin J. Bay, Esq.
**THE BRISTOL GROUP PLLC**
1707 L Street, NW
Suite 1050
Washington, DC 20036

*Counsel to Mid Continent Steel & Wire, Inc.*

Dated: September 30, 2026

**CERTIFICATE OF COMPLIANCE**

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that these comments comply with the word limitation requirement. The word count for Response of Defendant-Intervenors Mid Continent Steel & Wire, Inc. to Consolidated Taiwan Respondents' Comments on Final Remand Results, as computed by The Bristol Group PLLC's word processing system, is 7,698 words, below the 10,000-word limit pursuant to Standard Chambers Procedures 2(B)(1)(b).

*/s/ Adam H. Gordon*
Adam H. Gordon
**THE BRISTOL GROUP PLLC**

**CERTIFICATE OF SERVICE**

I hereby certify that on the 30th day of September, 2026, I electronically filed a copy of the forgoing using the CM/ECF system, which sent a notification of such filing to counsel of record for all parties.

*/s/ Adam H. Gordon*
Adam H. Gordon